24-1498

IN THE

# United States Court of Appeals for the Federal Circuit

AG DER DILLINGER HUTTENWERKE,

Plaintiff-Appellant,

ILSENBURGER GROBBLECH GMBH, SALZGITTER FLACHSTAHL GMBH, SALZGITTER MANNESMANN GROBBLECH GMBH, SALZGITTER MANNESMANN INTERNATIONAL GMBH, FRIEDR. LOHMANN GMBH, THYSSENKRUPP STEEL EUROPE AG,

Plaintiffs,

v.

UNITED STATES, SSAB ENTERPRISES LLC, NUCOR CORPORATION,

Defendants-Appellees.

Appeal from the United States Court of International Trade in
1:17-cv-00158-LMG, Leo M. Gordon, Senior Judge

## OPENING BRIEF OF
## PLAINTIFF-APPELLANT AG DER DILLINGER HÜTTENWERKE

Marc E. Montalbine
J. Kevin Horgan
Merisa A. Horgan
**deKieffer & Horgan, PLLC**
1156 Fifteenth St., N.W.
Suite 1101
Washington, DC 20005
(202) 783-6900
*Counsel for Plaintiff-Appellant*

June 21, 2024

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number**   24-1498

**Short Case Caption**   AG der Dillinger Huttenwerke v. US

**Filing Party/Entity**   AG der Dillinger Hüttenwerke

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 06/21/2024

Signature:   /s/ Marc E. Montalbine

Name:   Marc E. Montalbine

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☐ None/Not Applicable |
| AG der Dillinger Hüttenwerke | | DHS-Dillinger Hütte Saarstahl AG |
| | | ArcelorMittal France S.A.S. |
| | | Saarstahl Aktiengesellschaft |
| | | SHS - Stahl-Holding-Saar GmbH & Co. KG a.A. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

FORM 9. Certificate of Interest

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable ☐   Additional pages attached

| | | |
|---|---|---|
| John Joseph Kenkel | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below) ☐   No ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## TABLE OF CONTENTS

STATEMENT OF RELATED CASES ...................................................................1

JURISDICTIONAL STATEMENT ....................................................................1

STATEMENT OF THE ISSUES.........................................................................1

STATEMENT OF THE CASE.............................................................................2

STATEMENT OF FACTS ...................................................................................5

SUMMARY OF THE ARGUMENT ...................................................................5

ARGUMENT .......................................................................................................9

I.      Standard of Review.................................................................................9

II.     Commerce's Dumping Calculations Fail to Account for Commercially
        Significant Differences in Physical Characteristics Between Sour Service
        and Standard Pressure Vessel Steel ...............................................11

        A.      Introduction & Factual Summary......................................................11

        B.      Commerce's Determination Regarding Sour Service Pressure Vessel
                Plate Is Inconsistent with Its Determination Regarding Sour Service
                Petroleum Transport Plate and Its Determination in *Bohler*...............22

        C.      Commerce Erred in Dismissing the Evidence Demonstrating
                Commercially Significant Physical Differences Between Sour Service
                Pressure Vessel Plate and Standard Pressure Vessel Plate .................24

        D.      Commerce's Claim of Information Deficiencies for the First Time in
                the Final Determination Violates 19 U.S.C. § 1677m(d)....................33

        E.      Commerce Failed to Apply a Fair and Objective Standard in its
                Analysis of Changes to the Product Characteristics ...........................34

III.    Commerce Erred in Adjusting Dillinger's Reported Costs of Production
        by Shifting Costs Incurred in the Production of Non-Prime Plate to
        Prime Plate  ..................................................................................36

i

A.    Introduction & Factual Summary..........................................................36

B.    Commerce's Shifting of Production Costs from Non-Prime Products to Prime Products is Contrary to Statute .............................................42

C.    The Claimed Factual Basis for Commerce's Use of Average Sales Price as the Cost of Production for Non-Prime Plate Is Not Supported by any Evidence on the Administrative Record..................................47

D.    Commerce's Resort to Facts Available Does Not Justify the Use of Average Selling Price as Costs of Production .....................................52

CONCLUSION AND RECOMMENDED APPELLATE REMEDY ...................58

# TABLE OF AUTHORITIES

**Cases**

AG der Dillinger Huttenwerke v. United States,
   534 F. Supp. 3d 1403 (CIT Aug. 18, 2021) ...................................... 19, 39

AG der Dillinger Hüttenwerke v. United States,
   592 F. Supp. 3d 1344 (CIT Sept. 23, 2022) ......................................... 40

AG der Dillinger Hüttenwerke v. United States,
   648 F. Supp. 3d 1321 (CIT June 23, 2023) ...................................... 20, 42

AG der Dillinger Hüttenwerke v. United States,
   672 F. Supp. 3d 1351 (CIT Dec. 21, 2023) ........................................... 21

Anderson v. U.S. Sec'y of Agric.,
   462 F. Supp. 2d 1333 (CIT 2006) ........................................................ 52

Atlantic Sugar, Ltd. v. United States,
   744 F.2d 1556 (Fed. Cir. 1984) ........................................................... 10

Bohler Bleche GMBH & Co. KG v. United States,
   324 F. Supp. 3d 1344 (CIT 2018) .................................................. *passim*

Carpenter Tech. Corp. v. United States,
   26 CIT 830 (2002) ............................................................................... 36

Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,
   467 U.S. 837 (1984) ........................................................................ 10,11

Consolidated Edison Corp. v. Labor Board,
   305 U.S. 197 (1938) ............................................................................. 10

Dillinger France S.A. v. United States,
   981 F.3d 1318 (Fed. Cir. 2020) ....................................................... *passim*

Gerald Metals, Inc. v. United States,
   132 F.3d 716 (Fed. Cir. 1997) ............................................................. 10

Hitachi Energy USA Inc. v. United States,
    34 F.4th 1375 (Fed. Cir. 2022) ...............................................................34

IPSCO, Inc. v. United States,
    965 F.2d 1056 (Fed. Cir. 1992)................................................38, 46, 47

Koyo Seiko Co. v. United States,
    36 F.3d 1565 (Fed. Cir. 1994)...............................................................11

LG Chem, Ltd. v. United States,
    534 F. Supp. 3d 1386 (CIT 2021) ..........................................................47

NEXTEEL Co. v. United States,
    569 F. Supp. 3d 1354 (CIT 2022) ..........................................................51

NEXTEEL Co. v. United States,
    601 F. Supp. 3d 1373 (CIT 2022) ..........................................................52

Nippon Steel Corp. v. United States,
    337 F.3d 1373 (Fed. Cir. 2003)..............................................................57

Pesquera Mares Australes Ltda. v. United States,
    266 F.3d 1372 (Fed. Cir. 2001)........................................................11, 12

Shandong Rongxin Imp. & Exp. Co., Ltd. v. United States,
    355 F. Supp. 3d 1365 (CIT 2019) ..........................................................56

SKF USA Inc. v. United States,
    263 F.3d 1369 (Fed. Cir. 2001)........................................................23, 52

SKF USA Inc. v. United States,
    675 F. Supp. 2d 1264 (CIT 2009) ..........................................................36

SNR Roulements v. United States,
    402 F.3d 1358 (Fed Cir 2005)...............................................................10

Timex V.I., Inc. v. United States,
    157 F.3d 879 (Fed. Cir. 1998)...............................................................11

Transactive Corp. v. United States,
    91 F.3d 232 (D.C. Cir. 1996) ................................................................23

Union Steel v. United States,
  836 F. Supp. 2d 1382 (CIT 2012) .................................................27, 30

Union Steel v. United States,
  713 F.3d 1101 (Fed. Cir. 2013)..................................................9, 12

Universal Camera Corp. v. NLRB,
  340 U.S. 474 (1951) ......................................................................10

Zhejiang Dunan Hetian Metal Co. v. United States,
  652 F.3d 1333 (Fed. Cir. 2011)...............................................56, 57

**Statutes**

19 U.S.C. § 1516a .............................................................................1

19 U.S.C. § 1516a(b)(1)(B)(i)..........................................................10

19 U.S.C. § 1677(16)(A)...........................................................12, 33

19 U.S.C. § 1677b(a)........................................................................11

19 U.S.C. § 1677b(a)(6)(C)(ii) ........................................................12

19 U.S.C. § 1677b(b)(3) .........................................8, 42- 44, 57

19 U.S.C. § 1677b(f)........................................................................38

19 U.S.C. § 1677b(f)(1)(A)........................................................9, 50

19 U.S.C. § 1677e(a)........................................................................56

19 U.S.C. § 1677e(b) ..................................................................9, 57

19 U.S.C. §1677m(d) ................................................18, 24, 33, 34

28 U.S.C. § 1295(a)(5)......................................................................1

28 U.S.C. § 1581(c) ..........................................................................1

**Regulations**

19 C.F.R. § 351.411 ........................................................................12

v

**Administrative Determinations**

Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany: Final Determination of Sales at Less Than Fair Value, 82 Fed. Reg. 16360 (Apr. 4, 2017)................................................................................2

Certain Carbon and Alloy Steel Cut-to-Length Plate from France: Final Determination of Sales at Less Than Fair Value, 82 Fed. Reg. 16363 (Apr. 4, 2017) ...........................................................................................43

Certain Carbon and Alloy Steel Cut-To-Length Plate from Austria, Belgium, France, the Federal Republic of Germany, Italy, Japan, the Republic of Korea, and Taiwan: Amended Final Affirmative Antidumping Determinations for France, the Federal Republic of Germany, the Republic of Korea and Taiwan, and Antidumping Duty Orders, 82 Fed. Reg. 24096 (May 25, 2017).....................3

**Other Authorities**

Statement of Administrative Action *accompanying the* Uruguay Round Agreements Act, H.R. No. 103-316, vol. 1 (1994) ......................................................................56

## STATEMENT OF RELATED CASES

In response to Federal Circuit Rule 47.5(a), Plaintiff-Appellant states that the Court has determined that the following cases shall be considered companion cases and assigned to the same merits panel: 24-1219 and 24-1498, with case 24-1219 designated as lead.  Although case 24-1219 arises from the same civil action as this current appeal, it is the result of a partial final judgment as to parties and issues that are not covered by this appeal.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1295(a)(5), as an appeal from the U.S. Court of International Trade ("CIT").  The CIT had jurisdiction under 28 U.S.C. § 1581(c), which gives the CIT jurisdiction over any action commenced with respect to final Commerce Department determinations under 19 U.S.C. § 1516a.

This appeal is timely.  Plaintiff-Appellant AG der Dillinger Hüttenwerke ("Dillinger") filed its notice of appeal on February 13, 2024, within 60 days of the CIT's final judgment issued on December 21, 2023, in <u>AG der Dillinger Hüttenwerke v. United States</u>, No. 17-00158.

## STATEMENT OF THE ISSUES

This case presents the following issues:

1.    Whether Commerce's failure to account for commercially significant

1

differences in the physical characteristics of pressure vessel plate used for the storage of sour ("corrosive") petroleum products when matching products as identical is supported by substantial evidence on the administrative record and otherwise in accordance with law?

2.    Whether Commerce's adjustment to Dillinger's reported costs of production by reducing the reported costs of non-prime plate to the average selling price of the non-prime plate and shifting the remaining costs to the costs of producing prime plate is supported by substantial evidence on the administrative record and otherwise in accordance with law?

## STATEMENT OF THE CASE

This appeal arises out of the antidumping duty investigation conducted by the U.S. Department of Commerce ("Commerce") on certain carbon and alloy steel cut-to-length plate from Germany.  Dillinger is a European producer of made-to-order specialty cut-to-length plate and was chosen by Commerce as one of two mandatory respondents in Germany.  Dillinger fully participated in Commerce's investigation.

Commerce published its contested final determination in the *Federal Register* on April 4, 2017.  *See* Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany: Final Determination of Sales at Less Than Fair Value, 82 Fed. Reg. 16360 (Apr. 4, 2017) ("Final Determination")

(Appx000009-0012); *see also* accompanying Issues and Decision Memorandum (March 29, 2017) ("Final-IDM") (Appx005882-5981).  The final determination was amended by notice published in the *Federal Register* on May 25, 2017.  *See* Certain Carbon and Alloy Steel Cut-To-Length Plate from Austria, Belgium, France, the Federal Republic of Germany, Italy, Japan, the Republic of Korea, and Taiwan: Amended Final Affirmative Antidumping Determinations for France, the Federal Republic of Germany, the Republic of Korea and Taiwan, and Antidumping Duty Orders, 82 Fed. Reg. 24096 (May 25, 2017).  The weighted-average dumping margin assigned to Dillinger was 5.52%.

Dillinger appealed certain aspects of Commerce's final determination to the U.S. Court of International Trade ("CIT") on June 23, 2017.  Relevant to this appeal were the following issues: (1) Commerce's failure to account for commercially significant differences in the physical characteristics of steels used to store and transport sour ("corrosive") petroleum products when matching products as identical and (2) Commerce's adjustment to Dillinger's reported costs of production by reducing the reported costs of non-prime plate to the average selling price of the non-prime plate and shifting the remaining costs to the costs of producing prime plate.

In a Memorandum and Order entered on August 18, 2021, the CIT sustained Commerce's decision not to account for commercially significant differences in

the physical characteristics of pressure vessel plate used for the storage of sour ("corrosive") petroleum products when matching products as identical. (Appx000032-40).  In Slip-Op. 23-187, the CIT declined to reconsider its earlier decision even though Commerce, pursuant to remand in Slip-Op. 23-94, changed its earlier decision concerning the related product of line pipe plate for the transport of sour ("corrosive") petroleum products and adjusted the model-match criteria for this product.  (Appx000166-177 & Appx000128-155).

In Slip-Op. 23-94, the CIT sustained Commerce's decision to reject the reported cost of production for non-prime plate and replace it with the likely selling price of the non-prime plate, after having remanded the issue twice in Slip Ops. 21-101 and 22-114 based upon this Court's decision in <u>Dillinger France S.A. v. United States</u>, 981 F.3d 1318 (Fed. Cir. 2020), which struck down Commerce's reliance upon the likely selling price of non-prime plate in its determination of cost.  (Appx000128-155, Appx000013-31 & Appx000102-110).

Final judgment sustaining Commerce's determinations on these issues was entered on December 21, 2023.  As a result of Commerce's various remand redeterminations, including those based upon issues not subject to this current appeal, the weighted-average dumping margin assigned to Dillinger was reduced to 4.99%.

## STATEMENT OF FACTS

The relevant facts for each argument are included with each argument section.

## SUMMARY OF THE ARGUMENT

Plaintiff-Appellant's appeal relates to two aspects of Commerce's final determination and redeterminations.

First, Commerce's dumping calculations fail to account for commercially significant differences in the physical characteristics between sour service pressure vessel steel and standard pressure vessel steel. In comparing the U.S. price charged for the subject merchandise and the price charged for the corresponding foreign like product in the home market of the foreign producer, Commercial may only treat merchandise as identical if any differences in the physical characteristics are only minor and not commercially significant. The vehicle used by Commerce to identify identical merchandise is the control number or "CONNUM." The CONNUM is constructed using a hierarchy of product characteristics (also known as the model-matching methodology) identified in the antidumping questionnaire.

In the product characteristics used by Commerce in this investigation, it placed the steel quality first in order of importance and listed 15 Quality codes for reporting a product's quality but specifically directed respondents to "{u}se additional number codes for each additional Quality you propose." Because the

5

one Quality code listed for Pressure Vessel/Boiler Quality steels (code 760) did not

account for commercially significant differences in the physical characteristics

between sour service pressure vessel steel and standard pressure vessel steel,

Dillinger, as expressly permitted by the questionnaire, used the additional Quality

code 759 to distinguish sour service pressure vessel plate from standard pressure

vessel plate in reporting its transaction-specific home market and U.S. sales

information.  Sour service refers to steel used to store or transport "sour" crude oil,

which contains high amounts of sulfur making the crude oil extremely corrosive to

standard steels.  Accordingly, steels used for sour service must be specially

manufactured with extremely low levels of phosphorus (P) and sulfur (S) to

withstand these corrosion effects.  Dillinger provided Commerce with extensive

evidence concerning the differences in physical characteristics, specifications,

manufacturing processes, costs of production, sales prices and marketing of sour

service pressure vessel plate.

At no time prior to the final determination, did Commerce note any

deficiencies in this information.  In its preliminary determination, the only

explanation given by Commerce for reassigning code 759 to the general pressure

vessel code (code 760) was that Dillinger added quality codes not included in

Commerce's questionnaire.  Commerce simply ignored Dillinger's evidence and

6

previous explanations that the questionnaire specifically permitted the use of additional codes.

The alleged deficiencies in Dillinger's information raised by Commerce for the first time in its final determination are factually incorrect and without legal significance. Commerce also violated section 1677m(d) by not promptly notifying Dillinger of any claimed deficiency in its data on the additional Quality codes. Commerce's rejection of the Quality code for sour service pressure vessel plate conflicts with its determination in this investigation after remand accepting Dillinger's additional Quality code 771 for sour service petroleum transport plate. The issues involving sour service petroleum transport plate and sour service pressure vessel plate are exactly the same. The only difference is the form of the downstream product using the steel plate. Commerce's determination also conflicts with its remand determination in *Bohler*, involving the companion investigation of cut-to-length plate from Austria, where Commerce amended its model-match methodology to better account for the commercially significant differences in physical characteristics owing to alloy content.

Second, Commerce erred in adjusting Dillinger's reported costs of production by shifting costs incurred in the production of non-prime plate to prime plate. Commerce's shifting of production costs from non-prime products to prime

products is contrary to statute as already explained by this Court in *Dillinger France* and *IPSCO*.

Section 1677b(b)(3) of the antidumping statute specifically states that the cost of production shall be an amount equal to the cost of materials, fabrication and other processing employed in producing the foreign like product. The statute does not permit the shifting of costs employed in producing a product to another product based upon the average selling price or the loss incurred on the sale of the product. As this Court stated in *IPSCO* and reiterated in *Dillinger France*, reducing a product's cost of production to that product's ultimate selling price amounts to "circular reasoning" that "contravened the express requirements of the statute which set forth the cost of production as an independent standard for fair value." As the Court recognized in *Dillinger France*, non-prime plate undergoes the same production process as prime plate and is not less costly to produce simply because it cannot be sold at full price.

The only justification provided by Commerce for the use of the average sales price of non-prime plate as the cost of production for that merchandise and the shifting of costs to prime plate is its incorrect assertion that Dillinger uses "this precise accounting treatment in its audited financial statements." Not only is this justification factually incorrect, it is legally deficient. As the Court found in

*Dillinger France*, it is contrary to section 1677b(f)(1)(A) to rely upon books and records based on likely selling price rather than cost of production.

Commerce's resort to facts available does not justify the use of average selling price as costs of production. The informational gap to be filled in this current situation is the actual costs of production of non-prime products. The statute expressly details that the reported cost of production for a product shall be an amount equal to the cost of materials, fabrication and other processing employed in producing the product. Accordingly, the selection of facts available for the actual costs of non-prime products must correspond, as closely as possible, to the cost of materials, fabrication and other processing employed in producing the non-prime products. There has been no determination that an adverse inference should be applied under section 1677e(b). The most reasonable calculation of the actual production costs of non-prime plate is the calculation reported by Dillinger, which uses the average actual total cost of manufacture for all plate sold during the period of investigation.

## ARGUMENT

### I.     Standard of Review

When reviewing the CIT's judgment concerning a final determination of Commerce, this Court reapplies the CIT's standard of review and reviews the CIT's decision *de novo*. Union Steel v. United States, 713 F.3d 1101, 1106 (Fed.

Cir. 2013).  Under this standard, the Court "shall hold unlawful any determination . . . found . . . to be unsupported by substantial evidence on the record or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i); *see also* SNR Roulements v. United States, 402 F.3d 1358, 1361 (Fed Cir. 2005).

"{S}ubstantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting Consolidated Edison Corp. v. Labor Board, 305 U.S. 197, 229 (1938)).  Furthermore, "substantial evidence" must be measured by a review of the record as a whole, "including whatever fairly detracts from the substantiality of the evidence."  Atlantic Sugar, Ltd. v. United States, 744 F.2d 1556, 1562 (Fed. Cir. 1984).  Thus, the substantial evidence standard "requires more than mere assertion of 'evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'"  Gerald Metals, Inc. v. United States, 132 F.3d 716, 720 (Fed. Cir. 1997) (quoting Universal Camera, 340 U.S. at 487).

Whether Commerce's interpretation and application of the antidumping statute is "in accordance with law," is determined by reference to the two-step analysis mandated by Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).  If the language of the statute is unambiguous, the plain

10

meaning of the text must be given effect. However, if the language of the statute is silent or ambiguous with respect to the specific issue, the Court then considers whether the agency's construction of the statute is permissible. *See* id. 843. Where Congress has not provided clear guidance on an issue, the courts will "defer to the agency's interpretation of its own statute as long as that interpretation is reasonable." Koyo Seiko Co. v. United States, 36 F.3d 1565, 1573 (Fed. Cir. 1994). This is commonly referred to as "Chevron" deference. *See* Timex V.I., Inc. v. United States, 157 F.3d 879, 881 (Fed. Cir. 1998).

**II.     Commerce's Dumping Calculations Fail to Account for Commercially Significant Differences in Physical Characteristics Between Sour Service and Standard Pressure Vessel Steel**

**A.     Introduction & Factual Summary**

The cornerstone of the antidumping law is that, in calculating the existence and amount of any dumping margin, Commerce must make a "fair comparison" between the U.S. price charged for the subject merchandise and the price charged for the corresponding foreign like product in the home market of the foreign producer (the "normal value"). 19 U.S.C. § 1677b(a); *see also*, Pesquera Mares Australes Ltda. v. United States, 266 F.3d 1372, 1374-75 (Fed. Cir. 2001). With respect to the products to be compared, the statute states that, in the first instance, Commerce must compare products that are "identical in physical characteristics." 19 U.S.C. § 1677(16)(A). Under Commerce's prior practice and the jurisprudence

of this Court and the U.S. Court of International Trade ("CIT"), merchandise can only be treated as identical if it has either (1) no differences in physical characteristics or (2) the differences are only minor and "not commercially significant." Union Steel v. United States, 753 F. Supp. 2d 1317, 1322 (CIT 2011) (citing Pesquera, 266 F.3d at 1382-81 (Fed. Cir. 2001)).

The vehicle used by Commerce to identify identical merchandise is the control number or "CONNUM." The CONNUM is constructed using a hierarchy of product characteristics (also known as the model-matching methodology) identified in the antidumping questionnaire by the fields beginning with the number "3." Merchandise having the same CONNUM is treated as identical. Merchandise having different CONNUMs cannot be treated as identical. Non-identical merchandise can only be used in price comparisons if identical product matches are not available and Commerce makes appropriate adjustments to account for the differences in merchandise (*i.e.*, "DIFMER" adjustment). 19 U.S.C. 1677b(a)(6)(C)(ii); 19 C.F.R. § 351.411.

In this investigation, Commerce designated a hierarchy of twelve product characteristics for product matching purposes. Letter from *U.S. Dep't of Commerce* to *deKieffer & Horgan* at Attachment 1 (June 10, 2016) (PD129) (hereinafter "DOC Product Characteristics Letter") (Appx000370-385). First in the order of importance was the steel quality reported in the field number 3.1. The

12

*Product Characteristics Letter* listed 15 Quality codes for reporting a product's

quality but specifically directed respondents to "{u}se additional number codes for

each additional Quality you propose." Id. at Attachment 1, p. 8 (Appx000377).

Specifically, the *Product Characteristics Letter* stated:

> Use additional number codes for each additional Quality you propose.
> Provide a detailed narrative description of each additional Quality you
> propose, and explain what differentiates each of those additional
> Qualities from each of the ones listed above with respect to actual
> physical properties. Specifically, explain why you have assigned the
> particular numeric code within the Quality code hierarchy
> for matching purposes.

Id.

Pursuant to these instructions, Dillinger used additional number codes for

sour service pressure vessel plate (code 759) and sour service petroleum transport

plate (code 771) and provided the requested narrative description and explanations.

*See, e.g.*, Section B Response, B-15 to B-16 (July 15, 2016) (Appx001692-1693);

Supplemental Section B & C Response, 10-11 (Sept. 20, 2016) (Appx003086-

3087); Second Supplemental Section A, B & C Response, at 8 (Oct. 20, 2016)

(Appx004453). Pressure vessel plate is used to manufacture tanks for holding

chemicals or liquid products such as crude oil. The final *Product Characteristics*

*Letter* listed one Quality code for "Pressure Vessel/Boiler Quality that is not

classifiable in another listed Quality subcategory" (code 760), although the initial

product characteristics proposed by Commerce listed seven codes for pressure

13

vessel steels.  DOC Product Characteristics Letter, Attachment 1, p. 7

(Appx000376); Letter from *U.S. Dep't of Commerce* to *Interested Parties*

Pertaining to Proposed Product Characteristics, 5-7 (May 19, 2016) ("DOC

Proposed Product Characteristics Letter") (Appx000229-231).  Petroleum transport

plate is used to manufacture oil pipelines.  This steel plate is otherwise referred to

as "line pipe plate."  The final *Product Characteristics Letter* listed one Quality

code for "Steels Designated Specifically for Transport of Petroleum Products"

(code 772).  DOC Product Characteristics Letter, Attachment 1, p. 7

(Appx000376).

Sour service refers to steel used to store or transport "sour" crude oil.  Crude

oil is routinely classified as sweet or sour with reference to the amount of sulfur it

contains.  Sour crude oil has a sulfur content of greater than 0.5% and some of this

sulfur is in the form of hydrogen sulfide ($H_2S$).  Hydrogen sulfide is extremely

corrosive and therefore steels used for sour service must be specially manufactured

with extremely low levels of phosphorus (P) and sulfur (S) to withstand the

corrosion effects, such as hydrogen induced cracking (HIC).  Letter from *deKieffer*

*& Horgan* to *U.S. Dep't of Commerce* at 2 (June 2, 2016) ("Dillinger Product

Characteristics Comments") (Appx000238).  Hydrogen induced cracking can lead

to catastrophic failures in the steel, resulting in massive explosions or severe

environmental pollution.  Id. at App. 1, pp. 4-5 (Appx000252-253).

Because phosphorus and sulfur appear naturally in the pig iron and scrap used to produce steel, the steel must be "cleaned" through different processes of desulfurization, dephosphorization and vacuum degassing. Second Supplemental Section A, B & C Response, App. SBC-31 (Appx004538-4580). The cleanliness of the steel must also be guarded throughout the casting process in order to avoid any resulfurization or reoxidization. Id. The maximum amount of phosphorus permitted for sour service pressure vessel steel is 0.010% and the maximum permissible amount of sulfur is 0.0010%. Supplemental Section B & C Response, 11-12 & App. SBC-11 (Appx003087-3088 & Appx003293-3309). These levels are far below the normal levels for standard pressure vessel steel such as ASTM A516 grades 60, 65 and 70, which have a maximum content of phosphorus of 0.025% and a maximum content of sulfur of 0.025%, and EN10028-3 grades P275 and P355, which have a maximum content of phosphorus of 0.025% and a maximum content of sulfur of 0.010%. Dillinger Section B Response, App. B-6, p. 263-264 (specification A516/A516M) (Appx002044-2045) & p. 1044-1059 (specification EN 10028-3) (Appx002825-2839). These differences in physical characteristics, production process and use result in significant differences between the costs of production and price of sour service steels and standards steel grades. See Dillinger Rule 56.2 Memorandum in Support of Motion for Judgment Upon the Agency Record, 7 & 12 (Mar. 12, 2018) ("Dillinger CIT Brief") (Appx006003-

6004).

Accordingly, based upon the commercially significant differences between sour service steels and standard steels, Dillinger used the additional Quality code 759 to distinguish sour service pressure vessel plate from the Quality code for standard pressure vessel plate (code 760) in reporting its transaction-specific home market and U.S. sales. Similarly, Dillinger used the additional Quality code 771 to distinguish sour service petroleum transport plate from the Quality code for standard petroleum transport plate (code 772). *See, e.g.*, <u>Section B Response</u>, B-15 to B-16 (Appx001692-1693); <u>Supplemental Section B & C Response</u>, 10-11 (Appx003086-3087); <u>Second Supplemental Section A, B & C Response</u>, at 8 (Appx004453).

Despite issuing numerous supplemental questionnaires, Commerce never noted any deficiencies in the information supplied by Dillinger supporting these additional quality codes or requested any additional information. Rather, Commerce's only reference to these codes in its supplemental questionnaires was to direct Dillinger, without providing any explanation, to revise its sales databases in order to exclude these codes. *See, e.g.*, <u>DOC Supplemental Section A, B & C Questionnaire</u>, 3 & 5 (Appx004436). In response to these requests, Dillinger again explained how the instructions for the Quality code in the *Product Characteristics Letter* expressly directed respondents to use additional number codes for each

16

additional Quality they proposed and that failing to use additional Quality codes for sour service steels would not make due allowance for differences affecting price comparability and not provide for a fair comparison between the export price and the normal value. *See, e.g.*, Second Supplemental Section A, B & C Response, at 8-10 (Appx004453-4455). Dillinger also again pointed Commerce to the information on the record demonstrating the commercially significant physically differences in sour service steels. Id.

In its preliminary determination, Commerce continued to ignore the fact that the questionnaire specifically invited respondents to use additional Quality codes and disregarded the additional codes for sour service pressure vessel plate and sour service petroleum transport plate in its margin calculations. The sole reason given by Commerce for disregarding these additional quality codes was "{b}ecause Dillinger reported quality code values in product characteristic field 3.1 (QUALITYH) that were not included in Commerce's Questionnaire." Preliminary Sales Calculation Memo, 2 (Nov. 4, 2016) (Appx004853). Dillinger addressed Commerce's stated objection in its case brief submitted during the original investigation, once again explaining that the questionnaire specifically permitted the addition of Quality codes. Dillinger Case Brief, 7-11 (Appx005812-5816).

Suddenly, in its final determination, Commerce for the first time claimed that there were deficiencies in the information submitted by Dillinger with respect

to the additional codes for sour service pressure vessel plate and sour service petroleum transport plate.  *See* <u>Final-IDM</u>, 76-78 (Appx005957-5959).  Commerce also continued to ignore that the questionnaire specifically permitted the addition of Quality codes, claiming that Dillinger's "proposal with respect to sour service pressure vessel plate was not made during the model match comment period for all the concurrent CTL plate AD investigations." <u>Id</u>. at 77 (Appx005958).  What Commerce simply failed to appreciate is that the *Product Characteristics Letter* issued at the end of the model match comment period for all the concurrent cut-to-length plate antidumping duty investigations expressly permitted respondents to propose and use Quality codes in addition to those listed in the questionnaire.  *See* <u>DOC Product Characteristics Letter</u>, Attachment 1, p. 8 (Appx000377).  Moreover, having failed to raise any of these alleged deficiencies during the investigation, itself, Commerce deprived Dillinger of "an opportunity to remedy or explain the deficiency" in contravention of 19 U.S.C. § 1677m(d).  In any event, as detailed below, all of the claimed deficiencies in Dillinger's information are without merit.

In its 56.2 brief and reply brief before the CIT, Dillinger challenged Commerce's claims in the final determination concerning the additional codes for sour service pressure vessel plate and sour service petroleum transport plate. <u>Dillinger CIT Brief</u>, 5-15 (Appx006001-6008); <u>Dillinger Reply Brief</u>, 1-8 (Aug. 22, 2018) (Appx006050-6057).  In its reply brief, Dillinger specifically cited to the

CIT's then recent decision in *Bohler* involving Commerce's final determination in the companion investigation of cut-to-length plate from Austria. In *Bohler*, the court found that Commerce's model-match methodology failed to account for commercially significant physical differences in alloy content and remanded the matter back to Commerce with the order "to amend its model-match methodology in this investigation . . . to better account for the commercially significant differences in physical characteristics among Plaintiffs' products owing to alloy content." Bohler Bleche GMBH & Co. KG v. United States, 324 F. Supp. 3d 1344, 1354 (CIT 2018) ("Bohler").

By Memorandum and Order entered on August 18, 2021, the CIT sustained Commerce's rejection of Dillinger's proposed quality code for sour service pressure vessel plate. AG der Dillinger Hüttenwerke v. United States, No. 17-00158 (CIT Aug. 18, 2021) (memorandum & order) (Appx000032-40). In its Memorandum and Order, the CIT nowhere mentions *Bohler*. The court stayed consideration of Dillinger's challenge to Commerce's rejection of the proposed quality code for sour service transport plate pending the outcome of the remanded issues in AG der Dillinger Huttenwerke v. United States, 534 F. Supp. 3d 1403 (CIT Aug. 18, 2021) ("Dillinger II").

By Opinion and Order dated June 23, 2023, the CIT remanded Commerce's determination to reject Dillinger's proposed quality code for sour service transport

plate for further explanation, and if appropriate, reconsideration.  In that opinion,

the court placed major emphasis upon *Bohler*.  AG der Dillinger Hüttenwerke v.

United States, 648 F. Supp. 3d 1321, 1335-36 (CIT June 23, 2023) ("Dillinger V").

The court stressed:

> Given Commerce's apparent recognition in Bohler that its model-
> match methodology insufficiently accounted for variations in the alloy
> content of the products at issue in that proceeding, the court concludes
> that Commerce should have the opportunity to explain why a similar
> outcome is not warranted here.

Id.  The CIT also emphasized that "{r}easoned decision-making requires a certain

measure of consistency." Dillinger V, at 1336 (citation omitted).

Upon remand, Commerce determined that the facts of this case were

"analogous" to *Bohler* and revised the antidumping duty calculations for Dillinger

by using the reported Quality code for sour service petroleum transport plate (code

771). Final Results of Redetermination Pursuant to Court Remand, 2-4 & 10

(Sept. 7, 2023) ("Redetermination IV" ) (Appx000157-159 & Appx000165).  In

summarizing the data submitted by Dillinger during the investigation, Commerce

explained:

> To support the commercially significant differences in the physical
> characteristics of sour service petroleum transport plate when
> compared to other steels designated for the transport of petroleum
> products, Dillinger provided: (1) sales and cost information for
> products with its proposed quality code, demonstrating the
> consistently higher net prices and costs for sour service petroleum
> transport plate and other steels designated specifically for the

20

> transport of petroleum products; and (2) documentation comparing the
> manufacturing of sour service petroleum transport plate to other steels
> designated specifically for the transport of petroleum products, as well
> demonstrating the unique physical properties of sour service
> petroleum transport plate.

Redetermination IV, 5 (Appx000160).  Commerce also explained that, like the

respondent in *Bohler*, "Dillinger similarly provided information on the record to

demonstrate the consistently higher costs and net prices for sour service petroleum

transport plate, along with supporting documentation."  Id. at 6 (Appx000161).

Moreover, in its final redetermination, Commerce finally admitted that the

antidumping questionnaire specifically "permitted respondents to include

additional quality codes not included in Commerce's list when reporting the

'quality' product characteristic for its products."  Redetermination IV, 5, n.18

(Appx000160).

Commerce however refused to use the reported Quality code for sour service

pressure vessel plate (code 759) in its revised calculations, stating only that "the

Court already sustained Commerce's rejection of this quality code" in its

Memorandum and Order of August 18, 2021.  Redetermination IV, 9

(Appx000164).

By Opinion and Order dated December 21, 2023, the CIT sustained

Commerce's fourth remand results and entered judgment the same day.  AG der

Dillinger Hüttenwerke v. United States, 672 F. Supp. 3d 1351 (CIT Dec. 21, 2023)

("Dillinger VII").

### B. Commerce's Determination Regarding Sour Service Pressure Vessel Plate Is Inconsistent with Its Determination Regarding Sour Service Petroleum Transport Plate and Its Determination in *Bohler*

Commerce's determination refusing to recognize a separate Quality code for sour service pressure vessel plate is at odds with its determination that the facts of this case are "analogous" to *Bohler* and that a separate Quality code for sour service petroleum transport plate is therefore warranted. The issues involving sour service petroleum transport plate and sour service pressure vessel plate are exactly the same. The only difference is the form of the downstream product using the steel plate. Sour service petroleum transport plate is used to make pipelines to transport sour crude oil and sour service pressure vessel plate is used to manufacture pressurized tanks holding sour crude oil.

As with the Quality code for sour service petroleum transport plate (code 771) discussed above, Dillinger provided Commerce with extensive documentation showing the differences in the actual physical characteristics with respect to sour service pressure vessel plate (code 759) and standard pressure vessel plate. All of this information is outlined below in section II.C of this brief and is comparable in every respect to the information accepted by Commerce in supporting the Quality code for sour service petroleum transport plate (code 771).

Commerce has failed to provide any explanation as to why *Bohler* should apply to its determination concerning sour service petroleum transport plate and not to its determination concerning sour service pressure vessel plate.  There is also no explanation as to why the CIT relied upon *Bohler* in remanding the sour service petroleum transport steel issue back to Commerce but failed to mention *Bohler* in its earlier decision sustaining Commerce's rejection of the additional Quality code for sour service pressure vessel plate.

Consistency is a core value of both administrative law and judicial review. It is beyond cavil that "like cases should be treated alike."  Here neither the CIT nor Commerce have posited any explanation as to why the differences in the physical characteristics of sour service pressure vessel plate should not be recognized in the same way as the differences in the physical characteristics of sour service petroleum transport plate in this case or the differences in alloy levels in *Bohler*.  As this Court stressed in *SKF USA* "an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently." SKF USA Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (quoting Transactive Corp. v. United States, 91 F.3d 232, 237 (D.C. Cir. 1996)).

**C.    Commerce Erred in Dismissing the Evidence Demonstrating Commercially Significant Physical Differences Between Sour Service Pressure Vessel Plate and Standard Pressure Vessel Plate**

Commerce's rejection of Dillinger's additional Quality code for sour service pressure vessel plate in its final determination is not supported by substantial evidence on the administrative record and is not in accordance with law.  Rather the evidence on the administrative record demonstrates that there are commercially significant physical differences between sour service pressure vessel plate and standard pressure vessel plate just as Commerce found with respect to sour service petroleum transport plate in its fourth remand redetermination.

First, it must be remembered that the only information Commerce requested in its questionnaire for the addition of Quality codes was as follows:

> Use additional number codes for each additional Quality you propose. Provide a detailed narrative description of each additional Quality you propose, and explain what differentiates each of those additional Qualities from each of the ones listed above with respect to actual physical properties.  Specifically, explain why you have assigned the particular numeric code within the Quality code hierarchy for matching purposes.

DOC Product Characteristics Letter, Attachment 1, p. 8 (Appx000377).  Dillinger timely provided this information and, prior to the final determination, Commerce never informed Dillinger of any deficiencies in this information as required by 19 U.S.C. § 1677m(d).

24

In fact, the information provided by Dillinger went far beyond that requested by Commerce in the questionnaire.  The information submitted by Dillinger showed that steels used for sour service must be specially manufactured with extremely low levels of phosphorus (P) and sulfur (S) to withstand the corrosion effects of the high level of sulfur in sour crude oil, such as hydrogen induced cracking (HIC).  Dillinger Product Characteristics Comments, 2 (Appx000238).  Dillinger provided Commerce with an extensive presentation showing in detail the production process for sour service pressure vessel steel.  Phosphorus and sulfur appear naturally in the pig iron and scrap used to produce steel.  Therefore, the steel must be "cleaned" through different processes of desulfurization, dephosphorization and vacuum degassing.  Second Supplemental Section A, B & C Response, App. SBC-31 (Appx004538-4580).  The cleanliness of the steel must also be guarded throughout the casting process in order to avoid any resulfurization or reoxidization.  Id.  Dillinger also provided steel specifications showing that the maximum amount of phosphorus permitted for sour service pressure vessel steel is 0.010% and the maximum permissible amount of sulfur is 0.0010%.  Supplemental Section B & C Response, 11-12 & App. SBC-11 (Appx003087-3088 & Appx003293-3309).  These levels are far below the normal levels for standard pressure vessel steel, which have a maximum content of phosphorus of 0.025% and a maximum content of sulfur of as much as 0.025%.  Dillinger Section B

Response, App. B-6, p. 263-264 (specification A516/A516M) (Appx002044-2045)
& p. 1044-1059 (specification EN 10028-3) (Appx002825-2839). The HIC
resistance of sour service pressure vessel steel is verified using a standardized test
developed by the National Association of Corrosion Engineers (NACE) known as
NACE TM 0284. Supplemental Section B & C Response, 11-12 & App. SBC-11
(Appx003087-3088 & Appx003293-3309).

Because of the extensive desulfurization and dephosphorization processes
required to produce sour service pressure vessel steel, the cost of production and
resulting sales price are higher than those of standard pressure vessel steel. This is
clearly seen from the cost and price data submitted in Dillinger's sales and cost
files. As shown by Table 1 in Dillinger's 56.2 brief at the CIT, when comparing
CONNUMs for sour service pressure vessel steel and standard pressure vessel steel
that differ only in the Quality code (*i.e.*, code 759 for sour service pressure vessel
steel and code 760 for standard pressure vessel/boiler quality steels) the cost of
production and the net price of sour service pressure vessel steel (code 759) are
consistently higher. Dillinger CIT Brief, 7 (Appx006003).

Accordingly, Commerce's assertion that "Dillinger did not provide any
evidence of significant systematic variations in pricing patterns between . . . sour
service pressure vessel plate and other pressure vessel/boiler quality plate" is
demonstrably false. *See* Final-IDM, 74 (Appx005955). Rather, in its home market

26

and U.S. sales files, Dillinger reported detailed transaction-specific information for every sale of sour service pressure vessel plate and standard pressure vessel plate sold during the period of investigation (POI).  As shown by the summary of this data in Table 1 of Dillinger's 56.2 brief at the CIT, this information demonstrates significant systematic variations in both costs of production and pricing patterns between sour service pressure vessel plate and standard pressure vessel plate. Dillinger CIT Brief, 7 (Appx006003).  These consistent cost and price differences between sour service pressure vessel steel and standard pressure vessel steel confirm that the differences in physical characteristics required to make the steel suitable for use with sour petroleum products (*i.e.*, the significant reduction in the levels of phosphorus and sulfur) are commercially significant.  *See* Union Steel v. United States, 836 F. Supp. 2d 1382, 1389 (CIT 2012) (holding that cost and price differences support a finding that differences in physical characteristics are commercially significant).

In its final determination, Commerce similarly claimed that Dillinger had failed to provide evidence of significant systematic variations in pricing patterns between sour service petroleum transport plate and standard petroleum transport plate.  However, in its fourth remand redetermination, Commerce reversed its determination and found that precisely the same sort of cost and price information Dillinger provided for sour service pressure vessel plate warranted a separate

Quality code for sour service petroleum transport plate. In fact, Commerce

specifically found that "Dillinger provided . . . sales and cost information for

products with its proposed quality code, demonstrating the consistently higher net

prices and costs for sour service petroleum transport plate and other steels

designated specifically for the transport of petroleum products." Redetermination

IV, 5 (Appx000160).

Commerce's claim that Dillinger did not provide evidence showing the

extent to which the product characteristics differed between sour service pressure

vessel plate and standard pressure vessel plate is also not supported by the

administrative record. *See* Final-IDM, 76 (Appx005957). While Commerce

acknowledged the low levels of sulfur and phosphorus required for producing sour

service pressure vessel plate, it erroneously claimed that Dillinger did not indicate

whether the levels of other elements varied from those for other pressure vessel

plate. Id. As detailed above, Dillinger submitted numerous steel specifications

showing wide difference in the levels of phosphorus and sulfur between sour

service pressure vessel plate and standard pressure vessel plate. *See, e.g.,*

Supplemental Section B & C Response, 11-12 & App. SBC-11 (DICREST

specifications DH-E51-F, DH-E17-I & DH-E18-I) (Appx003087-3088 &

Appx003293-3309); Dillinger Section B Response, App. B-6, p. 263-264

(specification A516/A516M) (Appx002044-2045) & p. 1044-1059 (specification

28

EN 10028-3) (Appx002825-2839). These specifications show that the chemical composition of sour service pressure vessel plate corresponds to the underlying standard pressure vessel plate grade (*e.g.*, ASTM A516, EN 10028-3, *etc.*) except for the severe restrictions with respect to phosphorus and sulfur. <u>Supplemental Section B & C Response</u>, App. SBC-11, p. 7 & 13 (Appx003300 & Appx003306). It is precisely the severe limitation in the levels of sulfur and phosphorus, which require the desulfurization and dephosphorization processes described above, that comprise the difference in physical characteristics between sour service pressure vessel plate and standard pressure vessel plate. The administrative record shows that these differences in the levels of phosphorus and sulfur are commercially significant and the final determination does not make any finding that these differences in physical characteristics are not commercially significant.

Again, in its final determination, Commerce similarly claimed that Dillinger did not provide evidence showing the extent to which the product characteristics differed between sour service petroleum transport plate and standard petroleum transport plate. However, in its fourth remand redetermination, Commerce reversed its determination and found that precisely the same sort of steel specification and production process information Dillinger provided for sour service pressure vessel plate warranted a separate Quality code for sour service petroleum transport plate. In fact, Commerce specifically found that "Dillinger

provided . . . documentation comparing the manufacturing of sour service petroleum transport plate to other steels designated specifically for the transport of petroleum products, as well demonstrating the unique physical properties of sour service petroleum transport plate." Redetermination IV, 5 (Appx000160).

The evidence provided by Dillinger also shows significant differences in the marketing and end use of sour service pressure vessel steel. These steels are subject to separate specifications severely limiting the levels of phosphorus and sulfur. Supplemental Section B & C Response, App. SBC-11 (Appx003293-3309). They are marketed under the separate brand name "DICREST." Id. They are used to produce pressure vessels designed to hold sour petroleum products, whereas standard pressure vessel steel cannot be used for this purpose because of its susceptibility to hydrogen induced cracking (HIC). Second Supplemental Section A, B & C Response, App. SBC-31 (Appx004538-4580). There is an industry-wide test (the NACE TM 0284 test) to identify those steels having the low levels of phosphorus and sulfur required to resist hydrogen induced cracking. Id. All of these items further demonstrate that the physical differences between sour service pressure vessel steel and standard pressure vessel steel are commercially significant. See Union Steel, 836 F. Supp. 2d at 1389 (holding that differences in marketing support a finding that physical differences are commercially significant). This evidence constitutes substantial evidence that there are

differences in the physical characteristics between sour service pressure vessel steel and standard pressure vessel steel and that these physical differences are commercially significant.

Finally, Commerce seems to claim that Dillinger's requested additional Quality code for sour service pressure vessel plate was untimely because it "was not made during the model match comment period for all the concurrent CTL plate AD investigations." Final-IDM, 77 (Appx005958). However, this claim of untimeliness has no factual or legal support. In the original product characteristics proposed by Commerce, the narrative description to the Quality code field specifically included the language that respondents could "{u}se additional number codes for each additional Quality you propose." DOC Proposed Product Characteristics Letter, 7 (Appx000231). In its comments on the proposed product characteristics, Dillinger specifically referred to this passage permitting respondents to add additional Quality codes and stated that it would propose additional Quality subcategories in its questionnaire responses should that be necessary. Dillinger Product Characteristics Comments, 3 (Appx000239). When Commerce issued its final product characteristics, it once again included the language that respondents could use additional Quality codes. DOC Product Characteristics Letter, Attachment 1, p. 8 (Appx000377). There is therefore no merit in Commerce's claim that Dillinger was prohibited from including additional

31

Quality codes in its questionnaire responses.

In fact, a key holding in *Bohler* is that the court specifically found that the plaintiffs' proposed revisions to Commerce's model-match methodology were not untimely even though they were made after the initial comment period had expired and Commerce had issued its final product characteristics.  *See* Bohler, 324 F. Supp. 3d at 1352.  The court specifically stated that this was "a case where 'the interests in fairness and accuracy outweigh the burden upon Commerce' presented by having to consider Plaintiffs' concerns about the model-match methodology." Id. (citation omitted).  Here it is important to understand that the additions to the model-match methodology requested by the plaintiffs in *Bohler* related to adding entirely new fields to the model-match methodology.  *See* id. at 1349.  If such significant additions to the model-match methodology cannot properly be considered untimely, then the limited addition of a Quality code for sour service pressure vessel plate as specifically permitted by the questionnaire instructions can certainly not be considered untimely.

In fact, all of Dillinger's questionnaire and supplemental questionnaire responses were timely filed, and Commerce did not reject any of Dillinger's responses.

Accordingly, substantial evidence on the administrative record demonstrates that the differences in the physical characteristics between sour service pressure

vessel plate and standard pressure vessel plate are commercially significant.

Commerce's treatment of these products as "identical" in its margin calculations

without making any determination that the acknowledged differences in the levels

of phosphorus and sulfur were only minor and not commercially significant

violates 19 U.S.C. § 1677(16)(A) and is therefore not in accordance with law.  To

the extent that the Court finds that Commerce did make a determination that the

differences in the levels of phosphorus and sulfur for these two products were not

commercially significant, that determination by Commerce is not supported by

substantial evidence on the administrative record.

### D.    Commerce's Claim of Information Deficiencies for the First Time in the Final Determination Violates 19 U.S.C. § 1677m(d)

As detailed above, Dillinger provided substantial evidence showing that the

physical differences between sour service pressure vessel plate and standard

pressure vessel plate are commercially significant, including product specifications

as well as complete price information on each transaction involving these products

and specific cost data for each product on a per-CONNUM basis.  Despite issuing

numerous supplemental questionnaires, Commerce never noted any deficiencies in

this information and simply ignored the information in its preliminary

determination.  It was not until its final determination, that Commerce claimed any

insufficiency in Dillinger's data, thereby depriving Dillinger of any opportunity to

33

respond to Commerce's comments.

Commerce's failure to promptly notify Dillinger of any claimed deficiency in its data on the product differences violates 19 U.S.C. § 1677m(d) and is therefore not in accordance with law. Pursuant to section 1677m(d), if Commerce determines that a response to a request for information does not comply with the request, it "shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency." Commerce cannot simply wait until the final determination and claim for the first time that the data provided in a respondent's questionnaire responses is deficient. As this Court stated in *Hitachi*, Commerce's failure to timely notify a party of deficiencies is a violation of 19 U.S.C. § 1677m(d) and the statutory entitlement to notice and opportunity to remedy any deficiency is unqualified. Hitachi Energy USA Inc. v. United States, 34 F.4th 1375, 1384 (Fed. Cir. 2022).

### E.    Commerce Failed to Apply a Fair and Objective Standard in its Analysis of Changes to the Product Characteristics

In its final determination, Commerce has failed to apply a fair and objective standard to Dillinger for identifying commercially significant differences in physical characteristics with respect to sour service pressure vessel plate. Instead, Commerce has applied to Dillinger a *post hoc* arbitrary standard that whatever

information was provided, regardless of its nature and quantity, was insufficient. At the same time, Commerce made significant changes in the originally proposed Quality codes at the request of the domestic producer Nucor Corporation ("Nucor") without requiring Nucor to present any evidence of differences in physical characteristics or price comparability. For example, Commerce added three new Quality codes for tool steel, mold steel and wear resistant/abrasion resistant steel even though Nucor did not provide any information concerning differences in physical characteristics or relative price and cost comparability. *See* letter from *Wiley Rein LLP* to *U.S. Dep't of Commerce* at 7 (June 2, 2016) ("Nucor Product Characteristics Comments") (Appx000329).

Similarly, Nucor convinced Commerce to make extensive changes in the Quality codes listed for pressure vessel steels without providing any information on differences in physical characteristics or relative price and cost comparability. The Quality codes originally proposed by Commerce included seven codes for pressure vessel steels. DOC Proposed Product Characteristics Letter, 5-7 (Appx000229-231). Without providing any evidence whatsoever, Nucor simply stated that "the seven pressure vessel categories should be limited to two groups, which better reflect the cost and price differences among these products." Nucor Product Characteristics Comments, 6 (Appx000328). Nucor then proposed one Quality code for alloyed pressure vessel steel and another for non-alloy pressure

vessel steel.  Id.  Commerce ultimately collapsed all pressure vessel steels into one

Quality code (code 760).  DOC Product Characteristics Letter, 7 (PD129).

Like any government agency, Commerce is under a duty to accord fairness

to the parties that appear before it.  SKF USA Inc. v. United States, 33 CIT 1866,

1878, 675 F. Supp. 2d 1264, 1276 (CIT 2009).  As the court stated in *Carpenter*

*Tech.*, "Respondents have a right to expect fair, impartial, and consistent treatment

in agency proceedings."  Carpenter Tech. Corp. v. United States, 26 CIT 830, 837-

38 (CIT 2002) (citations omitted).  It is therefore incumbent upon Commerce to

apply its standards impartially to all parties similarly situated.  Id. at 838.

Commerce violated this principle of fundamental fairness when it applied vastly

different standards to Dillinger in comparison to the domestic producer Nucor for

making changes in the product characteristic hierarchy used to determine

"identical" merchandise.

### III.    Commerce Erred in Adjusting Dillinger's Reported Costs of Production by Shifting Costs Incurred in the Production of Non-Prime Plate to Prime Plate

#### A.    Introduction & Factual Summary

In its final determination, Commerce reduced the reported costs of

Dillinger's non-prime plate[1] by nearly 40% and transferred this amount to the

---

[1] Non-prime plate is produced in the same production run as prime plate using the same materials, processes, labor and overhead.  Non-prime plate is simply the portion of plate from the production run that does not meet the customer

reported costs of Dillinger's prime plate.  Final COP Memo, Attachment 1 (March 29, 2017) (Appx005986).  Commerce claimed that the "full costs" should not be assigned to non-prime plate, because "there is no evidence on the record to indicate that Dillinger's non-prime merchandise can be used in the same general applications as its prime merchandise."  Final-IDM, 89-90 (Appx005970-5971).  Commerce then reduced the reported costs of Dillinger's non-prime plate to the non-prime plates' sales price and transferred the excess costs to the reported costs of prime plate.  Final COP Memo, Attachment 1 (Appx005986).

Commerce thereby ignored the fact that non-prime plate cannot be identified until the end of production and therefore undergoes the exact same production steps as prime plate.  Section A Response, A-18 to A-19 (Appx000409-410).  Non-prime plate does not become less costly simply because it cannot be sold at full price.  Commerce's adjustment has the effect of reporting the cost of non-prime plate at less than the actual full cost incurred in producing that merchandise and reporting the cost of production for prime plate at an amount greater than the actual cost incurred in producing that merchandise and is therefore not in accordance with the antidumping statute.

---

specifications for prime material.  Non-prime plate however can still be sold as plate, and both prime and non-prime plate are covered by the scope of this investigation.

On December 3, 2020, this Court struck down Commerce's treatment of non-prime plate in *Dillinger France*, concerning the concurrent investigation of cut-to-length plate from France. The Court noted that Dillinger France, just like Plaintiff-Appellant in this current appeal, had "reported the cost of non-prime plate as equal to the average actual cost of all plate." Dillinger France S.A. v. United States, 981 F.3d 1318, 1321 (Fed. Cir. 2020) ("Dillinger France"). Citing its earlier decision in *IPSCO*, the Court stated that calculating the costs of non-prime material based upon its likely selling price was "'an unreasonable circular methodology' because it 'contravened the express requirements of the statute which set forth the cost of production as an independent standard for fair value.'" Dillinger France, 981 F.3d at 1322 (quoting IPSCO, Inc. v. United States, 965 F.2d 1056, 1061 (Fed. Cir. 1992)). The Court stressed that the "legislative history confirms the statute's unambiguous intent to provide cost of production as an independent yardstick for deciding whether home and export sales prices are suitable for fair value comparisons." Dillinger France, 981 F.3d at 1322 (quoting IPSCO, 965 F.2d at 1060).

The Court also rejected Commerce's argument that its use of the likely selling price in calculating the costs of production of non-prime plate was permitted under 19 U.S.C. § 1677b(f) because Dillinger France's books and records were based on likely selling price. The Court stated that section 1677b(f)

only permits Commerce to rely on a producer's or exporter's books and records if they are in accordance with GAAP and reasonably reflect the costs of production. Dillinger France, 981 F.3d at 1323. The Court concluded that, because "Dillinger's books and records were based on 'likely selling price' rather than cost of production . . . , Commerce erred in relying on them." Id. at 1324 (citation omitted).

On August 18, 2021, the CIT remanded this issue back to Commerce "to reconcile its COP determination" with this Court's decision in *Dillinger France*, noting that *Dillinger France* "held that Commerce's decision to rely on information reflecting a respondent's 'likely selling price,' rather than actual cost data, violates the requirements of § 1677b(f)." Dillinger II, 534 F. Supp. 3d at 1407 (citing Dillinger France, 981 F.3d at 1321-24). On remand, Commerce made no change in its determination. Commerce continued to reject the average actual cost of all plate reported by Dillinger as the cost of non-prime plate and instead reduced the reported cost of non-prime plate to its average sales value. Commerce claimed that it selected the average selling price of the non-prime products as facts otherwise available because this amount was used by Dillinger in its normal books and records. Final Results of Redetermination, 13 (Jan. 20, 2022) (Appx000056) ("Redetermination II"). However, as explained below, Dillinger's books and records kept in accordance with the generally accepted accounting principles of

Germany do not report the cost of non-prime plate as the sales value of the non-prime plate.

In any event, this Court in *Dillinger France* stressed that the books and records of a company can only be relied upon when they reasonably reflect the costs associated with the production and sale of the merchandise and specifically determined that Commerce erred in relying upon the respondent's books and records because they were based on "likely selling price" rather than cost of production.  Dillinger France, 981 F.3d at 1321-22 & 1324.  In its remand redetermination, Commerce provided no explanation as to how the average sales value of non-prime plate reasonably reflected the costs associated with the production of the non-prime merchandise.  Commerce simply ignored this Court's decision in *Dillinger France*.

On September 23, 2022, the CIT again remanded this issue back to Commerce, stating that, "in making its selection of facts otherwise available, Commerce must explain how its reliance on information indicating the 'likely selling price' of non-prime products accords with its obligation to ensure that the reported costs of production reasonably reflect the cost of producing the merchandise under consideration." AG der Dillinger Hüttenwerke v. United States, 592 F. Supp. 3d 1344, 1349 (CIT Sept. 23, 2022) ("Dillinger IV").  On remand, Commerce again made no change in its determination.  Final Results of

Redetermination, 2 (Dec. 15, 2022) (Appx000112) ("Redetermination III") (stating

that the final estimated weighted-average dumping margin calculated for Dillinger

remains unchanged). Commerce continued to reject the average actual cost

reported by Dillinger as the cost of non-prime plate and instead reduced the

reported cost of non-prime plate to its average sales value. Commerce continued

to provide no explanation as to how the average sales value of non-prime plate

reasonably reflected the costs associated with the production of the non-prime

merchandise. Commerce simply erroneously claimed that, in its "audited financial

statements," Dillinger transfers the loss on sales of non-prime plate to the costs of

production of prime products. *See* Redetermination III, 14-15 (Appx000124-125).

As detailed below, this claim is demonstrably false and, indeed, Commerce's

redetermination does not cite to any record evidence supporting its statement. In

fact, the source of the average sales value used by Commerce for the "cost" of non-

prime plate was not any audited financial statements or inventory records. Rather,

the source of the average sales value used by Commerce was the narrative response

to Dillinger's supplemental section D questionnaire on the question concerning the

"quantity and value of non-prime, defective, and low quality plates sold during the

POI." *See* Final COP Memo, Attachment 1 (March 29, 2017) (Appx005986)

(citing to Dillinger Supplemental Section D Questionnaire Response, 22 (Sept. 28,

2016)) (Appx003954). This figure has absolutely nothing to do with the costs of

41

production.

Despite these clear errors in Commerce's redetermination, the CIT sustained Commerce's adjustments to Dillinger's reported costs of non-prime plate.  AG der Dillinger Hüttenwerke v. United States, 648 F. Supp. 3d 1321 (CIT June 23, 2023) ("Dillinger V").

### B.    Commerce's Shifting of Production Costs from Non-Prime Products to Prime Products is Contrary to Statute

In its final results of redetermination, Commerce has expressly shifted production costs from non-prime products to prime products.  Commerce's stated rational is that the "lost value" on the non-prime products is a cost of producing the prime products.  Redetermination III, 5 (Appx000115).  By lost value, Commerce apparently means the fact that the sales price of the non-prime products does not cover the costs of production of those products, thereby resulting in a loss on the sale.  However, the fact that non-prime plate is sold at a loss does not in any way reduce the actual costs of producing that plate.

Section 1677b(b)(3) of the antidumping statute specifically enumerates the elements to be included in the calculation of the cost of production as follows:

> For purposes of this part, the cost of production shall be an amount equal to the sum of—
>
> (A) the cost of materials and of fabrication or other processing of any kind employed in producing the foreign like product, during a period which would ordinarily permit the production of that foreign like product in the ordinary course of business;

>(B) an amount for selling, general, and administrative expenses based on actual data pertaining to production and sales of the foreign like product by the exporter in question; and

>(C) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the foreign like product in condition packed ready for shipment.

19 U.S.C. § 1677b(b)(3).  There is no provision in the statute to reduce the costs of materials, fabrication and processing employed in producing the merchandise by the "lost value" resulting from the sale of the merchandise.  Nor is there any provision in the statute to increase the costs of materials, fabrication and processing employed in producing the merchandise by the "lost value" resulting from the sale of other merchandise.  Commerce's shifting of production costs from non-prime products to prime products is therefore contrary to the express wording of the statute and not in accordance with law.

Indeed, the increase of production costs to account for "lost value" is contrary to Commerce's longstanding practice of excluding inventory write-downs in the costs of production.  As Commerce stated in its Issues and Decision Memorandum for the final determination in the companion investigation on *CTL Plate from France*,:

>Our practice is to exclude inventory write-downs that are attributable to finished goods from a respondent's COP because we consider the write-down of finished goods to be more clearly related to the sale of merchandise rather than to its production.

Certain Carbon and Alloy Steel Cut-to-Length Plate from France: Final

Determination of Sales at Less Than Fair Value, 82 Fed. Reg. 16363 (Apr. 4, 2017) accompanying Issues and Decision Memorandum, 57 & n.184 (March 29, 2017).

In its final results of redetermination, Commerce admits that this is its established practice and that this established practice relates to the write-down of finished goods to below their cost of production. *See* Redetermination III, 15-16 (Appx000125-126). This is precisely what Commerce is doing in its calculation of "lost value" in this case. It is taking a write-down of the finished goods inventory for non-prime plate based upon the difference between the cost of production of that plate and its sales price and then applying this write-down to the cost of prime products.

Commerce's attempt to label the write-down in the value of the non-prime plate finished goods inventory as "indirect costs" for the production of prime products finds no support in law, and Commerce cites to no statute, regulation, court decision or prior administrative determination supporting this categorization. As explained above, the statute expressly details that the reported cost of production for a product "shall be an amount equal" to "the cost of materials and of fabrication or other processing of any kind employed in producing" the product. 19 U.S.C. § 1677b(b)(3). Under this clear definition, the actual costs of non-prime products must correspond, as closely as possible, to the cost of materials, fabrication or other processing employed in producing the non-prime products.

44

The same is true for the costs of production reported for prime products.  The reported cost of prime products must be equal to the cost of materials, fabrication and processing employed in producing those products.  Both prime and non-prime plate meet the definition of merchandise under consideration and there is no provision in the statute that would permit the shifting of the cost of production from one product of merchandise under consideration to another product of merchandise under consideration.

Commerce's shifting of production costs from non-prime products to prime products is also contrary to this Court's decision in *Dillinger France*.  In that decision, the Court explained the problem with Commerce's original determination regarding the treatment of non-prime plate as follows:

> Commerce accordingly adjusted Dillinger's reported costs for non-prime plate "to reflect the sales values recorded in {Dillinger's} normal books and records" and allocated the difference to the costs for Dillinger's prime plate.  In doing so, Commerce reduced the cost of non-prime plate and allocated a greater portion of cost to prime plate based on the selling price of non-prime plate.

Dillinger France, 981 F.3d at 1321 (citations omitted).  In striking down Commerce's determination, the Court specifically held that, because "Dillinger's books and records were based on 'likely selling price' rather than cost of production . . . , Commerce erred in relying on them."  Id. at 1324 (citation omitted).

Moreover, the reporting of a non-prime product's production costs based upon sales value was expressly struck down by this Court in <u>IPSCO, Inc. v. United States</u>, 965 F.2d 1056 (Fed. Cir. 1992). In that case, the Court struck down as "unreasonable" a methodology that would allocate production costs to the non-prime merchandise based upon market value, thereby reducing the allocated production costs for non-prime merchandise to below its actual cost of production. <u>Id</u>. at 1058-59. The Court explicitly found that "{b}y its terms, the statute expressly covers actual production costs" and the statute's broad language does not "authorize adjustment of these production costs to account for products of a lower grade or less value." <u>Id</u>. at 1059-60. The Court in *IPSCO* also found that reducing a product's cost of production to that product's ultimate selling price amounted to "circular reasoning" that "contravened the express requirements of the statute which set forth the cost of production as an independent standard for fair value." <u>IPSCO</u>, 965 F.2d at 1061.

*IPSCO* was expressly reaffirmed by this Court in *Dillinger France* with respect to precisely the same shifting of production costs from non-prime products to prime products done by Commerce in this case. In *Dillinger France*, the Court stated:

> Here, there is no dispute that Commerce relied on the likely selling price of non-prime plate in its determination of cost. Thus, if *IPSCO* governs, Commerce's reliance on Dillinger's books and records was

46

impermissible.

Dillinger France, 981 F.3d at 1322.  The Court went on to explain how *IPSCO* did

govern the case and that Commerce's actions in shifting production costs from

non-prime products to prime products was unlawful.  Id. at 1322-24.

Similar to this Court decisions in *Dillinger France* and *IPSCO*, the CIT in

*LG Chem* affirmed that a value-based cost methodology must be rejected as an

unreasonable circular methodology.  In that case, the CIT affirmed Commerce's

rejection of a value-based cost methodology due to the problem of "circularity,"

meaning that "prices are used to determine the product-specific costs which in turn

are either compared to those same prices or are used to construct prices (*i.e.*,

through the sales-below-cost test and constructed value)."  LG Chem, Ltd. v.

United States, 534 F. Supp. 3d 1386, 1394 (CIT 2021).

Accordingly, Commerce's shifting of production costs from non-prime

products to prime products and reporting the costs of non-prime products at their

average sales price is contrary to the express provisions of the antidumping statute.

**C.    The Claimed Factual Basis for Commerce's Use of Average
        Sales Price as the Cost of Production for Non-Prime Plate Is
        Not Supported by Any Evidence on the Administrative
        Record**

The only justification provided by Commerce for the use of the average

sales price of non-prime plate as the cost of production for that merchandise and

the shifting of costs to prime plate is its incorrect assertion that Dillinger uses "this precise accounting treatment in its audited financial statements." Redetermination III, 5 (Appx000115).  As detailed below, this claim is demonstrably false and, indeed, Commerce's redetermination does not cite to any record evidence supporting its statement.

The average sales value used by Commerce as the cost of production of non-prime plate was not taken from any audited financial statements or inventory records.  Rather, the source of the information was the narrative response to Dillinger's supplemental section D questionnaire on the question concerning the "quantity and value of non-prime, defective, and low quality plates sold during the POI." *See* Final COP Memo, Attachment 1 (Appx005986) (citing to Dillinger Supplemental Section D Questionnaire Response, 22) (Appx003954).  This figure has absolutely nothing to do with the costs of production.

The record evidence in this case shows that Dillinger does not separately classify prime products differently for inventory purposes, but rather assigns the same manufacturing costs to both prime and non-prime products.  These inventory values, without any distinction between prime and non-prime products, also tie directly to Dillinger's audited financial statements.  It is therefore a fundamental error for Commerce to claim that Dillinger uses the likely selling price of non-prime products as their costs "in its audited financial statements." *See*

Redetermination III, 15 (Appx000125).

As the record clearly shows, all costs related to the production of heavy plate, regardless of whether the plate is prime or non-prime, are booked to the same cost object/inventory account for heavy plate (*Grobbleche*).  Remand Questionnaire Response, 8-9 (Oct. 5, 2021) (Appx006099-6100).  There is no segregation in the costs of prime and non-prime material in Dillinger's books and records; nor is any "loss in value" on the sale of non-prime material transferred to the cost of production for prime material.  The single actual average cost reported in the heavy plate inventory for all plate is used as the basis for reporting inventory values and manufacturing costs in both the financial and cost accounting systems.  Id.  Indeed, Dillinger provided documentation tying the inventory value in this account at the end of the year to Dillinger's 2015 audited financial statements.  Id. at App. R-4 (Appx006160-6166).

At verification, Commerce also confirmed that Dillinger tracks actual consumption and actual production costs only by broad cost objects that reflect major production steps, such as slab or plate production.  Cost Verification Report, 6 (Jan. 27, 2017) (Appx005772).  Commerce specifically found that the actual cost system has only one cost object for heavy plate under which all the production costs for the merchandise under consideration ("MUC") were incurred.  Id.

Neither do the notes to Dillinger's audited financial statements show any

shifting of costs from non-prime to prime plate as erroneously claimed by

Commerce.  *See* <u>Redetermination III</u>, 14-15 (Appx000124-125).  The valuing of

inventory at the lower of cost or market value at the end of the fiscal year is a basic

accounting principle that does not in any way result in the shifting of costs from

non-prime to prime merchandise.  *See* <u>Reply Brief</u>, 16-17 (Appx006065-6066).

It is therefore a fundamental error for Commerce to claim that Dillinger uses

the likely selling price of non-prime products as their costs "in its audited financial

statements."  *See* <u>Redetermination III</u>, 15 (Appx000125).

Moreover, even if Dillinger's normal books and records had used the likely

selling price of non-prime plate as its costs of production, how an item is treated in

a respondent's accounting records is not determinative.  Rather, the costs of

production used in Commerce's antidumping duty calculations must reasonably

reflect a respondent's actual costs regardless of how costs are reported in a

respondent's books and records.  *See* 19 U.S.C. § 1677b(f)(1)(A).  This was the

clear holding of this Court in *Dillinger France* where the Court stated that

Commerce erred in relying on Dillinger France's books and records because they

"were based on 'likely selling price' rather than cost of production."  <u>Dillinger</u>

<u>France</u>, 981 F.3d at 1324.  This was also Commerce's clear determination in

*NEXTEEL* where it stated:

> {I}n *Dillinger*, the U.S. Court of Appeals for the Federal Circuit
> (CAFC) held that Commerce's CV calculation must reasonably reflect
> a respondent's actual cost, whether or not the respondent's books and
> records reflect such costs.

Final Results of Redetermination Pursuant to Ct. Remand, 7 (July 18, 2022) (Case

No. 1:20-cv-03898-CRK (ECF 96-1)) ("NEXTEEL Redetermination").

Because Dillinger does not classify prime and non-prime products

differently for inventory purposes, but rather assigns the same manufacturing costs

to both prime and non-prime products, this case is analogous to the situation

presented in *NEXTEEL*.  In that case, the CIT remanded the issue of the treatment

of non-prime material based upon this Court's decision in *Dillinger France*

because Commerce's methodology used the likely market value of the non-prime

product rather than the actual cost of production reported by the respondent,

NEXTEEL.  NEXTEEL Co. v. United States, 569 F. Supp. 3d 1354, 1371 (CIT

2022).

On remand, Commerce stopped reducing NEXTEEL's reported costs of

non-prime products based on resale value and instead accepted NEXTEEL's cost

reporting that assigned prime and non-prime products the same full cost.  In its

remand redetermination, Commerce stated:

> In the instant case, NEXTEEL does not separately classify prime
> products differently for inventory purposes, but rather assigns the
> same manufacturing costs to both prime and non-prime products.
> Moreover, in its normal books and records, NEXTEEL calculates the

cost for non-prime products in the same manner as prime products. Consequently, NEXTEEL's reported costs reflect the full actual costs of producing its prime and non-prime products as required in *Husteel*. Therefore, for purposes of this remand and consistent with the CAFC's decision in *Dillinger*, we have reversed the adjustment made in the Final Results and rely on what the CAFC referred to as the actual costs of prime and non-prime products as reported by NEXTEEL.

NEXTEEL Redetermination, 7-8 (footnotes omitted).  The CIT sustained

Commerce's remand redetermination on this point.  NEXTEEL Co. v. United

States, 601 F. Supp. 3d 1373, 1378 (CIT 2022).

This is exactly the same as Dillinger's situation in this case.  As detailed

above, Dillinger does not classify prime and non-prime products differently for

inventory purposes, but rather assigns the same manufacturing costs to both prime

and non-prime products.  Remand Questionnaire Response, 8-9 (Oct. 5, 2021);

(Appx006099-6100).  As this Court has stressed, "{a}n agency action is arbitrary

when the agency offers insufficient reasons for treating similar situations

differently."  SKF USA Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir.

2001).  Similarly, the CIT has made clear that a "fundamental principle of law and

justice is that like cases should be treated alike."  Anderson v. U.S. Sec'y of Agric.,

462 F. Supp. 2d 1333, 1339 (CIT 2006).

### D.    Commerce's Resort to Facts Available Does Not Justify the Use of Average Selling Price as Costs of Production

Beginning with its second remand redetermination, Commerce claimed that

52

it was using the average selling price of non-prime plate as the "best available

information on the record" for the "the actual product-specific costs of producing

non-prime products." Redetermination II, 40-41 (Appx000083-000084).

However, the average selling price of non-prime plate that Commerce imposes as

facts available is neither product-specific nor in any way related to the costs of

production. Rather, Commerce simply based the cost of production of each non-

prime product sold during the POI upon the same average selling price of the non-

prime products sold during the POI. This one average selling price of less than

350 Euros/ton bears no relation to the actual costs of producing the non-prime plate

and is less than the total cost of manufacture (TOTCOM) of any of the reported

CONNUMs. *See* Dillinger Comments in Opposition to Final Results of

Redetermination, 4-5 (Feb. 21, 2023) (Appx006295-6296) ("Comments in

Opposition to Redetermination III").

    From the very beginning of this investigation, Dillinger notified Commerce

of its difficulties in reporting all of the physical characteristics for non-prime plate.

*See* Notification of Difficulties in Responding to the Questionnaire & Contact with

Official in Charge, 1-2 (June 8, 2016) (Appx000360-361). As explained by

Dillinger, any plate that has been rejected as prime merchandise is sold by the

railcar load as "odds and ends" ("*Wildmassbleche*"). Any one railcar load can be

comprised of various different sizes and grades of plate. This plate is sold without

any warranty as to type, grade, specification or chemistry, and no grade/specification information is recorded in Dillinger's computerized sales records concerning these sales.  Id.; *see also*, Remand Questionnaire Response, 13-14 (Appx006104-6105).  Once the plate is down-graded as non-prime and placed on the pile, it loses all traceability to the original production order.

In its remand redetermination, Commerce acknowledged that:

> Dillinger has explained that its system does not record the physical characteristics of the non-prime products produced or the actual product-specific costs of producing the non-prime products.  Indeed, we acknowledge that Dillinger informed us of its inability to report the physical characteristics of non-prime products during the investigation.  Moreover, there is no evidence on the record to demonstrate that Dillinger does, in fact, track the physical characteristics of non-prime products produced or the actual product-specific costs of the non-prime products.

Redetermination II, 13 (Appx000056).

Therefore, Dillinger reported the costs of non-prime plate using the best and most specific actual cost information its books and records would allow.  Because non-prime plate can only be distinguished from prime plate at the end of the production process and therefore both types of plate use precisely the same materials and undergo precisely the same processing steps, Dillinger's reporting methodology of using the actual average cost of production of all plate during the POI is reasonable.  Dillinger properly based its cost reporting for non-prime merchandise on actual costs of production.  The cost of manufacture (COM) for

the non-prime CONNUMs reported by Dillinger corresponds to the average ***actual***

total cost of manufacture for all plate produced during the POI of nearly 550

EUR/ton.  *See* <u>Remand Questionnaire Response</u>, 6 & App. R-5 (Appx006097 &

Appx006167-6245).

This is precisely the same situation the Court encountered in *Dillinger*

*France*.  There the Court noted that, "{i}n reporting costs to Commerce, Dillinger

reported the cost of non-prime plate as equal to the ***average actual cost of all plate***

because, according to Dillinger, 'non-prime plate undergoes the same production

process as prime plate and . . . is not less costly to produce simply because it

cannot be sold at full price.'"  <u>Dillinger France</u>, 981 F.3d at 1321 (emphasis

added).  In *Dillinger France*, the Court raised no issue with the cost of non-prime

plate being based upon average actual costs.  Rather, the focus was upon

Commerce's reduction of the cost of non-prime plate and allocating a greater

portion of cost to prime plate based on the selling price of non-prime plate.  <u>Id</u>.

Instead of using the average actual total cost of manufacture reported by

Dillinger as the cost for non-prime plate, Commerce used the average resale price

of non-prime plate as the cost for non-prime plate and transferred the difference to

the cost for prime plate as it had done in the *Dillinger France* case.  <u>Final COP</u>

<u>Memo</u>, Attachment 1 (Appx005986).  Commerce fails to explain how the average

sales price of non-prime plate bears any relation to the cost of producing that

product.  Moreover, while Commerce criticized the average actual cost information reported by Dillinger as not "product-specific," the average sales value used by Commerce as facts available is neither product-specific nor related to actual costs.

As stated in the Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA"), the information Commerce uses as facts available must be "reasonable to use under the circumstances."  *See* Statement of Administrative Action, H.R. Rep. No. 103-316, at 869 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4198.  In fact, the SAA states that in cases involving the use of facts available, Commerce "must make {its} determinations based on all evidence of record, weighing the record evidence to determine that which is most probative of the issue under consideration."  Id.  Similarly, in *Shandong*, the CIT explained:

> The provisions of § 1677e(a) are known as "facts available," or "neutral facts available," and the guiding principle for choosing what facts to apply is accuracy in the given case.

Shandong Rongxin Imp. & Exp. Co., Ltd. v. United States, 355 F. Supp. 3d 1365, 1370 (CIT 2019).

Moreover, as this Court found in *Zhejiang*, Commerce can only use facts otherwise available to fill a gap in the record.  Zhejiang Dunan Hetian Metal Co. v. United States, 652 F.3d 1333, 1348 (Fed. Cir. 2011).  The informational gap to be filled in this current situation is the actual costs of production of non-prime

products. The statute expressly details that the reported cost of production for a product "shall be an amount equal" to "the cost of materials and of fabrication or other processing of any kind employed in producing" the product. 19 U.S.C. § 1677b(b)(3). Accordingly, the selection of facts available for the actual costs of non-prime products must correspond, as closely as possible, to the cost of materials, fabrication and other processing employed in producing the non-prime products.

Commerce may only use an inference that is adverse to the interests of a respondent in selecting from among the facts otherwise available if Commerce makes a separate determination that the respondent has failed to cooperate by not acting to the best of its ability to comply under 19 U.S.C. § 1677e(b). Zhejiang, 652 F.3d. at 1346 (citing Nippon Steel Corp. v. United States, 337 F.3d 1373, 1381 (Fed. Cir. 2003)). Commerce has made no such determination in this case.

The most reasonable calculation of the actual production costs of non-prime plate is the calculation reported by Dillinger. This information corresponds to the average actual total cost of manufacture for all plate sold during the POI. Remand Questionnaire Response, 6-7 & App. R-5 (Appx006097-6098 & Appx006167-6245). This amount was calculated using the total standard costs from the primary cost report and then adjusted to actual costs using a two-step cost variance, resulting in an average actual cost of production of approximately 550 Euros/ton.

Id. at App. R-5 (Appx006167-6245).

That the costs are an average does not diminish the fact that it is based upon actual costs of production. Non-prime plate can come from any steel grade and customer order and both types of plate use precisely the same materials and undergo precisely the same processing steps since non-prime plate can only be distinguished from prime plate at the end of the production process. Indeed, the average actual cost of production used by Dillinger is almost identical to the weighted-average total cost of manufacture (TOTCOM) of all reported CONNUMs. *See* Comments in Opposition to Redetermination III, 4-5 (Appx006295-6296). This is to be expected since non-prime plate can come from any steel grade and customer order.

It is an error for Commerce to replace this specific actual cost information with the average sales value of non-prime plate. This average sales value information bears no relation to the cost of materials, fabrication and other processing employed in producing the non-prime plate; nor is it more product-specific than the cost data reported by Dillinger.

## CONCLUSION AND RECOMMENDED APPELLATE REMEDY

In light of the foregoing, Plaintiff-Appellant requests that this Court enter judgment in its favor, reversing the judgment of the U.S. Court of International Trade and remanding the matter to the U.S. Department of Commerce with

instructions to recalculate Plaintiff-Appellant's weighted-average dumping margin by (1) no longer reassigning Dillinger's reported 759 quality code as the 760 quality code and (2) accepting the costs of production reported for prime and non-prime plate without any adjustment for market value.

Respectfully submitted,

/s/ Marc E. Montalbine

Marc E. Montalbine*
J. Kevin Horgan
Merisa A. Horgan
**deKieffer & Horgan, PLLC**
1156 Fifteenth St., N.W.
Suite 1101
Washington, DC 20005
(202) 783-6900

June 21, 2024                                         *Counsel for Plaintiff-Appellant*

_____

* Admitted to Virginia Bar; practice limited to Federal International Trade Matters pursuant to D.C. Bar Rule 49(c)(2).

ADDENDUM

will facilitate the marketing of cauliflower by providing the industry with more flexibility.

The official grade of a lot of cauliflower covered by these standards will be determined by the procedures set forth in the Regulations Governing Inspection, Certification, and Standards of Fresh Fruits, Vegetables and Other Products (7 CFR 51.1, 7 CFR 51.61).

The United States Standards for Grades of Cauliflower will be effective 30 days after publication of this notice in the **Federal Register**.

**Authority:** 7 U.S.C. 1621–1627.

Dated: May 19, 2017.

**Bruce Summers,**

*Acting Administrator, Agricultural Marketing Service.*

[FR Doc. 2017–10674 Filed 5–24–17; 8:45 am]

**BILLING CODE 3410–02–P**

---

# DEPARTMENT OF COMMERCE

## International Trade Administration

**[A–433–812, A–423–812, A–427–828, A–428–844, A–475–834, A–588–875, A–580–887, A–583–858]**

## Certain Carbon and Alloy Steel Cut-To-Length Plate From Austria, Belgium, France, the Federal Republic of Germany, Italy, Japan, the Republic of Korea, and Taiwan: Amended Final Affirmative Antidumping Determinations for France, the Federal Republic of Germany, the Republic of Korea and Taiwan, and Antidumping Duty Orders

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** Based on affirmative final determinations by the Department of Commerce (the Department) and the International Trade Commission (the ITC), the Department is issuing antidumping duty orders on certain carbon and alloy steel cut-to-length plate (CTL plate) from Austria, Belgium, France, the Federal Republic of Germany (Germany), Italy, Japan, the Republic of Korea (Korea), and Taiwan. In addition, the Department is amending its final affirmative determinations with respect to France, Germany, Korea, and Taiwan.

**DATES:** May 25, 2017.

**FOR FURTHER INFORMATION CONTACT:** Edythe Artman at (202) 482–3931 (Austria), Andrew Medley at (202) 482–6345 (Belgium), Terre Keaton Stefanova at (202) 482–1280 (France), David Goldberger at (202) 482–4136 (Germany), Alice Maldonado at (202)

482–4682 (Italy), Kabir Archuletta at (202) 482–2593 (Japan), Michael J. Heaney at (202) 482–4475 (Korea), or Tyler Weinhold (Taiwan) at (202) 482–1121, AD/CVD Operations, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW., Washington, DC 20230.

**SUPPLEMENTARY INFORMATION:**

## Background

In accordance with sections 735(d) and 777(i)(1) of the Tariff Act of 1930, as amended (the Act), and 19 CFR 351.210(c), on April 4, 2017, the Department published its affirmative final determinations in the less-than-fair-value (LTFV) investigations of CTL plate from Austria, Belgium, France, Germany, Italy, Japan, Korea, and Taiwan.[1] On May 18, 2017, the ITC notified the Department of its affirmative determination, pursuant to section 735(d) of the Act, that an industry in the United States is materially injured within the meaning of section 735(b)(1)(A)(i) of the Act, by reason of the LTFV imports of CTL plate from Austria, Belgium, France, Germany, Italy, Japan, Korea, and Taiwan, and its determination that critical circumstances do not exist with respect to imports of subject merchandise from Austria, Belgium, and Italy that are subject to the Department's affirmative critical circumstances findings.[2]

---

[1] *See Certain Carbon and Alloy Steel Cut-To-Length Plate from Austria: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances,* 82 FR 16366 (April 4, 2017); *Certain Carbon and Alloy Steel Cut-To-Length Plate from Belgium: Final Determination of Sales at Less Than Fair Value and Final Determination of Critical Circumstances, in Part,* 82 FR 16378 (April 4, 2017); *Certain Carbon and Alloy Steel Cut-To-Length Plate from France: Final Determination of Sales at Less Than Fair Value,* 82 FR 16363 (April 4, 2017) (*France Final*); *Certain Carbon and Alloy Steel Cut-To-Length Plate from the Federal Republic of Germany: Final Determination of Sales at Less Than Fair Value,* 82 FR 16360 (April 4, 2017) (*Germany Final*); *Certain Carbon and Alloy Steel Cut-to-Length Plate from Italy: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances,* 82 FR 16345 (April 4, 2017); *Certain Carbon and Alloy Steel Cut-To-Length Plate from Japan: Final Determination of Sales at Less Than Fair Value,* 82 FR 16349 (April 4, 2017); *Certain Carbon and Alloy Steel Cut-To-Length Plate from the Republic of Korea: Final Determination of Sales at Less Than Fair Value and Final Negative Critical Circumstances Determination,* 82 FR 16369 (April 4, 2017) (*Korea Final*); and *Certain Carbon and Alloy Steel Cut-To-Length Plate from Taiwan: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances Final,* 82 FR 16372 (April 4, 2017) (*Taiwan Final*).

[2] *See Letter regarding CTL plate from Austria, Belgium, France, Germany, Italy, Japan, Korea, and Taiwan Australia, Brazil, China, Indonesia, and Portugal (May 18, 2017) (ITC Letter). See also*

## Scope of the Orders

The merchandise covered by these orders is certain CTL plate. *See* Appendix A for Austria, Belgium, France, Germany, and Italy, Appendix B for Korea, Appendix C for Japan, and Appendix D for Taiwan.

## Amendment to Final Determinations

A ministerial error is defined as an error in addition, subtraction, or other arithmetic function, clerical error resulting from inaccurate copying, duplication, or the like, and any other similar type of unintentional error which the Secretary considers ministerial.[3]

## France Amended Final Determination

Pursuant to section 735(e) of the Act and 19 CFR 351.224(e) and (f), the Department is amending the *France Final* to reflect the correction of ministerial errors in the final estimated weighted-average dumping margin calculated for Dillinger France S.A. (Dillinger France). In addition, because Dillinger France's estimated weighted-average dumping margin is the basis for the estimated weighted-average dumping margin determined for all other French producers and exporters of subject merchandise, we also are revising the "all-others" rate in *France Final.*[4][5]

## Germany Amended Final Determination

Pursuant to section 735(e) of the Act and 19 CFR 351.224(e) and (f), the Department is amending the *Germany Final* to reflect the correction of a ministerial error in the final estimated weighted-average dumping margin calculated for AG der Dillinger Hüttenwerke (Dillinger Germany). In addition, because the Department determined the estimated weighted-average dumping margin for all other German producers and exporters of subject merchandise based on a weighted-average of the respondents' estimated weighted-average dumping margins using publicly-ranged quantities for their sales of subject

---

*Carbon and Alloy Steel Cut-to-Length Plate from Austria, Belgium, France, Germany, Italy, Japan, Korea, and Taiwan Investigation Nos. 701–TA–561 and 731–TA–1317–1318, 1321–1325, and 1327 (Final)* USITC Publication 4691 (May 2017) (ITC Report).

[3] *See* section 735(e) of the Act and 19 CFR 351.224(f).

[4] *See* "Estimated Weighted-Average Dumping Margins" section below.

[5] *See* Memorandum, "Less-Than-Fair-Value Investigation of Certain Carbon and Alloy Steel Cut-To-Length Plate from France: Allegation of Ministerial Error in the Final Determination," dated April 28, 2017.

merchandise, we also are revising the "all-others" rate in *Germany Final.*[6][7]

### Korea Amended Final Determination

Pursuant to section 735(e) of the Act and 19 CFR 351.224(e) and (f), the Department is amending the *Korea Final* to reflect the correction of ministerial errors in the final estimated weighted-average dumping margin calculated for POSCO. In addition, because POSCO's estimated weighted-average dumping margin is the basis for the estimated weighted-average dumping margin for all other Korean producers and exporters of subject merchandise, we also are revising the "all-others" rate in *Korea Final.*[8][9]

### Taiwan Amended Final Determination

Pursuant to section 735(e) of the Act and 19 CFR 351.224(e) and (f), the Department is amending the *Taiwan Final* to reflect the correction of a ministerial error in the final estimated weighted-average dumping margin calculated for China Steel Corporation. In addition, because the Department determined the estimated weighted-average dumping margin for all other Taiwanese producers and exporters of subject merchandise based on a simple average of the respondents' estimated weighted-average dumping margins, we also are revising the "all-others" rate in *Taiwan Final.*[10][11] In addition, in the *Taiwan Final,* we identified an error in the scope language for Taiwan included in the Appendix. *See* Appendix D, below, for the corrected scope language.

### Antidumping Duty Orders

As stated above, on May 18, 2017, in accordance with sections 735(b)(1)(A)(i) and 735(d) of the Act, the ITC notified the Department of its determination that the industry in the United States producing CTL plate is materially injured with respect to CTL plate from

Austria, Belgium, France, Germany, Italy, Japan, Korea, and Taiwan and its determination that critical circumstances do not exist with respect to imports of subject merchandise from Austria, Belgium, and Italy that are subject to the Department's affirmative critical circumstances finding[12] Therefore, in accordance with section 735(c)(2) of the Act, we are issuing these antidumping duty orders. Because the ITC determined that imports of CTL plate from Austria, Belgium, France, Germany, Italy, Japan, Korea, and Taiwan are materially injuring a U.S. industry, unliquidated entries of such merchandise from Austria, Belgium, France, Germany, Italy, Japan, Korea, and Taiwan, entered or withdrawn from warehouse for consumption, are subject to the assessment of antidumping duties.

Therefore, in accordance with section 736(a)(1) of the Act, the Department will direct U.S. Customs and Border Protection (CBP) to assess, upon further instruction by the Department, antidumping duties equal to the amount by which the NV of the merchandise exceeds the export price (or constructed export price) of the merchandise, for all relevant entries of CTL plate from Austria, Belgium, France, Germany, Italy, Japan, Korea, and Taiwan. Antidumping duties will be assessed on unliquidated entries of CTL plate from Austria, Belgium, France, Germany, Italy, Japan, Korea, and Taiwan entered, or withdrawn from warehouse, for consumption on or after November 14, 2016, the date of publication of the preliminary determinations,[13] but will

not include entries occurring after the expiration of the provisional measures period and before publication in the **Federal Register** of the ITC's injury determination as further described below.

### Continuation of Suspension of Liquidation

In accordance with section 735(c)(1)(B) of the Act, we will instruct CBP to continue to suspend liquidation on all relevant entries of CTL plate from Austria, Belgium, France, Germany, Italy, Japan, Korea, and Taiwan. These instructions suspending liquidation will remain in effect until further notice.

We will also instruct CBP to require cash deposits for estimated antidumping duties equal to the amounts as indicated below. Accordingly, effective on the date of publication in the **Federal Register** of the ITC's affirmative injury determinations, CBP will require, at the same time as importers would normally deposit estimated duties on this subject merchandise, a cash deposit equal to the estimated weighted-average dumping margins listed below.[14] The relevant "all-others" rates apply to all producers or exporters not specifically listed, as appropriate.

### Provisional Measures

Section 733(d) of the Act states that instructions issued pursuant to an affirmative preliminary determination may not remain in effect for more than four months, except where exporters representing a significant proportion of exports of the subject merchandise request the Department to extend that four-month period to no more than six months. At the request of exporters that account for a significant proportion of exports of CTL plate from Austria, Belgium, France, Germany, Italy, Japan, Korea, and Taiwan, we extended the four-month period to six months in each proceeding.[15] In the underlying investigations, the Department published the preliminary determinations on November 14, 2016. Therefore, the extended period, beginning on the date of publication of the preliminary determinations, ended on May 12, 2017.

Therefore, in accordance with section 733(d) of the Act and our practice, we

---

[6] *See* the "Estimated Weighted-Average Dumping Margins" section below.

[7] *See* Memorandum, "Less-Than-Fair-Value Investigation of Certain Carbon and Alloy Steel Cut-To-Length Plate from Germany: Allegation of Ministerial Error in the Final Determination," dated May 2, 2017.

[8] *See* the "Estimated Weighted-Average Dumping Margins" section below.

[9] *See* Memorandum, "Antidumping Duty Less-Than-Fair-Value Investigation of Certain Carbon and Alloy Steel Cut-To-Length Plate from the Republic of Korea: Allegation of Ministerial Error in the Final Determination," dated concurrently with this notice.

[10] *See* the "Estimated Weighted-Average Dumping Margins" section below.

[11] *See* Memorandum, "Amended Final Determination of the Less-Than-Fair-Value Investigation of Carbon and Alloy Steel Cut-To-Length Plate from Taiwan: Allegation of Ministerial Error for China Steel Corporation," dated concurrently with this notice.

[12] *See* ITC Letter and ITC Report.

[13] *See Certain Carbon and Alloy Steel Cut-To-Length Plate from Austria: Preliminary Determination of Sales at Less Than Fair Value and Postponement of the Final Determination,* 81 FR 79416 (November 14, 2016) (*Austria Prelim*); *Certain Carbon and Alloy Steel Cut-To-Length Plate from Belgium: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination,* 81 FR 79431 (November 14, 2016) (*Belgium Prelim*); *Certain Carbon and Alloy Steel Cut-To-Length Plate from France: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination,* 81 FR 79437 (November 14, 2016) (*France Prelim*); *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination,* 81 FR 79446 (November 14, 2016) (*Germany Prelim*); *Certain Carbon and Alloy Steel Cut-To-Length Plate from Italy: Preliminary Determination of Sales at Less Than Fair Value, Affirmative Determination of Critical Circumstances, and Postponement of Final Determination,* 81 FR 79423 (November 14, 2016) (*Italy Prelim*); *Certain Carbon and Alloy Steel Cut-To-Length Plate from Japan: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination,* 81 FR 79427 (November 14, 2016) (*Japan Prelim*); *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Affirmative Preliminary*

*Determination of Sales at Less Than Fair Value and Postponement of Final Determination,* 81 FR 79441 (November 14, 2016) (*Korea Prelim*); and *Certain Carbon and Alloy Steel Cut-To-Length Plate from Taiwan: Preliminary Determination of Sales at Less Than Fair Value,* 81 FR 79420 (November 14, 2016) (*Taiwan Prelim*).

[14] *See* section 736(a)(3) of the Act.

[15] *See Austria Prelim, Belgium Prelim, France Prelim, Germany Prelim, Italy Prelim, Japan Prelim, Korea Prelim,* and *Taiwan Prelim.*

will instruct CBP to terminate the suspension of liquidation and to liquidate, without regard to antidumping duties, unliquidated entries of CTL plate from Austria, Belgium, France, Germany, Italy, Japan, Korea, and Taiwan entered, or withdrawn from warehouse, for consumption after May 12, 2017, the date on which the provisional measures expired, until and through the day preceding the date of publication of the ITC's injury determinations in the **Federal Register**. Suspension of liquidation will resume on the date of publication of the ITC's determination in the **Federal Register**.

## Critical Circumstances

With regard to the ITC's negative critical circumstances determination on imports of CTL plate from Austria, Belgium, and Italy, we will instruct CBP to lift suspension and to refund any cash deposits made to secure the payment of estimated antidumping duties with respect to entries of subject merchandise entered, or withdrawn from warehouse, for consumption on or after August 16, 2016 (*i.e.,* 90 days prior to the date of publication of the *Austria Prelim, Belgium Prelim,* and *Italy Prelim*), but before November 14, 2016 (*i.e.,* the date of publication of the *Austria Prelim, Belgium Prelim,* and *Italy Prelim*).

## Estimated Weighted-Average Dumping Margins

The estimated weighted-average dumping margins for each antidumping order are as follows:

| | Producer/exporter | Estimated weighted-average dumping margin (percent) |
|---|---|---|
| Austria ........................... | Bohler Bleche GmbH & Co KG, Bohler Edelstahl GmbH & Co KG, Bohler International GmbH, voestalpine Grobblech GmbH, and voestalpine Steel Service Center GmbH. | 53.72 |
| | All Others .................................................................................................................... | 53.72 |
| Belgium ......................... | Industeel Belgium S.A .................................................................................................. | 5.40 |
| | NLMK Clabecq S.A., NLMK Plate Sales S.A., NLMK Sales Europe S.A., NLMK Manage Steel Center S.A., and/or NLMK La Louviere S.A. | 51.78 |
| | All Others .................................................................................................................... | 5.40 |
| France ........................... | Dillinger France S.A ..................................................................................................... | 6.15 |
| | Industeel France S.A .................................................................................................... | 148.02 |
| | All Others .................................................................................................................... | 6.15 |
| Germany ........................ | AG der Dillinger Hüttenwerke ...................................................................................... | 5.52 |
| | Ilsenburger Grobblech GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Flachstahl GmbH, and Salzgitter Mannesmann International GmbH. | 22.90 |
| | All Others .................................................................................................................... | 21.04 |
| Italy .............................. | NLMK Verona SpA ........................................................................................................ | 22.19 |
| | Officine Tecnosider s.r.l ............................................................................................... | 6.08 |
| | Marcegaglia SpA .......................................................................................................... | 22.19 |
| | All Others .................................................................................................................... | 6.08 |
| Japan ............................ | Tokyo Steel Manufacturing Co., Ltd ............................................................................ | 14.79 |
| | JFE Steel Corporation .................................................................................................. | 48.67 |
| | Shimabun Corporation .................................................................................................. | 48.67 |
| | All Others .................................................................................................................... | 14.79 |
| Korea ............................ | POSCO ......................................................................................................................... | 7.10 |
| | All Others .................................................................................................................... | 7.10 |
| Taiwan ........................... | China Steel Corporation ............................................................................................... | 75.42 |
| | Shang Chen Steel Co., Ltd .......................................................................................... | 3.62 |
| | All Others .................................................................................................................... | 39.52 |

## Notifications to Interested Parties

This notice constitutes the antidumping duty orders with respect to CTL plate from Austria, Belgium, France, Germany, Italy, Japan, Korea, and Taiwan pursuant to section 736(a) of the Act. Interested parties can find a list of antidumping duty orders currently in effect at *http:// enforcement.trade.gov/stats/ iastats1.html.*

These amended final determinations and orders are published in accordance with sections 735(e) and 736(a) of the Act and 19 CFR 351.210(c), 351.211(b), and 351.224(e) and (f).

Dated: May 19, 2017.

Ronald K. Lorentzen,

*Acting Assistant Secretary for Enforcement and Compliance.*

## APPENDICES

### (A) Scope of the Orders for CTL Plate From Austria, Belgium, France, Germany, and Italy

The products covered by these orders are certain carbon and alloy steel hot-rolled or forged flat plate products not in coils, whether or not painted, varnished, or coated with plastics or other non-metallic substances (cut-to-length plate). Subject merchandise includes plate that is produced by being cut-to-length from coils or from other discrete length plate and plate that is rolled or forged into a discrete length. The products covered include (1) Universal mill plates (*i.e.,* flat-rolled products rolled on four faces or in a closed box pass, of a width exceeding 150 mm but not exceeding 1250 mm, and of a thickness of not less than 4 mm, which are not in coils and without patterns in relief), and (2) hot-rolled or forged flat steel products of a thickness of 4.75 mm or more and of a width which exceeds 150 mm and measures at least twice the thickness, and which are not in coils, whether or not with patterns in relief. The covered products described above may be rectangular, square, circular or other shapes and include products of either rectangular or non-rectangular cross-section where such non-rectangular cross-section is achieved subsequent to the rolling process, *i.e.,* products which have been "worked after rolling" (*e.g.,* products which have been beveled or rounded at the edges).

For purposes of the width and thickness requirements referenced above, the following rules apply:

(1) Except where otherwise stated where the nominal and actual thickness or width

measurements vary, a product from a given subject country is within the scope if application of either the nominal or actual measurement would place it within the scope based on the definitions set forth above, and

(2) where the width and thickness vary for a specific product (*e.g.*, the thickness of certain products with non-rectangular cross-section, the width of certain products with non-rectangular shape, *etc.*), the measurement at its greatest width or thickness applies.

Steel products included in the scope of this order are products in which: (1) Iron predominates, by weight, over each of the other contained elements; and (2) the carbon content is 2 percent or less by weight.

Subject merchandise includes cut-to-length plate that has been further processed in the subject country or a third country, including but not limited to pickling, oiling, levelling, annealing, tempering, temper rolling, skin passing, painting, varnishing, trimming, cutting, punching, beveling, and/or slitting, or any other processing that would not otherwise remove the merchandise from the scope of the order if performed in the country of manufacture of the cut-to-length plate.

All products that meet the written physical description, are within the scope of this order unless specifically excluded or covered by the scope of an existing order. The following products are outside of, and/or specifically excluded from, the scope of this order:

(1) Products clad, plated, or coated with metal, whether or not painted, varnished or coated with plastic or other non-metallic substances;

(2) military grade armor plate certified to one of the following specifications or to a specification that references and incorporates one of the following specifications:

- MIL–A–12560,
- MIL–DTL–12560H,
- MIL–DTL–12560J,
- MIL–DTL–12560K,
- MIL–DTL–32332,
- MIL–A–46100D,
- MIL–DTL–46100–E,
- MIL–46177C,
- MIL–S–16216K Grade HY80,
- MIL–S–16216K Grade HY100,
- MIL–S–24645A HSLA–80;
- MIL–S–24645A HSLA–100,
- T9074–BD–GIB–010/0300 Grade HY80,
- T9074–BD–GIB–010/0300 Grade HY100,
- T9074–BD–GIB–010/0300 Grade HSLA80,
- T9074–BD–GIB–010/0300 Grade HSLA100, and
- T9074–BD–GIB–010/0300 Mod. Grade HSLA115,

except that any cut-to-length plate certified to one of the above specifications, or to a military grade armor specification that references and incorporates one of the above specifications, will not be excluded from the scope if it is also dual- or multiple-certified to any other non-armor specification that otherwise would fall within the scope of this order;

(3) stainless steel plate, containing 10.5 percent or more of chromium by weight and not more than 1.2 percent of carbon by weight;

(4) CTL plate meeting the requirements of ASTM A–829, Grade E 4340 that are over 305 mm in actual thickness;

(5) Alloy forged and rolled CTL plate greater than or equal to 152.4 mm in actual thickness meeting each of the following requirements:

(a) Electric furnace melted, ladle refined & vacuum degassed and having a chemical composition (expressed in weight percentages):

- Carbon 0.23–0.28,
- Silicon 0.05–0.20,
- Manganese 1.20–1.60,
- Nickel not greater than 1.0,
- Sulfur not greater than 0.007,
- Phosphorus not greater than 0.020,
- Chromium 1.0–2.5,
- Molybdenum 0.35–0.80,
- Boron 0.002–0.004,
- Oxygen not greater than 20 ppm,
- Hydrogen not greater than 2 ppm, and
- Nitrogen not greater than 60 ppm;

(b) With a Brinell hardness measured in all parts of the product including mid thickness falling within one of the following ranges:

(i) 270–300 HBW,
(ii) 290–320 HBW, or
(iii) 320–350HBW;

(c) Having cleanliness in accordance with ASTM E45 method A (Thin and Heavy): A not exceeding 1.5, B not exceeding 1.0, C not exceeding 0.5, D not exceeding 1.5; and

(d) Conforming to ASTM A578–S9 ultrasonic testing requirements with acceptance criteria 2 mm flat bottom hole;

(6) Alloy forged and rolled steel CTL plate over 407 mm in actual thickness and meeting the following requirements:

(a) Made from Electric Arc Furnace melted, Ladle refined & vacuum degassed, alloy steel with the following chemical composition (expressed in weight percentages):

- Carbon 0.23–0.28,
- Silicon 0.05–0.15,
- Manganese 1.20–1.50,
- Nickel not greater than 0.4,
- Sulfur not greater than 0.010,
- Phosphorus not greater than 0.020,
- Chromium 1.20–1.50,
- Molybdenum 0.35–0.55,
- Boron 0.002–0.004,
- Oxygen not greater than 20 ppm,
- Hydrogen not greater than 2 ppm, and
- Nitrogen not greater than 60 ppm;

(b) Having cleanliness in accordance with ASTM E45 method A (Thin and Heavy): A not exceeding 1.5, B not exceeding 1.5, C not exceeding 1.0, D not exceeding 1.5;

(c) Having the following mechanical properties:

(i) With a Brinell hardness not more than 237 HBW measured in all parts of the product including mid thickness; and having a Yield Strength of 75ksi min and UTS 95ksi or more, Elongation of 18% or more and Reduction of area 35% or more; having charpy V at −75 degrees F in the longitudinal direction equal or greater than 15 ft. lbs (single value) and equal or greater than 20 ft. lbs (average of 3 specimens) and conforming to the requirements of NACE MR01–75; or

(ii) With a Brinell hardness not less than 240 HBW measured in all parts of the product including mid thickness; and having a Yield Strength of 90 ksi min and UTS 110 ksi or more, Elongation of 15% or more and

Reduction of area 30% or more; having charpy V at −40 degrees F in the longitudinal direction equal or greater than 21 ft. lbs (single value) and equal or greater than 31 ft. lbs (average of 3 specimens);

(d) Conforming to ASTM A578–S9 ultrasonic testing requirements with acceptance criteria 3.2 mm flat bottom hole; and

(e) Conforming to magnetic particle inspection in accordance with AMS 2301;

(7) Alloy forged and rolled steel CTL plate over 407 mm in actual thickness and meeting the following requirements:

(a) Made from Electric Arc Furnace melted, ladle refined & vacuum degassed, alloy steel with the following chemical composition (expressed in weight percentages):

- Carbon 0.25–0.30,
- Silicon not greater than 0.25,
- Manganese not greater than 0.50,
- Nickel 3.0–3.5,
- Sulfur not greater than 0.010,
- Phosphorus not greater than 0.020,
- Chromium 1.0–1.5,
- Molybdenum 0.6–0.9,
- Vanadium 0.08 to 0.12
- Boron 0.002–0.004,
- Oxygen not greater than 20 ppm,
- Hydrogen not greater than 2 ppm, and
- Nitrogen not greater than 60 ppm.

(b) Having cleanliness in accordance with ASTM E45 method A (Thin and Heavy): A not exceeding 1.0(t) and 0.5(h), B not exceeding 1.5(t) and 1.0(h), C not exceeding 1.0(t) and 0.5(h), and D not exceeding 1.5(t) and 1.0(h);

(c) Having the following mechanical properties: A Brinell hardness not less than 350 HBW measured in all parts of the product including mid thickness; and having a Yield Strength of 145ksi or more and UTS 160ksi or more, Elongation of 15% or more and Reduction of area 35% or more; having charpy V at −40 degrees F in the transverse direction equal or greater than 20 ft. lbs (single value) and equal or greater than 25 ft. lbs (average of 3 specimens);

(d) Conforming to ASTM A578–S9 ultrasonic testing requirements with acceptance criteria 3.2 mm flat bottom hole; and

(e) Conforming to magnetic particle inspection in accordance with AMS 2301.

The products subject to the order are currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under item numbers: 7208.40.3030, 7208.40.3060, 7208.51.0030, 7208.51.0045, 7208.51.0060, 7208.52.0000, 7211.13.0000, 7211.14.0030, 7211.14.0045, 7225.40.1110, 7225.40.1180, 7225.40.3005, 7225.40.3050, 7226.20.0000, and 7226.91.5000.

The products subject to the order may also enter under the following HTSUS item numbers: 7208.40.6060, 7208.53.0000, 7208.90.0000, 7210.70.3000, 7210.90.9000, 7211.19.1500, 7211.19.2000, 7211.19.4500, 7211.19.6000, 7211.19.7590, 7211.90.0000, 7212.40.1000, 7212.40.5000, 7212.50.0000, 7214.10.0000, 7214.30.0010, 7214.30.0080, 7214.91.0015, 7214.91.0060, 7214.91.0090, 7225.11.0000, 7225.19.0000, 7225.40.5110, 7225.40.5130, 7225.40.5160, 7225.40.7000, 7225.99.0010, 7225.99.0090, 7226.11.1000, 7226.11.9060, 7226.19.1000, 7226.19.9000,

7226.91.0500, 7226.91.1530, 7226.91.1560, 7226.91.2530, 7226.91.2560, 7226.91.7000, 7226.91.8000, and 7226.99.0180.

The HTSUS subheadings above are provided for convenience and customs purposes only. The written description of the scope of the order is dispositive.

**(B) Scope of the Order for CTL Plate From Korea**

The products covered by this order are certain carbon and alloy steel hot-rolled or forged flat plate products not in coils, whether or not painted, varnished, or coated with plastics or other non-metallic substances (cut-to-length plate). Subject merchandise includes plate that is produced by being cut-to-length from coils or from other discrete length plate and plate that is rolled or forged into a discrete length. The products covered include (1) Universal mill plates (i.e., flat-rolled products rolled on four faces or in a closed box pass, of a width exceeding 150 mm but not exceeding 1250 mm, and of a thickness of less than 4 mm, which are not in coils and without patterns in relief), and (2) hot-rolled or forged flat steel products of a thickness of 4.75 mm or more and of a width which exceeds 150 mm and measures at least twice the thickness, and which are not in coils, whether or not with patterns in relief. The covered products described above may be rectangular, square, circular or other shapes and include products of either rectangular or non-rectangular cross-section where such non-rectangular cross-section is achieved subsequent to the rolling process, i.e., products which have been ''worked after rolling'' (e.g., products which have been beveled or rounded at the edges).

For purposes of the width and thickness requirements referenced above, the following rules apply:

(1) except where otherwise stated where the nominal and actual thickness or width measurements vary, a product from a given subject country is within the scope if application of either the nominal or actual measurement would place it within the scope based on the definitions set forth above unless the product is already covered by an order existing on that specific country (i.e., Certain Hot Rolled Steel Flat Products from Australia, Brazil, Japan, the Republic of Korea, the Netherlands, the Republic of Turkey, and the United Kingdom: Amended Final Affirmative Antidumping Determinations for Australia, the Republic of Korea, and the Republic of Turkey and Antidumping Duty Orders, 81 FR 67962 (October 3, 2016), and

(2) where the width and thickness vary for a specific product (e.g., the thickness of certain products with non-rectangular cross-section, the width of certain products with non-rectangular shape, etc.), the measurement at its greatest width or thickness applies.

Steel products included in the scope of this order are products in which: (1) iron predominates, by weight, over each of the other contained elements; and (2) the carbon content is 2 percent or less by weight.

Subject merchandise includes cut-to-length plate that has been further processed in the subject country or a third country, including but not limited to pickling, oiling, levelling, annealing, tempering, temper rolling, skin passing, painting, varnishing, trimming, cutting, punching, beveling, and/or slitting, or any other processing that would not otherwise remove the merchandise from the scope of the order if performed in the country of manufacture of the cut-to-length plate.

All products that meet the written physical description, are within the scope of this order unless specifically excluded or covered by the scope of an existing order. The following products are outside of, and/or specifically excluded from, the scope of this order:

(1) products clad, plated, or coated with metal, whether or not painted, varnished or coated with plastic or other non-metallic substances;

(2) military grade armor plate certified to one of the following specifications or to a specification that references and incorporates one of the following specifications:

- MIL–A–12560,
- MIL–DTL–12560H,
- MIL–DTL–12560J,
- MIL–DTL–12560K,
- MIL–DTL–32332,
- MIL–A–46100D,
- MIL–DTL–46100–E,
- MIL–46177C,
- MIL–S–16216K Grade HY80,
- MIL–S–16216K Grade HY100,
- MIL–S–24645A HSLA–80;
- MIL–S–24645A HSLA–100,
- T9074–BD–GIB–010/0300 Grade HY80,
- T9074–BD–GIB–010/0300 Grade HY100,
- T9074–BD–GIB–010/0300 Grade HSLA80,
- T9074–BD–GIB–010/0300 Grade HSLA100, and
- T9074–BD–GIB–010/0300 Mod. Grade HSLA115,

except that any cut-to-length plate certified to one of the above specifications, or to a military grade armor specification that references and incorporates one of the above specifications, will not be excluded from the scope if it is also dual- or multiple-certified to any other non-armor specification that otherwise would fall within the scope of this order;

(3) stainless steel plate, containing 10.5 percent or more of chromium by weight and not more than 1.2 percent of carbon by weight;

(4) CTL plate meeting the requirements of ASTM A–829, Grade E 4340 that are over 305 mm in actual thickness;

(5) Alloy forged and rolled CTL plate greater than or equal to 152.4 mm in actual thickness meeting each of the following requirements:

(a) Electric furnace melted, ladle refined & vacuum degassed and having a chemical composition (expressed in weight percentages):

- Carbon 0.23–0.28,
- Silicon 0.05–0.20,
- Manganese 1.20–1.60,
- Nickel not greater than 1.0,
- Sulfur not greater than 0.007,
- Phosphorus not greater than 0.020,
- Chromium 1.0–2.5,
- Molybdenum 0.35–0.80,
- Boron 0.002–0.004,
- Oxygen not greater than 20 ppm,

- Hydrogen not greater than 2 ppm, and
- Nitrogen not greater than 60 ppm;

(b) With a Brinell hardness measured in all parts of the product including mid thickness falling within one of the following ranges:

(i) 270–300 HBW,
(ii) 290–320 HBW, or
(iii) 320–350HBW;

(c) Having cleanliness in accordance with ASTM E45 method A (Thin and Heavy) A not exceeding 1.5, B not exceeding 1.0, C not exceeding 0.5, D not exceeding 1.5; and

(d) Conforming to ASTM A578–S9 ultrasonic testing requirements with acceptance criteria 2 mm flat bottom hole;

(6) Alloy forged and rolled steel CTL plate over 407 mm in actual thickness and meeting the following requirements:

(a) Made from Electric Arc Furnace melted, Ladle refined & vacuum degassed, alloy steel with the following chemical composition (expressed in weight percentages):

- Carbon 0.23–0.28,
- Silicon 0.05–0.15,
- Manganese 1.20–1.50,
- Nickel not greater than 0.4,
- Sulfur not greater than 0.010,
- Phosphorus not greater than 0.020,
- Chromium 1.20–1.50,
- Molybdenum 0.35–0.55,
- Boron 0.002–0.004,
- Oxygen not greater than 20 ppm,
- Hydrogen not greater than 2 ppm, and
- Nitrogen not greater than 60 ppm;

(b) Having cleanliness in accordance with ASTM E45 method A (Thin and Heavy) A not exceeding 1.5, B not exceeding 1.5, C not exceeding 1.0, D not exceeding 1.5;

(c) Having the following mechanical properties:

(i) With a Brinell hardness not more than 237 HBW measured in all parts of the product including mid thickness; and having a Yield Strength of 75ksi min and UTS 95ksi or more, Elongation of 18% or more and Reduction of area 35% or more; having charpy V at -75 degrees F in the longitudinal direction equal or greater than 15 ft. lbs (single value) and equal or greater than 20 ft. lbs (average of 3 specimens) and conforming to the requirements of NACE MR01–75; or

(ii) With a Brinell hardness not less than 240 HBW measured in all parts of the product including mid thickness; and having a Yield Strength of 90 ksi min and UTS 110 ksi or more, Elongation of 15% or more and Reduction of area 30% or more; having charpy V at -40 degrees F in the longitudinal direction equal or greater than 21 ft. lbs (single value) and equal or greater than 31 ft. lbs (average of 3 specimens);

(d) Conforming to ASTM A578–S9 ultrasonic testing requirements with acceptance criteria 3.2 mm flat bottom hole; and

(e) Conforming to magnetic particle inspection in accordance with AMS 2301;

(7) Alloy forged and rolled CTL plate over 407 mm in actual thickness and meeting the following requirements:

(a) Made from Electric Arc Furnace melted, ladle refined & vacuum degassed, alloy steel with the following chemical composition (expressed in weight percentages):

- Carbon 0.25–0.30,

- Silicon not greater than 0.25,
- Manganese not greater than 0.50,
- Nickel 3.0–3.5,
- Sulfur not greater than 0.010,
- Phosphorus not greater than 0.020,
- Chromium 1.0–1.5,
- Molybdenum 0.6–0.9,
- Vanadium 0.08 to 0.12
- Boron 0.002–0.004,
- Oxygen not greater than 20 ppm,
- Hydrogen not greater than 2 ppm, and
- Nitrogen not greater than 60 ppm.

(b) Having cleanliness in accordance with ASTM E45 method A (Thin and Heavy): A not exceeding 1.0(t) and 0.5(h), B not exceeding 1.5(t) and 1.0(h), C not exceeding 1.0(t) and 0.5(h), and D not exceeding 1.5(t) and 1.0(h);

(c) Having the following mechanical properties: A Brinell hardness not less than 350 HBW measured in all parts of the product including mid thickness; and having a Yield Strength of 145ksi or more and UTS 160ksi or more, Elongation of 15% or more and Reduction of area 35% or more; having charpy V at -40 degrees F in the transverse direction equal or greater than 20 ft. lbs (single value) and equal or greater than 25 ft. lbs (average of 3 specimens);

(d) Conforming to ASTM A578–S9 ultrasonic testing requirements with acceptance criteria 3.2 mm flat bottom hole; and

(e) Conforming to magnetic particle inspection in accordance with AMS 2301.

At the time of the filing of the petition, there was an existing antidumping duty order on certain cut-to-length carbon-quality steel plate products from Korea. *See Notice of Final Determination of Sales at Less Than Fair Value: Certain Cut-To-Length Carbon-Quality Steel Plate Products from Korea,* 64 FR 73,196 (Dep't Commerce Dec. 29, 1999), as amended, 65 FR 6,585 (Dep't Commerce Feb 10, 2000) (1999 Korea AD Order). The scope of the antidumping duty order with regard to cut-to-length plate from Korea covers only (1) subject cut-to-length plate not within the physical description of cut-to-length carbon quality steel plate in the 1999 Korea AD Order, regardless of producer or exporter; and (2) cut-to-length plate produced and/or exported by those companies that were excluded or revoked from the 1999 Korea AD Order as of April 8, 2016. The only revoked or excluded company is Pohang Iron and Steel Company, also known as POSCO.

The products subject to the order are currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under item numbers: 7208.40.3030, 7208.40.3060, 7208.51.0030, 7208.51.0045, 7208.51.0060, 7208.52.0000, 7211.13.0000, 7211.14.0030, 7211.14.0045, 7225.40.1110, 7225.40.1180, 7225.40.3005, 7225.40.3050, 7226.20.0000, and 7226.91.5000.

The products subject to the order may also enter under the following HTSUS item numbers: 7208.40.6060, 7208.53.0000, 7208.90.0000, 7210.70.3000, 7210.90.9000, 7211.19.1500, 7211.19.2000, 7211.19.4500, 7211.19.6000, 7211.19.7590, 7211.90.0000, 7212.40.1000, 7212.40.5000, 7212.50.0000, 7214.10.0000, 7214.30.0010, 7214.30.0080, 7214.91.0015, 7214.91.0060, 7214.91.0090, 7225.11.0000, 7225.19.0000, 7225.40.5110,

7225.40.5130, 7225.40.5160, 7225.40.7000, 7225.99.0010, 7225.99.0090, 7226.11.1000, 7226.11.9060, 7226.19.1000, 7226.19.9000, 7226.91.0500, 7226.91.1530, 7226.91.1560, 7226.91.2530, 7226.91.2560, 7226.91.7000, 7226.91.8000, and 7226.99.0180.

The HTSUS subheadings above are provided for convenience and customs purposes only. The written description of the scope of the order is dispositive.

**(C) Scope of the Order for CTL Plate From Japan**

The products covered by this order are certain carbon and alloy steel hot-rolled or forged flat plate products not in coils, whether or not painted, varnished, or coated with plastics or other non-metallic substances (cut-to-length plate). Subject merchandise includes plate that is produced by being cut-to-length from coils or from other discrete length plate and plate that is rolled or forged into a discrete length. The products covered include (1) Universal mill plates (*i.e.,* flat-rolled products rolled on four faces or in a closed box pass, of a width exceeding 150 mm but not exceeding 1250 mm, and of a thickness of not less than 4 mm, which are not in coils and without patterns in relief), and (2) hot-rolled or forged flat steel products of a thickness of 4.75 mm or more and of a width which exceeds 150 mm and measures at least twice the thickness, and which are not in coils, whether or not with patterns in relief. The covered products described above may be rectangular, square, circular or other shapes and include products of either rectangular or non-rectangular cross-section where such non-rectangular cross-section is achieved subsequent to the rolling process, *i.e.,* products which have been "worked after rolling" (*e.g.,* products which have been beveled or rounded at the edges).

For purposes of the width and thickness requirements referenced above, the following rules apply:

(1) except where otherwise stated where the nominal and actual thickness or width measurements vary, a product from a given subject country is within the scope if application of either the nominal or actual measurement would place it within the scope based on the definitions set forth above unless the product is already covered by an order existing on that specific country (*i.e., Certain Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, the Republic of Korea, the Netherlands, and the Republic of Turkey, and the United Kingdom: Amended Final Affirmative Antidumping Determinations for Australia, the Republic of Korea, and the Republic of Turkey and Antidumping Duty Orders,* 81 FR 67962 (October 3, 2016), and

(2) where the width and thickness vary for a specific product (*e.g.,* the thickness of certain products with non-rectangular cross-section, the width of certain products with non-rectangular shape, *etc.*), the measurement at its greatest width or thickness applies.

Steel products included in the scope of this order are products in which: (1) Iron predominates, by weight, over each of the other contained elements; and (2) the carbon content is 2 percent or less by weight.

Subject merchandise includes cut-to-length plate that has been further processed in the subject country or a third country, including but not limited to pickling, oiling, levelling, annealing, tempering, temper rolling, skin passing, painting, varnishing, trimming, cutting, punching, beveling, and/or slitting, or any other processing that would not otherwise remove the merchandise from the scope of the order if performed in the country of manufacture of the cut-to-length plate.

All products that meet the written physical description, are within the scope of this order unless specifically excluded or covered by the scope of an existing order. The following products are outside of, and/or specifically excluded from, the scope of this order:

(1) products clad, plated, or coated with metal, whether or not painted, varnished or coated with plastic or other non-metallic substances;

(2) military grade armor plate certified to one of the following specifications or to a specification that references and incorporates one of the following specifications:

- MIL–A–12560,
- MIL–DTL–12560H,
- MIL–DTL–12560J,
- MIL–DTL–12560K,
- MIL–DTL–32332,
- MIL–A–46100D,
- MIL–DTL–46100–E,
- MIL–46177C,
- MIL–S–16216K Grade HY80,
- MIL–S–16216K Grade HY100,
- MIL–S–24645A HSLA–80;
- MIL–S–24645A HSLA–100,
- T9074–BD–GIB–010/0300 Grade HY80,
- T9074–BD–GIB–010/0300 Grade HY100,
- T9074–BD–GIB–010/0300 Grade HSLA80,
- T9074–BD–GIB–010/0300 Grade HSLA100, and
- T9074–BD–GIB–010/0300 Mod. Grade HSLA115,

except that any cut-to-length plate certified to one of the above specifications, or to a military grade armor specification that references and incorporates one of the above specifications, will not be excluded from the scope if it is also dual- or multiple-certified to any other non-armor specification that otherwise would fall within the scope of this order;

(3) stainless steel plate, containing 10.5 percent or more of chromium by weight and not more than 1.2 percent of carbon by weight;

(4) CTL plate meeting the requirements of ASTM A–829, Grade E 4340 that are over 305 mm in actual thickness;

(5) Alloy forged and rolled CTL plate greater than or equal to 152.4 mm in actual thickness meeting each of the following requirements:

(a) Electric furnace melted, ladle refined & vacuum degassed and having a chemical composition (expressed in weight percentages):

- Carbon 0.23–0.28,
- Silicon 0.05–0.20,
- Manganese 1.20–1.60,
- Nickel not greater than 1.0,
- Sulfur not greater than 0.007,
- Phosphorus not greater than 0.020,
- Chromium 1.0–2.5,
- Molybdenum 0.35–0.80,

- Boron 0.002–0.004,
- Oxygen not greater than 20 ppm,
- Hydrogen not greater than 2 ppm, and
- Nitrogen not greater than 60 ppm;

(b) With a Brinell hardness measured in all parts of the product including mid thickness falling within one of the following ranges:

(i) 270–300 HBW,

(ii) 290–320 HBW, or

(iii) 320–350HBW;

(c) Having cleanliness in accordance with ASTM E45 method A (Thin and Heavy): A not exceeding 1.5, B not exceeding 1.0, C not exceeding 0.5, D not exceeding 1.5; and

(d) Conforming to ASTM A578–S9 ultrasonic testing requirements with acceptance criteria 2 mm flat bottom hole;

(6) Alloy forged and rolled steel CTL plate over 407 mm in actual thickness and meeting the following requirements:

(a) Made from Electric Arc Furnace melted, Ladle refined & vacuum degassed, alloy steel with the following chemical composition (expressed in weight percentages):

- Carbon 0.23–0.28,
- Silicon 0.05–0.15,
- Manganese 1.20–1.50,
- Nickel not greater than 0.4,
- Sulfur not greater than 0.010,
- Phosphorus not greater than 0.020,
- Chromium 1.20–1.50,
- Molybdenum 0.35–0.55,
- Boron 0.002–0.004,
- Oxygen not greater than 20 ppm,
- Hydrogen not greater than 2 ppm, and
- Nitrogen not greater than 60 ppm;

(b) Having cleanliness in accordance with ASTM E45 method A (Thin and Heavy): A not exceeding 1.5, B not exceeding 1.5, C not exceeding 1.0, D not exceeding 1.5;

(c) Having the following mechanical properties:

(i) With a Brinell hardness not more than 237 HBW measured in all parts of the product including mid thickness; and having a Yield Strength of 75ksi min and UTS 95ksi or more, Elongation of 18% or more and Reduction of area 35% or more; having charpy V at -75 degrees F in the longitudinal direction equal or greater than 15 ft. lbs (single value) and equal or greater than 20 ft. lbs (average of 3 specimens) and conforming to the requirements of NACE MR01–75; or

(ii) With a Brinell hardness not less than 240 HBW measured in all parts of the product including mid thickness; and having a Yield Strength of 90 ksi min and UTS 110 ksi or more, Elongation of 15% or more and Reduction of area 30% or more; having charpy V at -40 degrees F in the longitudinal direction equal or greater than 21 ft. lbs (single value) and equal or greater than 31 ft. lbs (average of 3 specimens);

(d) Conforming to ASTM A578–S9 ultrasonic testing requirements with acceptance criteria 3.2 mm flat bottom hole; and

(e) Conforming to magnetic particle inspection in accordance with AMS 2301;

(7) Alloy forged and rolled steel CTL plate over 407 mm in actual thickness and meeting the following requirements:

(a) Made from Electric Arc Furnace melted, ladle refined & vacuum degassed, alloy steel with the following chemical composition (expressed in weight percentages):

- Carbon 0.25–0.30,
- Silicon not greater than 0.25,
- Manganese not greater than 0.50,
- Nickel 3.0–3.5,
- Sulfur not greater than 0.010,
- Phosphorus not greater than 0.020,
- Chromium 1.0–1.5,
- Molybdenum 0.6–0.9,
- Vanadium 0.08 to 0.12
- Boron 0.002–0.004,
- Oxygen not greater than 20 ppm,
- Hydrogen not greater than 2 ppm, and
- Nitrogen not greater than 60 ppm.

(b) Having cleanliness in accordance with ASTM E45 method A (Thin and Heavy): A not exceeding 1.0(t) and 0.5(h), B not exceeding 1.5(t) and 1.0(h), C not exceeding 1.0(t) and 0.5(h), and D not exceeding 1.5(t) and 1.0(h);

(c) Having the following mechanical properties: A Brinell hardness not less than 350 HBW measured in all parts of the product including mid thickness; and having a Yield Strength of 145ksi or more and UTS 160ksi or more, Elongation of 15% or more and Reduction of area 35% or more; having charpy V at -40 degrees F in the transverse direction equal or greater than 20 ft. lbs (single value) and equal or greater than 25 ft. lbs (average of 3 specimens);

(d) Conforming to ASTM A578–S9 ultrasonic testing requirements with acceptance criteria 3.2 mm flat bottom hole; and

(e) Conforming to magnetic particle inspection in accordance with AMS 2301.

The products subject to the order are currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under item numbers: 7208.40.3030, 7208.40.3060, 7208.51.0030, 7208.51.0045, 7208.51.0060, 7208.52.0000, 7211.13.0000, 7211.14.0030, 7211.14.0045, 7225.40.1110, 7225.40.1180, 7225.40.3005, 7225.40.3050, 7226.20.0000, and 7226.91.5000.

The products subject to the order may also enter under the following HTSUS item numbers: 7208.40.6060, 7208.53.0000, 7208.90.0000, 7210.70.3000, 7210.90.9000, 7211.19.1500, 7211.19.2000, 7211.19.4500, 7211.19.6000, 7211.19.7590, 7211.90.0000, 7212.40.1000, 7212.40.5000, 7212.50.0000, 7214.10.0000, 7214.30.0010, 7214.30.0080, 7214.91.0015, 7214.91.0060, 7214.91.0090, 7225.11.0000, 7225.19.0000, 7225.40.5110, 7225.40.5130, 7225.40.5160, 7225.40.7000, 7225.99.0010, 7225.99.0090, 7226.11.1000, 7226.11.9060, 7226.19.1000, 7226.19.9000, 7226.91.0500, 7226.91.1530, 7226.91.1560, 7226.91.2530, 7226.91.2560, 7226.91.7000, 7226.91.8000, and 7226.99.0180.

The HTSUS subheadings above are provided for convenience and customs purposes only. The written description of the scope of the order is dispositive.

## (D) Scope of the Order for CTL Plate From Taiwan

The products covered by this order are certain carbon and alloy steel hot-rolled or forged flat plate products not in coils, whether or not painted, varnished, or coated with plastics or other non-metallic substances (cut-to-length plate). Subject merchandise includes plate that is produced by being cut-to-length from coils or from other discrete length plate and plate that is rolled or forged into a discrete length. The products covered include (1) Universal mill plates (*i.e.,* flat-rolled products rolled on four faces or in a closed box pass, of a width exceeding 150 mm but not exceeding 1250 mm, and of a thickness of not less than 4 mm, which are not in coils and without patterns in relief), and (2) hot-rolled or forged flat steel products of a thickness of 4.75 mm or more and of a width which exceeds 150 mm and measures at least twice the thickness, and which are not in coils, whether or not with patterns in relief. The covered products described above may be rectangular, square, circular or other shapes and include products of either rectangular or non-rectangular cross-section where such non-rectangular cross-section is achieved subsequent to the rolling process, *i.e.,* products which have been "worked after rolling" (*e.g.,* products which have been beveled or rounded at the edges).

For purposes of the width and thickness requirements referenced above, the following rules apply:

(1) except where otherwise stated where the nominal and actual thickness or width measurements vary, a product from a given subject country is within the scope if application of either the nominal or actual measurement would place it within the scope based on the definitions set forth above unless the product is already covered by an order existing on that specific country (i.e. *Notice of Antidumping Duty Order; Certain Hot-Rolled Carbon Steel Flat Products From Taiwan,* 66 FR 59563 (November 29, 2001)); and

(2) where the width and thickness vary for a specific product (*e.g.,* the thickness of certain products with non-rectangular cross-section, the width of certain products with non-rectangular shape, *etc.*), the measurement at its greatest width or thickness applies.

Steel products included in the scope of this order are products in which: (1) Iron predominates, by weight, over each of the other contained elements; and (2) the carbon content is 2 percent or less by weight.

Subject merchandise includes cut-to-length plate that has been further processed in the subject country or a third country, including but not limited to pickling, oiling, levelling, annealing, tempering, temper rolling, skin passing, painting, varnishing, trimming, cutting, punching, beveling, and/or slitting, or any other processing that would not otherwise remove the merchandise from the scope of the order if performed in the country of manufacture of the cut-to-length plate.

All products that meet the written physical description, are within the scope of this order unless specifically excluded or covered by the scope of an existing order. The following products are outside of, and/or specifically excluded from, the scope of this order:

(1) Products clad, plated, or coated with metal, whether or not painted, varnished or coated with plastic or other non-metallic substances;

(2) military grade armor plate certified to one of the following specifications or to a specification that references and incorporates one of the following specifications:

- MIL–A–12560,
- MIL–DTL–12560H,
- MIL–DTL–12560J,
- MIL–DTL–12560K,
- MIL–DTL–32332,
- MIL–A–46100D,
- MIL–DTL–46100–E,
- MIL–46177C,
- MIL–S–16216K Grade HY80,
- MIL–S–16216K Grade HY100,
- MIL–S–24645A HSLA–80,
- MIL–S–24645A HSLA–100,
- T9074–BD–GIB–010/0300 Grade HY80,
- T9074–BD–GIB–010/0300 Grade HY100,
- T9074–BD–GIB–010/0300 Grade HSLA80,
- T9074–BD–GIB–010/0300 Grade HSLA100, and
- T9074–BD–GIB–010/0300 Mod. Grade HSLA115,

except that any cut-to-length plate certified to one of the above specifications, or to a military grade armor specification that references and incorporates one of the above specifications, will not be excluded from the scope if it is also dual- or multiple-certified to any other non-armor specification that otherwise would fall within the scope of this order;

(3) stainless steel plate, containing 10.5 percent or more of chromium by weight and not more than 1.2 percent of carbon by weight;

(4) CTL plate meeting the requirements of ASTM A–829, Grade E 4340 that are over 305 mm in actual thickness;

(5) Alloy forged and rolled CTL plate greater than or equal to 152.4 mm in actual thickness meeting each of the following requirements:

(a) Electric furnace melted, ladle refined & vacuum degassed and having a chemical composition (expressed in weight percentages):

- Carbon 0.23–0.28,
- Silicon 0.05–0.20,
- Manganese 1.20–1.60,
- Nickel not greater than 1.0,
- Sulfur not greater than 0.007,
- Phosphorus not greater than 0.020,
- Chromium 1.0–2.5,
- Molybdenum 0.35–0.80,
- Boron 0.002–0.004,
- Oxygen not greater than 20 ppm,
- Hydrogen not greater than 2 ppm, and
- Nitrogen not greater than 60 ppm;

(b) With a Brinell hardness measured in all parts of the product including mid thickness falling within one of the following ranges:
(i) 270–300 HBW,
(ii) 290–320 HBW, or
(iii) 320–350HBW;

(c) Having cleanliness in accordance with ASTM E45 method A (Thin and Heavy): A not exceeding 1.5, B not exceeding 1.0, C not exceeding 0.5, D not exceeding 1.5; and

(d) Conforming to ASTM A578–S9 ultrasonic testing requirements with acceptance criteria 2 mm flat bottom hole;

(6) Alloy forged and rolled steel CTL plate over 407 mm in actual thickness and meeting the following requirements:

(a) Made from Electric Arc Furnace melted, Ladle refined & vacuum degassed, alloy steel with the following chemical composition (expressed in weight percentages):

- Carbon 0.23–0.28,
- Silicon 0.05–0.15,
- Manganese 1.20–1.50,
- Nickel not greater than 0.4,
- Sulfur not greater than 0.010,
- Phosphorus not greater than 0.020,
- Chromium 1.20–1.50,
- Molybdenum 0.35–0.55,
- Boron 0.002–0.004,
- Oxygen not greater than 20 ppm,
- Hydrogen not greater than 2 ppm, and
- Nitrogen not greater than 60 ppm;

(b) Having cleanliness in accordance with ASTM E45 method A (Thin and Heavy): A not exceeding 1.5, B not exceeding 1.5, C not exceeding 1.0, D not exceeding 1.5;

(c) Having the following mechanical properties:

(i) With a Brinell hardness not more than 237 HBW measured in all parts of the product including mid thickness; and having a Yield Strength of 75ksi min and UTS 95ksi or more, Elongation of 18% or more and Reduction of area 35% or more; having charpy V at −75 degrees F in the longitudinal direction equal or greater than 15 ft. lbs (single value) and equal or greater than 20 ft. lbs (average of 3 specimens) and conforming to the requirements of NACE MR01–75; or

(ii) With a Brinell hardness not less than 240 HBW measured in all parts of the product including mid thickness; and having a Yield Strength of 90 ksi min and UTS 110 ksi or more, Elongation of 15% or more and Reduction of area 30% or more; having charpy V at −40 degrees F in the longitudinal direction equal or greater than 21 ft. lbs (single value) and equal or greater than 31 ft. lbs (average of 3 specimens);

(d) Conforming to ASTM A578–S9 ultrasonic testing requirements with acceptance criteria 3.2 mm flat bottom hole; and

(e) Conforming to magnetic particle inspection in accordance with AMS 2301;

(7) Alloy forged and rolled steel CTL plate over 407 mm in actual thickness and meeting the following requirements:

(a) Made from Electric Arc Furnace melted, ladle refined & vacuum degassed, alloy steel with the following chemical composition (expressed in weight percentages):

- Carbon 0.25–0.30,
- Silicon not greater than 0.25,
- Manganese not greater than 0.50,
- Nickel 3.0–3.5,
- Sulfur not greater than 0.010,
- Phosphorus not greater than 0.020,
- Chromium 1.0–1.5,
- Molybdenum 0.6–0.9,
- Vanadium 0.08 to 0.12
- Boron 0.002–0.004,
- Oxygen not greater than 20 ppm,
- Hydrogen not greater than 2 ppm, and
- Nitrogen not greater than 60 ppm.

(b) Having cleanliness in accordance with ASTM E45 method A (Thin and Heavy): A not exceeding 1.0(t) and 0.5(h), B not exceeding 1.5(t) and 1.0(h), C not exceeding 1.0(t) and 0.5(h), and D not exceeding 1.5(t) and 1.0(h);

(c) Having the following mechanical properties: A Brinell hardness not less than 350 HBW measured in all parts of the product including mid thickness; and having

a Yield Strength of 145ksi or more and UTS 160ksi or more, Elongation of 15% or more and Reduction of area 35% or more; having charpy V at −40 degrees F in the transverse direction equal or greater than 20 ft. lbs (single value) and equal or greater than 25 ft. lbs (average of 3 specimens);

(d) Conforming to ASTM A578–S9 ultrasonic testing requirements with acceptance criteria 3.2 mm flat bottom hole; and

(e) Conforming to magnetic particle inspection in accordance with AMS 2301.

The products subject to the order are currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under item numbers: 7208.40.3030, 7208.40.3060, 7208.51.0030, 7208.51.0045, 7208.51.0060, 7208.52.0000, 7211.13.0000, 7211.14.0030, 7211.14.0045, 7225.40.1110, 7225.40.1180, 7225.40.3005, 7225.40.3050, 7226.20.0000, and 7226.91.5000.

The products subject to the order may also enter under the following HTSUS item numbers: 7208.40.6060, 7208.53.0000, 7208.90.0000, 7210.70.3000, 7210.90.9000, 7211.19.1500, 7211.19.2000, 7211.19.4500, 7211.19.6000, 7211.19.7590, 7211.90.0000, 7212.40.1000, 7212.40.5000, 7212.50.0000, 7214.10.0000, 7214.30.0010, 7214.30.0080, 7214.91.0015, 7214.91.0060, 7214.91.0090, 7225.11.0000, 7225.19.0000, 7225.40.5110, 7225.40.5130, 7225.40.5160, 7225.40.7000, 7225.99.0010, 7225.99.0090, 7226.11.1000, 7226.11.9060, 7226.19.1000, 7226.19.9000, 7226.91.0500, 7226.91.1530, 7226.91.1560, 7226.91.2530, 7226.91.2560, 7226.91.7000, 7226.91.8000, and 7226.99.0180.

The HTSUS subheadings above are provided for convenience and customs purposes only. The written description of the scope of the order is dispositive.

[FR Doc. 2017–10757 Filed 5–24–17; 8:45 am]

**BILLING CODE 3510–DS–P**

---

# DEPARTMENT OF COMMERCE

## International Trade Administration

### [C–580–888]

### Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea: Countervailing Duty Order

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.
**SUMMARY:** Based on affirmative final determinations by the Department of Commerce (the Department) and the International Trade Commission (the ITC), the Department is issuing a countervailing duty (CVD) order on certain carbon and alloy steel cut-to-length plate (CTL plate) from the Republic of Korea (Korea).
**DATES:** May 25, 2017.
**FOR FURTHER INFORMATION CONTACT:** Yasmin Bordas at (202) 482–3813 or John Corrigan (202) 482–7438, AD/CVD Operations, Office VI, Enforcement and Compliance, International Trade

## Preliminary Determinations by the ITC

The ITC will preliminarily determine, within 45 days after the date on which the Petitions were filed, whether there is a reasonable indication that imports of silicon metal from Australia, Brazil, and/or Kazakhstan are materially injuring, or threatening material injury to, a U.S. industry.[33] A negative ITC determination will result in the investigation being terminated with respect to that country.[34] Otherwise, these investigations will proceed according to statutory and regulatory time limits.

## Submission of Factual Information

Factual information is defined in 19 CFR 351.102(b)(21) as: (i) Evidence submitted in response to questionnaires; (ii) evidence submitted in support of allegations; (iii) publicly available information to value factors under 19 CFR 351.408(c) or to measure the adequacy of remuneration under 19 CFR 351.511(a)(2); (iv) evidence placed on the record by the Department; and (v) evidence other than factual information described in (i)–(iv). Any party, when submitting factual information, must specify under which subsection of 19 CFR 351.102(b)(21) the information is being submitted and, if the information is submitted to rebut, clarify, or correct factual information already on the record, to provide an explanation identifying the information which the factual information seeks to rebut, clarify, or correct. Time limits for the submission of factual information are addressed in 19 CFR 351.301, which provides specific time limits based on the type of factual information being submitted. Parties should review the regulations prior to submitting factual information in these investigations.

## Extension of Time Limits Regulation

Parties may request an extension of time limits before the expiration of a time limit established under 19 CFR 351.301, or as otherwise specified by the Secretary. In general, an extension request will be considered untimely if it is filed after the expiration of the time limit established under 19 CFR 351.301. For submissions that are due from multiple parties simultaneously, an extension request will be considered untimely if it is filed after 10:00 a.m. on the due date. Under certain circumstances, we may elect to specify a different time limit by which extension requests will be considered untimely for submissions which are due

from multiple parties simultaneously. In such a case, we will inform parties in the letter or memorandum setting forth the deadline (including a specified time) by which extension requests must be filed to be considered timely. An extension request must be made in a separate, stand-alone submission; under limited circumstances we will grant untimely-filed requests for the extension of time limits. Review *Extension of Time Limits; Final Rule,* 78 FR 57790 (September 20, 2013), available at *http://www.gpo.gov/fdsys/pkg/FR-2013-09-20/html/2013-22853.htm,* prior to submitting factual information in these investigations.

## Certification Requirements

Any party submitting factual information in an AD or CVD proceeding must certify to the accuracy and completeness of that information.[35] Parties are hereby reminded that revised certification requirements are in effect for company/government officials, as well as their representatives. Investigations initiated on the basis of petitions filed on or after August 16, 2013, and other segments of any AD or CVD proceedings initiated on or after August 16, 2013, should use the formats for the revised certifications provided at the end of the *Final Rule.*[36] The Department intends to reject factual submissions if the submitting party does not comply with the applicable revised certification requirements.

## Notification to Interested Parties

Interested parties must submit applications for disclosure under APO in accordance with 19 CFR 351.305. On January 22, 2008, the Department published *Antidumping and Countervailing Duty Proceedings: Documents Submission Procedures; APO Procedures,* 73 FR 3634 (January 22, 2008). Parties wishing to participate in these investigations should ensure that they meet the requirements of these procedures (*e.g.,* the filing of letters of appearance as discussed at 19 CFR 351.103(d)).

This notice is issued and published pursuant to sections 702 and 777(i) of the Act.

---

[33] *See* section 703(a)(2) of the Act.
[34] *See* section 703(a)(1) of the Act.
[35] *See* section 782(b) of the Act.
[36] *See Certification of Factual Information To Import Administration During Antidumping and Countervailing Duty Proceedings,* 78 FR 42678 (July 17, 2013) ("*Final Rule*"); *see also* frequently asked questions regarding the *Final Rule,* available at *http://enforcement.trade.gov/tlei/notices/factual_info_final_rule_FAQ_07172013.pdf.*

---

Dated: March 28, 2017.

**Ronald K. Lorentzen,**
*Acting Assistant Secretary for Enforcement and Compliance.*

## Appendix I

### Scope of the Investigations

The scope of these investigation covers all forms and sizes of silicon metal, including silicon metal powder. Silicon metal contains at least 85.00 percent but less than 99.99 percent silicon, and less than 4.00 percent iron, by actual weight. Semiconductor grade silicon (merchandise containing at least 99.99 percent silicon by actual weight and classifiable under Harmonized Tariff Schedule of the United States (HTSUS) subheading 2804.61.0000) is excluded from the scope of these investigations.

Silicon metal is currently classifiable under subheadings 2804.69.1000 and 2804.69.5000 of the HTSUS. While HTSUS numbers are provided for convenience and customs purposes, the written description of the scope remains dispositive.

[FR Doc. 2017–06622 Filed 4–3–17; 8:45 am]

**BILLING CODE 3510–DS–P**

---

# DEPARTMENT OF COMMERCE

## International Trade Administration

[A–428–844]

### Certain Carbon and Alloy Steel Cut-to-Length Plate From the Federal Republic of Germany: Final Determination of Sales at Less Than Fair Value

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (the Department) determines that certain carbon and alloy steel cut-to-length plate (CTL plate) from the Federal Republic of Germany (Germany) is being, or is likely to be, sold in the United States at less than fair value (LTFV). The period of investigation (POI) is April 1, 2015, through March 31, 2016. The final dumping margins of sales at LTFV are listed below in the "Final Determination" section of this notice.

**DATES:** Effective April 4, 2017.

**FOR FURTHER INFORMATION CONTACT:** Ross Belliveau or David Goldberger, AD/CVD Operations, Office II, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW., Washington, DC 20230; telephone: (202) 482–4952 and (202) 482–4136, respectively.

**SUPPLEMENTARY INFORMATION:**

**Federal Register** / Vol. 82, No. 63 / Tuesday, April 4, 2017 / Notices    **16361**

## Background

On November 14, 2016, the Department published the *Preliminary Determination* of sales at LTFV of CTL plate from Germany.[1] On November 29, 2016, we amended our *Preliminary Determination.*[2] A summary of the events that occurred since the Department published the *Preliminary Determination,* as well as a full discussion of the issues raised by parties for this final determination, may be found in the Issues and Decision Memorandum, which is hereby adopted by this notice.[3]

## Scope of the Investigation

The scope of the investigation covers CTL plate from Germany. For a complete description of the scope of the investigation, *see* Appendix I.

## Analysis of Comments Received

All issues raised in the case and rebuttal briefs by parties in this investigation are addressed in the Issues and Decision Memorandum. A list of the issues raised is attached to this notice as Appendix II. The Issues and Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *https:// access.trade.gov,* and it is available to all parties in the Central Records Unit, room B–8024 of the main Department of Commerce building. In addition, a complete version of the Issues and Decision Memorandum can be accessed directly at *http://enforcement.trade.gov/ frn/index.html.* The signed and electronic versions of the Issues and Decision Memorandum are identical in content.

## Verification

As provided in section 782(i) of the Tariff Act of 1930, as amended (the Act), in November and December 2016, we

conducted verification of the sales and cost information submitted by AG der Dillinger Hüttenwerke (Dillinger) and Ilsenburger Grobblech GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Flachstahl GmbH, and Salzgitter Mannesmann International GmbH (collectively, Salzgitter) for use in our final determination. We used standard verification procedures, including an examination of relevant accounting and production records, and original source documents provided by Dillinger and Salzgitter.[4]

## Changes Since the Preliminary Determination

Based on our analysis of the comments received and our findings at verification, we made certain changes to the margin calculations for Dillinger and Salzgitter. For a discussion of these changes, *see* the "Margin Calculations" section of the Issues and Decision Memorandum.

## All-Others Rate

Section 735(c)(5)(A) of the the Act provides that the estimated all-others rate shall be an amount equal to the weighted average of the estimated weighted-average dumping margins established for exporters and producers individually investigated excluding any zero or *de minimis* margins, and margins determined entirely under section 776 of the Act.

For the final determination, the Department calculated the all-others

rate based on a weighted average of Dillinger's and Salzgitter's margins using publicly-ranged quantities of their sales of subject merchandise.[5]

## Final Determination

The final weighted-average dumping margins are as follows:

| Exporter/manufacturer | Weighted-average dumping margins (percent) |
|---|---|
| AG der Dillinger Hüttenwerke ... | 5.38 |
| Ilsenburger Grobblech GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Flachstahl GmbH, and Salzgitter Mannesmann International GmbH ...................... | 22.90 |
| All Others .................................. | 21.03 |

## Disclosure

We will disclose the calculations performed within five days of the date of publication of this notice to parties in this proceeding in accordance with 19 CFR 351.224(b).

## Continuation of Suspension of Liquidation

In accordance with section 735(c)(1)(B) of the Act, the Department will instruct U.S. Customs and Border Protection (CBP) to continue to suspend liquidation of all appropriate entries of CTL plate from Germany, as described in Appendix I of this notice, which were entered, or withdrawn from warehouse, for consumption on or after November 14, 2016, the date of publication of the preliminary determination of this investigation in the **Federal Register**.

Further, the Department will instruct CBP to require a cash deposit equal to the estimated amount by which the normal value exceeds the U.S. price as shown above.

---

[1] *See Certain Carbon and Alloy Steel Cut-to-Length Plate From the Federal Republic of Germany: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination,* 81 FR 79446 (November 14, 2016) (*Preliminary Determination*).

[2] *See Certain Carbon and Alloy Steel Cut-to-Length Plate From the Federal Republic of Germany: Amended Preliminary Determination of Sales at Less Than Fair Value,* 81 FR 85930 (November 29, 2016) (Amended Preliminary Determination).

[3] *See* Memorandum, "Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate From Germany," dated concurrently with this notice (Issues and Decision Memorandum).

[4] For discussion of our verification findings, *see* the following memoranda: Memorandum, "Verification of the Sales Response of AG der Dillinger Hüttenwerke in the Antidumping Duty Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate From Germany," dated December 20, 2016; Memorandum, "Verification of Berg Steel Pipe Corp. in the Antidumping Duty Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate From Germany," dated January 4, 2017; Memorandum, "Verification of the Cost Response of Salzgitter AG in the Antidumping Duty Investigation of Certain Carbon and Alloy Steel Cut-To-Length Plate from Federal Republic of Germany," dated January 4, 2017; Memorandum, "Verification of the Sales Response of Berg Steel Pipe Corp. in the Antidumping Duty Investigation of Certain Carbon and Alloy Steel Cut-To-Length Plate from the Federal Republic of Germany," dated January 25, 2017; Memorandum, "Verification of the Home Market Sales Response of Salzgitter Mannesmann Grobblech GmbH in the Antidumping Duty Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate From the Federal Republic of Germany," dated January 31, 2017; Memorandum, "Verification of the Sales Response of Salzgitter Mannesmann International GmbH in the Antidumping Duty Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate From the Federal Republic of Germany," dated February 1, 2017; Memorandum, "Verification of the Sales Response of Salzgitter Mannesmann Stahlhandel GmbH International GmbH in the Antidumping Duty Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate From the Federal Republic of Germany," dated February 1, 2017.

[5] *See* Memorandum, "Certain Carbon and Alloy Steel Cut-to-Length Plate From Germany: Calculation of the Final Margin for All Other Companies," dated March 29, 2017. With two respondents, we normally calculate (A) a weighted-average of the dumping margins calculated for the mandatory respondents; (B) a simple average of the dumping margins calculated for the mandatory respondents; and (C) a weighted-average of the dumping margins calculated for the mandatory respondents using each company's publicly-ranged values for the merchandise under consideration. We compare (B) and (C) to (A) and select the rate closest to (A) as the most appropriate rate for all other companies. *See Ball Bearings and Parts Thereof From France, Germany, Italy, Japan, and the United Kingdom: Final Results of Antidumping Duty Administrative Reviews, Final Results of Changed-Circumstances Review, and Revocation of an Order in Part,* 75 FR 53661, 53663 (September 1, 2010).

**16362**   **Federal Register** / Vol. 82, No. 63 / Tuesday, April 4, 2017 / Notices

## International Trade Commission (ITC) Notification

In accordance with section 735(d) of the Act, we will notify the ITC of the final affirmative determination of sales at LTFV. Because this final determination in this proceeding is affirmative, in accordance with section 735(b)(2) of the Act, the ITC will make its final determination as to whether the domestic industry in the United States is materially injured, or threatened with material injury, by reason of imports of CTL plate from Germany no later than 45 days after our final determination. If the ITC determines that material injury or threat of material injury does not exist, the proceeding will be terminated and all cash deposits will be refunded. If the ITC determines that such injury does exist, the Department will issue an antidumping duty order directing CBP to assess, upon further instruction by the Department, antidumping duties on all imports of the subject merchandise entered, or withdrawn from warehouse, for consumption on or after the effective date of the suspension of liquidation.

## Notification Regarding Administrative Protective Orders (APO)

This notice serves as a reminder to parties subject to APO of their responsibility concerning the disposition of proprietary information disclosed under APO in accordance with 19 CFR 351.305(a)(3). Timely notification of the return or destruction of APO materials, or conversion to judicial protective order, is hereby requested. Failure to comply with the regulations and the terms of an APO is a sanctionable violation.

This determination and this notice are issued and published pursuant to sections 735(d) and 777(i)(1) of the Act.

Dated: March 29, 2017.

**Ronald K. Lorentzen,**

*Acting Assistant Secretary for Enforcement and Compliance.*

## Appendix I

### Scope of the Investigation

The products covered by this investigation are certain carbon and alloy steel hot-rolled or forged flat plate products not in coils, whether or not painted, varnished, or coated with plastics or other non-metallic substances (cut-to-length plate). Subject merchandise includes plate that is produced by being cut-to-length from coils or from other discrete length plate and plate that is rolled or forged into a discrete length. The products covered include (1) Universal mill plates (i.e., flat-rolled products rolled on four faces or in a closed box pass, of a width exceeding 150 mm but not exceeding 1250 mm, and of a thickness of not less than 4 mm, which are not in coils and without

patterns in relief), and (2) hot-rolled or forged flat steel products of a thickness of 4.75 mm or more and of a width which exceeds 150 mm and measures at least twice the thickness, and which are not in coils, whether or not with patterns in relief. The covered products described above may be rectangular, square, circular or other shapes and include products of either rectangular or non-rectangular cross-section where such non-rectangular cross-section is achieved subsequent to the rolling process, i.e., products which have been "worked after rolling" (e.g., products which have been beveled or rounded at the edges).

For purposes of the width and thickness requirements referenced above, the following rules apply:

(1) except where otherwise stated where the nominal and actual thickness or width measurements vary, a product from a given subject country is within the scope if application of either the nominal or actual measurement would place it within the scope based on the definitions set forth above; and

(2) where the width and thickness vary for a specific product (e.g., the thickness of certain products with non-rectangular cross-section, the width of certain products with non-rectangular shape, etc.), the measurement is at its greatest width or thickness applies.

Steel products included in the scope of this investigation are products in which: (1) Iron predominates, by weight, over each of the other contained elements; and (2) the carbon content is 2 percent or less by weight.

Subject merchandise includes cut-to-length plate that has been further processed in the subject country or a third country, including but not limited to pickling, oiling, levelling, annealing, tempering, temper rolling, skin passing, painting, varnishing, trimming, cutting, punching, beveling, and/or slitting, or any other processing that would not otherwise remove the merchandise from the scope of the investigation if performed in the country of manufacture of the cut-to-length plate.

All products that meet the written physical description, are within the scope of this investigation unless specifically excluded or covered by the scope of an existing order. The following products are outside of, and/ or specifically excluded from, the scope of this investigation:

(1) Products clad, plated, or coated with metal, whether or not painted, varnished or coated with plastic or other non-metallic substances;

(2) military grade armor plate certified to one of the following specifications or to a specification that references and incorporates one of the following specifications:

- MIL–A–12560,
- MIL–DTL–12560H,
- MIL–DTL–12560J,
- MIL–DTL–12560K,
- MIL–DTL–32332,
- MIL–A–46100D,
- MIL–DTL–46100–E,
- MIL–46177C,
- MIL–S–16216K Grade HY80,
- MIL–S–16216K Grade HY100,
- MIL–S–24645A HSLA–80,
- MIL–S–24645A HSLA–100,

- T9074–BD–GIB–010/0300 Grade HY80,
- T9074–BD–GIB–010/0300 Grade HY100,
- T9074–BD–GIB–010/0300 Grade HSLA80,
- T9074–BD–GIB–010/0300 Grade HSLA100, and
- T9074–BD–GIB–010/0300 Mod. Grade HSLA115,

except that any cut-to-length plate certified to one of the above specifications, or to a military grade armor specification that references and incorporates one of the above specifications, will not be excluded from the scope if it is also dual- or multiple-certified to any other non-armor specification that otherwise would fall within the scope of this investigation;

(3) stainless steel plate, containing 10.5 percent or more of chromium by weight and not more than 1.2 percent of carbon by weight;

(4) CTL plate meeting the requirements of ASTM A–829, Grade E 4340 that are over 305 mm in actual thickness;

(5) Alloy forged and rolled CTL plate greater than or equal to 152.4 mm in actual thickness meeting each of the following requirements:

(a) Electric furnace melted, ladle refined & vacuum degassed and having a chemical composition (expressed in weight percentages):

- Carbon 0.23–0.28,
- Silicon 0.05–0.20,
- Manganese 1.20–1.60,
- Nickel not greater than 1.0,
- Sulfur not greater than 0.007,
- Phosphorus not greater than 0.020,
- Chromium 1.0–2.5,
- Molybdenum 0.35–0.80,
- Boron 0.002–0.004,
- Oxygen not greater than 20 ppm,
- Hydrogen not greater than 2 ppm, and
- Nitrogen not greater than 60 ppm;

(b) With a Brinell hardness measured in all parts of the product including mid thickness falling within one of the following ranges:
(i) 270–300 HBW,
(ii) 290–320 HBW, or
(iii) 320–350HBW;

(c) Having cleanliness in accordance with ASTM E45 method A (Thin and Heavy): A not exceeding 1.5, B not exceeding 1.0, C not exceeding 0.5, D not exceeding 1.5; and

(d) Conforming to ASTM A578–S9 ultrasonic testing requirements with acceptance criteria 2 mm flat bottom hole;

(6) Alloy forged and rolled steel CTL plate over 407 mm in actual thickness and meeting the following requirements:

(a) Made from Electric Arc Furnace melted, Ladle refined & vacuum degassed, alloy steel with the following chemical composition (expressed in weight percentages):

- Carbon 0.23–0.28,
- Silicon 0.05–0.15,
- Manganese 1.20–1.50,
- Nickel not greater than 0.4,
- Sulfur not greater than 0.010,
- Phosphorus not greater than 0.020,
- Chromium 1.20–1.50,
- Molybdenum 0.35–0.55,
- Boron 0.002–0.004,
- Oxygen not greater than 20 ppm,
- Hydrogen not greater than 2 ppm, and
- Nitrogen not greater than 60 ppm;

(b) Having cleanliness in accordance with ASTM E45 method A (Thin and Heavy): A not exceeding 1.5, B not exceeding 1.5, C not exceeding 1.0, D not exceeding 1.5;

(c) Having the following mechanical properties:

(i) With a Brinell hardness not more than 237 HBW measured in all parts of the product including mid thickness; and having a Yield Strength of 75ksi min and UTS 95ksi or more, Elongation of 18% or more and Reduction of area 35% or more; having charpy V at −75 degrees F in the longitudinal direction equal or greater than 15 ft. lbs (single value) and equal or greater than 20 ft. lbs (average of 3 specimens) and conforming to the requirements of NACE MR01−75; or

(ii) With a Brinell hardness not less than 240 HBW measured in all parts of the product including mid thickness; and having a Yield Strength of 90 ksi min and UTS 110 ksi or more, Elongation of 15% or more and Reduction of area 30% or more; having charpy V at −40 degrees F in the longitudinal direction equal or greater than 21 ft. lbs (single value) and equal or greater than 31 ft. lbs (average of 3 specimens);

(d) Conforming to ASTM A578−S9 ultrasonic testing requirements with acceptance criteria 3.2 mm flat bottom hole; and

(e) Conforming to magnetic particle inspection in accordance with AMS 2301;

(7) Alloy forged and rolled steel CTL plate over 407 mm in actual thickness and meeting the following requirements:

(a) Made from Electric Arc Furnace melted, ladle refined & vacuum degassed, alloy steel with the following chemical composition (expressed in weight percentages):

- Carbon 0.25–0.30,
- Silicon not greater than 0.25,
- Manganese not greater than 0.50,
- Nickel 3.0–3.5,
- Sulfur not greater than 0.010,
- Phosphorus not greater than 0.020,
- Chromium 1.0–1.5,
- Molybdenum 0.6–0.9,
- Vanadium 0.08 to 0.12
- Boron 0.002–0.004,
- Oxygen not greater than 20 ppm,
- Hydrogen not greater than 2 ppm, and
- Nitrogen not greater than 60 ppm.

(b) Having cleanliness in accordance with ASTM E45 method A (Thin and Heavy): A not exceeding 1.0(t) and 0.5(h), B not exceeding 1.5(t) and 1.0(h), C not exceeding 1.0(t) and 0.5(h), and D not exceeding 1.5(t) and 1.0(h);

(c) Having the following mechanical properties: A Brinell hardness not less than 350 HBW measured in all parts of the product including mid thickness; and having a Yield Strength of 145ksi or more and UTS 160ksi or more, Elongation of 15% or more and Reduction of area 35% or more; having charpy V at −40 degrees F in the transverse direction equal or greater than 20 ft. lbs (single value) and equal or greater than 25 ft. lbs (average of 3 specimens);

(d) Conforming to ASTM A578−S9 ultrasonic testing requirements with acceptance criteria 3.2 mm flat bottom hole; and

(e) Conforming to magnetic particle inspection in accordance with AMS 2301.

The products subject to the investigation are currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under item numbers: 7208.40.3030, 7208.40.3060, 7208.51.0030, 7208.51.0045, 7208.51.0060, 7208.52.0000, 7211.13.0000, 7211.14.0030, 7211.14.0045, 7225.40.1110, 7225.40.1180, 7225.40.3005, 7225.40.3050, 7226.20.0000, and 7226.91.5000.

The products subject to the investigation may also enter under the following HTSUS item numbers: 7208.40.6060, 7208.53.0000, 7208.90.0000, 7210.70.3000, 7210.90.9000, 7211.19.1500, 7211.19.2000, 7211.19.4500, 7211.19.6000, 7211.19.7590, 7211.90.0000, 7212.40.1000, 7212.40.5000, 7212.50.0000, 7214.10.0000, 7214.30.0010, 7214.30.0080, 7214.91.0015, 7214.91.0060, 7214.91.0090, 7225.11.0000, 7225.19.0000, 7225.40.5110, 7225.40.5130, 7225.40.5160, 7225.40.7000, 7225.99.0010, 7225.99.0090, 7226.11.1000, 7226.11.9060, 7226.19.1000, 7226.19.9000, 7226.91.0500, 7226.91.1530, 7226.91.1560, 7226.91.2530, 7226.91.2560, 7226.91.7000, 7226.91.8000, and 7226.99.0180.

The HTSUS subheadings above are provided for convenience and customs purposes only. The written description of the scope of the investigation is dispositive.

## Appendix II

### List of Topics Discussed in the Issues and Decision Memorandum

I. Summary
II. Background
III. Scope of the Investigation
IV. Scope Comments
V. Margin Calculations
VI. Discussion of the Issues
  1. Differential Pricing Methodology
  2. Application of Adverse Facts Available to Salzgitter
  3. Excluding Sales Produced by an Unaffiliated Manufacturer for Salzgitter
  4. Shipment Date for Salzgitter's Export Price Sales
  5. Level of Trade for Salzgitter
  6. Capping Freight Revenue for Berg Steel Pipe Corp.'s (BSPC's) Sales
  7. Capping BSPC's Revenues for Further Manufacturing by Associated Expenses
  8. Salzgitter's Short-Term Euro-Denominated Interest Rate
  9. Treatment of Salzgitter Home Market Resales of Further-Processed CTL Plate
  10. Adding a Fabrication Product Characteristic for Salzgitter
  11. Salzgitter Credit Expense Revisions at Verification
  12. Salzgitter Home Market Revenue Items
  13. MGB Underreported Costs
  14. MGB Scrap Offset
  15. Cost Adjustments for Other Salzgitter Manufacturing Entities
  16. MGB's G&A Ratio Denominator
  17. Further Manufacturing General and Administrative (G&A) Ratio Denominator
  18. Further Manufacturing Scrap Offset
  19. Further Manufacturing Verification Minor Corrections
  20. Home Market Affiliated Service Center Sales for Dillinger
  21. Level of Trade for Dillinger
  22. Reassignment of Quality Codes for Dillinger
  23. Descaling Product Characteristic for Dillinger
  24. Interest Rate for Dillinger's U.S. Credit Expenses
  25. Excluding Sales of Military Grade Plate for Dillinger
  26. Payment Dates for Certain of Dillinger's Home Market and U.S. Sales
  27. Corrections from Verification for Dillinger
  28. Currency Conversions for Certain Movement Expenses Reported for Dillinger's U.S. Sales
  29. Inclusion of Interest Rate in the Affiliated Input Cost of Production for Dillinger
  30. Non-Prime Plate Product Costs for Dillinger
  31. Blast Furnace Coke Adjustment for Dillinger
  32. Dillinger's Reported Affiliated Party Costs
  33. G&A Expense Ratio Adjustment Related to Services Obtained from an Affiliated Party for Dillinger
  34. Cost Reconciliation Adjustments for Dillinger
VII. Recommendation

[FR Doc. 2017–06628 Filed 4–3–17; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

**[A–427–828]**

### Certain Carbon and Alloy Steel Cut-to-Length Plate From France: Final Determination of Sales at Less Than Fair Value

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (the Department) determines that certain carbon and alloy steel cut-to-length plate (CTL plate) from France is being, or is likely to be, sold in the United States at less than fair value (LTFV). The period of investigation (POI) is April 1, 2015, through March 31, 2016. The final dumping margins of sales at LTFV are listed below in the ''Final Determination'' section of this notice.

**DATES:** Effective April 4, 2017.

**FOR FURTHER INFORMATION CONTACT:** Brandon Custard or Terre Keaton Stefanova, AD/CVD Operations, Office II, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW., Washington, DC 20230; telephone: (202) 482–1823 and (202) 482–1280, respectively.

**SUPPLEMENTARY INFORMATION:**

### Background

On November 14, 2016, the Department published the *Preliminary*

Slip Op. 21-101

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| AG DER DILLINGER HÜTTENWERKE, <br><br>           Plaintiff, <br><br>    and <br><br> ILSENBURGER GROBBLECH GMBH, SALZGITTER MANNESMANN GROBBLECH GMBH, SALZGITTER FLACHSTAHL GMBH, SALZGITTER MANNESMANN INTERNATIONAL GMBH, and FRIEDR. LOHMANN GMBH, <br><br>           Consolidated Plaintiffs, <br>    and <br><br> THYSSENKRUPP STEEL EUROPE AG, <br><br>           Plaintiff-Intervenor, <br><br>    v. <br><br> UNITED STATES, <br><br>           Defendant, <br><br> NUCOR CORPORATION and SSAB ENTERPRISES LLC, <br><br>           Defendant-Intervenors. | Before: Leo M. Gordon, Judge <br><br> Consol. Court No. 17-00158 |

**OPINION and ORDER**

[Commerce's <u>Final Determination</u> remanded in part.]

Dated: August 18, 2021

    <u>Marc E. Montalbine</u>, <u>Gregory S. Menegaz</u>, and <u>Alexandra H. Salzman</u>, deKieffer & Horgan, PLLC of Washington, D.C. for Plaintiff AG der Dillinger Hüttenwerke.

    <u>Robert L. LaFrankie</u>, Crowell & Moring LLP, of Washington, D.C. for Plaintiff-Intervenor thyssenkrupp Steel Europe AG.

<u>Kelly Ann Krystyniak</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, D.C. for Defendant United States.  On the brief were <u>Brian M. Boynton</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, <u>Tara K. Hogan</u>, Assistant Director, and <u>Vito S. Solitro</u>, Trial Attorney.  Of counsel were <u>Natan P. L. Tubman</u> and <u>Ayat Mujais</u>, Attorneys, U.S. Department of Commerce, Office of Chief Counsel for Trade Enforcement and Compliance of Washington, D.C.

<u>Alan H. Price</u>, <u>Christopher B. Weld</u>, and <u>Stephanie M. Bell</u>, Wiley Rein LLP of Washington, D.C. for Defendant-Intervenor Nucor Corporation.

Gordon, Judge: This consolidated action involves a challenge to the final determination in the antidumping duty investigation conducted by the U.S. Department of Commerce ("Commerce") of certain carbon and alloy steel cut-to-length plate ("CTL plate") from the Federal Republic of Germany.  <u>See</u> <u>Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany</u>, 82 Fed. Reg. 16,360 (Dep't of Commerce Apr. 4, 2017) ("<u>Final Determination</u>"), and accompanying Issues and Decision Memorandum, A-428-844 (Mar. 29, 2017), http://enforcement.trade.gov/frn/summary/germany/2017-06628-1.pdf (last visited this date) ("<u>Decision Memorandum</u>").

Before the court are the motions for judgment on the agency record of Plaintiff AG der Dillinger Hüttenwerke ("Dillinger") and Consolidated Plaintiffs Ilsenburger Grobblech GMBH, Salzgitter Mannesmann Grobblech GMBH, Salzgitter Flachstahl GMBH, and Salzgitter Mannesmann International GMBH (collectively "Salzgitter"). <u>See</u> Pl. Dillinger Mem. in Supp. of Rule 56.2 Mot. for J. on the Agency R., ECF No. 40[1] ("Dillinger Br."); Salzgitter Consol. Pls.' Rule 56.2 Mot. for J. on the Agency R.,

---

[1] All citations to the parties' Rule 56.2 briefs and the agency record are to their confidential versions unless otherwise noted.

ECF No. 43 ("Salzgitter Br."); Def.'s Mem. Opp. Pls.' Rule 56.2 Mots. for J. on the Admin. R., ECF No. 55 ("Def.'s Resp."); Def.-Int. Nucor Corporation Resp. Br., ECF No. 58; Reply Br. of Pl. Dillinger, ECF No. 62 ("Dillinger Reply"); Reply in Supp. of Consol. Pls.' Rule 56.2 Mot. for J. on the Agency R., ECF No. 64 ("Salzgitter Reply"). Plaintiff-Intervenor thyssenkrupp Steel Europe AG ("thyssenkrupp") also filed a brief in support of Plaintiff Salzgitter's Rule 56.2 Motion. See Pl.-Int.'s Memorandum of Law in Support of Pl. Salzgitter's Rule 56.2 Mot., ECF No. 41 ("thyssenkrupp Br."). The court has jurisdiction pursuant to Section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2018),[2] and 28 U.S.C. § 1581(c) (2018).

The court previously addressed Dillinger and Salzgitter's claims regarding the application of partial adverse facts available by Commerce for certain home market CTL plate sales made by Dillinger and Salzgitter's respective affiliates. See AG der Dillinger Huttenwerke v. United States, 43 CIT ___, 399 F. Supp. 3d 1247 (2019) ("Dillinger I"). Subsequently, the court remanded the action to Commerce. See Remand Order, ECF No. 83. Before the court are Commerce's Final Results of Redetermination Pursuant to Court Remand ("Remand Results"), ECF No. 85-1, filed pursuant to Dillinger I and the Remand Order. See Def.-Int. SSAB Enter. LLC's Comments Opposing Remand Results, ECF No. 96; Def.-Int. Nucor Corp.'s Revised Comments on Remand Determ., ECF No. 100; Def.'s Resp. to Comments on Remand Redeterm., ECF No. 104; Consol. Pls.' Resp. Comments in Support of Remand Determ., ECF No. 106.

---

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2018 edition.

The court again remands the Final Determination to Commerce for reconsideration of Dillinger's challenges to non-prime CTL plate cost shifting, application of the major input rule, treatment of certain general and administrative ("G&A") expenses, and the AFA issue.  The court, in a separate opinion, see AG der Dillinger Huttenwerke v. United States, 45 CIT ___, Slip Op. 21-102 (Aug. 18, 2021), sustains the Final Determination as to Dillinger's challenges on differential pricing and adjustment of interest expenses to include a portion of Dillinger's parent holding company's interest expense.

## I. Standard of Review

The court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).  More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole.  Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006).  Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).  Fundamentally, though, "substantial evidence" is best understood as a word

formula connoting reasonableness review. 3 Charles H. Koch, Jr., <u>Administrative Law and Practice</u> § 9.24[1] (3d ed. 2021). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." 8A <u>West's Fed. Forms</u>, National Courts § 3.6 (5th ed. 2021).

Separately, the two-step framework provided in <u>Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837, 842–45 (1984), governs judicial review of Commerce's interpretation of the antidumping statute. <u>See</u> <u>United States v. Eurodif S.A.</u>, 555 U.S. 305, 316 (2009) (Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

## II. Discussion

### A. Cost Shifting (Non-Prime Plate Adjustment)

Dillinger challenges Commerce's cost of production ("COP") determination for its prime and non-prime plates. Dillinger Br. at 33–37; <u>see also</u> 19 U.S.C. § 1677b(e) & 19 U.S.C. § 1677b(f)(1)(A). Commerce found that Dillinger uses an internal "factory results report" to "value[ ] non-prime products at their likely selling price, and uses this value as an offset to prime production." <u>Decision Memorandum</u> at 90 (footnote omitted). Commerce considered it reasonable to rely on this report to reallocate cost between prime and non-prime plates. <u>Id.</u> at 89–90. Dillinger argues that this reallocation contravened the statute and applicable case law. <u>See</u> Dillinger Br. at 33–37.

The U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") has held that Commerce's decision to rely on information reflecting a respondent's "likely selling price," rather than actual cost data, violates the requirements of § 1677b(f).  Dillinger France S.A. v. United States, 981 F.3d 1318, 1321–24 (Fed. Cir. 2020) ("Dillinger France II"). Accordingly, the court remands this issue to Commerce to reconcile its COP determination with the Federal Circuit's decision in Dillinger France II.

### B. Major Input Rule (re: Blast Furnace Coke)

Dillinger describes itself as an "integrated" steel mill, meaning that it performs all steps necessary for producing steel internally from raw materials, such as iron ore and blast furnace coke, to the finished rolled steel product.  Dillinger Br. at 37.  During the period of investigation ("POI"), Dillinger obtained pig iron, a major raw material input used to produce CTL plate, from its affiliated producer, Rogesa Roheisengesellschaft ("Rogesa").  Rogesa obtained blast furnace coke, a major raw material input used to produce pig iron, from an affiliated producer, Zentralkokerei Saar Gesellschaft ("ZKS"). See Decision Memorandum at 90.

Dillinger challenges Commerce's use of Rogesa's affiliated and unaffiliated consumption values in applying the major input rule.  See Dillinger Br. at 39–44; Dillinger Reply at 18–19; see also 19 U.S.C. § 1677b(f)(3) (major input rule); 19 C.F.R. § 351.407(b).  Dillinger argues that Commerce deviated from the requirements of the applicable regulation, 19 C.F.R. § 351.407(b), when it selected Rogesa's reported consumption values instead of Rogesa's spot purchases of coke from unaffiliated

suppliers as the basis for determining the value of coke under the major input rule. See Dillinger Br. at 38–39; Dillinger Reply at 17–20. The court does not agree.

19 C.F.R. § 351.407(b) provides that Commerce "normally" will determine the value of a major input purchased from an affiliated person based on the "higher" of the price paid to an affiliated party, the amount usually reflected in sales of the major input, or the affiliate's cost of producing the input. The regulation does not "require" Commerce to use unaffiliated purchase prices as the basis for the valuation. Here, Commerce explained that the Rogesa's consumption values were usable as opposed to most companies Commerce deals with that typically "co-mingle the physical inventory and records for purchases of raw materials from differing suppliers, and thus are not able to provide consumption value information by input and supplier." Decision Memorandum at 93. Commerce preferred the reported Rogesa consumption values for coke as more accurate than the recorded purchase prices because the consumption values reflected both affiliated and unaffiliated suppliers (enabling a comparison) and because ZKS also reported its COP information on a consumption-value basis. See id. Since Rogesa provided consumption values for its coke by supplier, Commerce reasonably decided to use those values in applying the major input rule. Accordingly, the court is not persuaded by Dillinger's argument that Commerce contravened § 351.407(b) by selecting consumption values over purchase prices for determining coke value under the major input rule.

Dillinger next argues that Commerce's use of coke consumption values unreasonably distorted the coke value calculations because Commerce's comparison of

affiliated and unaffiliated consumption values failed to properly account for (1) contemporaneity, (2) freight expenses, (3) a certain credit note that ZKS issued to Rogesa, and (4) G&A and interest expenses. <u>See</u> Dillinger Br. at 39–42; Dillinger Reply at 22–25.

Dillinger notes that the recorded consumption values reflect the value of coke purchased "in large part prior to the POI." Dillinger Br. at 40. Dillinger also notes that Rogesa's purchases of blast furnace coke during the POI from unaffiliated suppliers involved different countries and significantly lower prices than purchases prior to the POI. <u>Id.</u> Dillinger argues that because Rogesa's consumption values reflect the value of coke purchased prior to the POI "at a time when market prices were considerably higher and are obviously influenced by higher freight costs," the consumption values "cannot reasonably be used as an indicator of what the transfer price of ZKS' coke sales during the POI would have been had it not been affiliated with R[ogesa]." <u>Id.</u> Defendant notes that "[n]othing in the regulation places a temporal limitation on the data that Commerce may use." Def.'s Resp. at 36. Defendant adds that "Commerce's selection of consumption values from Rogesa's records, some of which were during the [POI], ensured that the transfer prices reflected the market under consideration, of which Rogesa was indisputably a participant." <u>Id.</u> These two responses, although true in the abstract, do not address the issue Dillinger is arguing—that the consumption values selected distort the input calculation. The regulation, of course, has an <u>implicit</u> temporal limitation on the data Commerce selects, and it is foolish for Commerce to contend otherwise. Likewise, saying that <u>some</u> of the records were during the POI does not

respond to Dillinger's contention that most (or "in large part") were not. The upshot is that the court cannot sustain this aspect of Commerce's decision as reasonable. More explanation is needed. The court will therefore remand this issue to Commerce for further analysis and explanation, and if necessary, reconsideration.

As for freight expenses (and potential distortions), Commerce acknowledged that it was necessary to adjust Rogesa's coke consumption values to ensure that those values were on the same basis as unaffiliated consumption values. See Decision Memorandum at 93. Commerce explained:

> Rogesa's coke consumption values from ZKS are freight exclusive (because both companies are located on the same factory premises), while the unaffiliated coke consumption values are freight inclusive. As a result, to ensure that the comparison between the affiliated and unaffiliated consumption values is on the same basis, we adjusted the unaffiliated consumption values to reflect freight-exclusive values. Therefore, for the final determination, we adjusted Rogesa's reported coke cost to reflect the higher of … Rogesa's consumption value of coke from its affiliate, ZKS, Rogesa's adjusted consumption value of coke from unaffiliated suppliers, or the reported COP of coke.

Id.

Dillinger contends that Commerce did not have information on the historic inventory values Commerce was using net of freight expenses because it never requested such information, having changed its methodology for the final determination. Dillinger Br. at 40. Dillinger explains that Rogesa's inventory of unaffiliated coke purchases made prior to the POI came from different countries than its unaffiliated purchases of coke during the POI, and thus they involved significantly different per ton freight costs. See id. at 41. Dillinger highlights that Commerce calculated an average

per ton freight cost based upon purchases of blast furnace coke from unaffiliated suppliers during the POI.  See id. at 40–41.  Therefore, according to Dillinger, Commerce's freight adjustment to Rogesa's unaffiliated consumption values unreasonably assumes that the freight expense for its pre-POI inventory is the same as that for unaffiliated purchases of coke during the POI.  See id.  Adjusting consumption values to ensure either a freight inclusive or freight exclusive comparison does seem reasonable.  The court remands this issue to Commerce to for further analysis and explanation, and, if necessary, reconsideration.

Dillinger also argues that Commerce erred in multiplying the freight cost per-ton by the quantity of coke on a dry basis and should have adjusted for the fact that the freight factor used by Commerce was based on the wet weight of coke.   Dillinger Br. at 42; Dillinger Reply at 22.  Commerce did not address this issue below, believing it was moot because Commerce used reported coke consumption values that were on the same weight basis, rather than purchase prices that may have reflected either a dry-weight or wet-weight basis.  See Decision Memorandum at 93.  Commerce though does need to address the potential unreasonableness of using a wet-weight basis freight factor for the adjustment of dry-weight basis consumption values.  Therefore, the court remands this issue to Commerce for further analysis and explanation, and if necessary, reconsideration.

As for the credit note (and its potential distortionary effect), Commerce reduced the reported affiliated coke consumption values used in applying the major input rule by the credit note issued by ZKS to Rogesa.  See id.  Dillinger challenges this adjustment,

which resulted in an additional cost to ZKS's reported cost of manufacture.  See Dillinger Br. at 41–42; Dillinger Reply at 24.  Defendant explains that to the extent Commerce's methodology resulted in a larger adjustment associated with ZKS's coke sales to Rogesa, it nevertheless more accurately reflects the average unit consumption values.  Def.'s Resp. at 39.  This though is a post hoc rationale that the court cannot sustain.  See Motor Vehicle Mfrs. Ass'n v. State Farm Ins., 463 U.S. 29, 50 (1983) ("courts may not accept appellate counsel's post hoc rationalizations for agency action" (citing Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962))).  Commerce should have requested a remand to address this issue directly in the first instance (if in fact it has a material effect on the margin).  Accordingly, the court remands this issue to Commerce for further analysis and explanation, and if necessary, reconsideration.

Dillinger also maintains that to have a comparison on the same basis, Commerce must use the "full value including G&A and INTEX (interest expenses) in analyzing whether the affiliated transfer price is below comparable market value."  Dillinger Br. at 41. Defendant responds that Commerce's use of consumption values as a basis for comparison obviated the need to make Dillinger's suggested adjustments to G&A and interest expenses, Def.'s Resp. at 39, but here again, this is post hoc rationalization of agency counsel, and the court will therefore remand this issue to Commerce for further consideration.

### C. Expenses for Inputs & Services Provided to Affiliates

Commerce adjusted the COP of the inputs and services that Dillinger provided to Rogesa and ZKS to include a portion of Dillinger's G&A expenses.    Decision Memorandum at 96.  Commerce explained:

> Because the G&A expense ratio is calculated using Dillinger's unconsolidated financial statements, the transactions between Dillinger and its affiliates, Rogesa and ZKS, have not been eliminated from these financial statements.  Thus, Dillinger's cost of goods sold includes both the cost of the inputs and services that Dillinger sold to Rogesa and ZKS, as well as the cost of the CTL plate that Dillinger sold to third parties.  In producing CTL plate, Dillinger consumes inputs produced by Rogesa and ZKS (e.g., pig iron); thus, embedded in the cost of the CTL plate Dillinger sold is also the cost inputs provided by Rogesa and ZKS, including the inputs and services that Rogesa and ZKS obtained from Dillinger.
>
> Therefore, in calculating the G&A expense ratio, we have essentially included the cost of the inputs and services provided to Rogesa and ZKS in the denominator twice; once when they were sold to the affiliates, and again when Dillinger consumed the inputs provided by Rogesa and ZKS.
>
> Based on this calculation, in order to account for all of Dillinger's G&A expenses, it is appropriate to apply Dillinger's G&A expense ratio to both the costs of: 1) the CTL plate; and 2) the inputs and services.  As a result, we disagree with Dillinger that application of the G&A expense ratio to the cost of the inputs and services Dillinger provided to its affiliates results in the double counting of Dillinger's G&A expenses.

Id.

Dillinger provided the labor to Rogesa and ZKS for production of blast furnace coke and pig iron. Commerce found that the provision of these services by Dillinger, and the cross-charges for them by Dillinger to its affiliates and from its affiliates to Dillinger, is ultimately both cost and income to Dillinger.  Dillinger argues that "any increase in the

Consol. Court No. 17-00158                                         Page 13

transfer price would merely result in other income being realized by Dillinger" and "[t]herefore it makes no sense to increase G&A expenses at one level and offset them by income at another level." Dillinger Br. at 43. Dillinger points to Commerce's long-standing practice of using "other income" to offset to G&A expenses. See Circular Welded Non-Alloy Steel Pipe from the Republic of Korea, 79 Fed. Reg. 37,284 (Dep't of Commerce July 1, 2014) (Final Results), and accompanying Issues and Decision Memorandum at cmts. 3 & 4.

Commerce, however, explained that its determination to rely on Dillinger's unconsolidated financial statements as the basis for the G&A expense ratio is consistent with its past practice. See Decision Memorandum at 96 & n.279 (citing Large Residential Washers from the Republic of Korea, 77 Fed. Reg. 75,988 (Dep't of Commerce Dec. 26, 2012), and accompanying Issues and Decision Memorandum ("Korean Washers IDM") at cmt. 7)). Commerce's "methodology is to calculate the rate based on the company-wide G&A costs incurred by the producing company allocated over the producing company's company-wide cost of sales, and not on a consolidated, divisional, or product-specific basis." Korean Washers IDM at 44. When relying on unconsolidated financial statements as the basis of the G&A expense ratio, Commerce must account for transactions between affiliates that otherwise are not eliminated from those statements. Decision Memorandum at 96 & n.280.

Commerce appears to have first determined the difference between the transfer price and market price for pig iron. Def.'s Resp. at 42 (citing Final Dillinger COP Memorandum, CD 767, Attach. 3). Commerce then multiplied the above difference by

the percentage of Rogesa's operations related to the production of pig iron, and further multiplied this by the percentage of pig iron used in the cost of manufacturing CTL plate to calculate the total adjustment to add to Dillinger's cost of manufacturing.  Id.  The calculated total reflects only the percentage of Rogesa's production pertaining to pig iron used in the manufacture of CTL plate.  Id.  Commerce used the same methodology for its calculations with respect to ZKS and coke.  Id.

Defendant dismisses Dillinger's argument that Commerce allegedly "treats the entire absolute cost of manufacture (COM) of plate and then builds a ratio where the denominator is limited only to COM of plate,"  Dillinger Br. at 44, as lacking merit because the contested increase was already calculated to pertain solely to the cost of pig iron and coke used in manufacturing CTL plate.  See Def.'s Resp. at 42 (citing Final Dillinger COP Memorandum, CD 767, Attach. 3).  Defendant maintains that Commerce thus built a denominator likewise limited to the cost of manufacturing CTL plate.

Dillinger argues that Commerce ignores the fact that the same total increase in the amount of the costs paid by the affiliates for Dillinger's labor services would have resulted in an equal amount of income to Dillinger for those services, and additional income to Dillinger is used as an offset to G&A expenses under Commerce's long-standing practice.  See Dillinger Br. at 43 (citing Circular Welded Non-Alloy Steel Pipe from the Republic of Korea, 79 Fed. Reg. 37,284 (Dep't of Commerce July 1, 2014) (Final Results), and accompanying Issues and Decisions Memorandum at cmts. 3 & 4).  Dillinger notes that Commerce failed to address its "prior" (or current) practice of off-setting G&A expenses with other income in its Decision Memorandum.  Moreover, in its response brief,

Consol. Court No. 17-00158                                                    Page 15

Defendant states only that "Dillinger's earnings on other activities simply do not relate to the cost of producing subject merchandise."  See Def.'s Resp. 41.  Dillinger contends that this statement has no support in the record and that the labor services provided by Dillinger to Rogesa and ZKS are directly related to the production of pig iron and blast furnace coke and have been included in Dillinger's reported COPs.  Therefore, Dillinger argues that any income earned on providing these labor services to Rogesa and ZKS are, by definition, activities directly related to the cost of producing subject merchandise.

Dillinger further contends that Commerce has provided no response to Dillinger's argument that Commerce's adjustment results in an illogical multiplication of G&A expenses by having Dillinger charge itself its own G&A expenses and then having these expenses flow into the total cost of manufacture for the end product, which is again charged with G&A expenses.  See Dillinger Br. at 43.  Dillinger insists that prior to Commerce's final adjustment there has been no double-counting of the cost of Dillinger's labor services to Rogesa and ZKS in the G&A expense ratio denominator.  Dillinger argues that the record shows pig iron produced by Rogesa was used in the production of both subject and non-subject merchandise, and that the remaining pig iron was consumed by a different company to make non-subject merchandise.  Id. at 43–44.  Defendant dismisses Dillinger's argument, contending that "Commerce took account of [the fact that not all of the pig iron produced by Rogesa was consumed by Dillinger for subject merchandise] by utilizing a methodology that only included pig iron used in the production of CTL plate."  Def.'s Resp. at 43.  Dillinger, however, rightfully highlights that Commerce's calculations for this adjustment on the record appear to be inconsistent with the agency's

purported acknowledgment that not all pig iron produced by Rogesa was consumed in the production of subject merchandise.  See Dillinger Reply at 27–28.

In support of its argument, Dillinger highlights that on the third line of Attachment 3 to the Cost Calculation Memorandum, Commerce lists a certain amount in Euros as the adjustment for the labor services Dillinger provided to Rogesa, which is based upon 100% of the labor services provided by Dillinger to Rogesa.  Dillinger points out that the amount is not in any way reduced to reflect the fact that more than half of Rogesa's pig iron was used in non-subject products.  See id.  Dillinger further notes that on the fourth line of the same attachment, Commerce calculates a "Percentage of Operations Related to the Production of Pig Iron," but this percentage only shows that a certain percentage of Rogesa's total sales related to pig iron, with the rest relating to non-pig iron products or other operating income.  Id. at 28.  Dillinger argues that this calculation does not take into account the fact that of these pig iron sales, less than half were consumed in the production of subject CTL plate.  Further, Dillinger offers that the rate of the certain percentage used by Commerce on the fifth line of Attachment 3 also does not adjust for the fact that most of the pig iron was used in non-subject products, but rather indicates the percentage of the total cost of CTL plate that is accounted for by pig iron.  Id.  Dillinger contends that the calculation for ZKS follows the same pattern and does not adjust for the pig iron and coke consumed in the production of non-subject merchandise.  In summary, Dilllinger argues that Commerce is simply taking the entire amount of the adjustment related to pig iron sales and applying it exclusively to subject CTL plate.  Id.

Commerce's explanation in the <u>Decision Memorandum</u> does not reasonably address or resolve Dillinger's arguments. This issue therefore requires further explanation or consideration, and accordingly is remanded.

### D. Remand Results on Partial Adverse Facts Available

In <u>Dillinger I</u>, the court sustained Commerce's application of partial AFA, but remanded the <u>Final Results</u> for Commerce to review whether the same correction made to partial AFA by Commerce in a parallel proceeding, <u>Dillinger France S.A. v. United States</u>, 43 CIT ___, 350 F. Supp. 3d 1349 (2019) ("<u>Dillinger France I</u>"), involving the same issue, "would have any material effect on the margins in this case, or if it would be immaterial." <u>Dillinger I</u>, 43 CIT at ___, 399 F. Supp. 3d at 1257. Commerce determined that a similar correction as ordered in <u>Dillinger France I</u> would have a material effect, and the court remanded to Commerce to recalculate the antidumping duty margin for Salzgitter. <u>See</u> Remand Order.

On remand, Commerce, under protest, recalculated Salzgitter's antidumping duty margin. Commerce noted that "the Court's order did not provide Commerce with the opportunity to consider an alternative partial AFA methodology, in light of the factual differences between the two cases." <u>See</u> <u>Remand Results</u> at 4. Commerce observed:

> [I]t is the role of Commerce to consider, in the first instance, whether a particular AFA methodology complies with the statute's directive in any particular case. Pursuant to the Court's order, Commerce was unable to consider whether an alternative methodology would have been more appropriate in the instant case. Due to this limitation, Commerce further agrees with Nucor that the Court's order deprives Commerce of the ability to further consider whether the purpose of section 776 of the Act, <u>i.e.</u>, inducing cooperation, has been satisfied. Accordingly, it is under respectful protest that Commerce has

> followed the Court's instructions directing us to recalculate
> Salzgitter's margin utilizing the partial AFA methodology
> discussed above.

Id.  As the court explained in Dillinger I, "[r]easoned decision-making requires a certain measure of consistency, which is not present across the French and German investigations.  As noted, the cases share near identical (almost verbatim) Issues and Decision Memoranda on the AFA issue." See Dillinger I, 43 CIT at ___, 399 F. Supp. 3d at 1257.  Commerce now argues in the Remand Results that the French and German investigations are somehow factually distinguishable so that the AFA methodology applied in the Dillinger France decisions may not be appropriate for the German investigation.  Given the remand for the other issues, the court will also remand the AFA issue so that Commerce may explain why, if there were material factual differences between the French and German investigations on the AFA issue, those differences were not reflected in the decision memoranda or Commerce's handling of AFA between the cases, which the court noted were nearly identical (virtually verbatim).  Commerce may reconsider this issue and may explain why an alternative AFA methodology might be appropriate, but Commerce must first provide a reasoned explanation for issuing virtually identical decision memoranda and AFA treatment across the two investigations, and then arguing on remand that there were material factual differences not previously identified or explained that warrant differing AFA treatment across the two investigations. If Commerce wishes to apply a different AFA approach in this proceeding than the one it ultimately applied in the French investigation, the agency must explain why such a disparate approach is reasonable.

Consol. Court No. 17-00158                                                        Page 19

### III. Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that Commerce address the issues remanded above; and it is further

**ORDERED** that Commerce shall file its remand results on or before November 16, 2021; and it is further

**ORDERED** that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after Commerce files its remand results with the court.


                                                    /s/ Leo M. Gordon
                                            _____
                                                Judge Leo M. Gordon



Dated: August 18, 2021
        New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| AG DER DILLINGER HÜTTENWERKE,<br><br>        Plaintiff,<br><br>   and<br><br>ILSENBURGER GROBBLECH GMBH, SALZGITTER MANNESMANN GROBBLECH GMBH, SALZGITTER FLACHSTAHL GMBH, SALZGITTER MANNESMANN INTERNATIONAL GMBH, and FRIEDR. LOHMANN GMBH,<br><br>        Consolidated Plaintiffs,<br>   and<br><br>THYSSENKRUPP STEEL EUROPE AG,<br><br>        Plaintiff-Intervenor,<br><br>   v.<br><br>UNITED STATES,<br><br>        Defendant,<br><br>NUCOR CORPORATION and SSAB ENTERPRISES LLC,<br><br>        Defendant-Intervenors. | Before: Leo M. Gordon, Judge<br><br>Consol. Court No. 17-00158 |

## MEMORANDUM and ORDER

[Model Match issue sustained in part with balance of issue stayed pending remand results.]

Dated: August 18, 2021

    Marc E. Montalbine, Gregory S. Menegaz, and Alexandra H. Salzman, deKieffer & Horgan, PLLC of Washington, D.C. for Plaintiff AG der Dillinger Hüttenwerke and Consolidated Plaintiff Friedr. Lohmann GmbH.

    Robert L. LaFrankie, Crowell & Moring LLP, of Washington, D.C., for Plaintiff-Intervenor thyssenkrupp Steel Europe AG.

Consol. Court No. 17-00158                                                   Page 2

     <u>Kelly Ann Krystyniak</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, D.C. for Defendant United States.  On the brief were <u>Brian M. Boynton</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, <u>Tara K. Hogan</u>, Assistant Director, and <u>Vito S. Solitro</u>, Trial Attorney.  Of counsel were <u>Natan P. L. Tubman</u> and <u>Ayat Mujais</u>, Attorneys, U.S. Department of Commerce, Office of Chief Counsel for Trade Enforcement and Compliance of Washington, D.C.

     <u>Alan H. Price</u>, <u>Christopher B. Weld</u>, and <u>Stephanie M. Bell</u>, Wiley Rein LLP of Washington, D.C. for Defendant-Intervenor Nucor Corporation.

     Gordon, Judge: This memorandum addresses the model match issue raised by Plaintiff AG der Dillinger Hüttenwerke ("Dillinger" or "Plaintiff") in this consolidated action, which involves a challenge to the final determination in the antidumping duty investigation conducted by the U.S. Department of Commerce ("Commerce") of certain carbon and alloy steel cut-to-length plate ("CTL plate") from the Federal Republic of Germany.  <u>See Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany</u>, 82 Fed. Reg. 16,360 (Dep't of Commerce Apr. 4, 2017) ("<u>Final Determination</u>"), and accompanying Issues and Decision Memorandum, A-428-844 (Mar. 29, 2017), http://enforcement.trade.gov/frn/summary/germany/2017-06628-1.pdf  (last visited this date) ("<u>Decision Memorandum</u>").  <u>See</u> Pl. Dillinger Mem. in Supp. of Rule 56.2 Mot. for J. on the Agency R., ECF No. 40 ("Dillinger Br.");[1] Def.'s Mem. Opp. Pls.' Rule 56.2 Mots. for J. on the Admin. R., ECF No. 55 ("Def.'s Resp."); Def.-Intervenor Nucor Corporation Resp. Br., ECF No. 58; Reply Br. of Pl. Dillinger, ECF No. 62 ("Dillinger Reply").

---

[1] Citations to the parties' Rule 56.2 briefs and agency record are to confidential versions unless otherwise noted.

For the reasons that follow, one aspect of the model match issue is stayed pending resolution of the remand results from Commerce.  See AG der Dillinger Huttenwerke v. United States, 45 CIT ___, Slip Op. 21-101 (Aug. 18, 2021).

## I. Standard of Review

The court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole.  Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006).  Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review.  3 Charles H. Koch, Jr. Administrative Law and Practice § 9.24[1] (3d ed. 2021).  Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action

"was reasonable given the circumstances presented by the whole record."  8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2021).

Separately, the two-step framework provided in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842–45 (1984), governs judicial review of Commerce's interpretation of the antidumping statute.  See United States v. Eurodif S.A., 555 U.S. 305, 316 (2009) (Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

## II. Discussion

Dillinger's challenge to Commerce's model-matching methodology involves the sorting and alignment of the foreign like product with the subject merchandise by control number ("CONNUM").[2]  The antidumping statute defines foreign like product as a product that "is identical in physical characteristics with, and was produced in the same country by the same person as, [the subject] merchandise."  19 U.S.C. § 1677(16)(A).  While the statute provides a definition, Commerce has discretion to determine the methodology to "match a U.S. product with a suitable home market product," i.e., the foreign like product. Decision Memorandum at 72 (citing JTEKT Corp. v. United States, 34 CIT ___, ___,

---

[2] A "CONNUM" is a contraction of the term "control number," and is Commerce jargon for a unique product (defined in terms of a hierarchy of specified physical characteristics determined in each antidumping proceeding).  All products whose product hierarchy characteristics are identical are deemed to be part of the same CONNUM and are regarded as "identical" merchandise for purposes of the price comparison.  The hierarchy of product characteristics defining a unique CONNUM varies from case to case depending on the nature of the merchandise under investigation.

Consol. Court No. 17-00158                                              Page 5

717 F. Supp. 2d 1322, 1329 (2010) (citing <u>SKF USA, Inc. v. United States</u>, 537 F.3d 1373,

1379 (Fed. Cir. 2008)), and <u>Pesquera Mares Australes Ltda. v. United States,</u> 266 F.3d

1372, 1384 (Fed. Cir. 2001)).  As part of model matching, Commerce has a long-standing

practice to consult with interested parties early in an investigation to address product

characteristics.  <u>See id.</u>  In determining the foreign like product, Commerce "does not

attempt to account for every conceivable difference between products when determining

which products are identical to others."  <u>Id.</u> at 73.  An "identical" foreign like product need

not be "exactly the same" as the subject merchandise, it may encompass minor

differences in physical characteristics that are "not commercially significant."  <u>Id.</u> (citing

<u>Pesquera</u>, 266 F.3d at 1384).

All "identical" merchandise is assigned the same CONNUM based on a hierarchy

of product characteristics identified in the antidumping questionnaire.  <u>See Decision</u>

<u>Memorandum</u> at 72 (citing <u>Fagersta Stainless AB v. United States</u>, 32 CIT 889, 893,

577 F. Supp. 2d 1270, 1276 (2008)).  Merchandise having different CONNUMs are not

treated as identical, and non-identical merchandise can only be used in price

comparisons if identical product matches are not available, and Commerce makes

appropriate adjustments to account for physical differences in merchandise

(the "DIFMER" adjustment).  <u>See</u> 19 U.S.C. § 1677b(a)(6)(C)(ii); 19 C.F.R. § 351.411.

At the outset of the investigation, Commerce sent a letter to all interested parties,

notifying them of the proposed list of product characteristics needed for identifying specific

products by CONNUM and outlining the procedure for the submissions of comment.

See Proposed Product Characteristics Letter ("Proposed List"), PD[3] 92.   Thereafter,

Commerce received comments from Dillinger, the petitioner, and other interested parties

to this and the companion antidumping duty investigation covering CTL plate from France

regarding the physical characteristics of the merchandise under consideration for

purposes of reporting.   See, e.g., Petitioner's Comments on Proposed List, PD 110;

Dillinger's Comments on Proposed List, PD 107. In its model match comments, Dillinger

proposed a quality code for "sour service petroleum transport plate"[4] ("sour transport

plate"), see Dillinger's Comments on Proposed List at 2–3, yet, did not propose a separate

quality code for "sour service pressure vessel plate" ("sour vessel plate").  See Decision

Memorandum at 76–77.

After analyzing the comments, Commerce notified the interested parties, including

Dillinger, that Commerce had designated a hierarchy of 12 product characteristics, based

on their importance, for product matching purposes.  See Final Product Characteristics

Letter from Commerce to Interested Parties, PD 129; see also Preliminary Determination

Memorandum at 8, PD 436; Decision Memorandum at 71–72 & n.214.   Listed first, in

order of importance, was the "Quality" of the steel products, followed by 15 "Quality" codes

---

[3] "PD" refers to a document contained in the public administrative record.  See ECF No. 23-5.  "CD" refers to a document contained in the confidential administrative record. See ECF No. 23-6.

[4] Dillinger explains that sour petroleum has a sulfur content of greater than 0.5%, some of which is in the form of hydrogen sulfide ($H_2S$), an "extreme" corrosive to pipe not specially manufactured with "extremely" low levels of phosphorus (P) and sulfur (S) to withstand such corrosive effects as hydrogen induced cracking ("HIC").  See Letter from deKieffer & Horgan to Commerce at 2 (June 2, 2016), PD 107; see also Second Supplemental Section A, B & C Response at App. SBC-31, PDs 400–401.

for reporting product quality. The list did not include Dillinger's proposed quality code for sour vessel plate; however, the instructions accompanying the list stated that respondents were to "[u]se additional number codes for each additional Quality you propose." Final Product Characteristics Letter, Attach. 1, at 8; see also Decision Memorandum at 77 n.236 (noting that "the Dillinger Model Match Comments makes no reference to a proposed subcategory for sour service pressure vessel plate. However, in that document Dillinger does note, 'Dillinger will also propose additional Quality subcategories at the time of submitting its section B & C responses should that be necessary.'").

In its response to Commerce's first supplemental questionnaire, Dillinger then proposed a separate quality code for sour vessel plate. See Dillinger Supp. B & C Response at 11–12, PD 323; Decision Memorandum at 76. Despite notification from Commerce of the applicable product codes for responding to Commerce's initial and supplemental questionnaires, Dillinger continued to unilaterally assign other product codes to some of its CTL plate, even though Commerce had rejected those other codes. See, e.g., Dillinger's First Supp. Section B&C Quest., CD 169; Dillinger Section B&C Response at 10–12, CD 266; Dillinger's Second Supp. Section A, B, and C Question. at 3, CD 43. Dillinger now contends that sour service steel (generally) warrants unique two product subcategory codes (sour transport plate and sour pressure plate) because there are significant cost and price differences among these products and their non-sour service counterparts. Dillinger Br. at 6–9, 12–14.

Commerce rejected Dillinger's proposed quality code for sour vessel plate because it was not submitted within the time for submitting model match comments for the

Consol. Court No. 17-00158                                                          Page 8

concurrent CTL plate investigations.  <u>Decision Memorandum</u> at 76.  Commerce also

noted that Dillinger did not subsequently provide information that "would justify either

allowing Dillinger to report revised quality codes for different pressure vessel plate

products, or revisiting this issue once parties had submitted their questionnaire

responses."  <u>Id.</u>  Commerce explained that it found Dillinger's proposed rationale for its

failure to include a sour vessel plate subcategory in its initial model match comments

troubling, stating that "[i]t is not clear why Dillinger would have needed to perform

additional analysis, unless it wanted further time to estimate the margin impact of such a

proposal.

As noted above, Dillinger "only discussed pricing data associated with its proposed

product characteristic changes in the context of the overall impact on Dillinger's

weighted-average margin."  <u>Id.</u> at 77 n.236.  Given these circumstances, Commerce's

decision to reject Dillinger's proposed quality code for sour vessel plate was reasonable.

<u>See, e.g.</u>, <u>Maverick Tube Corp. v. United States</u>, 39 CIT ___, ___, 107 F. Supp. 3d 1318,

1330 (2015) (sustaining agency decision to reject model-match comments submitted after

end of comment period); <u>JTEKT Corp. v. United States</u>, 38 CIT ___, ___, 37 F. Supp. 3d

1326, 1335–36 (2014) (reasonable to reject untimely proposals for product characteristics

"in light of the time constraints under which [Commerce] must conduct a review" and its

"obligations to ensure both consistency and procedural fairness with respect to all parties

in a review").

Consol. Court No. 17-00158                                                            Page 9

The court will stay further consideration of Dillinger's challenge to Commerce's rejection of Dillinger's other proposed quality code (sour transport plate), pending the outcome of the remanded issues.

Accordingly, it is hereby

**ORDERED** that Commerce's rejection of Dillinger's proposed quality code for sour vessel plate is sustained; and it is further

**ORDERED** that Dillinger's challenge to Commerce's rejection of Dillinger's proposed quality code for sour transport plate is stayed pending the outcome of the remanded issues pursuant to <u>AG der Dillinger Huttenwerke v. United States</u>, 45 CIT ___, Slip Op. 21-101 (Aug. 18, 2021).


                                                            _____/s/ Leo M. Gordon_____
                                                                   Judge Leo M. Gordon


Dated: August 18, 2021
        New York, New York



**UNITED STATES DEPARTMENT OF COMMERCE**
**Office of the General Counsel**
OFFICE OF THE CHIEF COUNSEL FOR TRADE ENFORCEMENT & COMPLIANCE
Washington, D.C.  20230

January 20, 2022

---

Mario Toscano
Clerk of the Court
U.S. Court of International Trade
One Federal Plaza
New York, NY  10278-0001

Re:    Redetermination Pursuant to Court Remand Order in
         *AG Der Dillinger Huttenwerke v. United States*, Consol. Court No. 17-00158

Dear Mr. Toscano:

     Pursuant to the Court's Order of August 18, 2021, please find attached the U.S. Department of Commerce's Redetermination Pursuant to Court Remand in the above-captioned action.  The Department's remand redetermination is a proprietary document.  A public version is also being filed with the Court.

     In accordance with Court Rule 56.2(h)(1), filing of the administrative record index for the remand proceeding will follow under separate cover.  Should you have any questions concerning the matter, please contact me at (202) 482-4750.

               Respectfully submitted,

               /s Ayat Mujais
               Ayat Mujais
               Attorney
               Office of the Chief Counsel
                  for Trade Enforcement & Compliance

Attachment

Mr. Mario Toscano
January 20, 2022
Page 2

cc:

Kelly A. Krystyniak
U.S. Department of Justice
Commercial Litigation Branch - Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 307-0163
Email: Kelly.a.krystyniak@usdoj.gov

Gregory S. Menegaz
deKieffer & Horgan, PLLC
1090 Vermont Ave., NW
Suite 410
Washington, DC 20004
(202) 783-6900
Email: gmenegaz@dhlaw.com

David E. Bond
White & Case, LLP
701 Thirteenth St., NW
1100
Washington, DC 20005
(202) 729-2307
Email: dbond@whitecase.com

Robert L. LaFrankie, II
Crowell & Moring, LLP
1001 Pennsylvania Ave., NW
Washington, DC 20004
(202) 624-2500
Email: Rlafrankie@crowell.com

Roger B. Schagrin
Schagrin Associates
900 Seventh St., NW
Suite 500
Washington, DC 20001
(202) 223-1700
Email: rschagrin@schagrinassociates.com

Alan H. Price
Wiley Rein, LLP

Mr. Mario Toscano
January 20, 2022
Page 3

       1776 K. St., NW
       Washington, DC 20006
       (202) 719-3375
       Email: aprice@wiley.law

A-428-844
Remand: Slip Op. 21-101
Court No. 17-00158
~~Business Proprietary~~
E&C/OII: DJG
*PUBLIC VERSION*

### *AG Der Dillinger Hüttenwerke, v. United States*
### Court No. 17-00158, Slip. Op. 21-101 (CIT August 18, 2021)

### Final Results of Redetermination Pursuant to Court Remand
### Certain Carbon and Alloy Steel Cut-to-Length Plate from Germany

## I.  SUMMARY

The Department of Commerce (Commerce) has prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (the Court)

in *AG Der Dillinger Hüttenwerke, v. United States*, Court No. 17-00158, Slip. Op. 21-101

(August 18, 2021) (*Dillinger Germany II*).  This action arises out of the final determination in the

less-than-fair-value (LTFV) investigation of certain carbon and alloy steel cut-to-length (CTL)

plate from Germany.[1]  The mandatory respondents in the underlying LTFV investigation are AG

Der Dillinger Hüttenwerke (Dillinger), and Ilsenburger Grobblech GmbH, Salzgitter

Mannesmann Grobblech GmbH, Salzgitter Flachstahl GmbH, and Salzgitter Mannesmann

International GmbH (collectively, Salzgitter).

The Court remanded to Commerce to consider its:  (1) reallocation of costs between

prime and non-prime steel plate for Dillinger; (2) application of the major input rule with respect

to contemporaneity and the freight factor applied to Dillinger's coke input; (3) adjustments to

---

[1] *See Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany:  Final Determination of Sales at Less Than Fair Value*, 82 FR 16360 (April 4, 2017) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM); *see also Certain Carbon and Alloy Steel Cut-to-Length Plate from Austria, Belgium, France, the Federal Republic of Germany, Italy, Japan, the Republic of Korea, and Taiwan:  Amended Final Affirmative Antidumping Determinations for France, the Federal Republic of Germany, the Republic of Korea and Taiwan, and Antidumping Duty Orders*, 82 FR 24096 (May 25, 2017) (*Amended Final Determination*).

Dillinger's cost of production (COP) for inputs and services provided to affiliates; and (4) application of a partial adverse facts available (AFA) methodology to certain downstream home market sales reported by Salzgitter.  In light of the Court's remand order, on remand Commerce: (1) relied on the total cost assigned to the prime and non-prime products as recorded in Dillinger's normal books and records in accordance with section 776(a) of the Tariff Act of 1930, as amended (the Act); (2) provided further explanation and revised the major input rule adjustment for Dillinger's coke inputs to reflect a contemporaneous comparison of coke consumption values and freight costs sourced from affiliated and unaffiliated suppliers; (3) provided further explanation and revised the adjustments to Dillinger's COP for inputs and services provided to affiliates; and (4) provided further explanation regarding the application of partial AFA to Salzgitter and revised the margin according to the AFA methodology applied in the *Final Determination*.  As a result of our analysis, we made changes to Dillinger's margin calculations, which result in a revised weighted-average dumping margin of 4.98 percent, and we have reverted to the margin calculated in the *Final Determination* for Salzgitter, which resulted in a weighted-average dumping margin of 22.90 percent.  Moreover, as a result of Commerce's revision to the weighted-average dumping margins for both Dillinger and Salzgitter, the revised all-others rate is 20.99 percent.

## II.     BACKGROUND

Commerce published the *Final Determination* on April 4, 2017.[2]  As discussed in the *Final Determination*, Commerce:  (1) adjusted Dillinger's reported costs for non-prime products to reflect the products' sales value as recorded in Dillinger's normal books and records and then reallocated the difference to the cost of prime plate;[3] (2) adjusted the reported coke cost of

---

[2] *See Final Determination*; *see also Amended Final Determination*.
[3] *See Final Determination* IDM at Comment 31.

Dillinger's affiliate, Rogesa Roheisengesellschaft (Rogesa), to reflect the higher of: (A) Rogesa's consumption value of coke from its affiliate, entralkokerei Saar Gesellschaft ( S), (B) Rogesa's adjusted consumption value of coke from unaffiliated suppliers, or (C) the reported COP of coke;[4] (3) adjusted the COP of the inputs and services Dillinger provided to Rogesa and S to include a portion of Dillinger's general and administrative (G&A) expenses;[5] and (4) applied partial AFA on sales made by one of Salzgitter's affiliated downstream resellers where Salzgitter did not identify the manufacturer of the CTL plate, assigning the highest non-aberrational net price among all of the downstream sales by that reseller to all of these sales where Salzgitter failed to report the manufacturer of the CTL plate.[6]

In its August 18, 2021 opinion, the Court remanded Commerce's *Final Determination*. First, the Court remanded for Commerce to reconcile its reallocation of costs between prime and non-prime plate consistent with the Court of Appeals for the Federal Circuit (CAFC)'s opinion in *Dillinger France II* and rely on the actual costs of production for prime and non-prime plate.[7]

Further, regarding the major and minor input rules, the Court remanded to Commerce certain elements of Commerce's calculation of the major input adjustment factor. The Court requested further explanation with respect to: (1) the use of non-contemporaneous affiliated and unaffiliated consumption values; (2) the use of freight costs that were not contemporaneous with the coke values used and were calculated on wet-weight basis but applied to a quantity of coke on a dry-weight basis, (3) whether transfer prices should be adjusted to include G&A and interest expenses; and (4) the potentially distortive impact of a credit note adjustment on the average

---

[4] *Id.* at Comment 31.
[5] *Id.* at Comment 33.
[6] *Id.* at Comment 2.
[7] *See Dillinger Germany II*, Slip Op. 21-101 at 5-6 (citing *Dillinger France S.A. v. United States*, 981 F. 3d 1318 (CAFC 2020) (*Dillinger France II*)).

consumption values used in the calculations.  Regarding Commerce's adjustment to Dillinger's

COP for the services provided to Rogesa and      S, the Court stated that Commerce failed to

address Dillinger's comments on the issue.  The Court remanded these issues for further

explanation or reconsideration because Commerce did not provide sufficient explanation for the

Court to determine if Commerce's determination was reasonable.[8]

Finally, the Court remanded to Commerce the opportunity to address its use of partial

AFA to calculate Salzgitter's margin in the *Final Determination*.  In *Dillinger Germany I*, the

Court ordered Commerce to recalculate the antidumping duty (AD) margin for Salzgitter using

the same partial AFA methodology it used in *Dillinger France I*, a parallel proceeding.[9]

Commerce, under protest, recalculated Salzgitter's margin using partial AFA, stating that the

Court had not provided Commerce an opportunity to consider alternative partial AFA

methodologies in light of the factual differences between *Dillinger Germany I* and *Dillinger

France I*.[10]  Thus, the Court remanded this issue again to allow Commerce to explain why a

different approach may be reasonable.

On September 21, 2021, we reopened the administrative record and issued a

supplemental questionnaire to Dillinger to obtain the physical characteristics of the non-prime

products produced and the actual cost of producing the non-prime products, to obtain

---

[8] *Id.* at 6-11.
[9] *See AG Der Dillinger Hüttenwerke, v. United States*, 399 F. Supp. 3d 1247 (CIT 2019) (*Dillinger Germany I*); *Dillinger France S.A., v. United States*, 350 F. Supp. 3d 1349 (CIT 2018) (*Dillinger France I*); and Final Results of Redetermination Pursuant to Court Remand, Certain Carbon and Alloy Steel Cut-to-Length Plate from Germany, *AG Der Dillinger Hüttenwerke, v. United States*, Court No. 17-00158, Slip Op. 19-87 (CIT July 16, 2019), dated October 8, 2019 (*Dillinger I* Remand Redetermination).
[10] *See* Final Results of Redetermination Pursuant to Court Remand, Certain Carbon and Alloy Steel Cut-to-Length Plate from France, *Dillinger France S.A. v. United States*, Court No. 17-00159, Slip Op. 18-150 (CIT October 31, 2018), dated March 11, 2019 (*Dillinger France I* Remand Redetermination).

information to ensure we have comparable consumption values to apply the major input rule, and

to analyze the inputs and services that Dillinger provided to Rogesa and      S.[11]

On October 5, 2021, Dillinger submitted its response to this supplemental

questionnaire.[12]

## III.    ANALYSIS

### A.  Non-Prime Plate Adjustment

As summarized above, the Court remanded Commerce's *Final Determination* to

reconcile its reallocation of costs between prime and non-prime plate consistent with the CAFC's

opinion in *Dillinger France II* and rely on the actual costs of production for prime and non-prime

plate.[13]  Therefore, analogous with *Dillinger France II*, Commerce reopened the record and

issued a supplemental questionnaire to Dillinger to obtain the physical characteristics of the non-

prime products produced and the actual cost of producing the non-prime products.[14]  Because

Commerce has an obligation to ensure that the reported costs of production reasonably reflect the

cost of producing the merchandise under consideration,[15] we specifically explained that it was

not appropriate to rely on the overall average cost of producing all prime products as a surrogate

---

[11] *See* Commerce's Letter, "Remand Supplemental   uestionnaire," dated September 21, 2021 (Remand Supplemental   uestionnaire).

[12] *See* Dillinger's Letter, "Response to Remand   uestionnaire," dated October 5, 2021 (Remand Supplemental Response).

[13] *See Dillinger Germany II*, Slip Op. 21-101 at 5-6.

[14] *See* Remand Supplemental   uestionnaire.  On March 25, 2021, Dillinger filed a motion to clarify the scope of the remand.  *See* Motion to Clarify Scope of Remand (March 25, 2021) (ECF 74, 75).  On March 26, 2021, the Court issued a stay order.  *See* Order to Stay Proceedings (March 26, 2021) (ECF 76).  On April 15, 2021, Commerce filed its response to the motion to clarify.  *See* Response to Motion to Clarify (April 15, 2021) (ECF 77).  On April 21, 2021, the Court issued an order denying the motion to clarify.  *See* Order Denying Motion to Clarify Scope of Remand (April 21, 2021) (ECF 78).

[15] *See* section 773(f)(1)(A) of the Act (stating that "{c}osts shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and *reasonably* reflect the costs associated with the production and sale of the merchandise." (emphasis added.))  Additionally, the Court has recognized that Commerce "must ensure that {a respondent's} reported costs capture all of the costs incurred by the respondent in producing the subject merchandise' before it can appropriately use that respondent's cost allocation methodology."  *See Sidenor Indus. SL v. United States*, 664 F. Supp. 2d 1349 (CIT 2009) (quoting *Myland Indus., Ltd. v. United States*, 31 CIT 1696, 1703 (CIT 2007)).

for the actual cost of producing the specific non-prime products at issue and requested that

Dillinger provide the actual product-specific COP of the non-prime products.[16]  Commerce

requires accurate and complete product-specific production cost information because such

information:  (1) provides the basis for determining whether comparison market sales were made

in the ordinary course of trade and can be used to calculate normal value (NV); (2) is used in the

difference-in-merchandise analysis; and (3) in certain other instances, is used as the basis for NV

itself.[17]  Indeed, both the CAFC and this Court have recognized that Commerce appropriately

analyzes reported product-specific costs of production.[18]  Moreover, the CAFC has recognized

that requiring costs to reflect cost differences attributable to physical characteristics ensures that

product-specific costs are reflective of the actual costs incurred to produce specific products and

has explained that "{r}eliance on physical characteristics, because of its ability to promote

consistency, is a predictable methodology that is administrable across all investigations and

administrative reviews."[19]

     In its supplemental questionnaire response on the issue of non-prime products, Dillinger

provided neither the physical characteristics of non-prime products produced, nor the actual

product-specific costs of production for the non-prime products.[20]  Specifically, concerning

Commerce's request for the physical characteristics of non-prime products, as Dillinger

explained during the investigation, it was not able to identify all physical characteristics of the

non-prime merchandise and it had already reported the physical characteristics at the greatest

---

[16] *See* Remand Supplemental    uestionnaire at 3.
[17] *See, e.g.*, *Notice of Final Results of Antidumping Duty Administrative Review:  Stainless Steel Bar from India*, 70 FR 54023 (September 15, 2005), and accompanying IDM at Comment 1.
[18] *See generally Thai Plastic Bags Indus. Co. v. United States*, 853 F. Supp. 2d 1267 (CIT, 2012), *aff'd, Thai Plastic Bags Indus. Co. v. United States*, 746 F.3d 1358 (Fed. Cir. 2014) (*Thai Plastic Bags*); *see also Hyundai Electric & Energy Systems Co., Ltd, v. United States*, 466 F. Supp. 3d 1303, 1309 (CIT 2020).
[19] *See Thai Plastic Bags*, 746 F.3d at 1368.
[20] *See* Remand Supplemental Response at 2-15.

6

level of detail possible.[21]  Moreover, despite Commerce's explicit request that Dillinger provide

the actual product-specific costs of production for the non-prime products, Dillinger again

explained how its systems capture costs,[22] and that production for these products are not

differentiated between prime and non-prime merchandise.[23]  Dillinger then reiterated that it

based its costs for producing non-prime products on the "average **actual** total cost of

manufacture for all plate produced during the {period of investigation (POI)}."[24]  In other words,

Dillinger did not provide the product-specific actual COP for the non-prime products, even

though it explained that all production "is made to order and non-prime plate results from the

normal production of making plate for the specific customer order."[25]

  During the investigation, Dillinger provided the information necessary to calculate the

actual costs of production for prime products.  As explained in detail here, in response to our

remand supplemental questionnaire, Dillinger did not provide Commerce with the information

needed to calculate the actual costs of production for the non-prime products.  Specifically,

Dillinger provided Commerce neither with the actual product-specific costs of producing the

non-prime products nor with the physical characteristics of the non-prime products produced.  As

the total actual costs incurred by Dillinger, and verified by Commerce,[26] must be allocated to all

products produced, including prime and non-prime products, not knowing the actual cost of

producing the non-prime merchandise directly impacts the amount of costs assigned to the

production of the prime products.  If too much or too little cost is assigned to the non-prime

---

[21] *Id.* at 8.
[22] *Id.* at 7.
[23] *Id.* at 8.
[24] *Id.* at 6 (emphasis in the original).
[25] *Id.* at 11.
[26] *See* Memorandum, "Verification of the Cost Response of AG de Dillinger H ttenwerke in the Antidumping Duty Investigation of Certain Carbon and Alloy Steel Cut-To-Length Plate from Germany," dated January 27, 2017 (Dillinger Cost Verification Report), at 21-22.

7

products, then too little or too much cost is assigned to the prime products produced. Simply put, Dillinger has not provided the actual costs of production of non-prime products.[27] Therefore, because necessary information is missing from the record, pursuant to section 776(a)(1) of the Act, we have relied on the total COP for both prime and non-prime merchandise as recorded in Dillinger's normal books and records as facts otherwise available to comply with the Court's order.

     1. **Necessary Information Is Missing from the Record**

While Dillinger attempts to downplay the necessity of the product-specific actual COP information by arguing that because the "COM {cost of manufacturing} for the non-prime {control numbers (CONNUMs)} reported by Dillinger corresponds to the average **actual** total cost of manufacture for all plate sold during the POI,"[28] it had "properly reported the COP for non-prime merchandise based upon actual costs of production,"[29] we disagree. It is well established that Commerce analyzes and relies upon product-specific costs.[30] It is not appropriate to substitute the "average actual total cost of manufacturing for all plate sold during the POI" for the actual product-specific costs. The use of an "average cost" would not, by definition, comply with the CAFC's order to determine the "actual costs of prime and non-prime products"[31] because it assigns the same cost to products with varying physical characteristics. Indeed, the distortive nature of simply taking the average cost of all products can be seen by the wide disparity in the reported actual total cost of manufacturing (TOTCOM) amounts for prime

---

[27] *See* Remand Supplemental Response at 8-9.
[28] *Id.* at 5 (emphasis in the original).
[29] *Id.* at 6.
[30] *See* Dillinger France S.A. v. United States, Court No. 17-00159; Final Results of Redetermination Pursuant to Court Remand (CIT February 18, 2021) (Dillinger France Final Remand 2021) at 7.
[31] *Id*.

products.[32]  Moreover, Dillinger acknowledged that the non-prime products can vary by size, specification, and grade, which indicates that the associated costs vary, as well.[33]

Commerce does not have information on the record of this proceeding that is necessary within the meaning of section 776(a)(1) of the Act.  Specifically, despite Commerce's request that Dillinger submit the product characteristics of the non-prime products and the actual product-specific cost of producing non-prime products to determine the actual COP for the prime and non-prime products, Dillinger did not submit either the physical characteristics of the non-prime products or the product-specific actual cost information.[34]  Dillinger is the sole party in control of the actual production information.  It is incumbent on the company to make a reasonable attempt to provide the actual product-specific cost information.  Dillinger explained that it was unable to provide the actual COP of the non-prime merchandise and, as a result, we do not have the actual COP information for the non-prime products produced.  Section 776(a)(1) of the Act provides, subject to section 782(d) of the Act, that Commerce shall select from among the facts otherwise available on the record if necessary information is not available on the record of a proceeding.

While Dillinger attempts to downplay the necessity of the product-specific actual COP information by arguing that because the "COM for the non-prime CONNUMs reported by Dillinger corresponds to the average **_actual_** total cost of manufacture for all plate sold during the POI,"[35] it had "properly reported the COP for non-prime merchandise based upon actual costs of production,"[36] we disagree.  It is well established that Commerce analyzes and relies upon

---

[32] _See_ Dillinger's Letter, "AG der Dillinger H ttenwerke Second Supplemental Section D Response," dated November 7, 2016 (Dillinger S RD2), at Exhibit SD-50 (containing a printout of Dillinger's COP database labeled "dhcop03").
[33] _Id_.
[34] _Id_.
[35] _Id._ at 5 (emphasis in the original).
[36] _Id._ at 6.

product-specific costs.[37]  It is not appropriate to substitute the "average actual total cost of manufacturing for all plate sold during the POI" for the actual product-specific costs.  The use of an "average cost" would not, by definition, comply with the CAFC's order to determine the "actual costs of prime and non-prime products"[38] because it assigns the same cost to products with varying physical characteristics.  Indeed, the distortive nature of simply taking the average cost of all products can be seen by the wide disparity in the reported actual TOTCOM amounts for prime products.[39]  Moreover, Dillinger acknowledged that the non-prime products can vary by size, specification, and grade, which indicates that the associated costs vary, as well.[40]

Dillinger's acknowledgment that non-prime products can vary by size, specification, and grade illustrates how Dillinger's inability to provide the actual physical characteristics of the non-prime products prevents Commerce from adjusting the reported overall average cost of prime products in an effort to estimate the actual product-specific costs of non-prime products. We note that, while Dillinger implies that it reported some of the physical characteristics (*i.e.*, "Dillinger is not able to identify all physical characteristics of the non-prime merchandise"),[41] the record demonstrates that Dillinger did not report any of the physical characteristics of the non-prime products in a useable manner.  In other words, while Dillinger submitted invoices to demonstrate that the non-prime products were plate (*i.e.*, the merchandise under consideration), the invoices did not contain precise information pertaining to the actual physical characteristics of the non-prime products.[42]  Therefore, because the CAFC has recognized that requiring costs to reflect cost differences attributable to physical characteristics ensures that product-specific costs

---

[37] *See* Dillinger France Final Remand 2021 at 7.
[38] *Id*.
[39] *See* Dillinger S  RD2 at Exhibit SD-50 (containing a printout of Dillinger's COP database labeled "dhcop03").
[40] *Id.*
[41] *Id.* at 8 and 10.
[42] *See, e.g.*, Remand Supplemental Response at Appendices R-3 and R-8.

reflect the actual costs to produce specific products,[43] Dillinger's failure to submit the physical characteristics of the non-prime products precludes Commerce from being able to determine the actual costs of the non-prime products.

Because Dillinger did not submit the physical characteristics of the non-prime products and incorrectly claimed that the reported overall average cost of prime products was sufficient, rather than submit the requested product-specific actual COP data as requested, Commerce does not have the necessary information to determine the actual COP of non-prime products. Therefore, Commerce must select from among the facts otherwise available to replace that missing information, pursuant to section 776(a)(1) of the Act.

## 2. Commerce Satisfied Its Obligation to Provide Dillinger With the Opportunity to Supply the Necessary Information

Commerce satisfied its obligation under section 782(d) of the Act, because Commerce notified Dillinger of the deficiencies in the information it had reported and afforded Dillinger the opportunity to submit the necessary information.[44] Section 782(d) of the Act provides that if Commerce determines that a response to a request for information does not comply with the request, Commerce will so inform the party submitting the response and will, to the extent practicable, provide that party the opportunity to remedy or explain the deficiency. If the party fails to remedy the deficiency within the applicable time limits, Commerce may, subject to section 782(e) of the Act, disregard all or part of the original and subsequent responses, as appropriate. Section 782(e) of the Act states further that Commerce shall not decline to consider submitted information if all of the following requirements are met: (1) the information is submitted by the established deadline; (2) the information can be verified; (3) the information is

---

[43] *See Thai Plastic Bags*, 746 F.3d at 1368.
[44] *See* Remand Supplemental Questionnaire at 1-2.

not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination; (4) the interested party demonstrated that it acted to the best of its ability; and (5) the information can be used without undue difficulties.

As explained above, Commerce satisfied its obligation under section 782(d) of the Act when it reopened the record and issued a supplemental questionnaire to Dillinger with the explanation that the information submitted during the LTFV investigation (*i.e.*, the overall average actual cost of products sold during the POI) was insufficient and that Commerce required the actual product-specific COP of the non-prime products produced. Rather than submit the requested product-specific information, Dillinger maintained that the information that it had submitted previously was sufficient because it was based on production value, rather than sales value.[45] Moreover, section 782(e) of the Act does not require that Commerce use the overall average cost data because, as explained above, the use of the overall average cost of all products as a proxy for the actual product-specific COP of the non-prime products cannot serve as a reliable basis for calculating an AD margin within the meaning of section 782(e)(3) of the Act.[46] Therefore, because the physical characteristics of the non-prime products and the product-specific COP of non-prime products is necessary information that is missing from the record, despite Commerce's reopening of the record to obtain the information, Commerce is selecting from among the facts otherwise available on the record to determine the COP of prime and non-prime products, pursuant to section 776(a)(1) of the Act.

### 3. Use of Facts A ailable

Pursuant to section 776(a) of the Act, Commerce will use "facts otherwise available" to fill gaps in the record if: (1) necessary information is not available; or (2) an interested party

---

[45] *See* Remand Supplemental Response at 6.
[46] *See Dillinger France I* Remand Redetermination at 10.

12

withholds information requested by Commerce, fails to provide the information by the deadline or in the manner requested, significantly impedes the proceedings, or provides information that cannot be verified.  As discussed above, because Dillinger failed to provide Commerce with the requested information, and because such information is necessary and missing from the record, we are selecting from among the facts otherwise available to fill the gap, pursuant to section 776(a)(1) of the Act.

In particular, Dillinger has explained that its system does not record the physical characteristics of the non-prime products produced or the actual product-specific costs of producing the non-prime products.[47]  Indeed, we acknowledge that Dillinger informed us of its inability to report the physical characteristics of non-prime products during the investigation.[48]  Moreover, there is no evidence on the record to demonstrate that Dillinger does, in fact, track the physical characteristics of non-prime products produced or the actual product-specific costs of the non-prime products.[49]

As a result, Commerce is using the cost assigned to the prime and non-prime merchandise as recorded in Dillinger's normal books and records, as facts otherwise available. We have selected the selling prices of the non-prime products as facts otherwise available because this amount is used by Dillinger in its normal books and records; importantly, was verified by Commerce; and it is the best information available on the record.[50]

---

[47] *See* Remand Supplemental Response at 8-9.
[48] *Id.* at 4.
[49] *See, e.g.*, Dillinger Cost Verification Report.
[50] *See* Dillinger Cost Verification Report at 22 ("We also reviewed the FER during the POI.  In the line item "Seconds," the cost is equal to the net sales for these non-prime items").

### B.  Major Input Rule Applied to Blast Furnace Coke

During the POI, Dillinger obtained pig iron, a major input in the production of the CTL plate, from its affiliate, Rogesa.[51]  Rogesa obtained blast furnace coke, a major input in the production of pig iron from an affiliate,     S.[52]  In analyzing the value of the affiliated coke inputs recorded in Rogesa's books during the investigation, Commerce compared the POI average consumption values for large and small coke purchased from     S (the transfer prices) to the POI average consumption values for large and small coke purchased from unaffiliated parties (the market prices).[53]  While Dillinger challenged Commerce's use of Rogesa's affiliated and unaffiliated consumption values, rather than using purchase prices, in applying the major input rule, the Court found Commerce's use of consumption values was reasonable.[54]  However, the Court remanded for Commerce to consider whether the comparison of unaffiliated and affiliated consumption values and associated freight costs used in applying the major input rule for the specific input (coke) were on a contemporaneous basis, and further whether the freight costs for the coke were calculated on a consistent basis (i.e., dry- versus wet-weight).[55]

In this regard, Dillinger argued that Rogesa's consumption values from unaffiliated suppliers reflect the values of coke purchased prior to the POI at the time when market prices were considerably higher, that freight costs were significantly different because the coke came from different countries than what was sourced during the POI, and that the calculated freight costs and the coke values to which they were applied were on different bases.[56]  After further

---

[51] See Dillinger's Letter, "AG der Dillinger Hüttenwerke Section D Response," dated July 15, 2016, at D-7.
[52] Id. at D-8.
[53] See Memorandum, "Cost of Production and Constructed Value Calculation Adjustments for the Final Determination – AG der Dillinger H  ttenwerke," dated March 29, 2017 (Dillinger Final Cost Calc Memo), at 2 and Attachments 2.1 and 2.2.
[54] See Dillinger Germany II, Slip Op. 21-101 at 7.
[55] Id. at 8 to 10.
[56] Id. at 9 and 10.

14

review, we agree with Dillinger that certain unaffiliated suppliers' consumption values used in the major input analysis were predominately based on purchases made prior to the POI and those associated freight costs distorted the unaffiliated consumption values.[57]  Further, we agree with Dillinger that the calculated freight costs used in the major input analysis were not on a consistent basis with the coke values to which they were applied.[58]  Therefore, to comply with the Court's order and mitigate the non-contemporaneous nature of the comparison of affiliated and unaffiliated consumption values, we obtained POI monthly inventory movement schedules for coke from each affiliated and unaffiliated supplier, information regarding when the last coke purchases were made by Rogesa from each supplier, and a schedule detailing the freight cost by supplier for each month of the POI.[59]  Accordingly, using the suppliers' POI inventory movement schedules that show the beginning inventory, purchases, consumption, and ending inventory, we were able to determine the appropriate contemporaneous population of POI coke consumption values from unaffiliated suppliers.[60]  In this regard, we eliminated from our calculation the consumption values from unaffiliated suppliers that had a significant POI beginning inventory balances of coke and/or had no purchases of coke during the POI.  We then recalculated the POI unaffiliated consumption values by weight averaging the consumption values for the remaining unaffiliated suppliers.  Likewise, using the detailed freight cost schedule,[61] we were able to recalculate a freight cost that represents an amount that is contemporaneous with the POI, only associated with coke supplied during the POI, and reflects a

---

[57] *See* Dillinger S   RD2 at Appendix SD-34.
[58] *Id.*
[59] *See* Remand Supplemental Response at Appendix R-11.
[60] *Id*. at Appendices R-9 and R-12.
[61] *Id*. at Appendix R-11.

dry weight basis.  As a result of these changes, the major input adjustment decreases from

percent to ___ percent.

We note, however, that because of the foregoing methodological change, we found that

small blast furnace coke was not purchased from unaffiliated suppliers during the POI.

Accordingly, because small blast furnace coke consumed during the POI was only sourced from

Rogesa's affiliate ___ S during the POI, we do not have a market consumption value to use in the

application of the major input rule.[62]  Accordingly, pursuant to section 776(a) of the Act,

Commerce will use "facts otherwise available" to fill gaps in the record if:  (1) necessary

information is not available; or (2) an interested party withholds information requested by

Commerce, fails to provide the information by the deadline or in the manner requested,

significantly impedes the proceedings, or provides information that cannot be verified.

Specifically, for small blast furnace coke, after changing the methodology in determining the

population of the unaffiliated consumption values that should be used as a comparison to the

affiliated consumption values in the application of the major input rule, we found that Dillinger

did not have any contemporaneous purchases of small blast furnace coke during the POI on the

record.  Because it is necessary to have contemporaneous purchases of small blast furnace coke

information on the record to use in the application of the major input rule, and such information

is missing from the record, we are selecting from among the facts otherwise available to fill the

gap, pursuant to section 776(a)(1) of the Act.  Therefore, as facts available, we applied the results

of the ___ S-sourced large coke major input analysis to the ___ S-sourced small coke consumption.

The Court also remanded for Commerce to consider whether G&A and financial

expenses must be added to ___ S' transfer prices to place them on the same basis as the market

---

[62] *Id*. at 19.

prices to which they are compared.[63]  In this regard, Dillinger argued that the market prices are fully-loaded prices that cover all costs of the unaffiliated seller including selling, G&A, and financial expenses, while the transfer prices to which they are compared are based only on      S' TOTCOM.[64]  According to Dillinger, Commerce's cost calculations ultimately add G&A and financial expenses to the reported TOTCOM; thus, the actual end value of the affiliated input is the transfer price plus the additional amounts for G&A and financial expenses.[65]  Hence, Dillinger concluded that in order for the transfer price to be on the same basis as the unaffiliated sales price, this fully loaded transfer price must be used in the analysis.[66]

In this argument, Dillinger ambiguously refers to G&A and financial expenses; thus, we are uncertain whether these are the G&A and financial expenses incurred by      S or those incurred by Dillinger.  Nevertheless, as it pertains to G&A and financial expenses, we find that all elements of our major input analysis are on a consistent basis.  The goal of the minor (*i.e.*, transactions disregarded) and major input rules is to determine whether the prices paid to affiliated parties for a specific input (in this case, coke) reflect arm's-length values.  Since arm's-length values when applying these rules represent transactions between two unrelated parties (*i.e.*, market prices) and prices that recover the COP as defined by the statute,[67] we are testing the affiliated purchase price for a specific input as recorded in a respondent's normal books and records to ensure it reflects the higher of market price (transactions disregarded) or both the market price and COP (*i.e.*, major input rule).  In this case,      S is an affiliated producer of a major input (*i.e.*, coke) used by Rogesa, and an affiliated producer of a major input (*i.e.*, pig iron)

---

[63] *See Dillinger Germany II*, Slip Op. 21-101 at 11.
[64] *See* Dillinger's Letter, "Plaintiff AG der Dillinger H  ttenwerke's Rule 56.2 Memorandum in Support of Motion for Judgment Upon the Agency Record," dated March 12, 2018 (Dillinger Brief), at 41.
[65] *Id.*
[66] *Id.*
[67] *See* section 773(b)(3)(A)(B) of the Act.

used by Dillinger to produce CTL plate.  Accordingly, we tested whether the price that      S charged Rogesa for coke, that passed to Dillinger through its purchases of pig iron from Rogesa, are arm's-length and above-cost transactions by comparing those transactions to the market price and COP.  In analyzing the value of the affiliated coke inputs recorded in Rogesa's books, Commerce compared the POI average consumption values for coke purchased from      S (the transfer price) to the POI average consumption value for Rogesa coke purchased from unaffiliated parties (the market price).[68]  Contrary to Dillinger's claim, it is not relevant how

S may have set its sales prices for the coke it sold to its affiliate Rogesa.  It is the amount actually charged by      S and paid and recorded by Rogesa in its normal books and records for the affiliated purchases of coke that is being tested, regardless of how that transfer price was determined by the affiliated seller.  Accordingly, Commerce compared the consumption value for coke inputs that Rogesa purchased from      S to the consumption value for the coke inputs that Rogesa purchased from unaffiliated parties.  Although Dillinger argues that Commerce will add G&A and financial expenses to the affiliated coke inputs in its cost calculations, these are downstream costs incurred by Dillinger that have nothing to do with the market price for coke purchases.  Furthermore, Dillinger's G&A and financial expenses will be added to all Dillinger activity; thus, both the affiliated and unaffiliated coke inputs would be part of the denominator used to calculate Dillinger's G&A and financial expense ratios and both the affiliated and unaffiliated coke inputs would be allocated a proportionate share of Dillinger's G&A and financial expenses.  In summary, our statutorily directed endeavor here is to test whether the affiliated transfer price paid by Dillinger reflects the higher of the market price or COP to ensure it represents an arm's-length transaction.[69]  Thus, we disagree that, with regard to G&A and

---

[68] *See* Dillinger Final Cost Calc Memo at Attachment 2.1.
[69] *See* Dillinger Final Cost Calc Memo at 2.

financial expenses, there is an imbalance in our comparison of Dillinger's purchases of coke from affiliated and unaffiliated parties.

With respect to the credit note referenced by the Court,[70] we have revisited Dillinger's original objections and find it is necessary to first clarify the issue before the Court. While the Court refers to our credit note adjustment applied at Attachment 2.1 of the final calculation memorandum, Dillinger does not contest the credit note adjustment for coke. Rather, Dillinger argues that "{t}he Department also did not account for the fact that, in Attachment 3 of its final cost calculation memorandum, it added over          Euros in additional costs to     S' reported cost of manufacture."[71] Thus, the adjustment at issue stems from Attachment 3 of our final cost calculation memorandum, which addresses the fair market value of the inputs and services that Dillinger provided to Rogesa and     S. Specifically, at Attachment 3, Commerce applied a minor input adjustment to     S' cost of manufacturing (COM) that increased, to a market value, the transfer price of the inputs and services provided by Dillinger to     S.[72] Dillinger contends that this amount must be factored into the Attachment 2.1 major input (coke) adjustment calculation because "when the Department compares unaffiliated sales prices with the affiliated cost of production under the major input rule, it must use the final affiliated cost of production {of coke} after all of the other adjustments made by the Department."[73]

In this regard, we disagree with Dillinger that the additional     S manufacturing costs calculated in Attachment 3 need to be accounted for in the calculation of our major input adjustment for affiliated coke inputs. Here, once again, Dillinger misplaces the purpose of the

---

[70] See *Dillinger Germany II*, Slip Op. 21-101 at 10.
[71] See Dillinger Brief at 41-42.
[72] See Dillinger Final Cost Calc Memo at Attachment 3.
[73] See Dillinger's Letter, "Reply Brief on Behalf of Plaintiff AG der Dillinger Hüttenwerke," dated August 22, 2018, at 24.

19

major input rule and, specifically, how the rule is applied in determining Dillinger's COM for CTL plate.        S is an affiliated producer of a major input (*i.e.*, coke) used by Rogesa, and an affiliated producer of a major input (*i.e.*, pig iron) used by Dillinger to produce CTL plate. Accordingly, the purpose of calculating        S' COP of coke is to ensure that the price        S charges Rogesa for coke, that passes to Dillinger through its purchases of pig iron from Rogesa, are arm's-length and above-cost transactions, by comparing those transactions to the market price and COP.  Therefore, despite our revision to        S' actual cost of producing the coke, our major input analysis determined that the market price for coke was higher than the transfer price or        S' COP for the coke.  Consequently, at Attachment 2.1, we adjusted Dillinger's reported costs to reflect the market value of the coke supplied by        S.[74]  In doing so, we based our adjustment factor on the difference between the average market price of coke and the average transfer price of coke (*i.e.*, the difference between the average consumption values for coke Rogesa obtained from unaffiliated parties and the average consumption values for coke Rogesa obtained from        S).  Because the reported costs reflect the transfer price of the coke (and not

        S' adjusted COP for the coke), it is appropriate to calculate the major input adjustment as the difference between the market value of the coke and the value that needs to be adjusted, *i.e.*, the transfer price of the coke.  Because we are adjusting those transfer prices to reflect market prices (and not to reflect        S' adjusted COP of coke), there is no need to factor in the additional coke manufacturing costs calculated at Attachment 3.  In fact, with regard to our adjustment of        S' COM, Attachment 3 confirms that "{t}his adjustment applies to the coke COM.  Since the market price of coke as calculated at Attachment 2.1 exceeds the transfer price and COP, the adjustment to the transfer price {of the Dillinger inputs and services} has no effect on the

---

[74] *See* Dillinger Final Cost Calc Memo at Attachment 2.1.

reported cost."[75]  Since we did not rely on     S' adjusted COP, but rather relied on the difference

between the market and transfer prices of coke to calculate our major input adjustment to

Dillinger's reported costs, we disagree that the additional     S manufacturing costs calculated at

Attachment 3 need to be factored into our calculation of the major input adjustment to the coke

inputs.

### C.  Adjustment to Expenses for Inputs and Services Provided to Affiliates

The Court also found that Commerce failed to fully address Dillinger's arguments that

the addition of Dillinger's G&A expenses to the cost of the labor services that Dillinger provided

to     S and Rogesa overstates costs.[76]  Accordingly, we have reexamined Dillinger's arguments

as directed by the Court.

During the POI, Dillinger provided labor services to its affiliates Rogesa and     S, who

paid Dillinger for these services and those costs became part of     S and Rogesa's COMs of the

coke     S provided to Rogesa and the pig iron Rogesa provided to Dillinger.[77]  To test whether

the affiliated labor service transactions were at arm's length, in the investigation we compared

the transfer prices Rogesa and     S paid Dillinger to Dillinger's cost of the services.[78]  While

these labor services are considered to be a minor input, we used the cost of providing the services

as a reasonable proxy for a market price because no market price for such services was

available.[79]  To calculate Dillinger's total cost of the services, we included a portion of

Dillinger's G&A expenses.  Commerce explained that this was appropriate because Dillinger's

G&A expense ratio was based on the unconsolidated financial statements, which do not

---

[75] *Id.* at Attachment 3.
[76] *See Dillinger Germany II*, Slip Op. 21-101 at 12-17.
[77] *See* Dillinger's Letter, "AG der Dillinger Hüttenwerke Supplemental Section D Response," dated September 28, 2016 (S  RD1), at 15.
[78] *See* Dillinger Final Cost Calc Memo at Attachment 3.
[79] *Id.* at 2.

eliminate transactions between the affiliated parties; therefore, Dillinger "essentially included the cost of the inputs and services provided to Rogesa and      S twice; once when they were sold to the affiliates, and once when Dillinger consumed the inputs provided by Rogesa and      S."[80] Consequently, in order to fully account for Dillinger's G&A expenses, it was necessary to include a portion of Dillinger's G&A expenses when calculating the total cost of the services Dillinger provided to Rogesa and      S.

Dillinger countered that, in adding the G&A expenses, Commerce failed to consider the payments from Rogesa and      S to Dillinger for the services.[81]  According to Dillinger, these payments were other income to Dillinger that Commerce allows as an offset to G&A expenses; thus, any increase in the Rogesa and      S costs at one level merely results in an increase in the other income that is allowed as an offset at another level.[82]  Essentially, Dillinger argued that by including both the cost of the labor services and the associated other income in the calculation of Dillinger's G&A expense ratio, Dillinger effectively eliminated the double-counting of the labor service costs in the denominator to the G&A expense ratio.[83]  As a result, Dillinger claimed that there was no need to also apply G&A expenses to the cost of the labor services that Dillinger provided to Rogesa and      S.

While we agree with Dillinger's logic in this matter, we disagree that Dillinger did, in fact, offset the cost of the labor services included in the denominator of the G&A expense ratio with the associated other income received from Rogesa and      S when Dillinger calculated its reported G&A expense ratio.  Our conclusions in the investigation were based on the detailed records of this case; however, in the Remand Supplemental    uestionnaire, we requested

---

[80] *See Final Determination* IDM at Comment 32.
[81] *See* Dillinger Brief at 43.
[82] *Id.*
[83] *Id.*

additional written confirmation of these facts from Dillinger.[84]  In its response, Dillinger confirmed that, although the labor service costs were included in the denominator to the G&A expense ratio, the associated other income was not included anywhere in the G&A expense ratio calculation.[85]  Therefore, by not offsetting the costs of the labor services with the associated income, Dillinger relied on a larger denominator in the calculation and thereby reduced the G&A expense ratio.  Therefore, Dillinger's chosen methodology for calculating the G&A expense ratio compelled Commerce to apply the diluted G&A expense ratio to the cost of the labor services (which are included in the denominator of the ratio calculation) to ensure that all of Dillinger's G&A expenses, as they relate to the production of CTL plate, were absorbed in the cost calculations.[86]

Dillinger also argued that including Dillinger's own G&A expenses (as they relate to the labor services) in the cost of the coke and pig iron that flow into Dillinger's TOTCOM, and then applying the G&A expense ratio to Dillinger's TOTCOM, which includes the coke and pig iron costs, double counts G&A expenses that relate to the labor services.[87]  We reviewed our final cost calculations to confirm that Dillinger's G&A expenses were not double counted in this manner.  In the investigation, Commerce increased Dillinger's TOTCOM by          percent for the portion of the labor service adjustment that was related to CTL plate.[88]  When Commerce calculated Dillinger's G&A expenses, we applied Dillinger's G&A expense ratio to a CTL plate TOTCOM that did not include the affiliated transaction adjustments.[89]  Hence, Dillinger's G&A

---

[84] *See* Remand Supplemental   uestionnaire.
[85] *See* Remand Supplemental Response at 21-22.
[86] *See* Memorandum, "Margin Calculations for AG der Dillinger Hüttenwerke S.A. Pursuant to Draft Results of Remand Redetermination," dated December 3, 2021 (Draft Remand Calculation Memorandum), at Attachment 4.
[87] *See* Dillinger Brief at 43-44.
[88] *See* Dillinger Final Cost Calc Memo at Attachment 3.
[89] *Id.* at 4.  Specifically, Commerce applied Dillinger's G&A expense ratio of          percent to the following net figure:  Dillinger's revised TOTCOM (*i.e.*, TCOMCOP) less TOTCOM          percent (the          percent reflects

expense ratio was not applied on top of the          percent adjustment and the G&A expenses related to the labor services were not double counted.

Finally, Dillinger argued that Commerce did not allocate any portion of the labor services adjustment to the non-subject products that were produced with Rogesa's pig iron, but rather allocated the entire adjustment to CTL plate.[90]  According to Dillinger, only          percent of the pig iron produced by Rogesa was used by Dillinger.  Further, of the amount related to Dillinger, Commerce's calculation erroneously "treats the entire absolute increase in the costs of coke and pig iron as if they flow 100     into the cost of manufacturing (COM) of plate and then builds a ratio where the denominator is limited to only the COM of plate."[91]  However, according to Dillinger, it used the Rogesa pig iron to produce both subject and non-subject products and Commerce's calculation failed to reflect this.

After further review, we agree with Dillinger that there are errors in our calculation of the labor services adjustment factor.  In the final cost calculation memo at Attachment 3, we calculated the difference between the total transfer price that Rogesa paid Dillinger for the labor services and Dillinger's total cost of the services (*i.e.*, the total adjustment of          thousand Euros).[92]  This total adjustment value is related to all Rogesa activity.  Therefore, to determine what portion of this total adjustment was related to CTL plate production, we first excluded the portion of the total adjustment that was related to Rogesa's non-pig iron activities (*i.e.*, multiplied the total adjustment value by the          percent that pig iron represents of Rogesa's

---

two adjustments – the          percent minor input labor service adjustment from Attachment 3 and the          percent major input coke adjustment from Attachment 2.1).
[90] While we calculated the additional G&A expenses that were related to the labor services Dillinger provided to      S, we did not adjust the transfer price Dillinger paid to      S to reflect      S' actual COP, but rather relied on the market price of the coke inputs.  *See* Dillinger Final Cost Calc Memo at Attachment 3.
[91] *See* Dillinger Brief at 44.
[92] *See* Dillinger Final Cost Calc Memo at Attachment 3.

24

total activities, excluding the difference).[93]  Next, we multiplied the result, *i.e.*, the portion of the total adjustment value that was related to pig iron, by the percentage that pig iron represents of Dillinger's TOTCOM (*i.e.*,          percent).[94]  However, this step was incorrect.  Instead, the second step should allocate the total adjustment related to Rogesa's pig iron production to the entities that purchased and consumed the pig iron (*e.g.*, Dillinger, *etc.*).  Therefore, this step should reflect the percentage of Rogesa's total pig iron production that was sold to Dillinger (*i.e.*, the          percent referenced by Dillinger, calculated as          metric tons (MT) of Rogesa's total          MT in pig iron production).[95]  Next, in our final cost calculations, we divided the result from the prior step by Dillinger's TOTCOM for CTL plate.[96]  However, this step was also incorrect.  Because Dillinger consumed pig iron in the production of both subject and non-subject merchandise, Dillinger's portion of the pig iron adjustment should be allocated to all products that were produced with pig iron.  Therefore, we agree with Dillinger that the denominator here should reflect Dillinger's COM for all products that were produced with Rogesa's pig iron, and not just the manufacturing costs for CTL plate.  The revised calculation is as follows: (          thousand Euros                    ) /          thousand Euros, which reflects          thousand Euros for CTL plate costs          thousand Euros for Dillinger France slab costs          thousand Euros for non-subject slab costs          thousand Euros for foundry costs.[97]  As a result, correcting this calculation decreases the labor services minor input adjustment that is related to Dillinger's cost of CTL plate from          percent to          percent.

### D.  Remand Results on Partial AFA

---

[93] *Id.*
[94] *Id.*
[95] *See* Dillinger Brief at 44; and S   RD1 at Appendix SD-10.
[96] *See* Dillinger Final Cost Calc Memo at Attachment 3.
[97] *See* Dillinger Final Cost Calc Memo at Attachment 3; Dillinger S   RD1 at Appendix SD-10; and S   RD2 at Appendix SD-44.

As noted above, in *Dillinger Germany I*, while the Court sustained Commerce's use of partial AFA to Dillinger and Salzgitter, the Court did not agree with how Commerce applied partial AFA in this instance, and thus instructed Commerce to recalculate the margins from the LTFV investigation for Dillinger and Salzgitter according to the methodology used in *Dillinger France II*.[98]   In response, Commerce recalculated Salzgitter's margin under protest, explaining that due to the Court's specific instructions, "Commerce was unable to consider whether an alternative methodology would have been more appropriate in the instant case … the Court's order deprives Commerce of the ability to further consider whether the purpose of section 776 of the Act, *i.e.*, inducing cooperation has been satisfied."[99]   Thus, in *Dillinger Germany II*, the Court remanded this issue to Commerce, allowing that "{i}f Commerce wishes to apply a different AFA approach in this proceeding than the one it ultimately applied in the French investigation, {Commerce} must explain why a disparate approach is reasonable."[100]

The Court noted that the fact patterns that led to Commerce's application of partial AFA in both the LTFV investigations underlying *Dillinger Germany I* and *Dillinger France I* did not appear distinguishable.[101]   Commerce acknowledges that the circumstances that led to Commerce's determination to resort to partial AFA in each investigation are essentially the same; in each investigation, the respondent (*i.e.*, Dillinger France S.A. (Dillinger France) in the CTL plate from France LTFV investigation and Dillinger and Salzgitter in the CTL plate from Germany LTFV investigation) failed to report the manufacturer for certain downstream sales of CTL plate resold by an affiliated reseller.[102]   However, as discussed below, the scope of

---

[98] *See Dillinger Germany* I, 399 F. Supp. 3d at 1257.
[99] *See Dillinger Germany I* Remand Redetermination at 4.
[100] *See Dillinger Germany II*, Slip Op. 21-101 at 18.
[101] *Id.* at 17-18.
[102] *See Final Determination* IDM at Comments 2 and 20; and *Certain Carbon and Alloy Steel Cut-to-Length Plate from France:  Final Determination of Sales at Less Than Fair Value*, 82 FR 16363 (April 4, 2017), and accompanying IDM at Comment 5.

Salzgitter's failure to cooperate is substantially different than the scope of Dillinger's (or Dillinger France's) failure to cooperate.

Specifically, Salzgitter reported approximately 28,000 downstream sales of CTL plate for which it did not identify the manufacturer,[103] out of a total of          Salzgitter-produced home market sales used in our analysis.[104]  Thus, these sales represented more than      percent of Salzgitter's home market sales used in our analysis.  In contrast, Dillinger reported only           downstream sales for which it did not identify the manufacturer, out of a total of          home market sales examined (*i.e.*, less than        percent).[105]  With this number of impacted downstream sales, the application of partial AFA, regardless of any methodology, had no measurable impact on Dillinger's margin.  While the number of sales with missing manufacturer information for Dillinger France is not on the record of this proceeding, Commerce notes that only a small number of Dillinger France's downstream home market sales lacked manufacturer information.  Thus, the application of partial AFA, regardless of any methodology, had no measurable impact on Dillinger France's margin.[106]

The difference between Salzgitter's, Dillinger's, and Dillinger France's missing information warrants the application of different partial AFA methodologies.  For Dillinger and Dillinger France, applying the partial AFA methodology in *Dillinger France I* (*i.e.*, treating all unidentified manufacturer sales as produced by the respondent, and relying on the reported sales prices on the record) had no effect on the margins calculated in the underlying LTFV

---

[103] These downstream sales were made by Salzgitter's affiliate Salzgitter Mannesmann Stahlhandel GmbH (SMSD). *See* Memorandum, "Final Determination Calculations for Salzgitter," dated March 29, 2017 (Salzgitter Final Calculation Memo), at Attachment I, SAS Log at page 55 (indicating that the number of observations where the seller is SMSD and the manufacturer is "UN    NOWN" is        ).
[104] *Id*. at Attachment I, SAS Log at page 56.
[105] *See* Memorandum, "Final Determination Calculations for Dillinger," dated March 29, 2017 (Dillinger Final Calculation Memo), at Attachment I, SAS Log at pages 67-68.
[106] *See Dillinger France I* Remand Redetermination at 6.

investigations.[107]  Therefore, Commerce's intended purpose in selecting the partial AFA

methodology, discussed in detail below, continued to be undisturbed on remand.  However, for

Salzgitter, applying this methodology had a material effect on the margin, resulting in a change

from the 22.90 percent calculated in the *Final Determination*, to a rate of zero percent and

Salzgitter's potential exclusion from the AD order.[108]  Thus, this methodology did not support

Commerce's goals in applying partial AFA, as stated below.

The Court sustained Commerce's use of partial AFA to Salzgitter.[109]  Specifically, the

Court agreed first with Commerce's application of facts otherwise available, noting that

Salzgitter was incorrect in stating it had provided Commerce with sufficient information.[110]  The

Court stated that it agreed Commerce could not determine whether to include or exclude certain

CTL plate transactions because of the missing manufacturer information and, thus, Commerce's

gap filling with facts otherwise available was required.[111]  Next, when looking at Commerce's

application of partial AFA and Salzgitter's arguments against this, the Court stated that

Salzgitter's arguments were unpersuasive.  Specifically, the Court was perplexed as to why

Salzgitter did not conduct its own statistical analysis to attempt to tie the missing manufacturer

information to the 28,000 CTL plate sales.[112]  The Court further pointed to the record, stating

that Salzgitter presented the Court with only "self-serving statements or interpretations of the

record" to show that Salzgitter had attempted to obtain the missing information, which were not

supported by the record itself, and thus Commerce's application of partial AFA was reasonable

when looking at the record as a whole.[113]

---

[107] *See Dillinger I* Remand Redetermination at 2; and *Dillinger France I* Remand Redetermination at 4.
[108] *Id*. at 2 and 4-5.
[109] *See Dillinger Germany I*, 399 F. Supp. 3d at 1256.
[110] *Id.* at 1253.
[111] *Id.*
[112] *Id.* at 1255 – 1256.
[113] *Id.*

Accordingly, Commerce's authority to apply partial AFA to Salzgitter for its failure to provide the requested manufacturer information for its downstream sales is not in dispute. However, the application of the *Dillinger France I* partial AFA methodology to Salzgitter deprives Commerce of the ability to apply section 776 of the Act meaningfully in this proceeding. It is well established that Congress intended Commerce to use AFA as a means to induce cooperation in its proceedings and address evasion concerns.[114] The purpose of AFA is to provide respondents with an incentive to cooperate in Commerce's investigations and reviews and ensure that necessary information is placed on the record to enable Commerce to reach a reasonable determination.[115] However, the change in the AFA methodology prescribed by the Court in *Dillinger France I* and applied to Salzgitter in the *Dillinger I* Remand Redetermination frustrates Commerce's goals of inducing cooperation by ensuring that a non-cooperating respondent does not receive a more favorable AFA rate than it would have received if the company had cooperated fully.

Here, Commerce considered the extent to which Salzgitter may benefit from its own lack of cooperation.[116] In selecting a partial AFA methodology, Commerce seeks to adopt a methodology that would induce future cooperation and ensure that necessary information is placed on the record. If respondents find there is no benefit to their cooperation, they may conclude that withholding information or providing only certain information, rather than providing a fulsome response, is more advantageous. These concerns now arise here because, using the *Dillinger France I* methodology, Salzgitter may well receive a more favorable

---

[114] *See Mueller Comercial de Mexico, S. de R.L. de C.V. v. United States*, 753 F.3d 1227, 1235 (Fed. Cir. 2014).
[115] *See F.Lii De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1028, 1032 (Fed. Cir. 2000).
[116] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, vol. 1 (1994) (SAA) at 870.

dumping margin than it would have received if the company had fully cooperated with Commerce, and, as a result, Salzgitter would ultimately be excluded from the AD order.

Because of Salzgitter's reporting failures, which are significant, representing more than percent of Salzgitter's home market sales used in our analysis, we are unable to determine what Salzgitter's margin would have been if Salzgitter had fully cooperated with our requests for information and properly reported the manufacturer of the downstream sales at issue. Commerce relies on the manufacturer information to match U.S. sales to comparison market sales produced by the same manufacturer for comparison purposes in calculating the dumping margin. Without this critical information, Commerce cannot properly identify which home market sales to compare to U.S. sales. Thus, Commerce cannot determine which of the nearly 28,000 downstream sales without a reported manufacturer were produced by Salzgitter (and are thus potentially comparable to Salzgitter's U.S. sales), and which were produced by other manufacturers (and are thus excluded from the comparison pool).

The impact of the missing manufacturer information is further demonstrated by the pricing of the sales with this missing information. To determine the highest non-aberrational net price (*i.e.*,          Euros) to be assigned to the downstream sales with missing manufacturer information, Commerce sorted all of SMSD's net prices for these sales in descending order and selected the transaction at the beginning of a smooth continuum of net prices.[117] Because Salzgitter failed to report the manufacturer of these sales, we cannot determine if the net prices correlated to the manufacturer of the CTL plate. Commerce cannot rule out the possibility that the sales with the highest prices were entirely or primarily of CTL plate manufactured by

---

[117] *See* Salzgitter Final Calculation Memo at 2, Attachment I, SAS Log at page 55, and Attachment I, SAS Output at 81.

Salzgitter, and Salzgitter's failure to report the manufacturer information was an attempt to obscure this fact, thereby distorting the margin.

The Court notes that Commerce did not raise the material factual differences between Salzgitter, Dillinger, and Dillinger France in the underlying final determinations of the LTFV investigations.[118] The differences described above were not relevant to our LTFV final determinations because the partial AFA methodology applied in the final determinations would ensure cooperation from respondents in future proceedings, particularly as applied to Salzgitter. However, after the Court ordered Commerce to apply the revised partial AFA methodology in *Dillinger France I*, these differences between the respondents became both apparent and relevant, as demonstrated in the different impact on the respondents' margins by applying this methodology and Commerce's inability to obtain its goals in applying partial AFA for Salzgitter.

Further, the Court in *Dillinger France I* considered the application of partial AFA only as it pertained to one respondent, Dillinger France, based on a different record in a different case. The Court in that proceeding (and Commerce in its remand redetermination) did not need to consider whether any differences between the respondents in the CTL plate from Germany LTFV investigation and CTL plate from France LTFV investigation were relevant. In this proceeding, we find that the difference in the application of partial AFA to the respondents, as described above, is relevant. Accordingly, Commerce's *Final Determination* partial AFA methodology for Salzgitter, which results in an estimated weighted-average dumping margin of 22.90 percent, should be sustained on remand.

---

[118] *See Dillinger Germany II,* Slip Op. 21-101 at 18.

## IV.  INTERESTED PARTY COMMENTS

On December 3, 2021, Commerce released the draft results of redetermination to all interested parties and invited interested parties to comment.[119]  On December 21, 2021, we received comments from Nucor Corporation (Nucor);[120] SSAB Enterprises LLC (SSAB);[121] Dillinger;[122] and Salzgitter.[123]

**Comment 1:  Non-Prime Plate Ad ustment**

*Dillinger Comments*

> Commerce erred in the Draft Remand Results in shifting the reported COP from non-prime to prime plate.  This methodology of shifting costs to reflect the sales value of the non-prime plate was rejected by the CAFC.[124]

> Commerce incorrectly claims that Dillinger values non-prime plate at its sales value in its normal books and records.  Rather, all costs related to the production of heavy plate, regardless of whether the plate is prime or non-prime merchandise, is booked to the same cost object.  Moreover, even if Dillinger's normal books and records valued non-prime plate at its sales value, under *Dillinger France I*, it would still be improper for Commerce to rely on this information in reporting COP.[125]

---

[119] *See AG Der Dillinger Hüttenwerke, v. United States* Court No. 17-00158, Slip. Op. 21-101 (CIT August 18, 2021), Draft Results of Redetermination Pursuant to Court Remand Certain Carbon and Alloy Steel Cut-to-Length Plate from Germany, issued on December 3, 2021 (Draft Remand Results).

[120] *See* Nucor's Letter, "Comments on Draft Results of Redetermination," dated December 21, 2021 (Nucor Comments).

[121] *See* SSAB's Letter, "Comments on Draft Remand Redetermination," dated December 21, 2021 (SSAB Comments).

[122] *See* Dillinger's Letter, "Comments on Draft Results of Redetermination," dated December 21, 2021 (Dillinger Comments).

[123] *See* Salzgitter's Letter, "Comments on Draft Results of Redetermination Pursuant to Second Court Remand," dated December 21, 2021 (Salzgitter Comments).

[124] *See* Dillinger Comments at 1-2 (citing *Dillinger France II*; *see also Dillinger Germany II*, Slip Op. 21-101).

[125] *Id*. at 2 (citing Remand Supplemental Response at 8-9; and *Dillinger France I* at 1324).

Commerce also incorrectly stated that Dillinger did not report the actual costs of producing non-prime plate.  The COM for the non-prime CONNUMs Dillinger reported corresponds to the average actual total COM for all plate sold during the POR.[126]

Throughout the underlying LTFV investigation, Dillinger fully disclosed its difficulties in reporting all of the physical characteristics for non-prime plate and proposed alternatives to report the physical characteristics it could not identify.  Commerce made no objections to Dillinger's non-prime physical characteristic reporting methodology.[127]

Moreover, the reporting of physical characteristics for non-prime merchandise is not necessary because no non-prime merchandise was sold to the United States; therefore, none of the home market sales of non-prime merchandise would be used in the margin calculations to be matched to U.S. sales.[128]

No necessary information is missing from the record.  Dillinger properly reported COP for both prime and non-prime merchandise and Commerce fully verified this information.  The calculation of COP for prime material is entirely independent from the calculation of COP for non-prime material and no party has challenged the costs of prime material.[129]

Although Commerce states that it must have actual product-specific cost information for non-prime plate, the average net sales value it uses as "facts available" is neither product-specific nor related to actual costs.  Commerce failed to demonstrate that the net sales value used for non-prime merchandise bears any relation to the actual costs of producing that plate.  Therefore, in no case can the net sales value of non-prime plate be properly

---

[126] *Id*. at 2-3 (citing Remand Supplemental Response at 6-7, 12-13, and Appendix R-5).
[127] *Id*. at 3-4.
[128] *Id*. at 4.
[129] *Id*. at 3.

used as "facts available" for the actual cost of non-prime plate under section 776(a) of the Act.[130]

The average actual costs Dillinger reported for the cost of non-prime plate represent the best information available on the record for the actual COP of non-prime plate. This information corresponds to the average actual total COM for all plate sold during the POI and fulfills the requirements of section 782(e) of the Act.[131]

Commerce's use of the likely selling price of non-prime plate, rather than the actual average COP reported by Dillinger, is effectively an impermissible adverse inference. Under section 776(b) of the Act, Commerce may only impose an adverse inference when a party has failed to cooperate. Dillinger fully cooperated to the best of its ability during the LTFV investigation; therefore, Commerce's implicit adverse inference in its non-prime plate adjustment methodology is unwarranted and unreasonable.[132]

*Nucor Comments*

Commerce properly relied on the costs for prime and non-prime merchandise, as recorded in Dillinger's normal books and records, as the best available information for the non-prime plate adjustment in the Draft Remand Results. Commerce's approach is fully supported by the record and is consistent with the statute, the Court's order, and the CAFC's opinion in *Dillinger France II.*[133]

---

[130] *Id*. at 4.
[131] *Id*. at 5.
[132] *Id*. at 5-6.
[133] *See* Nucor Comments at 13-16 (citing sections 776(a) and 782(d) of the Act; and *Dillinger France II*, 981 F.3d at 1321 and 1324).

*Commerce's Position:*

We continue to find that, because Dillinger failed to submit either the actual product-specific costs of producing the non-prime products or the physical characteristics of the non-prime products, as requested, Commerce does not have the information that is necessary to calculate the actual costs of prime and non-prime products. As explained above, Commerce has an obligation to ensure that the reported COP reasonably reflect the cost of producing the merchandise under consideration and necessarily analyzes information pertaining to the cost of producing the merchandise under consideration on both an aggregate and product-specific basis.[134] Moreover, the Court ordered a remand requiring Commerce to "reconcile its COP determination with the CAFC decision in *Dillinger France II*."[135] In *Dillinger France II*, the CAFC specifically ordered a remand requiring Commerce to "determine the actual costs of prime and non-prime products."[136] Indeed, given the combination of the CAFC's directive that Commerce "determine the actual costs of prime and nonprime products" and Commerce's long-standing, judicially-approved practice of analyzing costs on a CONNUM-specific basis,[137] it is perplexing that Dillinger continues to claim that its failure to submit the actual product-specific costs of producing non-prime products or, at a minimum, the physical characteristics of non-prime products, as Commerce requested, has not resulted in a record lacking necessary information.

Dillinger's argument, that section 782(c) of the Act requires that Commerce depart from its long-standing, judicially-approved practice of analyzing costs on a CONNUM-specific basis

---

[134] *See* Remand Supplemental   uestionnaire at 3; *see also Thai Plastic Bags*, 746 F. 3d at 1368.
[135] *See Dillinger Germany II*, Slip Op. 21-101 at 6.
[136] *See Dillinger France II*, 981 F. 3d at 1321.
[137] *See Thai Plastic Bags*, 746 F.3d at 1368.

because Dillinger cannot provide the necessary information, is misplaced.[138]  Section 776(a)(1)
of the Act requires that Commerce apply facts otherwise available if "necessary information is
not available on the record."  Unlike section 776(a)(2)(B) of the Act, which requires that
Commerce consider section 782(c) of the Act before applying facts available when an interested
party fails to provide requested information by the deadlines or in the form and manner
requested, section 776(a)(1) of the Act simply requires that necessary information is not
available on the record.  Here, as discussed above, information pertaining to the actual cost of
producing the non-prime products and their physical characteristics is necessary information and
Dillinger's claim that it is unable to provide the necessary information does not create an
obligation for Commerce to depart from its long-standing, judicially-approved practice of
analyzing costs on a CONNUM-specific basis.

Further, Dillinger's argument that Commerce must accept the overall average cost of
prime products as a surrogate for the actual costs of producing non-prime products because no
party challenged Dillinger's reporting of physical characteristics for non-prime plate is meritless.
First, Commerce explained above why the overall average cost of producing prime products is
not an appropriate substitute for the actual product-specific COP.  Second, Dillinger's argument
that Commerce never challenged Dillinger's reporting of the physical characteristics of non-
prime products fails to acknowledge key facts.  The combination of Dillinger's assertion that it
could not report the physical characteristics of non-prime products, Commerce's decision to

---

[138] Section 782(c) of the Act provides that "{i}f an interested party, promptly after receiving a request from the
administering authority or the Commission for information, notifies the administering authority or the Commission
(as the case may be) that such party is unable to submit the information requested in the requested form and manner,
together with a full explanation and suggested alternative forms in which such party is able to submit the
information, the administering authority or Commission (as the case may be) shall consider the ability of the
interested party to submit the information in the requested form and manner and *may* modify such requirements to
the extent necessary to avoid imposing an unreasonable burden on that party" (emphasis added). Section 782(c) of
the Act does not require that Commerce alter its judicially approved practice of analyzing costs on a CONNUM-
specific basis.

accept the allocation of total costs assigned to non-prime products as recorded in Dillinger's normal books and records (*i.e.*, the actual sales value), and the fact that no non-prime products were sold to customers in the United States (*i.e.*, the non-prime products sold in the home market would never serve as a potential match to products sold in the United States), rendered a discussion of Dillinger's claimed inability to report the physical characteristics of non-prime products unnecessary for the *Final Determination*. While Dillinger's reporting of the physical characteristics was not relevant for the *Final Determination*, the accurate reporting of the physical characteristics of non-prime products became necessary once the Court held that Commerce must determine the actual costs of prime and non-prime products. Accordingly, Commerce reopened the record and issued a supplemental questionnaire to obtain the information deemed necessary by the Court (*i.e.*, the actual CONNUM-specific costs and the physical characteristics of non-prime products).[139] As discussed above, Dillinger did not submit the requested information.[140]

Dillinger's argument that the costs of non-prime products have no impact on the margin calculation, since no non-prime merchandise was sold to the United States, is flawed. It is a *non sequitur* to state that "the draft results of redetermination err in shifting reported costs of production from non-prime plate to prime plate"[141] and then argue that the issue has no impact on the margin calculation.[142] Because the shifting of costs from prime to non-prime products has a direct effect on the costs of both product groups, it directly affects the results of the sales-below-cost test and calculation of constructed value profit, regardless of whether non-prime products were sold in the United States. Indeed, the fact that the weighted-average dumping

---

[139] *See* Remand Supplemental Questionnaire.
[140] *See* Remand Supplemental Response at 1-8.
[141] *See* Dillinger Comments at 1-2.
[142] *Id* at 4.

margin changes as a result of the allocation of costs between prime and non-prime products demonstrates that there is an impact on the calculated weighted-average dumping margin, and it also illustrates why ensuring the accurate reporting of product-specific production costs is an essential step in Commerce's obligation to ensure that the reported costs reasonably reflect the cost of producing the merchandise under consideration.[143]

As mentioned above, we continue to find that Dillinger failed to submit either the actual product-specific costs of producing the non-prime products or the physical characteristics of the non-prime products and have applied facts otherwise available, pursuant to section 776(a)(1) of the Act, because necessary information (*i.e.*, the actual CONNUM-specific costs of producing non-prime products) is not available on the record. Section 776(a)(1) of the Act simply requires that necessary information is missing from the record and does not, unlike section 776(a)(2) of the Act consider whether a party has impeded a proceeding or withheld information. Section 776(a) of the Act states that *either* necessary information is missing from the record *or* an interested party has impeded the proceed or withheld information. There is no *and* statement; section 776(a) does not require both conditions to be met to apply facts otherwise available. Indeed, in a recent case this Court held that section 776(a) of the Act has several layers and multiple uses, stating "{n}otably, paragraphs (1) and (2) are in the alternative, joined by the word 'or,' meaning that Commerce must use facts otherwise available if *either* necessary

---

[143] *See* section 773(f)(1)(A) of the Act (stating that "{c}osts shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and *reasonably* reflect the costs associated with the production and sale of the merchandise." (emphasis added.)) Additionally, the Court has recognized that Commerce "must ensure that {a respondent's} reported costs capture all of the costs incurred by the respondent in producing the subject merchandise' before it can appropriately use that respondent's cost allocation methodology." *See Sidenor Indus. SL v. United States*, 664 F. Supp. 2d 1349 (CIT 2009) (quoting *Myland Indus., Ltd. v. United States*, 31 CIT 1696, 1703 (CIT 2007)).

information is not available *or* the circumstances in paragraph (2) apply."[144]  Accordingly,

Dillinger's argument that it cooperated to the best of its ability in this proceeding and, thus, that

Commerce has imposed an impermissible adverse inference under section 776(b) of the Act is

misplaced.  What is required is merely that one of the conditions provided by the statute is met –

here, the record is missing necessary information and, thus, one of the conditions under section

776(a) of the Act is met.

We disagree with Dillinger's assertions that the overall average cost of producing non-

prime plate satisfies the requirements of section 782(e) of the Act and represents the best

available information on the record such that the use of facts otherwise available is not

necessary.  Section 782(e) of the Act provides that:

> Commerce shall not decline to consider submitted information if all of the following
> requirements are met:  (1) the information is submitted by the established deadline;
> (2) the information can be verified; (3) the information is not so incomplete that it
> cannot serve as a reliable basis for reaching the applicable determination; (4) the
> interested party demonstrated that it acted to the best of its ability; and (5) the
> information can be used without undue difficulties.

As explained previously, the use of the overall average cost of producing prime products cannot

serve as a reliable basis for calculating an accurate weighted-average dumping margin because it

assigns the same costs to products with varying physical characteristics even though there is, in

fact, a wide disparity in the reported actual total COM amounts for prime products.[145]

Dillinger's contention that the use of the overall average actual cost of producing prime plate

satisfies the Court's and the CAFC's directive because it necessarily results in the calculation of

the actual aggregate costs of producing non-prime products is false.  As discussed above, while

---

[144] *See Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1336 (CIT 2020) (further explaining that the first
pathway for applying the facts otherwise available analysis focuses solely on the absence of necessary information,
not the reason why it is missing).
[145] *See* Dillinger S   RD2 at Exhibit SD-50 (containing a printout of Dillinger's COP database labeled "dhcop03").

Dillinger knows its total costs of producing all products (*i.e.*, both prime and non-prime),[146] Dillinger does not record the actual product-specific costs of producing non-prime products.[147] Dillinger's argument that the overall actual average cost of producing all of its prime plate sold equals the product-specific cost of the non-prime plate produced assumes, without evidence, that the product mixes of prime and non-prime products produced during the period are identical. If Dillinger had wanted to present evidence of the specific non-prime products produced, it could have relied on production reports or finished goods inventory excerpts to show which production runs resulted in the production of non-prime plate. Dillinger chose not to do so. Further, we disagree with Dillinger's claim that we incorrectly stated that it values non-prime plate at its sales value in its normal books and records. In fact, in its supplemental questionnaire response, Dillinger stated that "in Dillinger's internal factory results, non-prime merchandise is reported at its sales value (*i.e.*, manufacturing costs  net sales value)."[148] Likewise, we disagree with Dillinger's argument that the net sales value of non-prime plate cannot be properly used as "facts available" for the actual cost of non-prime plate. As mentioned above, since Dillinger was not able to provide the actual specific costs of producing the non-prime products or the physical characteristics of the non-prime products, Commerce has to resort to use the best available information on the record. Accordingly, because Dillinger has not reported the actual product-specific costs of producing non-prime products and, because Commerce has verified the total costs of producing all products during the POI,[149] we are relying on the allocation of costs between prime and non-prime products recorded in Dillinger's normal books and records as the best available information. While we recognize that the use of the non-prime cost information

---

[146] *See* Dillinger Cost Verification Report at 9.
[147] *See* SD  R1 at 22.
[148] *See* SD  R1 at 22.
[149] *See* Dillinger Cost Verification Report at 9.

recorded in Dillinger's normal books and records (*i.e.*, the actual sales prices) does not vary by CONNUM and does not reflect cost differences attributable to the physical characteristics, this information is preferable because it is based on the actual costs Dillinger assigns to the non-prime products produced in its normal books and records.

**Comment 2:  Ma or Input Rule Applied to Blast Furnace Co  e**

*Dillinger Comments*

Commerce's failed to explain in the Draft Remand Results how it determined the "Affiliated Consumption (Transfer Price)" of      EUR/MT.  The source for this value is either incorrect or missing from the Draft Remand Calculation Memorandum. Specifically, Commerce cites "Attachment 1.2." as the source of this figure; however, no such attachment exists.[150]

Commerce fails to explain in the Draft Remand Results how the calculated transfer price comports with the Court's instruction that the adjustment be contemporaneous and on the same basis (*i.e.*, wet- vs. dry-weight basis, freight, G&A, and interest expenses).  Rather, Commerce's Draft Remand Results adjustment distorts the actual difference between the contemporaneous POI prices for large coke purchased from      S and unaffiliated parties.[151]

Commerce's average freight calculation for unaffiliated coke purchases is distortive because it calculated an average freight rate for the POI for all unaffiliated coke purchases, rather than apply the county-specific POI freight rate that Dillinger reported.[152]

---

[150] *See* Dillinger Comments at 6 (citing Draft Remand Calculation Memorandum at Attachment 3.).
[151] *Id.* at 6-7 (citing Remand Supplemental Response at Appendix R-13).
[152] *Id.* at 7.

41

Commerce further erred by applying facts available to the small blast furnace coke consumed, for which there were no contemporaneous purchases of small blast furnace coke from unaffiliated parties. In such circumstances, Commerce's normal practice would be to compare the transfer price with the affiliate's COP of the input. Instead, Commerce used the adjustment calculated for large blast furnace coke to increase Dillinger's reported costs for small blast furnace coke. In doing so, Commerce essentially applied an adverse inference in applying the major input rule to Dillinger's small coke purchases, even though none of the statutory requirements of section 776(a) or (b) of the Act are present.[153]

If Commerce continues to adjust      S' total cost of producing coke to add G&A and other expenses to the transfer price of the inputs and services Dillinger provided, Commerce must also include the additional cost of over              Euros to the market price in its major input analysis of the coke inputs supplied by      S. Otherwise, Commerce overstates the difference between the cost and the market value.[154]

*Nucor Comments*

Commerce's calculation of the major input adjustment for coke in the *Final Determination* was appropriate and supported by the record. However, in consideration of the Court's remand instructions and the additional information collected by Commerce as part of this proceeding, Nucor considers that Commerce's adjustment in the Draft Remand Results complies with the Court's instructions.[155]

---

[153] *Id*.
[154] *Id.* at 7-8.
[155] *See* Nucor Comments at 16.

*Commerce's Position:*

We disagree with Dillinger that the Draft Remand Results fail to explain how Commerce determined its proposed market value and how the proposed value comports with the Court's ruling of being contemporaneous and on the same basis.[156]  First, we acknowledge that the reference to Attachment 1.2 in the Draft Remand Calculation Memorandum was an error; the correct reference is to Attachment 3 at page 2.  Nevertheless, the calculation of the EUR/MT figure is shown on the second page of Attachment 3 to the Draft Remand Calculation Memorandum, as Dillinger acknowledges.[157]  While Dillinger also claims there is no explanation as to how Commerce derived the figures on this page, Dillinger notes the source Commerce cited in this calculation.  Specifically, Dillinger states that the "source for the calculation is '11/7/16 Supp D, Appendix SD-34' so it is not clear as to whether any of the information in Dillinger's October 5, 2021 questionnaire response was used in arriving at the          Eur/MT figure."[158]  Thus, while Dillinger acknowledges that Commerce explained how the market value was calculated, Dillinger suggests that Commerce is limited to using only the Remand Supplemental Response in the remand redetermination.  We disagree.  Commerce referenced the source for each value used in the calculation of the          EUR/MT figure in the Draft Remand Results.[159]  The fact that a source document listed on the worksheet was from the record of the LTFV investigation does not mean the calculation is unsupported or unexplained.

We also disagree that our calculation in the Draft Remand Results distorts the actual difference between the contemporaneous POI price of large coke purchased from          S, and the

---

[156] While Dillinger identifies the "'Affiliated Consumption (Transfer Price)'" of          EUR/MT" (*see* Dillinger Comments at 6), this value and the associated source document (Attachment 1.2) subsequently referenced by Dillinger actually reflect the unaffiliated consumption value (market price), rather than the transfer price.
[157] *See* Dillinger Comments at 6.
[158] *Id*.
[159] *See* Draft Remand Calculation Memorandum at Attachment 3.

43

price of purchases from unaffiliated third parties. Dillinger in its comments referred to POI average purchase values,[160] and therefore disregards the Court's decision to uphold Commerce's use of consumption values in this proceeding.[161] The per-unit cost of          EUR/MT Commerce calculated reflects an average consumption value, while the          EUR/MT Dillinger proffered pertains to an average purchase value. The Court states that "the court is not persuaded by Dillinger's argument that Commerce contravened {19 CFR} 351.407(b) by selecting consumption values over purchase prices for determining coke value under the major input rule."[162] Therefore, there is no distortion in Commerce's use of consumption values in comparing affiliated and unaffiliated supplier pricing behavior in the major input calculation.

We also disagree with Dillinger that Commerce's average freight calculation in the Draft Remand Results is distortive. In its brief to the Court, Dillinger argued that Commerce made an unreasonable assumption that coke transport costs from                    are the same as those from                              .[163] Our revisions in the Draft Remand Results remedy this issue. While our calculation of the average freight cost during the POI still reflects transport from                    , we deducted this POI average freight cost from a revised per-unit average coke consumption value that no longer includes the non-POI purchases from                    .[164] Further, we only deducted these freight costs from the consumption values of coke that were transported from                    . Thus, our overall revised major input analysis addresses Dillinger's original concern that the average

---

[160] *See* Dillinger Comments at 6-7.
[161] *See Dillinger Germany II*, Slip Op. 21-101 at 7.
[162] *Id.*
[163] *See* Dillinger Brief at 41.
[164] *See* Dillinger Final Cost Calc Memo at Attachment 2.2.

freight cost Commerce calculated was too low to be used to adjust purchases from
.[165]

However, Dillinger now argues that Commerce must calculate a country-specific freight rate. We disagree. First, Dillinger failed to proffer this argument prior to this remand proceeding even though our use of an average freight rate is consistent with our freight calculation in the *Final Determination*.[166] Rather, Dillinger challenged the use of pre-POI unaffiliated blast furnace coke purchases that were "influenced by higher freight costs"[167] and were not properly adjusted with a freight rate that reflects purchases from "
."[168] Because the pre-POI purchases that Dillinger challenged have been removed from our calculations, we now properly match the average POI freight costs from
, with purchases from those same countries.[169] Second, Commerce routinely relies on averages in calculating major and minor input adjustments.[170] In fact, the courts have approved Commerce's use of overall averages in its calculations.[171] Thus, after the changes applied in our Draft Remand Results, we do not find that using an average freight rate for                                          to adjust purchases from those same countries is unreasonable.

---

[165] *See* Dillinger Brief at 41.
[166] *See* Dillinger Final Cost Calc Memo at Attachment 2.2.
[167] *See* Dillinger Brief at 40.
[168] *See* Dillinger Brief at 41.
[169] *See* Draft Remand Recalculation Memorandum at Attachment 3.
[170] *See, e.g.*, *Light-Walled Rectangular Pipe and Tube from Mexico: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 FR 16646 (April 22, 2019), and accompanying IDM at Comment 5, where Commerce used an average of two market prices in the major input analysis; and, *Fine Denier Polyester Staple Fiber from the Republic of Korea: Final Affirmative Determination of Sales at Less Than Fair Value*, 83 FR 24743 (May 30, 2018), and accompanying IDM at Comment 11, where Commerce explains that "{t}he reported costs are a weighted-average of the costs TC   incurred during the POI. Accordingly, the transactions disregarded analysis also needs to be based on the weighted-average of all the affiliated and unaffiliated purchases TC   made during the POI."
[171] *See Non-Oriented Electrical Steel from the Republic of Korea: Final Determination of Sales at less Than Fair Value and Negative Determination of Critical Circumstances*, 79 FR 61612 (October 14, 2014), and accompanying IDM at Comment 2.

We also disagree with Dillinger that Commerce essentially applied an adverse inference in its calculation of the major input adjustment to small blast furnace coke consumption. Dillinger states that under the major input rule, Commerce practice is to simply compare the transfer price with the affiliate's cost of producing the input when there are no contemporaneous market prices on the record.[172]  Dillinger adds that, contrary to Commerce's claims, it is not necessary to have contemporaneous purchases of small blast furnace coke information on the record to use in the application of the major input rule.[173]  Dillinger's interpretation of the major input rule is incorrect.  In the absence of a market price, Commerce's practice is to obtain surrogate information, where available, that would allow it to fulfill the requirements of sections 773(f)(2) and (3) of the Act to test the affiliated party transactions for major inputs against both market prices and the affiliate's COP.[174]  In this case, we determined that the most reasonably available information was the pricing behavior between the same parties for a similar input. Thus, we relied on the difference between the market value and transfer price of large coke, as this data is readily available and the inputs are similar.[175]  Therefore, Commerce did not apply an adverse inference in its calculation of the margin input adjustment.  Rather, we relied on the information available on the record in order to satisfy the statutory analysis described in sections 773(f)(2) and (3) of the Act, that is, a comparison of the transfer price for a major input to both a market price and to the affiliate's COP for the input.  Because no contemporaneous market price for small blast furnace coke was available on the record, we relied on the difference between the market and transfer prices for large blast furnace coke as indicative of the affiliate's pricing

---

[172] *See* Dillinger Comments at 7.
[173] *Id*.
[174] *See Mattresses from Cambodia:  Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 86 FR 15894 (March 25, 2021) (*Mattresses from Cambodia*), and accompanying IDM at Comment 1.
[175] *See* Draft Remand Calculation Memorandum at Attachment 3.

behavior for small coke.  Therefore, we did not err in using the facts available on the record to determine whether the small coke transfer prices reflect market prices, but rather relied on the best information available to comply with the analysis outlined in the statute.

Finally, Dillinger contends that, if Commerce adjusts     S' cost of producing the blast furnace coke, this adjustment should also be factored into Commerce's major input analysis of the affiliated coke inputs.  While we performed a transactions disregarded analysis of the inputs and services     S obtained from Dillinger in accordance with section 773(f)(2) of the Act, ultimately, we did not rely on     S' total cost of producing coke in our calculation of the major input adjustment to coke inputs.[176]  As noted above, in our major input analysis of the affiliated coke inputs, we determined that the market value was higher than both the transfer price and the affiliate's actual cost of producing the coke.  Because Dillinger's reported costs include coke inputs at their transfer price, our major input adjustment is therefore calculated as the difference between the market price and the transfer price for the coke.  Therefore,     S' actual cost of producing the coke was not a component in the calculation of our major input adjustment, and any potential adjustment to     S' total blast furnace coke costs (large and small) need not be incorporated into the major input adjustment applied to the reported costs.

**Comment 3:  Ad ustment to E penses for Inputs and Ser ices Pro ided to Affiliates**

*Dillinger Comments*

There is no basis for Commerce's adjustment.  It is not in dispute that the transfer prices Dillinger charged     S and Rogesa were higher than Dillinger's total cost of the inputs and services provided.  However, increasing the transfer price to include a portion of Dillinger's G&A expenses only increases Dillinger's other income which, under

---

[176] *See* Dillinger Final Cost Calc Memo at Attachment 3; and Draft Remand Calculation Memorandum at Attachment 3.

Commerce's long-standing practice, is treated as an offset to G&A expenses. Thus, Commerce's adjustment that increases G&A expenses at one level and offsets them by income at another level makes no sense.[177]

Commerce failed to adequately explain the calculation of this adjustment in the Draft Remand Results because the market value figure used in the calculation cannot be found in Attachment 4 of the Dillinger Final Cost Calc Memo, the source referenced in the Draft Remand Results.[178]

In the Draft Remand Results, Commerce miscalculated the denominator used in the calculation of the adjustment. Instead of       Euros, Commerce should use Dillinger's full POI COP of       Euros. Alternatively, Commerce should revise the portion of the denominator related to CTL plate to reflect the total COM of CTL plate of       Euros, rather than the       Euros used in the Draft Remand Results.[179]

*Nucor Comments*

In its Draft Remand Results, Commerce properly continued to adjust the reported costs so that the inputs and services Dillinger provided to     S and Rogesa, and the inputs     S and Rogesa in turn provided to Dillinger, reflect arm's length values.[180]

Commerce addressed each specific argument raised by Dillinger regarding the calculation and implemented several revisions as a result.[181]

---

[177] *See* Dillinger Comments at 8.
[178] *Id.* at 8-9.
[179] *Id.* at 9 (citing S   RD2 at Appendix SD-44; and Draft Remand Calculation Memorandum at Attachment 4).
[180] *See* Nucor Comments at 18.
[181] *Id.*

Therefore, pursuant to the Court's order, Commerce's Draft Remand Results fully

address Dillinger's comments and explain Commerce's adjustments related to the inputs

and services Dillinger provided to ▪▪▪▪S and Rogesa.[182]

*Commerce's Position:*

In accordance with the Court's order, Commerce addressed each argument proffered by

Dillinger with regard to the inputs and services that Dillinger provided to its affiliates ▪▪S

and Rogesa during the POI. While our evaluation of Dillinger's original arguments resulted in

revisions to our analysis and calculation of this adjustment, our revised analysis nonetheless

demonstrates that there is a basis for an adjustment.

As noted above, Commerce compared the transfer prices Dillinger charged ▪▪S and

Rogesa for the inputs and services to Dillinger's total cost of the inputs and services. We

calculated the total cost of these affiliated transactions as the cost of the inputs and services

provided plus an allocated portion of Dillinger's G&A expenses (calculated by applying

Dillinger's G&A expense ratio to the cost of the inputs and services). While Dillinger claims the

transfer price covers the cost of the inputs and services, Dillinger's reported cost for the inputs

and services did not include G&A expenses.[183] We explained above that it was appropriate to

include a portion of Dillinger's G&A expenses because the denominator to Dillinger's G&A

expense ratio included the cost of the inputs and services provided to Dillinger's affiliates.

Although Dillinger continues to argue that the other income collected from ▪▪▪▪S and Rogesa for

the inputs and services (the transfer price) offsets the associated costs and makes an allocation of

G&A expenses to the cost of the inputs and services unnecessary, we disagree. As noted above,

we confirmed with Dillinger that the other income collected from ▪▪▪▪S and Rogesa (the transfer

---

[182] *Id.* at 18-19.
[183] *See* S▪▪RD1 at Appendix SD-26.

price) was not included in the calculation of Dillinger's G&A expense ratio. Had Dillinger excluded the cost of the inputs and services from the G&A expense ratio denominator or included the other income in the denominator to "offset" the associated costs, then Dillinger would be correct that it is unnecessary to add G&A expenses to the cost of these affiliated inputs and services. However, this is not the case. Dillinger's calculation of its G&A expense ratio, which includes the cost of the inputs and services provided to        S and Rogesa in its denominator, effectively acknowledges that a portion of its G&A expenses are related to these affiliated activities. Thus, our addition of a portion of Dillinger's G&A expenses in calculating the total cost of the affiliated inputs and services merely follows Dillinger's reported methodology for calculating its G&A expense ratio.

Regarding Dillinger's comments on our calculation worksheet, we first note that the worksheet includes fields for values, for any formulas used to calculate values, and for references to source documents used in the calculation. For the market value shown on the worksheet, our reference to Attachment 4 of the Dillinger Final Cost Calc Memo provides the source for Dillinger's G&A expense ratio, which is a component of the formula that calculates the market value. However, we note that we also calculated the same market value in the Dillinger Final Cost Calc Memo; therefore, the market value itself can be found at Attachment 3 of that document.

Finally, Dillinger objects to the denominator used in the calculation of the adjustment but provides no argument to support the use of the proffered alternatives. We examined the alternative denominators submitted by Dillinger and find that they are not on the same basis as the per-unit TOTCOMs to which the adjustment will be applied. Specifically, Dillinger's

alternative denominators include G&A and other expenses that are not included in TOTCOM.[184]
As a result, we do not find it appropriate to rely on the alternative denominators Dillinger
submitted for the calculation of the affiliated transactions adjustment.

**Comment 4: Remand Results on Partial AFA**

*Salzgitter Comments*

> Commerce's draft remand results do not meet the Court's remand requirements because
> Commerce failed to adequately explain the alleged differences between the AFA
> determinations in the underlying LTFV investigations of CTL plate from Germany and
> France that would support different AFA treatment. In particular, Commerce's reliance
> on highlighting the difference in the number of reported sales for which manufacturer
> data was missing is overly simplistic. Commerce should instead consider the quantity of
> such sales that would have been compared to U.S. sales; under that metric there is no
> significant difference between Salzgitter and the Dillinger companies.[185]

> Commerce incorrectly stated that applying the *Dillinger France I* AFA methodology to
> Salzgitter frustrates the goal of inducing cooperation by ensuring a non-cooperative
> respondent does not receive a more favorable rate than if it had cooperated fully. Based
> on Salzgitter's analysis, Salzgitter would not have received a more favorable AFA rate if
> it had reported the manufacturer for all home market sales.[186]

> Commerce's application of the AFA methodology from the *Final Determination* is
> unreasonable and contrary to the conclusions in *Dillinger France I*, in which the Court
> noted that the reliability of the reported sales prices had not been questioned. There is no

---

[184] *See* S  RD2 at Appendix SD-44.
[185] *See* Dillinger Comments at 3-5.
[186] *Id*. at 5-8.

information gap for Commerce to fill with AFA because Salzgitter reported the requisite information for the vast majority of sales at issue.  Further, the missing manufacturer information would not affect the margin, according to Salzgitter's methodologies of incorporating none, some, or all of the unknown manufacturer sales in the calculation of NV.[187]

*SSAB Comments*

Commerce's draft remand results explain in detail the material differences in applying the *Dillinger I* AFA methodology between Salzgitter, Dillinger, and Dillinger France, pursuant to the Court's remand instructions.  Commerce's application of the *Final Determination* AFA methodology to Salziter is appropriate given these meaningful differences.[188]

The application of AFA is an essential tool to provide respondents with an incentive to cooperate that ensures they do not receive a more favorable result by failing to cooperate.  As Commerce explained in the draft remand results, the application of the *Dillinger France I* methodology to Salzgitter may well have provided Salzgitter with a more favorable dumping margin than if Salzgitter had fully cooperated.  Thus, Commerce's application of the *Final Determination* AFA rate fulfills the purpose of establishing an adequate deterrent to future noncooperation.[189]

Commerce's selection of Salzgitter's AFA rate is also appropriate in this instance because it relied on Salzgitter's own price information and applied it to those sales where Salzgitter did not cooperate by supplying all of the requested information.  As a result,

---

[187] *Id*. at 8-11.
[188] *See* SSAB Comments at 1-5.
[189] *Id.* at 5-9.

Commerce's selection was reasonable and consistent with the statutory intent of applying AFA.[190]

*Nucor Comments*

Commerce fully explained in the draft remand results the factual differences between Salzgitter, Dillinger, and Dillinger France, and why these differences justify applying partial AFA differently. Commerce's explanation fully complies with the Court's remand and should be maintained in the final results of redetermination.[191]

Specifically, Salzgitter failed to identify the manufacturer for 28,000 SMSD sales, which accounted for a significant portion of Salzgitter's home market sales; thus, the application of the AFA rate also had a significant margin impact. In contrast, the number of downstream sales for which Dillinger failed to report the manufacturer was small; thus, the application of the AFA rate had no impact on the margin. Accordingly, the number of affected sales represents the extent of each respondent's failure to cooperate and the corresponding extent to which each record was incomplete, facts which support different approaches to the application of AFA.[192]

Commerce further satisfied the Court's remand by pointing out that application of the *Dillinger I* methodology to Salzgitter would likely result in a more favorable result (*i.e.*, exclusion from the antidumping duty order) than if Salzgitter had cooperated fully. This result would undermine the purpose of AFA to encourage full cooperation by all respondents.[193]

---

[190] *Id.* at 9-10.
[191] *See* Nucor Comments at 8-10.
[192] *Id.* at 10-11.
[193] *Id.* at 11-13.

*Commerce's Position:*

The Court remanded the *Final Determination* to Commerce to explain why: (1) Commerce did not address the material factual differences between Salzgitter, Dillinger, and Dillinger France on the AFA issue in the *Final Determination* and the CTL plate from France LTFV investigation;[194] (2) these material factual differences warrant differing AFA treatment among these companies;[195] and (3) applying a different AFA methodology to Salzgitter than to Dillinger and Dillinger France is reasonable.[196]

As discussed above, Commerce complied fully with the Court's instructions. We explained that the material factual differences between the companies were not apparent or relevant in the CTL plate from France and Germany LTFV final determinations in applying the original partial AFA methodology, but are now apparent and relevant based on the application of the *Dillinger France I* partial AFA methodology. We demonstrated above that these material differences had a significant impact on Salzgitter's margin, but no impact on the margins calculated for either Dillinger or Dillinger France. In turn, these differences affected Commerce's goals in using partial AFA as a means to induce cooperation because the margin result for Salzgitter under the *Dillinger France I* methodology provides no incentive for Salzgitter to cooperate by providing requested information to Commerce. Accordingly, applying the *Final Determination* partial AFA methodology to Salzgitter is reasonable.

Contrary to Salzgitter's claims, the Court did not instruct Commerce to rely on record information not in dispute (*i.e.*, Salzgitter's reported home market price data) in responding to the Court's remand.[197] The Court previously affirmed that Commerce's application of partial

---

[194] *See Dillinger Germany II* at 18.
[195] *Id.*
[196] *Id.*
[197] *See* Salzgitter Comments at 7-9 (citing *Dillinger France I*, 350 F. Supp. 3d at 1364).

AFA to Salzgitter in the *Final Determination* was warranted.[198]  In its opinion, the Court acknowledged Commerce's statutory authority under section 782(d) of the Act to "disregard all or part of the original and subsequent responses" when relying on AFA.[199]  Accordingly, applying the *Final Determination* partial AFA methodology to Salzgitter does not conflict with the Court's instructions.

Salzgitter contends that Commerce failed to adequately explain the material differences between Salzgitter and the Dillinger companies.  To make this claim, Salzgitter asserts that comparing the number of home market sales with missing manufacturer data (*i.e.*, 28,000 for Salzgitter compared to ___ for Dillinger) is irrelevant; the relevant metric is the number and quantity (in metric tons) of home market sales that Commerce may have compared to the products sold to the United States.[200]  Salzgitter would have Commerce establish a new test of materiality to determine whether AFA is warranted – a test that would allow a respondent, not Commerce, to determine what information is relevant for Commerce's analysis.  However, Salzgitter's proposal is not one advocated by the Court in either *Dillinger France I* or *Dillinger Germany I*, nor is it supported by the statute.

As described in detail above, the application of the *Dillinger France I* partial AFA methodology to Salzgitter deprives Commerce of the ability to apply section 776 of the Act meaningfully in this proceeding because it frustrates Commerce's goals of inducing cooperation by ensuring that a non-cooperating respondent does not receive a more favorable AFA rate than it would have received if the company had cooperated fully.  Under the *Dillinger France I* partial AFA methodology, Salzgitter would receive a zero rate and, consequently, would be excluded

---

[198] *See Dillinger Germany I*, 399 F. Supp. 3d at 1256.
[199] *Id.*
[200] *See* Salzgitter Comments at 4-5.

from the AD order.  Because of Salzgitter's failure to provide requested information, Commerce

cannot determine what the resulting margin would have been if Salzgitter had complied fully

with Commerce's requests to report the manufacturer information for all of its home market

sales.  Thus, it is reasonable to assume that Salzgitter would receive a more favorable result

under the *Dillinger France I* methodology as a result of withholding information than by

providing the requested information and allowing Commerce to properly analyze the sales in

question.

     Salzgitter argues that the three alternatives it proposed in the *Final Determination* to

account for the missing manufacturer data all resulted in a zero or *de minimis* margin;[201]

therefore, Salzgitter did not receive a more favorable result than if it had provided the requested

information.  However, the Court already rejected this approach in *Dillinger Germany I*, noting

that Salzgitter's conclusions regarding these alternative constituted "mere speculation" and "self-

serving statements or interpretations of the record," highlighting Salzgitter's failure to identify

where the record actually identified the effect on Salzgitter's margin if it had supplied the

manufacturer data for all its home market sales.[202]

     Commerce applied the *Dillinger France I* methodology to Salzgitter in response to the

Court's directions in *Dillinger Germany I*.  The differences between Dillinger France and

Salzgitter were not relevant to the Court in *Dillinger France I* because only the application of

partial AFA to Dillinger France was at issue.  While the Court in *Dillinger Germany I* had

directed Commerce to follow the *Dillinger France I* partial AFA methodology in the interest of

---

[201] These alternatives are to treat:  1) none of the home market sales with missing manufacturer data as Salzgitter-manufactured plate; 2) all of these sales as Salzgitter-manufactured plate; or 3) a percentage of each sale as Salzgitter-manufactured plate based on SMSD's annual plate purchases from each supplier.  *See* Salzgitter Comments at 6 (citing Salzgitter's Letter, "Salzgitter Case Brief," dated February 13, 2017, at 14-15).
[202] *See Dillinger Germany I*, 399 F. Supp. 3d at 1256.

consistency, the Court in *Dillinger Germany II* has now provided Commerce with an opportunity to explain why the *Dillinger France I* partial AFA methodology should not be applied to Salzgitter. Commerce's explanation above details the differences between Salzgitter and the Dillinger companies in: (1) the number of sales lacking the requested manufacturer information; (2) the net prices among the sales with the missing data; and (3) the impact on the margin caused by the respondents' failure to provide the requested information. These differences are significant and warrant the application of a different partial AFA methodology than that prescribed by *Dillinger France I* to achieve the purpose of the statute to incentivize a respondent's full cooperation in an antidumping proceeding.

## V.    FINAL RESULTS OF REDETERMINATION

As a result of our redetermination, Dillinger's and Salzgitter's estimated weighted-average dumping margins are 4.98 percent and 22.90 percent, respectively.[203] Moreover, in accordance with section 735(c)(5)(A) of the Act, which provides that the estimated all-others rate shall be an amount equal to the weighted average of the estimated weighted-average dumping margins established for exporters and producers individually investigated, excluding any zero and *de minimis* margins, we revised the all-others rate based on the margins noted above for Dillinger and Salzgitter, in accordance with the *Amended Final Determination*. Accordingly, as a result of our redetermination, the all-others rate is 20.99 percent.[204]

Because Dillinger's margin and the all-others rate are different from the rates in the *Amended Final Determination*, we intend to issue a *Timken* notice with the amended final determination, should the Court sustain these final results of redetermination. Should the Court

---

[203] *See* Draft Remand Calculation Memorandum; and *Amended Final Determination*, 82 FR at 24098, respectively.
[204] *See* Memorandum, "Calculation of the All-Others Rate for the Draft Results of Redetermination," dated December 3, 2021.

sustain these final results of redetermination with respect to Salzgitter, the published *Timken* notice/amended final determination on the above determinations would not need to include a discussion of Salzgitter because Salzgitter's original weighted-average dumping margin of 22.90 percent calculated in the *Final Determination* would be reinstated.

1/19/2022

X 

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance

Slip Op. 22-114

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| AG DER DILLINGER HÜTTENWERKE, | |
| Plaintiff, | |
| and | |
| ILSENBURGER GROBBLECH GMBH, SALZGITTER MANNESMANN GROBBLECH GMBH, SALZGITTER FLACHSTAHL GMBH, SALZGITTER MANNESMANN INTERNATIONAL GMBH, and FRIEDR. LOHMANN GMBH, | |
| Consolidated Plaintiffs, | |
| and | Before: Leo M. Gordon, Judge |
| THYSSENKRUPP STEEL EUROPE AG, | |
| Plaintiff-Intervenor, | Consol. Court No. 17-00158 |
| v. | |
| UNITED STATES, | |
| Defendant, | |
| and | |
| NUCOR CORPORATION and SSAB ENTERPRISES LLC, | |
| Defendant-Intervenors. | |

## MEMORANDUM and ORDER

[Remanding Commerce's <u>Second Remand Results</u>.]

Dated: September 23, 2022

Consol. Court No. 17-00158                                               Page 2

     Marc E. Montalbine, J. Kevin Horgan, Gregory S. Menegaz, Alexandra H. Salzman, and Merisa A. Horgan, deKieffer & Horgan, PLLC, of Washington, D.C., for Plaintiff AG der Dillinger Hüttenwerke.

     David E. Bond, Ron Kendler, and Allison Kepkay, White & Case LLP, of Washington, D.C., for Consolidated Plaintiffs Ilsenburger Grobblech GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Flachstahl GmbH, and Saltzgitter Mannesmann International GmbH.

     Kelly A. Krystyniak, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, D.C., for Defendant United States.  On the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, Tara K. Hogan, Assistant Director.  Of counsel was Ayat Mujais, Attorney, U.S. Department of Commerce, Office of Chief Counsel for Trade Enforcement and Compliance of Washington, D.C.

     Roger B. Schagrin, Luke A. Meisner, and Nicholas J. Birch, Schagrin Associates, of Washington, D.C., for Defendant-Intervenor SSAB Enterprises LLC.

     Alan H. Price, Christopher B. Weld, and Stephanie M. Bell, Wiley Rein LLP, of Washington, D.C., for Defendant-Intervenor Nucor Corporation.

     Gordon, Judge: This consolidated action involves a challenge to the final determination in the antidumping ("AD") investigation conducted by the U.S. Department of Commerce ("Commerce") of certain carbon and alloy steel cut-to-length plate ("CTL plate") from the Federal Republic of Germany.  See Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany, 82 Fed. Reg. 16,360 (Dep't of Commerce Apr. 4, 2017) ("Final Determination"), and accompanying Issues and Decision Memorandum, A-428-844 (Mar. 29, 2017), http://enforcement.trade.gov/frn/summary/germany/2017-06628-1.pdf (last visited this date) ("Decision Memorandum").

     Before the court are Commerce's Final Results of Redetermination Pursuant to Court Remand, ECF No. 129 ("Second Remand Results") filed pursuant to the court's

Consol. Court No. 17-00158                                                    Page 3

remand order in <u>AG der Dillinger Huttenwerke v. United States</u>, 45 CIT ___, 534 F. Supp. 3d 1403 (2021) ("<u>Dillinger I</u>").  The court presumes familiarity with the history of this action. Plaintiff AG der Dillinger Hüttenwerke ("Dillinger") challenges Commerce's determination to use "likely selling price" for the cost of production for non-prime plate as "facts available" when the record was missing necessary actual cost information, and Consolidated Plaintiffs Ilsenburger Grobblech GMBH, Salzgitter Mannesmann Grobblech GMBH, Salzgitter Flachstahl GMBH, and Salzgitter Mannesmann International GMBH (collectively "Salzgitter") challenge Commerce's determination to use partial AFA for certain home market CTL plate sales made by their respective affiliates when Plaintiff failed to submit manufacturing.  <u>See</u> Pl. Dillinger Comments on Remand Redetermination, ECF No. 134 ("Dillinger Comments"); Salzgitter Consol. Pls.' Comments on Remand Redetermination, ECF No. 135 ("Salzgitter Comments"); Def.'s Resp. to Comments on Remand Redetermination, ECF No. 141 ("Def.'s Resp."); Def.-Int. SSAB's Comments on Remand Redetermination, ECF 139 ("Def.-Int. SSAB's Comments"); Def.-Int. Nucor Corporation's Comments on Remand Redetermination, ECF No. 146 ("Def. Int. Nucor's Comments").  The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii)[1], and 28 U.S.C. § 1581(c) (2018).

For the reasons set forth below, the court remands this action to Commerce for further explanation, and if appropriate, reconsideration, regarding its determination as to

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2018 edition.

whether the "likely selling price" of non-prime plate recorded in Dillinger's books and records is "the best available information on the record" for evaluating and adjusting the cost of production under 19 U.S.C. § 1677b(f). The court reserves decision on Salzgitter's challenge to Commerce's use of partial AFA.

## I. Standard of Review

The court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006); see also Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr. & Richard Murphy,

Consol. Court No. 17-00158                                                    Page 5

Administrative Law and Practice § 9.24[1] (3d ed. 2022).  Therefore, when addressing

a substantial evidence issue raised by a party, the court analyzes whether the challenged

agency action "was reasonable given the circumstances presented by the whole record."

8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2022).

## II. Discussion

In a parallel matter involving the similar parties and subject merchandise, albeit

involving a different country of production and a different administrative record, the U.S.

Court of Appeals for the Federal Circuit ("Federal Circuit") remanded Commerce's

determination to adjust the reported costs of the respondent's non-prime plate based on

the "likely selling price" for non-prime plate reported in the respondent's normal books

and records, directing that § 1677b(f) requires Commerce to determine the actual cost of

production for prime and non-prime CTL plate.  See Dillinger France S.A. v. United States,

981 F.3d 1318, 1321–24 (Fed. Cir. 2020).  In doing so, the court explained that "[b]ecause

Dillinger's books and records did not reasonably reflect the costs associated with the

production and sale of the merchandise as required by 19 U.S.C. § 1677b(f),"

Commerce's determination could not be sustained.  Id.  Given the near identical nature

of the challenge to Commerce's cost adjustment under § 1677b(f) in this matter, which

also involved Commerce's reliance on an internal factory report ("FER") from Dillinger

indicating the "likely selling price" of non-prime plate, this Court similarly remanded

Commerce's cost adjustment determination so that Commerce could apply the Federal

Circuit's guidance and make its adjustment based on the actual cost of production of

prime and non-prime CTL plate.  See Dillinger I, 45 CIT at ___, 534 F. Supp. 3d at 1407.

Consol. Court No. 17-00158                                                    Page 6

On remand, Commerce "reopened the administrative record and issued a
supplemental questionnaire to Dillinger to obtain the physical characteristics of the
non-prime products produced and the actual cost of producing the non-prime products."
Second Remand Results at 4.  In response, Dillinger informed Commerce that it could
not provide any actual cost information and that it had already submitted the limited
information it had on the physical characteristics of non-prime plate.  Second Remand
Results at 6–7.  Dillinger argued that instead Commerce should rely on the average cost
of total CTL production for calculating any cost of production adjustment under § 1677b(f)
"because non-prime plate can only be distinguished from prime plate at the end of the
production process and therefore both types of plate use precisely the same materials
and undergo precisely the same processing steps."  Id.; see also Dillinger Comments
at 4.  Commerce, however, rejected Dillinger's proposed alternative after determining that
using such an average would distort the disparity in cost across prime CTL products as
well as the disparity in "size, specification, and grade" amongst non-prime products.  See
Second Remand Results at 8–9.  Given these circumstances, Commerce found that there
was a gap in the record as to the requisite information of the actual cost of production for
Dillinger's non-prime plate.  Id. at 12–13.  Commerce concluded that it was therefore
necessary to select from facts available pursuant to 19 U.S.C. § 1677e(a)(1), and
consequently would rely on "the cost assigned to the prime and non-prime merchandise
as recorded in Dillinger's normal books and records [(i.e., the FER)], as facts otherwise
available."  Id. at 13 (further explaining that Commerce "selected the selling prices of the
non-prime products as facts otherwise available because this amount is used by Dillinger

in its normal books and records; importantly, was verified by Commerce; and it is the best available information on the record.").

In the remand proceedings in the parallel action, Commerce made nearly identical findings and reached the same conclusion.  See Dillinger France S.A. v. United States, Court No. 17-00159, ECF No. 85 (Aug. 25, 2021) (results of remand redetermination addressing allocation of costs between Dillinger France's production of non-prime and prime plates).  When plaintiffs there challenged Commerce's determination to continue relying upon the "likely selling price" from Dillinger's FER, as facts otherwise available, in making its cost adjustments for prime and non-prime plate, the court sustained "Commerce's general invocation of facts available to supply the costs of production for Dillinger's prime and non-prime products."  See Dillinger France S.A. v. United States, Slip Op. 22-97, 46 CIT ___, 2022 WL 3453574 at *6 (Aug. 18, 2022).  However, the court also held that Commerce failed to explain why it was reasonable to rely on the "likely selling price" from the FER in Dillinger's normal books and records as the best available information for determining the cost of producing the merchandise as directed by the Federal Circuit.  Id. at *7 (noting that Commerce's purported explanation in the remand failed to address "why relying on Dillinger's normal books and records -- which reflect the likely selling price of non-prime pipe rather than the costs of production -- better accords with Commerce's obligation to ensure that the reported costs of production reasonably reflect the cost of producing the merchandise under consideration." (internal quotation marks omitted)).  The court further observed that this "analytic deficiency is particularly apparent given that both data sets under consideration exhibit the same Commerce-

identified flaw of assigning costs without variance for physical characteristics." Id. (internal citation omitted).  Accordingly, the court remanded the matter to Commerce again for further explanation and/or reconsideration of this issue. Id.

Since the issue, Commerce's analysis, and the arguments of the parties are nearly identical to those presented in Dillinger France, the court concludes that a remand is equally appropriate here.  Because Dillinger has failed to place information on the record demonstrating the actual cost of production of its non-prime products, Commerce may reasonably rely on facts otherwise available pursuant to § 1677e(a)(1); however, in making its selection of facts otherwise available, Commerce must explain how its reliance on information indicating the "likely selling price" of non-prime products accords with its obligation to ensure that the reported costs of production reasonably reflect the cost of producing the merchandise under consideration.

Consol. Court No. 17-00158                                                      Page 9

### III. Conclusion

For the foregoing reasons it is hereby

**ORDERED** that this action is remanded to Commerce; it is further

**ORDERED** that Commerce shall file its remand results on or before December 15,

2022; and it is further

**ORDERED** that, if applicable, the parties shall file a proposed scheduling order

with page limits for comments on the remand results no later than seven days after

Commerce files its remand results with the court.


                                                        /s/ Leo M. Gordon
                                              _____
                                                   Judge Leo M. Gordon



Dated: September 23, 2022
          New York, New York

A-428-844
Remand
Slip Op. 22-114
Court No. 17-00158
POI:  04/01/2015 – 03/31/2016
**Public Document**
E&C/OA:  PG/SM

**AG der Dillinger Hüttenwerke v. United States**,
**Court No. 17-00158, Slip Op. 22-114 (CIT September 23, 2022)**
**Certain Carbon and Alloy Steel Cut-to-Length Plate from Germany**

### FINAL RESULTS OF REDETERMINATION
### PURSUANT TO COURT REMAND

**I.    SUMMARY**

The U.S. Department of Commerce (Commerce) has prepared these final results of
redetermination pursuant to the remand order of the U.S. Court of International Trade (the Court)
in *AG der Dillinger Hüttenwerke v. United States et al.*, Court No. 17-00158, Slip. Op. 22-114
(CIT September 23, 2022) (*Dillinger Germany III*).  This action arises out of the final
determination in the less-than-fair-value (LTFV) investigation of certain carbon and alloy steel
cut-to-length plate (CTL plate) from Germany.[1]

In *Dillinger Germany III*, the Court upheld Commerce's use of facts otherwise available
in Commerce's calculations because Dillinger failed to place information on the record
demonstrating the actual cost of production (COP) of its non-prime products.  However, the
Court remanded Commerce's application of facts otherwise available, stating that Commerce
inadequately explained its reliance on AG der Dillinger Hüttenwerke's (Dillinger) normal books

---

[1] *See Certain Carbon and Alloy Steel Cut-to-Length Plate from Germany:  Final Determination of Sales at Less Than Fair Value*, 82 FR 16360 (April 4, 2017) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM); *see also Certain Carbon and Alloy Steel Cut-to-Length Plate from Austria, Belgium, France, the Federal Republic of Germany, Italy, Japan, the Republic of Korea, and Taiwan:  Amended Final Affirmative Antidumping Determinations for France, the Federal Republic of Germany, the Republic of Korea and Taiwan, and Antidumping Duty Orders*, 82 FR 24096 (May 25, 2017) (*Amended Final Determination*).

and records as facts otherwise available to supply the missing cost information.[2]  Thus, the Court remanded Commerce to provide further explanation or reconsideration of the information used as facts otherwise available, in line with the parallel *Dillinger France* remand regarding the same issue.[3]

Consistent with the Court's order in *Dillinger Germany III*, on remand, Commerce has further explained why continuing to rely on Dillinger's books and records, *i.e.*, the recorded total costs assigned to the prime and non-prime products, to determine the COP for the non-prime products is the only reasonable approach.  Consequently, the final estimated weighted-average dumping margin calculated for Dillinger in the *Second Remand Redetermination* remains unchanged.[4]

## II.    BACKGROUND

In the LTFV investigation, Commerce adjusted the reported costs for non-prime products to reflect the cost recorded in Dillinger's normal books and records, based on estimated sales values, and then allocated the excess costs allocated to non-prime products (*i.e.*, the difference between the reported and adjusted costs for non-prime products) to the COP for prime products.[5]

In *Dillinger Germany I*, the Court remanded to Commerce to reconsider its application of partial adverse facts available (AFA) to certain downstream home market sales reported by Dillinger.[6]  Pursuant to *Dillinger Germany I*, Commerce issued its *First Remand*

---

[2] *See Dillinger Germany III*, Court No. 17-00158, Slip. Op. 22-114 at 6-7.
[3] *See Dillinger France S.A., v. United States et al.*, 589 F. Supp. 3d 1252 (CIT 2022) (*Dillinger France*).
[4] *See Final Results of Redetermination Pursuant to Court Remand, Certain Carbon and Alloy Steel Cut-to-Length Plate from Germany*, Court No. 17-00158 (CIT August 18, 2021), dated January 19, 2022 (*Second Remand Redetermination*), at 57–58, available at https://access.trade.gov/resources/remands/21-101.pdf.
[5] *See Final Determination* IDM at Comment 11.
[6] *See AG der Dillinger Hüttenwerke v. United States*, 399 F. Supp. 3d 1247 (CIT 2019) (*Dillinger Germany I*).

*Redetermination*, in which Commerce reconsidered how it applied partial AFA to these sales.[7]
As a result of its redetermination and consistent with the instructions of the Court, Commerce
modified its application of the partial AFA and recalculated Dillinger's estimated weighted-
average dumping margin. Commerce's decision had no impact on Dillinger's recalculated
estimated weighted-average dumping margin, which was unchanged from that calculated in the
*Amended Final Determination* (*i.e.*, 5.52 percent).[8]

In *Dillinger Germany II*, the Court remanded to Commerce to consider its reallocation of
costs between prime and non-prime steel plate for Dillinger, among other Dillinger cost issues,
as well as the application of a partial AFA methodology to certain downstream home market
sales reported by Ilsenburger Grobblech GmbH, Salzgitter Mannesmann Grobblech GmbH,
Salzgitter Flachstahl GmbH, and Salzgitter Mannesmann International GmbH (collectively,
Salzgitter).[9] To comply with the Court's order, Commerce reopened the record and issued a
supplemental questionnaire to Dillinger to obtain the physical characteristics of the non-prime
products produced and the actual cost of producing the non-prime products.[10] Dillinger,
however, failed to provide either the physical characteristics of non-prime products produced or
the actual product-specific COPs for the non-prime products.[11] Because there was no
information on the record to calculate the actual COP of the non-prime products, on remand,
Commerce continued to rely on the cost assigned to the prime and non-prime products as
recorded in Dillinger's normal books and records as facts otherwise available. Commerce did
this in accordance with section 776(a)(1) of the Tariff Act of 1930, as amended (the Act),

---

[7] *See Final Results of Redetermination Pursuant to Court Remand, Certain Carbon and Alloy Steel Cut-to-Length Plate from Germany,* Court No. 17-00158, Slip Op. 19-87 (CIT July 16, 2019), dated October 8, 2019 (*First Remand Redetermination*), available at https://access.trade.gov/resources/remands/19-87.pdf.
[8] *Id.* at 5.
[9] *See AG der Dillinger Hüttenwerke v. United States*, 534 F. Supp. 3d 1403 (CIT 2021) (*Dillinger Germany II*).
[10] *See Second Remand Redetermination* at 4-5.
[11] *Id.* at 6-7.

3

because Dillinger failed to provide its actual product-specific COPs for non-prime products, as requested by Commerce. In addition, in response to the Court's order, Commerce made other revisions to Dillinger's reported costs and provided further explanation regarding the application of partial AFA to Salzgitter. As a result of the changes to Dillinger's reported costs, Commerce recalculated Dillinger's estimated weighted-average dumping margin (*i.e.*, 4.98 percent).[12]

In *Dillinger Germany III*, the Court upheld Commerce's use of facts otherwise available for determining the COP of Dillinger's non-prime products. However, the Court remanded Commerce's selection of the facts otherwise available. As detailed below, because of Dillinger's failure to provide the information necessary to determine accurate product-specific COPs for non-prime products, the best available information is that recorded in Dillinger's normal books and records. Thus, the estimated weighted-average dumping margin calculated for Dillinger in the *Second Remand Redetermination* remains unchanged.

## III.  ANALYSIS

Commerce has continued to rely on Dillinger's normal books and records, which is the only reasonable approach for determining the allocation of total costs between prime and non-prime products, and the per-unit costs of non-prime products. In *Dillinger Germany III*, the Court held that Commerce's use of facts available pursuant to section 776(a)(1) of the Act was appropriate because Dillinger failed to submit its actual cost of producing non-prime products.[13] However, the Court also directed that, "in making its selection of facts otherwise available, Commerce must explain how its reliance on information indicating the 'likely selling price' of non-prime products accords with its obligation to ensure that the reported costs of production

---

[12] *Id.* at 2. In the *Second Remand Redetermination*, Commerce also revised the margin for Salzgitter and recalculated the all-others rate to be 22.90 percent and 20.99 percent, respectively. *Id.*
[13] *See Dillinger Germany III*, Court No. 17-00158, Slip. Op. 22-114 at 8.

4

reasonably reflect the <u>cost of producing the merchandise</u> under consideration."[14]  Accordingly, Commerce has prepared these final results of redetermination to explain how the information recorded for non-prime products in Dillinger's normal books and records is not only the best available information on the record, but also ensures that the reported costs reasonably reflect the cost of producing both prime and non-prime products.

> In the *Second Remand Redetermination*, Commerce explained that:

> {a}s the total actual costs incurred by Dillinger, and verified by Commerce, must be allocated to all products produced, including prime and non-prime products, not knowing the actual cost of producing the non-prime products directly impacts the amount of costs assigned to the production of prime products.  If too much or too little cost is assigned to the non-prime products, then too little or too much cost is assigned to the prime products produced.[15]

Here, the production of non-prime products is an inevitable consequence of its production of prime products because Dillinger does not intend to produce non-prime products.

For example, while Dillinger may intend to produce 100 prime units, it may conclude after quality testing that two of the units are imperfect plates that are not suitable for use in the same applications as prime products.[16]  Relying on Dillinger's normal books and records, as facts available, to value both the prime and non-prime merchandise is the only reasonable approach because it recognizes that, where Dillinger cannot produce 98 perfect plates without producing two imperfect plates, the lost value of the two imperfect plates is actually a cost of producing the 98 perfect ones and should be accounted for as such.

Therefore, for reasons discussed above, Dillinger's normal books and records are more reasonable to use as facts otherwise available because they recognize that the lost value of the

---

[14] *Id.* (emphasis in original).
[15] *See Second Remand Redetermination* at 7-8.
[16] *See* Memorandum, "2015-2016 Antidumping Duty Investigation of Certain Carbon and Alloy Steel Cut-To-Length Plate from Germany:  Verification of the Cost Response of AG der Dillinger Hüttenwerke," dated January 27, 2017.

non-prime products, which is an inevitable result of Dillinger's production of prime products, is appropriately considered to be a cost of producing the prime products. Consequently, Dillinger's proposal to assign the overall average cost of all prime products is unreasonable because it would distort the disparity in cost across prime CTL plate products, as well as the disparity in "size, specification, and grade" among non-prime products.[17] Thus, although both Dillinger's proposal and Dillinger's normal books and records are flawed because Dillinger chooses not to track the actual costs of producing non-prime products, we find that the use of the amounts recorded in Dillinger's normal books and records is reasonable for use as facts otherwise available.

## IV.   INTERESTED PARTY COMMENTS

On November 16, 2022, Commerce released the draft results of redetermination to all interested parties and invited parties to comment.[18] On November 23, 2022, we received comments from Dillinger and Nucor Corporation (Nucor), which are summarized below.[19]

*Dillinger's Comments:*

- Because facts available are used to fill an informational gap and, in this proceeding, the information gap to be filled is the actual costs of producing non-prime products which, pursuant to section 773(b)(3)(A) of the Act, shall be equal to the cost of materials and of fabrication or other processing of any kind employed in producing the product, the information used as facts available must correspond as closely as possible to the actual cost of producing the non-prime products.
- Commerce has not explained how the "likely selling price" corresponds to the actual cost of materials and fabrication.
- The likely selling price is below the total cost of any product control numbers (CONNUMs) in Dillinger's reported cost data.
- The sales value used by Commerce as the "COP for non-prime products" is not taken from the internal factory results.

---

[17] *See Second Remand Redetermination* at 9.

[18] *See* Draft Results of Redetermination Pursuant to Court Remand, Certain Carbon and Alloy Steel Cut-to-Length Plate from Germany, *AG der Dillinger Hüttenwerke v. United States*, Court No. 17-00158, Slip Op. 22-114 (CIT September 23, 2022), dated November 16, 2022 (Draft Results of Redetermination).

[19] *See* Dillinger's Letter, "Comments on Draft Results of Redetermination," dated November 23, 2022 (Dillinger's Comments); *see* Nucor's Letter, "Comments on Draft Results of Redetermination," dated November 23, 2022 (Nucor's Comments).

6

- Non-prime products undergo the same production process as prime products and do not become less costly because they cannot be sold at full price.
- The Statement of Administrative Action states that the information Commerce uses as facts available must be reasonable under the circumstances.[20]  Commerce's use of the likely selling price fails this standard of reasonableness.
- Dillinger's proposed methodology is the most reasonable calculation of the cost of producing non-prime products because it is based on the actual total cost of manufacture for all plate sold during the period of investigation (POI).  This methodology uses the total standard costs from the primary cost report and then adjusts to actual costs using a two-step cost variance.
- Because non-prime plates can only be distinguished at the end of the production process, prime and non-prime plates use the same materials and undergo the same processing.
- The U.S. Court of Appeals for the Federal Circuit (Federal Circuit) prohibited the use of the likely selling price in place of the COP.
- Commerce's reference to "lost value" apparently means the fact that the sales price of non-prime products does not cover the COP of those products, which results in a loss on the sale.
- There is no statutory provision which authorizes either the reduction of the actual costs for the lost value resulting from a sale or the increase of actual costs attributable to the loss on another sale.  Thus, Commerce's shifting of production costs from non-prime to prime products is contrary to the express wording of the statute.
- Commerce's increase in the production costs of prime products to account for lost value is contrary to Commerce's longstanding practice of excluding inventory write-downs in the COP.[21]
- Commerce's shifting of costs from non-prime to prime products also runs counter to the decision of the Federal Circuit in *Dillinger France II* which stated that "{b}ecause Dillinger's books and records were based on 'likely selling price' rather than cost of production, Commerce erred in relying on them."[22]
- In *IPSCO*, the Federal Circuit struck down as unreasonable a methodology that allocated production costs to non-prime products based on market value, thereby reducing the production costs of non-prime products to below their actual COP.[23]  Moreover, in *IPSCO*, the Federal Circuit found that reducing a product's COP to the product's selling price amounted to "circular reasoning" which "contravened the express requirement of the statute which sets forth the cost of production as an independent standard for fair value."[24]

---

[20] *See* Dillinger's Comments at 4 (citing Statement of Administrative Action, H.R. Rep. No. 103-316, at 869 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4198).

[21] *Id.* at 6 (citing *Polyethylene Retail Carrier Bags from Thailand:  Final Results of Antidumping Duty Administrative Review*, 76 FR 12700 (March 8, 2011), and accompanying IDM at Comment 6; *see also Stainless Steel Wire Rod from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review*, 69 FR 19153 (April 12, 2004), and accompanying IDM at Comment 7).

[22] *Id.* at 7 (citing *Dillinger France S.A. v. United States,* 981 F.3d 1318, 1321-24 (Fed. Cir. 2020) (*Dillinger France II*)).

[23] *Id.* at 7 – 8 ((citing *IPSCO, Inc. v. United States*, 965 F.2d 1056, 1058 (Fed. Cir. 1992) (*IPSCO*)).

[24] *Id*. (citing *IPSCO*, 965 F. 2d at 1059).

- In *Dillinger France II*, the Federal Circuit expressly affirmed *IPSCO* and stated that "if *IPSCO* governs, Commerce's reliance on Dillinger's books and records was impermissible."[25]

- Commerce's shifting of production costs from non-prime products to prime products also conflicts with the recent redetermination in *Husteel* in which the Court, after stating that Commerce's reallocation of costs from non-prime to prime products was "problematic" in light of the Federal Circuit's decision in *Dillinger France II*, remanded the matter back to Commerce.[26] On remand, Commerce stopped reducing the reported costs of non-prime products to resale value and accepted the respondent's cost reporting, which assigned full cost to both prime and non-prime products.[27]

- The situation in *Husteel*, in which the respondent did not track the costs of prime and non-prime products separately and reported the same average COP for both prime and non-prime products, is analogous to the current proceeding, because Dillinger does not track the costs of prime and non-prime products, and, therefore, calculated an average actual COP for non-prime products.

- Commerce's use of the likely selling price of non-prime products rather than the actual COP allocated to non-prime products is an impermissible adverse inference.

- Section 776(b) of the Act provides that Commerce may only impose an adverse inference when it "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with the request for information."

- Dillinger complied to the best of its ability, and, in Commerce's final results of redetermination submitted on January 20, 2022, Commerce acknowledged that there was no evidence that Dillinger tracks the physical characteristics of non-prime products or the actual product-specific cost of producing non-prime products.

- Commerce's assumption in its use of likely selling price is that the actual cost of producing non-prime products is only roughly 60 percent as high as the cost of producing prime products. Commerce's assumption is not supported by record evidence and is unreasonable when the products use the same materials and undergo the same production processes.

*Nucor's Comments:*

- Commerce explained why its reliance on the costs recorded in Dillinger's normal books and records for prime and non-prime products is appropriate and reasonably reflects the cost of producing prime and non-prime products.

- Commerce highlighted the fact that the production of non-prime products is a consequence of the production of prime products and is, therefore, a cost of producing the prime products.

- Commerce explained that, while Dillinger may intend to produce 100 prime units, Dillinger may conclude that two of the units are imperfect and, thus, have to sell these two units at a reduced price.

---

[25] *Id.* at 8 (citing *Dillinger France II*, 981 F. 3d at 1322).
[26] *Id.* at 8 – 9 ((citing *Husteel Co. v. United States*, 520 F. Supp. 3d 1296, 1309 (CIT 2021)).
[27] *Id.* ((citing *Husteel Co. v. United States*, 552 F. Supp. 3d 1405 (CIT 2022) (*Husteel*)).

8

- The loss associated with selling these two non-prime products is an unavoidable cost of producing the 98 prime units.
- Assigning costs in a manner which acknowledges this reality is an appropriate method for allocating costs and results in a reasonable representation of the actual costs of merchandise under consideration.

**Commerce's Position:**

We continue to rely on the allocation of total costs between prime and non-prime products as recorded in Dillinger's normal books and records as facts available, pursuant to section 776(a)(1) of the Act. The information recorded in Dillinger's normal books and records, including the likely selling price of non-prime products, to allocate costs for the POI is the most reasonable information on the record to fill in the informational gap caused by Dillinger's failure to provide either the actual cost of producing non-prime products and their physical characteristics, or other information from its production records. Such information could have provided Commerce with the information needed to ascertain the non-prime product's actual costs and to comply with the Federal Circuit's directive to determine the actual costs of prime and non-prime products. Dillinger's argument that *Dillinger France II* prohibits the use of the information recorded in its normal books and records as facts otherwise available is unreasonable because it not only ignores the actual language and directive of the Federal Circuit but is also premised on unsupported assumptions concerning the informational gap (*i.e.*, the actual costs of producing non-prime products) created by Dillinger's decision not to submit the information that Commerce requested.

The Federal Circuit in *Dillinger France II* did not prohibit Commerce's reliance on the information recorded in Dillinger's normal books and records as facts otherwise available to allocate total POI costs between prime and non-prime products. In *Dillinger France II*, the Federal Circuit held that Commerce was prohibited from relying on Dillinger's normal books

9

Appx000119

and records to determine the total costs allocable to non-prime products for the purpose of calculating their normal value, because Dillinger's normal books and records assign costs to non-prime products based on their likely selling prices, rather than Dillinger's actual costs of producing and selling the non-prime products.[28] In *Dillinger Germany III*, this Court, after sustaining Commerce's decision to apply facts otherwise available,[29] agreed with Commerce that the Federal Circuit's decision in *Dillinger France II* does not prevent Commerce from relying on Dillinger's normal books and records as facts otherwise available.[30] Accordingly, because the Federal Circuit's decision in *Dillinger France II* pertained to the calculations of normal value and constructed value and does not address or limit the nature of information Commerce may rely on as facts otherwise available, Dillinger's arguments concerning *Dillinger France II* and *IPSCO* are unavailing. Moreover, Dillinger's argument that Commerce should accept its "estimated" costs of producing non-prime products because Commerce relied on the costs assigned to non-prime products in the normal books and records of the respondent in *Husteel* ignores that, in *Husteel*, Commerce relied on these costs because it determined that the respondent "does not separately classify prime and non-prime products, nor does it value these products differently for inventory purposes, but rather assigns them full cost"[31] and that the respondent's "reported costs reflect the actual costs of producing non-prime products."[32] In this proceeding, Dillinger, unlike the respondent in *Husteel*, values prime and non-prime products differently. Specifically, Dillinger values non-prime products at their likely selling price, rather than full cost.

---

[28] *See Dillinger France II*, 981 F. 3d at 1324.
[29] *Dillinger Germany III*, Court No. 17-00158, Slip. Op. 22-114 at 7.
[30] *Id.*
[31] *See Husteel*, 552 F. Supp. 3d at 1411.
[32] *Id.* (quoting page 5 of the Final Results of Redetermination Pursuant to Ct. Remand, Sept. 2, 2021, ECF, No. 113 filed in the *Husteel* litigation).

Dillinger's normal books and records provide reasonable information to rely on to fill the gap caused by Dillinger's failure to submit information pertaining to its actual "cost of materials and fabrication or other processing of any kind employed in producing the merchandise"[33] (*i.e.*, the actual costs of non-prime products). Specifically, record evidence supports the conclusion that the use of the information recorded in Dillinger's normal books and records results in the accurate allocation of total direct and indirect costs reasonably attributed to the cost of producing prime products, while Dillinger's arguments rely on assumptions (*e.g.*, Dillinger assumes, without supporting record evidence to demonstrate which product runs resulted in the production of non-prime products, that the actual costs of producing non-prime products cannot be lower than the cost of producing prime products). Moreover, Dillinger's argument that Commerce's reliance on the allocation of costs between prime and non-prime products recorded in its normal books and records is unreasonable and that Commerce must rely on its proffered "estimate" is based on assumptions which are unsupported by record evidence precisely due to Dillinger's decision not to provide Commerce with information concerning the physical characteristics of the non-prime merchandise produced or the actual product-specific costs of producing non-prime products.

Dillinger's argument that its proffered "estimate" should be accepted as reasonable because it was based on the total standard costs from the primary costs report and then adjusted to actual costs using a two-step cost variance, resulting in an average COP, is a red herring. An overall product-line yield rate is meaningless for the purposes of determining the product-specific costs of producing non-prime plates because Dillinger did not provide necessary information concerning the actual physical characteristics of the non-prime products produced.

---

[33] *Id*. at 7.

There is no evidence to support an inference that the dispersion of the physical characteristics of non-prime products is the same as the dispersion of the physical characteristics of prime products.

Further, there is no evidence on the record to support Dillinger's assumption that its costs of producing non-prime products cannot be lower than its cost of producing its prime products. Absent the physical characteristics and actual COP information for the non-prime products produced, which are solely in the possession of Dillinger, none of the above assumptions are supported by record information. For these same reasons, Dillinger's argument that Commerce's reliance on its normal books and records is unreasonable and that the costs of producing non-prime products cannot be lower than the costs of producing prime products is without merit.

Dillinger's insistence that Commerce rely on its proffered "estimate" rather than its normal books and records and its claims that its "estimate" is a more suitable figure to use as facts otherwise available at this stage of the proceeding is curious considering that Dillinger was given the opportunity to submit information to demonstrate its actual costs of producing non-prime products. Dillinger misconstrues Commerce's statement that "there is no evidence on the record to demonstrate that Dillinger does, in fact, track the physical characteristics of non-prime products produced or the actual product-specific costs of the non-prime products"[34] as an endorsement of Dillinger's assertion that it could not have provided Commerce with the necessary information pertaining to the physical characteristics of the non-prime products and their actual COP. Commerce noted its concern with Dillinger's decision not to submit "the product-specific actual cost of production for the non-prime products, even though it explained that all production is 'made to order and non-prime plate results from the normal production of

---

[34] *See Second Remand Redetermination* at 13.

making plate for the specific customer order'"[35] and that its "system uses actual cost and

consumption of inputs and actual yields."[36] Quite simply, Commerce stated that there was no

record evidence to demonstrate that Dillinger tracked either the physical characteristics of non-

prime products or their actual product-specific COPs, which is not the same as stating that

Dillinger could not have reviewed its records to ascertain the requested information. In other

words, Dillinger could have submitted the product-specific information it uses in its annual

review of product-specific standards,[37] along with production records, which, because products

are produced to order,[38] would likely contain information on the physical characteristics of the

products it was attempting to produce. Such information could have permitted Commerce to

ascertain the actual costs of producing non-prime products. Dillinger failed to provide the

information requested by Commerce, which is solely in its control and, instead, argued that its

proffered methodology, which it subsequently admitted was "just an estimate," was sufficient. It

is unclear why Dillinger chose not to review its records to supply Commerce with the requested

information or, at a minimum, submit documentation to illustrate which production runs resulted

in the production of non-prime plates. In any event, Dillinger did not provide the necessary

information on the record and the application of facts otherwise available was appropriate. For

the reasons articulated herein, Commerce reasonably relied on Dillinger's books and records to

fill the informational gap created by Dillinger's decision not to provide the cost information that

it now seeks to "estimate."

---

[35] *See* Dillinger's Letter, "Response to Remand Questionnaire," dated October 5, 2021 (Remand Questionnaire Response), at 11.
[36] *See* Dillinger's Letter, "AG der Dillinger Hüttenwerke Section D Response," dated July 15, 2016, at D-15.
[37] *See* Memorandum, "Verification of the Cost Response of AG der Dillinger Hüttenwerke in the Antidumping Duty Investigation of Certain Carbon and Alloy Steel Cut-To-Length Plate from Germany," dated January 27, 2017, at 5 – 7.
[38] *See* Remand Questionnaire Response at 11.

13

There is no record evidence to support Dillinger's assertion that Commerce's reliance on the likely selling price recorded in its normal books and records is an unreasonable basis for the allocation of costs to non-prime products. However, there is record evidence to demonstrate that the use of the likely selling price of non-prime products results in a reasonable allocation of total costs to prime products, because it recognizes the total direct costs (*i.e.*, direct materials and conversion costs) and indirect costs (*i.e.*, the lost value of the non-prime plates) attributable to the production of prime plates. In other words, record evidence supports the hypothetical that, where Dillinger cannot produce 98 perfect plates without producing two imperfect plates, any lost value of the two imperfect plates is an additional cost of producing the 98 perfect ones and Dillinger's normal books and records accounted for it as such.

For example, Dillinger's audited financial statements acknowledge that finished goods and work-in-process (WIP) inventories are assessed at its manufacturing costs or the lower fair value derived from the sales market. Importantly, Dillinger's auditor confirmed that these financial statements, which Dillinger prepared, "give a true and fair view of the assets, financial and earning position of the Company for the year then ended in accordance with the accounting rules and principles according to German commercial law."[39] Moreover, the auditor specifically noted that "the audit includes the assessment of the applied accounting principles and substantive estimates of the Board of Management of the company…our audit did not raise any objections."[40] In other words, the auditor acknowledged that Dillinger's practice of allocating the lost value attributable to the production of non-prime products to prime products resulted in a reasonable allocation of both the direct and indirect costs to the production of prime products.

---

[39] *See* Dillinger's Letter, "AG der Dillinger Hüttenwerke Supplemental Section A Response," dated August 3, 2016, at Appendix S-9.
[40] *Id.*

14

Dillinger's assertion that the allocation of lost value to non-prime products results in an inaccurate and impermissible allocation of manufacturing costs to the pool of costs to be allocated to prime products and its insistence that Commerce rely on its methodology, which it has admitted is "just an estimate,"[41] ignores not only the justification it uses for this precise accounting treatment in its audited financial statements, but also the fact that the reason Commerce does not have the actual costs of producing non-prime products is Dillinger's failure to supply this information.  Accordingly, because Commerce is faced with a situation where, because Dillinger did not submit information which would have permitted Commerce to determine the actual costs of producing non-prime products for the purposes of calculating normal value, it is entirely reasonable for Commerce, as facts otherwise available, to rely on Dillinger's normal books and records.

We note that reliance on Dillinger's normal books and records for this purpose is not counter to Commerce's practice regarding write-downs of finished goods.  Commerce has explained previously that it includes write-downs of raw materials and WIP in the calculation of a respondent's total COP during the period in which a write-down occurs because, when the company subsequently consumes the written-down raw materials and/or WIP, it will value the input at the written-down value, rather than historical cost, so that not including the write-downs would result in costs never being captured.[42]  As Dillinger noted, Commerce's treatment of write-downs of finished goods differs in that Commerce does not include such write-downs in the calculation of a respondent's total COP because write-downs of finished goods are more

---

[41] *See Dillinger France*, 589 F. Supp. 3d  at 1257.
[42] *See Circular Welded Non-Alloy Steel Pipe from the Republic of Korea:  Final Results of the Antidumping Duty Administrative Review*, 75 FR 34980 (June 21, 2010), and accompanying IDM at Comment 2.

closely associated with the sale, as opposed to the production, of merchandise.[43]  The reason why Commerce considers the write-down of finished goods to be associated with the sale, rather than production, of merchandise is because the finished goods are valued at historical cost so that including the write-down of finished goods would result in double counting a portion of the costs.  In the current proceeding, we are simply using the information recorded in Dillinger's normal books and records (*i.e.*, the likely selling price of non-prime products) to determine the allocation of total period manufacturing costs between prime and non-prime products.

As explained above, Commerce's reliance on Dillinger's normal books and records is a reasonable application of facts otherwise available, pursuant to section 776(a)(1) of the Act.  Dillinger is quite simply mistaken that Commerce's reliance on its books and records to fill an informational gap created by Dillinger's decision is an impermissible adverse inference because Commerce's reliance on the information recorded in Dillinger's normal books and records accords with its own recognition that the information recorded in its normal books and records results in the total direct and indirect costs reasonably attributable to the production of prime products being allocated to prime products.

## V.    FINAL RESULTS OF REDETERMINATION

For the reasons discussed above, we have continued to use the approach presented in the draft results of redetermination as the approach in these final results of redetermination.  As a result, Commerce is relying on the costs recorded for the prime and non-prime products as recorded in Dillinger's normal books and records as facts otherwise available pursuant to section 776(a)(1) of the Act because Dillinger failed to provide its actual product-specific COP for non-prime products.  Commerce's decision in this regard results in no change to Dillinger's estimated

---

[43] *See Stainless Steel Wire Rod from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review*, 69 FR 19153 (April 12, 2004), and accompanying IDM at Comment 7.

weighted-average dumping margin calculated in the *Second Remand Redetermination* (*i.e.*, 4.98 percent). Because Dillinger's margin is different from the rate in the *Amended Final Determination*, we intend to issue a *Timken* notice with the amended final determination, should the Court sustain these final results of redetermination.[44]

12/15/2022

X 

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance

---

[44] We also intend to include the revised all-others rate of 20.99 percent calculated in the *Second Remand Redetermination* in this *Timken* notice.

Slip Op. 23 - 94

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| AG DER DILLINGER HÜTTENWERKE,<br><br>          Plaintiff,<br><br>   and<br><br>ILSENBURGER GROBBLECH GMBH, SALZGITTER MANNESMANN GROBBLECH GMBH, SALZGITTER FLACHSTAHL GMBH, SALZGITTER MANNESMANN INTERNATIONAL GMBH, and FRIEDR. LOHMANN GMBH,<br><br>          Consolidated Plaintiffs,<br>   and<br><br>THYSSENKRUPP STEEL EUROPE AG,<br><br>          Plaintiff-Intervenor,<br><br>   v.<br><br>UNITED STATES,<br><br>          Defendant,<br><br>   and<br><br>NUCOR CORPORATION and SSAB ENTERPRISES LLC,<br><br>          Defendant-Intervenors. | Before: Leo M. Gordon, Judge<br><br>Consol. Court No. 17-00158 |

**OPINION and ORDER**

[Commerce's application of facts otherwise available to Dillinger and partial adverse facts available to Salzgitter sustained; Commerce's application of its model-match methodology remanded.]

Dated: June 23, 2023

Marc E. Montalbine, deKieffer & Horgan, PLLC, of Washington, D.C., argued for Plaintiff AG der Dillinger Hüttenwerke.  With him on the brief were Gregory S. Menegaz, Alexandra H. Salzman, and Merisa A. Horgan.

Ron Kendler and Allison Kepkay, White & Case LLP, of Washington, D.C., argued for Consolidated Plaintiffs Ilsenburger Grobblech GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Flachstahl GmbH, and Saltzgitter Mannesmann International GmbH.  With them on the brief was David E. Bond.

Kara M. Westercamp, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, D.C., argued for Defendant United States. On the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and Tara K. Hogan, Assistant Director.  Of counsel was Ayat Mujais, Attorney, U.S. Department of Commerce, Office of Chief Counsel for Trade Enforcement and Compliance of Washington, D.C.

Jeffrey Gerrish, Schagrin Associates, of Washington, D.C., argued for Defendant-Intervenor SSAB Enterprises LLC.  With him on the brief were Roger B. Schagrin, Luke A. Meisner, and Nicholas J. Birch.

Stephanie M. Bell, Wiley Rein LLP, of Washington, D.C., argued for Defendant-Intervenor Nucor Corporation.  With her on the brief were Alan H. Price and Christopher B. Weld.

Gordon, Judge: This consolidated action involves challenges to the final determination in the antidumping ("AD") investigation conducted by the U.S. Department of Commerce ("Commerce") of certain carbon and alloy steel cut-to-length plate ("CTL plate") from the Federal Republic of Germany. See Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany, 82 Fed. Reg. 16,360 (Dep't of Commerce Apr. 4, 2017) ("Final Determination"), and accompanying Issues and Decision Memorandum,           A-428-844           (Mar.           29,           2017), http://enforcement.trade.gov/frn/summary/germany/2017-06628-1.pdf (last visited this date) ("Decision Memorandum").

Before the court are Commerce's Final Results of Redetermination Pursuant to Court Remand, ECF No. 153 ("Third Remand Results") filed pursuant to the court's remand order in AG der Dillinger Huttenwerke v. United States, 46 CIT ___, 592 F. Supp. 3d 1344 (2022) ("Dillinger II"). Plaintiff AG der Dillinger Hüttenwerke ("Dillinger") challenges Commerce's determination to use "likely selling price" for the cost of production for non-prime plate as facts otherwise available when it was missing necessary actual cost information, as well as Commerce's rejection of Dillinger's proposed change to the agency's model-match methodology to include a proposed additional quality code for "sour transport plate."[1] See Pl. Dillinger's Comments in Opp'n to Final Results of Redetermination, ECF No. 162 ("Dillinger Comments"); see also Def.'s Resp. to Comments on Remand Redetermination, ECF No. 168 ("Def.'s Resp."); Pl. Dillinger Mem. in Supp. of Rule 56.2 Mot. for J. on the Agency R., ECF No. 40 ("Dillinger MSJ"); Def.'s Mem. Opp. Pls.' Rule 56.2 Mots. for J. on the Admin. R., ECF No. 55 ("Def.'s MSJ Resp."); Reply Br. of Pl. Dillinger, ECF No. 62 ("Dillinger MSJ Reply").

Separately, Consolidated Plaintiffs Ilsenburger Grobblech GMBH, Salzgitter Mannesmann Grobblech GMBH ("SMSD"), Salzgitter Flachstahl GMBH, and Salzgitter Mannesmann International GMBH (collectively, "Salzgitter") challenge Commerce's determination from the results of the previous remand to use partial AFA for certain home

---

[1] The parties refer to the products covered by proposed quality code 771 with different terms including "Sour Service Petroleum Transport Plate" and "Sour Service Line Pipe Steel." See Decision Memorandum at 77 ("Dillinger first proposed a distinct quality reporting code for sour service petroleum transport plate in its Dillinger Model Match Comments."); Dillinger Br. at 11 (describing "sour service petroleum transport or line pipe steel (code 771)"). The court will continue to use the shorthand term "sour transport plate" for consistency.

market CTL plate sales made by their respective affiliates when Salzgitter failed to submit manufacturing information. <u>See</u> Salzgitter Consol. Pls.' Comments on Remand Redetermination, ECF No. 135 ("Salzgitter Comments"); Commerce's Final Results of Redetermination Pursuant to Court Remand, ECF No. 129 ("<u>Second Remand Results</u>"); <u>see also</u> Def.'s Resp. to Comments on Remand Redetermination, ECF No. 141 ("Def.'s 2RR Resp."); Def.-Int. SSAB's Comments on Remand Redetermination, ECF No. 139; Def.-Int. Nucor Corporation's Comments on Remand Redetermination, ECF No. 146. The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii),[2] and 28 U.S.C. § 1581(c) (2018).

For the reasons set forth below, the court sustains: (1) Commerce's determination to assign the "likely selling price" as the cost of production for non-prime plate recorded in Dillinger's books and records as "the best available information on the record" for evaluating and adjusting the cost of production under 19 U.S.C. § 1677b(f); and (2) Commerce's application of partial AFA to Salzgitter. The court remands the issue of Commerce's application of its model-match methodology to Dillinger for further explanation, or if appropriate, reconsideration.

## I. Standard of Review

The court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing

---

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2018 edition.

agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006); see also Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr. & Richard Murphy, Administrative Law and Practice § 9.24[1] (3d ed. 2023). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." 8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2023).

## II. Discussion

### A. Use of "Likely Selling Price" to Calculate Cost of Production under § 1677b

The court presumes familiarity with its prior decisions regarding Commerce's calculation of the cost of production of Dillinger's non-prime products under 19 U.S.C. § 1677b.  In its most recent opinion, the court held that "[b]ecause Dillinger has failed to place information on the record demonstrating the actual cost of production of its non-prime products, Commerce may reasonably rely on facts otherwise available pursuant to § 1677e(a)(1)."  Dillinger II, 46 CIT at ___, 592 F. Supp. 3d at 1349.  However, the court remanded the determination of facts otherwise available for Commerce to "explain how its reliance on information indicating the 'likely selling price' of non-prime products accords with its obligation to ensure that the reported costs of production reasonably reflect the cost of producing the merchandise under consideration."  Id. On remand, Commerce explained "how the information recorded for non-prime products in Dillinger's normal books and records is not only the best available information on the record, but also ensures that the reported costs reasonably reflect the cost of producing both prime and non-prime products."  Third Remand Results at 5; see also id. at 4 (noting that Commerce continues "to rely on ['the likely selling price' information from] Dillinger's normal books and records," which Commerce maintains is "the only reasonable approach for determining the allocation of total costs between prime and non-prime products, and the per-unit costs of non-prime products.").

Dillinger continues to challenge the reasonableness of Commerce's finding that Dillinger values the cost of producing non-prime merchandise at the "likely selling price"

in its normal books and records.  Dillinger contends that the application of facts otherwise available, i.e., Commerce's reliance on the "likely selling price" of the non-prime merchandise recorded in Dillinger's books and records, was unreasonable given the totality of the record as well as the guidance from the U.S. Court of Appeals for the Federal Circuit ("Court of Appeals") in Dillinger France S.A. v. United States, 981 F.3d 1318, 1321 (Fed. Cir. 2020).  See Dillinger Comments at 1.  Dillinger further maintains that Commerce misread the record by finding that Dillinger uses the likely selling price of non-prime products to value costs in its audited financial statements.  Id. at 4.  Dillinger also argues that "[b]y using the likely selling price of non-prime plate rather than the actual cost of production allocated to non-prime plate in Dillinger's verified cost calculation, Commerce has imposed an impermissible adverse inference."  Id. at 14.  As explained below, because Dillinger has failed to demonstrate that Commerce's application of facts otherwise available was unreasonable given the limited information in the record, the court is unpersuaded by Dillinger's arguments and sustains Commerce's determination on this issue.

The parties' dispute centers on Commerce's finding that "[t]he information recorded in Dillinger's normal books and records, including the likely selling price of non-prime products, to allocate costs for the [period of investigation ("POI")] is the most reasonable information on the record to fill in the informational gap caused by Dillinger's failure to provide either the actual cost of producing non-prime products and their physical characteristics, or other information from its production records."  Third Remand Results at 9.  Commerce emphasizes that Dillinger "could have provided Commerce with the

information needed to ascertain the non-prime product's actual costs and to comply with the Federal Circuit's directive [in <u>Dillinger France</u>] to determine the actual costs of prime and non-prime products." <u>Id.</u> Commerce highlights the fact that it had previously re-opened the record to allow Dillinger to provide such critical actual cost information for Commerce's calculations, but Dillinger's failure to provide such information resulted in Commerce resorting to using facts otherwise available under 19 U.S.C. § 1677e(a). <u>Id.</u> at 3, 9–10.

Dillinger maintains that Commerce should have used Dillinger's proffered information regarding the average actual total cost of manufacture for all of its plate sold during the POI. <u>See</u> Dillinger Comments at 7. While Dillinger acknowledges that its proposal would require Commerce to accept data from an "average," Dillinger maintains that its preferred calculation nonetheless represents the "most reasonable calculation of the actual production costs" because Dillinger's proffered information "is based upon **actual** costs." <u>Id.</u> In rejecting Dillinger's proposed alternative, Commerce explained that:

> Dillinger's normal books and records are more reasonable to use as facts otherwise available because they recognize that the lost value of the non-prime products, which is an inevitable result of Dillinger's production of prime products, is appropriately considered to be a cost of producing the prime products. Consequently, Dillinger's proposal to assign the overall average cost of all prime products is unreasonable because it would distort the disparity in cost across prime CTL plate products, as well as the disparity in "size, specification, and grade" among non-prime products. Thus, although both Dillinger's proposal and Dillinger's normal books and records are flawed because Dillinger chooses not to track the actual costs of producing non-prime products, we find that the use of the amounts recorded in Dillinger's normal books and records is reasonable for use as facts otherwise available.

Third Remand Results at 5–6.

Dillinger responds by emphasizing Commerce's obligation under 19 U.S.C. § 1677b(b)(3) to calculate Dillinger's actual cost of production of non-prime products. Dillinger contends that Commerce may resort to facts otherwise available under § 1677e(a) only to fill an "informational gap" in the record, and that Commerce's reliance on the likely sales price for non-prime merchandise as a substitute for the actual cost of production is an unreasonable application of facts otherwise available as the estimated sales values of non-prime merchandise "has absolutely nothing to do with the costs of production." Dillinger Comments at 2–4. Dillinger maintains that Commerce unreasonably relied on this selling price information because this information was not how Dillinger actually valued the cost of production for non-prime products in its audited financial statements. See id. at 1–2 (arguing that Commerce unreasonably conflated record here with record in Dillinger France, which was subject to different generally accepted accounting principles and practices).

Dillinger's argument is unpersuasive. Dillinger placed this likely selling price information on the record as part of its response in the Supplemental Section D Questionnaire regarding "the 'quantity and value of non-prime, defective, and low quality plates sold during the POI.'" See id. at 3 (citing Dillinger's Supplemental Section D Questionnaire Response). Commerce has previously explained the importance of reviewing information as to the "physical characteristics of the non-prime products produced and the actual cost of producing the non-prime products," and even

re-opened the record to allow Dillinger to place actual cost information on the record.
See Third Remand Results at 3.   When Dillinger failed to provide this actual cost
information, Commerce determined it was necessary to resort to facts otherwise available
under § 1677e(a) and to use the best available information on the record to fill this gap,
a determination already sustained in Dillinger II.  See id. at 9–10.  Commerce found that
this likely selling price information submitted by Dillinger is the "best available information"
on the record to value the cost of producing non-prime products in the absence of
accurate, actual cost of production data.  See id. at 4, 5.

Despite maintaining that Commerce's reliance on Dillinger's likely selling price
information was unreasonable as that information was unrelated to the cost of production,
Dillinger fails to demonstrate that Commerce acted unreasonably in finding that "Dillinger
values non-prime products at their likely selling price, rather than full cost."  See id. at 10.
In light of this finding based on Dillinger's questionnaire response, coupled with Dillinger's
failure to put data corresponding to the actual cost of production of non-prime products
on the record, the court sustains Commerce's use of the likely selling price information to
value the cost of production of non-prime products as a reasonable application of facts
otherwise available under § 1677e(a).

Dillinger lastly contends that "[b]y using the likely selling price of non-prime plate
rather than the actual cost of production allocated to non-prime plate in Dillinger's verified
cost calculation, Commerce has imposed an impermissible adverse inference."  Dillinger
Comments at 14.   Dillinger maintains that "[u]nder the statute, Commerce may only
impose an adverse inference when it 'finds that an interested party has failed to cooperate

by not acting to the best of its ability to comply with the request for information.'"  Id. (quoting 19 U.S.C. § 1677e(b)).  Dillinger argues that "[b]y rejecting all of these other cost of production figures and applying an unreasonably low cost of production to non-prime plate based upon resale value, Commerce is applying an adverse inference that impermissibly shifts costs from non-prime plate to prime plate and thereby increases the dumping margin."  Id. at 20.

Dillinger's argument is unsupported by the record.  Dillinger's naked assertion that Commerce is applying an adverse inference lacks any basis beyond the fact that Commerce's selection of facts otherwise available ultimately resulted in an increase in Dillinger's calculated dumping margin. As Commerce explained:

> Dillinger is quite simply mistaken that Commerce's reliance on its books and records to fill an informational gap created by Dillinger's decision is an impermissible adverse inference because Commerce's reliance on the information recorded in Dillinger's normal books and records accords with its own recognition that the information recorded in its normal books and records results in the total direct and indirect costs reasonably attributable to the production of prime products being allocated to prime products.

Third Remand Results at 16.  Defendant further highlights that Commerce did not make a finding that an adverse inference was warranted pursuant to 19 U.S.C. § 1677e(b)— a prerequisite for applying an adverse inference when selecting from among the facts otherwise available on the record.  See Def.'s Resp. at 9 (citing Third Remand Results). Dillinger's dissatisfaction with its resulting dumping margin, without more, does not demonstrate that Commerce's selection of facts otherwise available was made with an impermissible adverse inference.  Dillinger's remaining arguments and cited case law are

without merit as they are predicated on the unfounded assumption that Commerce
applied an adverse inference here.  Accordingly, the court sustains Commerce's reliance
on Dillinger's normal books and records as a reasonable application of facts otherwise
available.

### B. Application of Partial AFA to Salzgitter

In a previous remand redetermination, Commerce explained that it used different
AFA methodologies to calculate Dillinger and Salzgitter's margins, resulting in totals of
4.98% and 22.9% respectively, because the scope of Salzgitter's non-disclosures was
significantly larger than Dillinger's non-disclosures.  See Second Remand Results at 27,
ECF No. 129.  Salzgitter challenged the reasonableness of this determination, and the
court reserved decision on this issue in Dillinger II.  See Dillinger II, 46 CIT at ___, 592 F.
Supp. 3d at 1347; see also Salzgitter Comments; Def.'s 2RR Resp.  In calculating
Salzgitter's margin, Commerce applied AFA to incentivize Salzgitter's future cooperation.
Second Remand Results at 27.  Specifically, Commerce explained that:

> [T]he application of the Dillinger France I[3] partial AFA
> methodology to Salzgitter deprives Commerce of the ability to

---

[3] In Dillinger France S.A. v. United States, 42 CIT ___, 350 F. Supp. 3d 1349 (2018)
("Dillinger France I"), the court remanded Commerce's application of partial AFA to
Dillinger France, concluding that the decision "to utilize the highest non-aberrational net
price among Dillinger's downstream home market sales" was unreasonable because
"the reliability of the reported sales prices has not been called into question and there is
no informational gap in the sale prices for Commerce to fill."  See id. at ___, 350 F.
Supp. 3d at 1364.  On remand, Commerce followed the court's guidance and determined
that it would "treat[] these downstream home market sales transactions as Dillinger
France-produced plate, rather than treating these transactions as sales of plate produced
by an unrelated manufacturer; and 2) rel[y] on the sale prices as reported."  See Dillinger
France S.A. v. United States, 43 CIT ___, ___ 393 F. Supp. 3d 1225, 1228 (2019) (quoting
Commerce's remand results adopting Dillinger France I methodology), rev'd in part on
other grounds, 981 F.3d 1318 (Fed. Cir. 2020); see also AG der Dillinger Huttenwerke v.

> apply [19 U.S.C. § 1677c] meaningfully in this proceeding. It is well established that Congress intended Commerce to use AFA as a means to induce cooperation in its proceedings and address evasion concerns. The purpose of AFA is to provide respondents with an incentive to cooperate in Commerce's investigations and reviews and ensure that necessary information is placed on the record to enable Commerce to reach a reasonable determination. However, the change in the AFA methodology prescribed by the Court in Dillinger France I and applied to Salzgitter in the Dillinger I Remand Redetermination frustrates Commerce's goal of inducing cooperation by ensuring that a non-cooperating respondent does not receive a more favorable AFA rate than it would have received it would have fully cooperated.

Id. at 29.

Dillinger reported manufacturer information for more than 99 percent of its downstream sales in this matter and, while the "number of sales with missing manufacturer information was not on the record" in Dillinger France, Commerce reported that "it was only a small number of Dillinger France's downstream sales." Id. at 27. Commerce could therefore approximate what Dillinger and Dillinger-France's margins would have been had they disclosed manufacturer information for all their downstream sales and could be sure that the Dillinger France I methodology would not materially impact either margin calculation. Id. at 27–28.

In contrast, Salzgitter did not report manufacturer information for approximately 28,000 downstream sales of CTL plate, representing a not-insignificant percentage of

---

United States, 43 CIT ___, ___, 399 F. Supp. 3d 1247, 1256–57 (2019) ("Dillinger I") (explaining that in Dillinger France, Commerce initially applied highest net-aberrational price to all sales without manufacturer information, but ultimately accepting the sales prices as reported, classifying all sales without manufacturer information as Dillinger produced sales—Dillinger France I methodology).

home market sales used in Commerce's analysis.  Id. at 27.  Thus, Commerce maintains

that it "could not determine what Salzgitter's margin would have been if Salzgitter had

fully cooperated with [its] requests for information and properly reported the manufacturer

of the downstream sales at issue," so Salzgitter "may well receive a more favorable

margin [using the Dillinger France I methodology] than it would have received if [it] had

fully cooperated."    Id. at 29–31.    As a result, Commerce applied the highest

non-aberrational net price for all of Salzgitter's sales without manufacturer information to

insure it did not receive a lower margin than it otherwise would have.  Id. at 30.

        Salzgitter maintains that this approach is unreasonable because Commerce

compared the scope of each exporter's non-disclosures inconsistently.  First, Salzgitter

argues that "substantial evidence does not support Commerce's conclusion that the sales

at issue for Dillinger France were smaller than the sales at issue for Salzgitter."  Salzgitter

Comments at 6.  Further, Salzgitter notes that even if the scope of its non-disclosure was

larger, very few of those sales would be necessary to calculate its antidumping margin.

Id. at 4.  Specifically, Salzgitter notes that:

> Commerce claimed that the universe of sales considered with
> respect to Salzgitter was larger than the universe of sales
> considered with respect to Dillinger France, Commerce did
> not similarly consider the linkage between the number of
> Salzgitter sales affected and Salzgitter's dumping margin.
> Indeed, were Commerce to apply the analysis used for
> Dillinger France to Salzgitter, it is clear that only a very small
> fraction of SMSD's sales for which manufacturer information
> was unknown were use "as a basis for normal value" and were
> "actually compared to U.S sales prices."

Id. (quoting Dillinger France S.A. v. United States, 43 CIT ___, ___, 393 F. Supp. 3d 1225, 1228 (2019)).  Salzgitter maintains that, if Commerce only considered sales that were necessary for its home market comparison, there would be little difference between the scope of Salzgitter and Dillinger's non-disclosures.  Id.

Salzgitter further contends that Commerce's application of § 1677e is unreasonable because there is no indication that Salzgitter benefitted from not fully disclosing all requested information, and there is no evidence that Salzgitter intentionally obscured any information for this purpose.  First, Salzgitter notes that it did not maliciously or dishonestly omit information, but rather its information systems were not equipped to record all of the information Commerce requested.  Id. at 6.  Second, Salzgitter maintains that it does not benefit from these omissions because its antidumping margin would likely have been zero percent even if it had disclosed all requested information.  Id. at 8.

Commerce disagrees.  First, Commerce notes that there is a factual difference between the overall number of sales that Dillinger and Dillinger-France reported without manufacturer information and the number of sales that Salzgitter reported without manufacturer information, and not just a difference in how many sales are relevant to each exporter's margin calculation.  Second Remand Results at 28.  Specifically, Commerce notes that the AFA methodology applied to Dillinger's sales without manufacturer information in this matter, as well as Dillinger-France's sales without manufacturer information, did not impact the margin calculation for Dillinger in either proceeding.  Id. at 27; see also First Remand Results at 2, ECF No. 85 (finding that applying partial AFA methodology of Dillinger France I to Dillinger did not impact

Dillinger's margin calculation). Salzgitter's margin, however, would have been reduced from 22.90 percent, when Commerce applied the highest net-aberrational price, to <u>zero</u> percent under the <u>Dillinger France I</u> methodology. <u>Second Remand Results</u> at 28, 54.

Commerce further explained that "these differences affected Commerce's goals in using partial AFA as a means to induce cooperation because the margin result for Salzgitter under the <u>Dillinger France I</u> methodology provides no incentive for Salzgitter to cooperate by providing requested information to Commerce." <u>Id.</u> at 54. Commerce rejected Salzgitter's suggested view of the record, stating that "Salzgitter would have Commerce establish a new test of materiality to determine whether AFA is warranted – a test that would allow a respondent, not Commerce, to determine what information is relevant for Commerce's analysis." <u>Id.</u> at 55. Commerce maintains that Salzgitter's margin must reflect the full extent of its non-disclosure, and determined that using the <u>Dillinger France I</u> methodology to assign Salzgitter a zero percent margin would not incentivize future cooperation. <u>Id.</u> at 54–57.

Since a zero percent margin cannot, by definition, be higher than what Salzgitter's margin would otherwise have been if it had disclosed all its manufacturer information, Commerce reasonably found that applying AFA to Salzgitter using the <u>Dillinger France I</u> methodology would be inconsistent with the intent of § 1677e. For the same reason, Commerce's refusal to adopt one of Salzgitter's three proposed alternative methods for calculating normal value is also reasonable, as all three of Salzgitter's proposed alternatives would have left Salzgitter with a <u>de minimis</u> dumping margin. <u>See</u> Salzgitter

Comments at 8–9 (explaining Salzgitter's proposed alternatives that Commerce calculate

its margin by (1) treating none of the sales as Salzgitter-manufactured plate; (2) treating

all sales as Salzgitter-manufactured plate; or (3) treating a percentage of each sale as

Salzgitter-manufactured plate based on SMSD's purchases from each supplier");

see also Second Remand Results at 55–56 (noting that "[u]nder the Dillinger France I

partial AFA methodology, Salzgitter would receive a zero rate and, consequently, would

be excluded from the AD order.  Because of Salzgitter's failure to provide requested

information, Commerce cannot determine what the resulting margin would have been

if Salzgitter had complied fully with Commerce's requests to report the manufacturer

information for all of its home market sales.  Thus, it is reasonable to assume that

Salzgitter would receive a more favorable result under the Dillinger France I methodology

as a result of withholding information than by providing the requested information and

allowing Commerce to properly analyze the sales in question").

19 U.S.C. § 1677e provides Commerce with discretion in applying AFA

methodologies. See, e.g., Nippon Steel Corp. v. United States, 337 F.3d 1373,1383

(Fed. Cir. 2003) (noting that 19 U.S.C. § 1677e does not require Commerce to find

"evidence of nefarious intentions" to apply AFA against the importer); F.lli de Cecco

di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000)

(stating that 19 U.S.C. § 1677c gives Commerce "broad discretion" in calculating

antidumping margins for "uncooperative respondents").  As the court observed in

Dillinger I, Salzgitter has failed to demonstrate that its proposed alternative methods

provide a reliable measure or approximation of what its margin would be if it fully disclosed

Consol. Court No. 17-00158                                                     Page 18

all relevant information.  See Dillinger I, 43 CIT at ___, 399 F. Supp. 3d at 1255–56.  Since Salzgitter did not provide any additional information to show that one of these alternative methodologies constituted the only reasonable path forward on this record, the court again concludes that Commerce acted reasonably in rejecting those proposed alternatives.

Salzgitter contends that, even if Commerce acted reasonably in applying a different AFA methodology than was applied to Dillinger, Commerce still unreasonably ignored information that Salzgitter had already placed on the record in calculating its margin. Salzgitter Comments at 10–11.  Specifically, Salzgitter maintains that under 19 U.S.C. §1677m(e) "Commerce was not permitted on remand to disregard [its] verified sales prices for the sales at issue as a result of the missing manufacturer [information]." Id. at 10.  Salzgitter maintains that it has demonstrated that "it would not receive a more favorable AFA rate using the methodology applied to Dillinger France than it would have received if it reported the manufacturer for all sales."  Id. at 8.  Nevertheless, Salzgitter admits that this conclusion requires Commerce to "not unjustifiably 'ignore record information that is not in dispute,' namely the prices and other information for the SMSD sales, which Commerce verified."  Id.  Although the court in Dillinger France raised concerns about Commerce's refusal to consider the submitted sales price data in applying AFA, this Court refused to reach the same conclusion in Dillinger I, observing that "Commerce has clear statutory authority pursuant to 19 U.S.C. § 1677m(d) to 'disregard all or part of the original and subsequent responses' in an adverse inference scenario." Dillinger I, 43 CIT at ___, 399 F. Supp. 3d at 1256; see also Second Remand Results

at 55 (highlighting that "the Court acknowledged Commerce's statutory authority under section 782(d) of the Act to 'disregard all or part of the original and subsequent responses' when relying on AFA").

Salzgitter responds that Commerce may only exercise this authority subject to § 1677m(e) and contends that Salzgitter's pricing information could not be disregarded by Commerce because Salzgitter's submission of information met all of the criteria under this provision. Salzgitter Comments at 10–11. The court previously addressed and rejected this same argument. See Dillinger I, 43 CIT at ___, 399 F. Supp. 3d at 1253 (explaining that "the 'information' to which § 1677m(e) refers, in the context of this proceeding, is the missing manufacturer information, not the remainder of 'the information' that Plaintiffs submitted. Plaintiffs acknowledge that the identity of the CTL plate manufacturers is relevant to whether home market transactions should or should not be included in margin calculations, and that they did not identify all of them. Plaintiffs thus cannot escape the conclusion that they failed to satisfy § 1677m(e) with respect to that information."). Because Salzgitter has failed to demonstrate any error in the court's prior analysis of this issue, the court again concludes that "Plaintiffs' reliance upon § 1677(m)(e) is misplaced." Id. As a result, the court cannot agree that Commerce's selected methodology for applying partial AFA to Salzgitter was unreasonable.

Lastly, Salzgitter contends that "Commerce's selection of the highest non-aberrational net price as AFA is inappropriate." Salzgitter Comments at 12. Salzgitter maintains that "that the sale from which this price was derived would not even be used as a basis for normal value in Salzgitter's margin calculation" because the

product at issue in that sale "was <u>so dissimilar to the products sold to the United States that it was not compared to a single U.S. sale</u>." <u>Id.</u>  Consequently, Salzgitter argues that "[i]t is unreasonable and punitive for Commerce to extrapolate the price of a wholly dissimilar product, and use that price as the basis for normal value for all of Salzgitter's home-market sales for which it could not identify the manufacturer." <u>Id.</u> at 13.  Commerce stated that "[t]o determine the highest non-aberrational net price [] to be assigned to the downstream sales with missing manufacturer information, Commerce sorted all of SMSD's net prices for these sales in descending order and selected the transaction at the beginning of a smooth continuum of net prices."  <u>Second Remand Results</u> at 30 (confidential information omitted).  Commerce further explained that "[b]ecause Salzgitter failed to report the manufacturer of these sales, we cannot determine if the net prices correlated to the manufacturer of the CTL plate.  Commerce cannot rule out the possibility that the sales with the highest prices were entirely or primarily of CTL plate manufactured by Salzgitter, and Salzgitter's failure to report the manufacturer information was an attempt to obscure this fact, thereby distorting the margin." <u>Id.</u> at 30–31.

Beyond generally decrying the unreasonableness of Commerce's selected AFA sale price, Salzgitter fails to suggest an alternative basis for an AFA sale price that would instead be the one and only reasonable option on the record.  While Salzgitter emphasizes the fact that Commerce does not have "unlimited authority" in applying AFA, Salzgitter does not identify how Commerce exceeded the bounds of reasonableness here, or what alternative AFA price Commerce should have selected in order to meet the purpose of § 1677e(b).  <u>See</u> Salzgitter Comments at 13 (noting that "[t]he purpose of

section 1677e(b) is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins." (quoting F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000)).  There is no dispute that Commerce has the discretion, where appropriate, to select the highest non-aberrational net price in applying AFA.  See BMW of N. Am. v. United States, 926 F.3d 1291, 1300 (Fed. Cir. 2019) (noting that court has "previously held that Commerce has wide discretion to assign the 'highest calculated rate' to uncooperative parties," but warning that "use of the highest rate is not automatic, however, and 'will depend upon the facts of a particular case.'" (internal citations omitted)).  Here, Commerce has considered the totality of the record and explained the factors that led to its differing application of AFA to Salzgitter as compared to Dillinger.  See Second Remand Results at 57 (highlighting differences in "(1) the number of sales lacking the requested manufacturer information; (2) the net prices among the sales with the missing data; and (3) the impact on the margin caused by the respondents' failure to provide the requested information.").  While Salzgitter contends that Commerce's selected AFA price (and resulting margin of 22.9%) is "punitive," Salzgitter fails to explain how Commerce's selection was unreasonable given the totality of the circumstances on the record.  Salzgitter also fails to suggest any alternative price from the record that Commerce could have selected as a reasonable application of AFA.  Based on the record as a whole, the court cannot agree with Salzgitter's contention that Commerce's selection of the highest non-aberrational net price on the record was "unreasonable and punitive."  See Salzgitter

Comments at 13.  Accordingly, the court sustains Commerce's application of partial AFA to Salzgitter.

### C.  Rejection of Dillinger's Proposed Quality Code for Sour Transport Plate

In a previous memorandum and order addressing Dillinger's challenge to Commerce's model-match methodology, the court sustained Commerce's rejection of Dillinger's proposed quality code for sour vessel plate but stayed consideration of "Dillinger's challenge to Commerce's rejection of Dillinger's other proposed quality code (sour transport plate), pending the outcome of the remanded issues."  See Memorandum and Order, ECF No. 121 (Aug. 18, 2021); see also Dillinger MSJ; Def.'s MSJ Resp.; Def.-Intervenor Nucor Corporation Resp. Br., ECF No. 58; Dillinger MSJ Reply.  The court assumes familiarity with that decision, which outlined the basic details as to how Commerce applies its model-match methodology and how that methodology was applied in this matter.  The court remands this issue again to Commerce for further consideration, and if appropriate, reconsideration.

Commerce rejected Dillinger's proposed quality code 771 (for sour transport plate), explaining:

> In its Dillinger Model Match Comments, Dillinger identified two examples of products contained in its proposed sour service petroleum transport plate quality subcategory:  NACE TM0284/ISO 15156-2 and NACE MR0175/ISO 15156. We did not adopt this suggested quality subcategory in the final model match methodology issued to interested parties, and instead we identified a single quality code for petroleum transport plate.
>
> Nonetheless, Dillinger reported sales in its questionnaire responses using its proposed quality code subcategory for

this product, and also changed the examples it provided for the subcategory to be "steel grades L450MS-PSL2, 5L-X65MS-PSL2, etc." without explanation. Dillinger did not identify what standards it had provided, if any, to identify the products to which it refers. The absence of any actual standards, identifying the full range of properties for such products, limits our ability to evaluate how such products compare to other petroleum transport plate products.

Dillinger provided a "Presentation on Requirements for Steel Plates in Sour Service" (Sour Service Presentation), which appears to be a slide presentation containing information about sour service. However, the Sour Service Presentation does not provide a systematic or clear reference to the range of properties of the products in question. Of the four example products Dillinger listed in the Dillinger Model Match Comments and its section B response, only one of them (i.e., NACE FR0175/ISO 15156) appears to be clearly identified in the Sour Service Presentation for use in the corrosive hydrogen sulfide environments Dillinger indicates require such plate, while the example products listed in Dillinger's section B response are not referenced at all.

Dillinger indicates that the sulfur content must be strictly limited for sour service petroleum transport plate, and we note that the Sour Service Presentation does appear to refer to a maximum allowable percentage level, which it refers to as "low." However, it is not evident that such a requirement applies to the two example "grades" (L450MS-PSL2, 5L-X65MS-PSL2) identified in Dillinger's section B response. Even assuming, arguendo, that those grades are within the API 5L line pipe specification, as the petitioner states, that would support the petitioner's argument that Dillinger's petroleum transport plate products are covered under the same specification as other petroleum plate products identified by the quality code established by the Department. The Sour Service Presentation also does not refer to the content requirements of carbon or the "expensive alloys" (i.e., copper and nickel) discussed in the Dillinger Model Match Comments.

Furthermore, assuming these elements are pertinent to the analysis, the Department's model match methodology

contains product characteristic fields that segregate products based on minimum specified content of two of those three elements (i.e., carbon and nickel). If the levels of these chemical elements are important distinguishing factors for sour service petroleum transport plate, as Dillinger indicates, the separate product characteristic fields for those elements would distinguish sour service petroleum transport plate products from other plate products.

Similarly, the heat treatment product characteristic may also distinguish these products from other petroleum transport plate products. The Sour Service Presentation refers to the use of "Q&T" (i.e., quenching and tempering) to effect the desired end properties of the sour service petroleum transport plate. Products that have been quenched and tempered will be assigned a different heat treatment code than those which have not undergone that treatment.

Therefore, we do not agree that a new quality reporting code is required to distinguish sour service petroleum transport plate from other products. We find that Dillinger did not subsequently provide information that would justify either allowing it to report revised quality codes for different petroleum transport plate products or revisiting this issue once parties had submitted their questionnaire responses. Instead, we find that Dillinger has failed to both: 1) justify creating a quality code subcategory for this product; and 2) clearly identify the products that would be classified in its proposed subcategory. Consequently, consistent with the Preliminary Determination, we continued to reassign all products which Dillinger reported with a quality code of 771 to have a quality code 772, thereby assigning all petroleum transport plate products the same quality code.

Decision Memorandum at 77–79 (footnotes omitted).

The model-match methodology, based on 19 U.S.C. § 1677(16)(A), determines

matches based on physical differences.  Courts have noted that this is a consideration

apart from whether physical characteristics result in price and cost differences between

products.  See Maverick Tube Corp. v. United States, 39 CIT ___, ___, 107 F. Supp. 3d

1318, 1330 (2015) ("differences in costs do not constitute differences in products in and of themselves").

As noted above, Dillinger explains that its sour transport plate is used with "sour" petroleum products containing high amounts of hydrogen sulfide, thus the sour transport plate is made with "extremely low levels of phosphorus and sulfur" to withstand the corrosion effects of the hydrogen sulfide.  See Dillinger MSJ at 11.  Dillinger thus maintains that there are non-minor, commercially significant differences in physical characteristics between sour transport plate and other petroleum transport products. See id. at 11–15; Dillinger MSJ Reply at 4–7 (citing Pesquera Mares Australes Ltda. v. United States, 266 F.3d 1372, 1384 (Fed. Cir. 2001) for proposition that merchandise can only be treated as identical under 19 U.S.C. § 1677(16)(A) if it has either (1) no differences in physical characteristics or (2) the differences are only minor and 'not commercially significant'").

Dillinger highlights Bohler Bleche GMBH & Co. KG v. United States, 42 CIT ___, 324 F. Supp. 3d 1344 (2018) ("Bohler"), in which the court "struck down the model-match methodology used in this investigation."  Dillinger MSJ Reply at 1.  Relying on this decision, Dillinger maintains that it should receive similar relief as the respondent in that case.  Id. at 2.  In Bohler, the plaintiff-respondents challenged a final determination by Commerce, which relied on the same model-match methodology that was used in the underlying proceeding here, arguing that Commerce had failed to adequately account for "the alloy content of Plaintiffs' specialized high alloy steel products, thereby failing to account for significant differences in physical characteristics, costs, and price."

See Bohler, 42 CIT at ___, 324 F. Supp. 3d at 1348.  While Commerce there disagreed "that the newly proposed methodologies would have the effect of creating closer matches between exported merchandise and home market merchandise," the court ultimately agreed with the plaintiffs that the "methodology insufficiently accounts for alloy content in Plaintiffs' products" and remanded the issue to Commerce for reconsideration.  Id., 42 CIT at ___, 324 F. Supp. 3d at 1348, 1354.  On remand, Commerce changed course and revised its methodology to better account for these alloy content differences.[4]

Here, in a similar fashion, Commerce rejected Dillinger's contention that the record reflected that lower levels of phosphorus and sulfur in these steels distinguished them from other petroleum transport plate.  See Decision Memorandum at 77–79 (reviewing record evidence cited by Dillinger in support of its position, and explaining findings that "Dillinger has failed to both: 1) justify creating a quality code subcategory for this product; and 2) clearly identify the products that would be classified in its proposed subcategory.").  Thus, although Commerce acknowledged the record evidence supporting a finding that Dillinger's sour transport plate had different physical characteristics than other comparable products (i.e., lower maximum sulfur content), Commerce ultimately did not agree "that a new quality reporting code is required to distinguish sour service petroleum

---

[4] While Commerce noted that it was changing its model-match methodology to meet the respondent's concerns in that matter "under protest," the Government did not appeal the court's subsequent decision sustaining those remand results.  See Bohler Bleche Remand Results at 2, Court No. 17-00163, ECF No. 55 (explaining that Commerce would adopt respondent's proposed alternative model-match methodology under protest); Bohler Bleche GMBH & Co. KG v. United States, 43 CIT ___, 362 F. Supp. 3d 1377 (2019) (sustaining as reasonable Commerce's adoption on remand of plaintiffs' alternative model-match methodology "as it fairly compares commercially significant differences in physical characteristics").

transport plate from other products." Decision Memorandum at 79. Given Commerce's apparent recognition in Bohler that its model-match methodology insufficiently accounted for variations in the alloy content of the products at issue in that proceeding, the court concludes that Commerce should have the opportunity to explain why a similar outcome is not warranted here.

Because Bohler and Commerce's subsequent remand results in that action were not published until after the submission of the Government's response brief in this litigation, Commerce has had no opportunity to address whether the circumstances in Bohler are comparable to those here. At oral argument, the court noted its concern for the parties that any response by the Government or Defendant-Intervenor to the circumstances of Bohler might constitute post hoc rationalization that the court could not use to sustain the decision-making of Commerce without potentially violating fundamental principles of administrative law. See, e.g., Burlington Truck Lines Inc. v. United States, 371 U.S. 156, 168 (1962) ("courts may not accept appellate counsel's post hoc rationalizations for agency action''); SEC v. Chenery Corp., 332 U.S. 194, 196 (1947) (warning that courts "must judge the propriety of [agency] action solely by the grounds invoked by the agency"). As the circumstances in Bohler appear analogous, the court reiterates its observation that "[r]easoned decision-making requires a certain measure of consistency." See Dillinger I, 43 CIT at ___, 399 F. Supp. 3d at 1257. Accordingly, the court remands this issue for Commerce to further explain why its determination is reasonable in light of its approach in Bohler, or if appropriate, reconsider its rejection of Dillinger's proposed quality code for sour transport plate.

Consol. Court No. 17-00158                                              Page 28

### III. Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that Commerce's determinations as to the cost adjustments for Dillinger's non-prime plate, as well as the application of partial AFA to Salzgitter, are sustained; it is further

**ORDERED** that Commerce's determination to reject Dillinger's proposed quality code for sour transport plate is remanded for further explanation, and if appropriate, reconsideration; it is further

**ORDERED** that Commerce shall file its remand results on or before September 7, 2023; and it is further

**ORDERED** that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after Commerce files its remand results with the court.

 

 

                                              _____/s/ Leo M. Gordon_____
                                                    Judge Leo M. Gordon


Dated: June 23, 2023
        New York, New York

A-428-844
Remand
Slip Op. 23-94
POI:  04/01/2015 – 03/31/2016
**Public Document**
E&C/OIX:  PG

*AG der Dillinger Hüttenwerke v. United States*,
**Court No. 17-00158, Slip Op. 23-94 (CIT June 23, 2023)**
**Certain Carbon and Alloy Steel Cut-to-Length Plate from Germany**

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (the Court)

in *AG der Dillinger Hüttenwerke v. United States et al.*, Court No. 17-00158, Slip. Op. 23-94

(CIT June 23, 2023) (*Dillinger Germany IV*).  This action arises out of the final determination in

the less-than-fair-value (LTFV) investigation of certain carbon and alloy steel cut-to-length plate

(CTL plate) from Germany.[1]

In *Dillinger Germany IV*, the Court upheld Commerce's:  (1) determination to assign the

"likely selling price" recorded in AG der Dillinger Hüttenwerke's (Dillinger) books and records

as the cost of production (COP) for non-prime plate; and (2) application of partial adverse facts

available (AFA) to Ilsenburger Grobblech GmbH, Salzgitter Mannesmann Grobblech GmbH,

Salzgitter Flachstahl GmbH, and Salzgitter Mannesmann International GmbH (collectively,

Salzgitter).  However, the Court remanded Commerce's model-match methodology, related

specifically to Commerce's rejection of Dillinger's proposed quality code for sour service

---

[1] *See Certain Carbon and Alloy Steel Cut-to-Length Plate from Germany:  Final Determination of Sales at Less Than Fair Value*, 82 FR 16360 (April 4, 2017) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM); *see also Certain Carbon and Alloy Steel Cut-to-Length Plate from Austria, Belgium, France, the Federal Republic of Germany, Italy, Japan, the Republic of Korea, and Taiwan:  Amended Final Affirmative Antidumping Determinations for France, the Federal Republic of Germany, the Republic of Korea and Taiwan, and Antidumping Duty Orders*, 82 FR 24096 (May 25, 2017) (*Amended Final Determination*).

petroleum transport plate, for further explanation or, if appropriate, reconsideration in light of Commerce's approach in *Bohler*.[2]

      As discussed below, consistent with the Court's order in *Dillinger Germany IV*, Commerce has reconsidered its rejection of Dillinger's proposed quality code for sour service petroleum transport plate in light of our determination in *Bohler*, which Commerce now finds is analogous to the instant investigation. Therefore, Commerce has revised Dillinger's calculations using its reported quality code for sour service petroleum transport plate (*i.e.*, 771). Consequently, the final estimated weighted-average dumping margin for Dillinger increases to 4.99 percent.[3]

## II.    BACKGROUND

      In the LTFV investigation, Commerce rejected Dillinger's proposed quality code of 771 for sour service petroleum transport plate and reassigned these products to have a quality code of 772 for all petroleum transport plate products.[4] Dillinger instituted litigation challenging this aspect of Commerce's model-match methodology, along with other issues.

      In *Dillinger Germany I*, the Court remanded to Commerce to reconsider its application of partial AFA to certain downstream home market sales reported by Dillinger.[5] Pursuant to *Dillinger Germany I*, Commerce issued its *First Remand Redetermination*, in which Commerce reconsidered how it applied partial AFA to these sales.[6] In *Dillinger Germany II*, the Court

---

[2] *See Dillinger Germany IV*, Court No. 17-00158, Slip Op. 23-94 at 4 and 25; *see also Bohler Bleche GMBH & Co. KG v. United States*, 324 F. Supp. 3d 1344 (CIT 2018) (*Bohler*).

[3] We note that this change does not affect the all-others rate, which remains unchanged from the rate calculated in *Final Results of Redetermination Pursuant to Court Remand, Certain Carbon and Alloy Steel Cut-to-Length Plate from Germany*, Court No. 17-00158 (CIT August 18, 2021), dated January 19, 2022 (*Second Remand Redetermination*), at 57-58, available at https://access.trade.gov/resources/remands/21-101.pdf.

[4] *See Final Determination* IDM at Comment 22.

[5] *See AG der Dillinger Hüttenwerke v. United States*, 399 F. Supp. 3d 1247 (CIT 2019) (*Dillinger Germany I*).

[6] *See Final Results of Redetermination Pursuant to Court Remand, Certain Carbon and Alloy Steel Cut-to-Length Plate from Germany,* Court No. 17-00158, Slip Op. 19-87 (CIT July 16, 2019), dated October 8, 2019 (*First Remand Redetermination*), available at https://access.trade.gov/resources/remands/19-87.pdf.

remanded to Commerce to consider its reallocation of costs between prime and non-prime steel plate for Dillinger, among other Dillinger cost issues, as well as the application of a partial AFA methodology to certain downstream home market sales reported by Salzgitter.[7]  In parallel with *Dillinger II*, the Court issued a separate memorandum and order sustaining Commerce's rejection of Dillinger's proposed quality code for sour service pressure vessel plate and staying Dillinger's challenge to Commerce's rejection of the proposed quality code for sour service petroleum transport plate pending the outcome of the cost issues on remand.[8]

In *Dillinger Germany III*, the Court remanded to Commerce to again reconsider its selection of the facts otherwise available for determining the COP of Dillinger's non-prime products.[9]  In *Dillinger Germany IV*, the Court sustained Commerce's determination to assign the "likely selling price" recorded Dillinger's books and records as the COP for non-prime plate and the application of partial AFA to Salzgittter.[10]  However, the Court remanded for further explanation and reconsideration Commerce's decision to reject Dillinger's proposed quality code for sour service petroleum transport plate, which, as noted above, had been stayed after *Dillinger Germany II*, in light of Commerce's approach in response to *Bohler*.[11]

## III.   ANALYSIS

As the Court ordered, Commerce has reconsidered its rejection of Dillinger's proposed quality code for sour service petroleum transport plate (*i.e.*, 771) in light of our analysis of the facts in *Bohler*.  In *Bohler*, the Court held that Commerce's model-match methodology used in the underlying LTFV investigation "failed to adequately account for 'the alloy content of the Plaintiffs' specialized high alloy steel products, thereby failing to account for significant

---

[7] *See AG der Dillinger Hüttenwerke v. United States*, 534 F. Supp. 3d 1403 (CIT 2021) (*Dillinger Germany II*).
[8] *See Memorandum and Order*, ECF No. 121 (August 18, 2021) (*August 2021 Order*).
[9] *See AG der Dillinger Hüttenwerke v. United States*, 592 F. Supp. 3d 1344 (CIT 2022) (*Dillinger Germany III*).
[10] *See Dillinger Germany IV* at 12.
[11] *Id.* at 22-28.

3

differences in physical characteristics, costs, and price.'"[12]  Specifically, in the LTFV investigation underlying *Bohler*, the respondent proposed the addition of two additional product characteristics (*i.e.*, grade and process) to account for the alloy content of its specialized, high-alloy steel products.[13]  The respondent suggested adding the field "grade" to define the amount of alloy in a product and its corresponding cost and the field "process" to account for significant variations in the cost of production arising from different manufacturing processes used to produce different steel products.[14]  According to the respondent, these additional product characteristics were necessary because the extant product characteristics "'{did} not provide an accurate basis for comparing {home market and export} sales … because it unreasonably group{ed} together high alloy, Special Steel CTL plate products that differ significantly … resulting in {product control numbers} … with wildly divergent sales prices and costs of production' which could 'lead to highly arbitrary dumping margin calculations.'"[15]  In *Bohler*, the Court sustained Commerce's exclusion of the respondent's field "process," but remanded to Commerce its exclusion of the field "grade," directing Commerce to "design a model-match methodology in {that} investigation that account{ed} for all commercially significant physical differences."[16]  On remand, Commerce replaced the field "quality" with the respondent's proposed field "grade," to account for all commercially significant differences, including alloy content.[17]

     In the instant case, as in *Bohler*, Dillinger asserts that Commerce's model-match methodology does not accurately account for physical differences between certain products it

---

[12] *Id*. (citing *Bohler*, 324 F. Supp. 3d at 1348).
[13] *See Bohler*, 324 F. Supp. 3d at 1348.
[14] *Id*.
[15] *Id*., 324 F. Supp. 3d at 1349.
[16] *Id.*
[17] *See Final Results of Redetermination Pursuant to Court Remand, Certain Carbon and Alloy Steel Cut-to-Length Plate from Austria*, Court No. 17-00163 (CIT July 9, 2018), dated October 9, 2018, at 7.

4

produces. To correct Commerce's model-match methodology, Dillinger proposed the addition of an additional subfield (*i.e.*, code 771) under the existing "quality" product characteristic to differentiate Dillinger's sour service petroleum transport plate, which is used to transport petroleum products containing high amounts of hydrogen sulfide, from other steels designated specifically for the transport of petroleum products (*i.e.*, currently code 772).[18] To support the commercially significant differences in the physical characteristics of sour service petroleum transport plate when compared to other steels designated for the transport of petroleum products, Dillinger provided: (1) sales and cost information for products with its proposed quality code, demonstrating the consistently higher net prices and costs for sour service petroleum transport plate and other steels designated specifically for the transport of petroleum products; and (2) documentation comparing the manufacturing of sour service petroleum transport plate to other steels designated specifically for the transport of petroleum products, as well demonstrating the unique physical properties of sour service petroleum transport plate.

Thus, we find that the facts of this case are analogous to those of *Bohler*. Specifically, in *Bohler*, the respondent argued for a revision to the model-match hierarchy, through the addition of two product characteristic fields (*i.e.*, "grade" and "process") to account for commercially significant physical differences, while Dillinger has similarly proposed a revision to the model-match hierarchy, through the additional quality product characteristic code (*i.e., 771*), to account for the different physical characteristics of sour service petroleum transport plate. Additionally, in *Bohler*, the respondent provided information on the record to support the additional product characteristic to demonstrate the impact of alloy content on the COP of its products, while

---

[18] Commerce also permitted respondents to include additional quality codes not included in Commerce's list when reporting the "quality" product characteristic for its products. *See* Commerce's Letter, "Product Characteristics for the Antidumping Duty Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Germany," dated June 10, 2016, at 8.

Dillinger similarly provided information on the record to demonstrate the consistently higher costs and net prices for sour service petroleum transport plate, along with supporting documentation.  As a result, we reconsidered our rejection of Dillinger's proposed quality code for sour service petroleum transport plate (*i.e.*, 771) and have now included this quality code in the CONNUMs used in the margin calculations for Dillinger to account for commercially significant physical differences between sour service petroleum transport plate and other steels designated specifically for the transport of petroleum products.[19]

## IV.   INTERESTED PARTY COMMENTS

On August 10, 2023, Commerce released the draft results of redetermination to all interested parties and invited parties to comment.[20]  On August 17, 2023, Dillinger and Nucor Corporation (the petitioner) submitted comments.[21]  The petitioner in its comments agreed with Commerce's Draft Remand.[22]  Dillinger's comments are summarized below.

*Dillinger's Comments*

- Commerce in its model-match methodology may only treat products as identical if the products have either:  (1) no differences in physical characteristics; or (2) only minor and "not commercially significant" differences.[23]
- Commerce's initial questionnaire expressly permitted Dillinger to include additional quality codes in its response.[24]
- Dillinger provided Commerce with hundreds of pages of standards and specifications illustrating the differences in the actual physical characteristics with respect to the proposed additional quality codes.[25]  This information is outlined in Dillinger's brief to the Court in the first iteration of this litigation.[26]

---

[19] *See* Memorandum, "Alternative Margin Calculations for AG der Dillinger Hüttenwerke S.A. Pursuant to Draft Results of Fourth Remand Redetermination," dated August 10, 2023.

[20] *See Draft Results of Redetermination Pursuant to Court Remand, Certain Carbon and Alloy Steel Cut-to-Length Plate from Germany*, Court No. 17-00158 (CIT June 23, 2023), dated August 10, 2023 (Draft Remand).

[21] *See* Dillinger's Letter, "Comments of Draft Results of Redetermination," dated August 17, 2023 (Dillinger's Comments); *see also* Petitioner's Letter, "Comments of Draft Results of Redetermination," dated August 17, 2023 (Petitioner's Comments).

[22] *See* Petitioner's Comments.

[23] *See* Dillinger's Comments. at 3 (citing *Union Steel* v. *United States*, 753 F. Supp. 2d 1317, 1322 (CIT 2011)).

[24] *Id*. at 3-4 (citing Commerce's Letter, "Product Characteristics for the Antidumping Duty Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Germany," dated June 10, 2016, at Attachment 1 at 8).

[25] *Id*.

[26] *Id*. at 3-4 and Attachment 1.

- Currently, Commerce's model-match methodology is insufficient because it does not account for how lower levels of phosphorus and sulfur in sour service petroleum transport plate significantly change the alloy content of the product, when compared to other steels designated specifically for the transport of petroleum products.[27]
- The manufacturing process for creating steel products that meets the specifications for sour service petroleum transport plate is more extensive than the manufacturing process for other steels designated specifically for the transport of petroleum products. Therefore, both the COP and sales price of sour service petroleum transport plate are higher than the COP and subsequent sales price of non-sour service petroleum transport plate.[28]
- Sour service petroleum transport plate is marketed and sold under a distinct grade name that includes an "S," signifying it complies with requirements of Annex H for sour service (*i.e.*, it can transport sour petroleum products without corroding).[29]
- The manufacturing, marketing, and use-case distinctions in physical differences between sour service petroleum transport plate and other steels designated specifically for the transport of petroleum products result in physical differences that are commercially significant. Therefore, Commerce cannot treat sour service petroleum transport plate as identical to other steels designated specifically for the transport of petroleum products that have not undergone the desulfurization and dephosphorization processes.[30]
- The addition of grade as a new product characteristic field, as the respondent in *Bohler* requested, would have effectively resolved the model-match issue in this investigation. However, Dillinger took a less impactful approach as it determined that simply adding an additional quality code would be sufficient.[31]
- Commerce incorrectly claimed that Dillinger has not submitted information regarding cost and price differences between sour service petroleum transport plate and other steels designated specifically for the transport of petroleum products. On the contrary, Dillinger submitted extensive sales and cost information for each transaction, and differentiated sour service petroleum transport plate from other steels designated specifically for the transport of petroleum products in its sales and cost files.[32]
- Commerce asserts that Dillinger must illustrate the existence of a significant difference-in-merchandise (DIFMER) adjustment (*i.e.*, 20 percent or more) between sour service petroleum transport plate and other steels designated specifically for the transport of petroleum products. However, nowhere in *Bohler* does the Court condition its decision on there the existence of a DIFMER of 20 percent or more.[33]
- When comparing control numbers for sour service sour service petroleum transport plate to other steels designated specifically for the transport of petroleum products that differ only in quality code, the DIFMER adjustments are meaningful.[34]
- Commerce has never established specific thresholds for cost differences in establishing its model-match criteria. Rather, Commerce has based its model- match criteria on

---

[27] *Id*. at 3-4.
[28] *Id*. at 4-5.
[29] *Id*. at 5.
[30] *Id*.
[31] *Id*. at 6.
[32] *Id*.
[33] *Id*. at 7.
[34] *Id*. at 7 and Attachment 2.

7

physical characteristics, regardless of whether such characteristics results in cost differences.[35]

- Commerce must also apply a fair and objective standard when identifying commercially significant differences in physical characteristics. It cannot require Dillinger to provide information that was never requested of other parties to this proceeding. For example, Commerce made changes to the quality codes based on comments Nucor submitted (*e.g.*, adding codes for tool steel and mold steel) without requiring Nucor to present evidence of differences in physical characteristics, price comparability, cost differences, or DIFMER.[36]

- Most significantly, Commerce folded seven quality codes related to pressure vessel steel into one quality code at the petitioner's behest, even though the petitioner did not submit information about cost comparability or sales price.[37]

- In *Bohler*, the Court specifically found that the plaintiffs' proposed addition of a new product characteristic field to Commerce's model-match methodology was not untimely, even though they were made after the initial comment period had expired and Commerce had issued its final product characteristics. If such significant additions to the model-match methodology cannot properly be considered untimely, then the limited addition of a quality code for sour service pressure vessel steel (as specifically permitted by the questionnaire instructions) cannot be considered untimely. Therefore, Commerce should reconsider its determination that Dillinger's addition of a quality code for sour service pressure vessel steel (*i.e.*, 759) was untimely.[38]

- Commerce noted in its *Final Determination* that there is no correlation between the magnitude of the weighted-average dumping margin and the extent to which Commerce's model-match methodology may be flawed. Therefore, Commerce's consideration of this issue should not be dependent upon the margin impact.[39]

- The proper model-match methodology is an issue that recurs in every subsequent administrative review, making it important to the proceeding.[40]

**Commerce's Position:**

We reviewed the comments submitted on the Draft Remand and, after considering those

comments and the facts on the record, agree with Dillinger that the facts of the instant

investigation are similar to those in *Bohler*. In the Draft Remand, we attempted to distinguish

the facts of this case from those of *Bohler*, noting that: (1) in *Bohler*, the respondent argued for

the addition of a new product characteristic to be added to the model-match hierarchy, while here

---

[35] *Id*. at 8 (citing *Final Determination* IDM at Comment 22).
[36] *Id*. 8-9.
[37] *Id*. at 9.
[38] *Id*. at 10.
[39] *Id*. at 12-13.
[40] *Id*. at 13.

8

Dillinger has proposed an additional code under the existing "quality" product characteristic; and (2) in *Bohler,* the respondent provided analysis supporting the additional product characteristic to demonstrate the impact of alloy content on the COP of its products, while Dillinger has provided no such analysis that would support a change in our determination here. Therefore, in the Draft Remand, because of the differences between *Bohler* and the instant investigation, we did not revisit our decision to reject Dillinger's proposed additional quality code for sour service petroleum transport plate (*i.e.*, 771).[41]

However, after considering Dillinger's comments on the Draft Remand, we have reconsidered our comparison of the facts of *Bohler* and the instant case, as described in the "Analysis" section above. Therefore, consistent with our determination in *Bohler*, we find it appropriate in this instance, and based on the facts here, to include Dillinger's proposed quality code for sour service petroleum transport plate in our calculation of Dillinger's margin for these final results of redetermination to account for commercially significant physical differences between sour service petroleum transport plate and other steels designated specifically for the transport of petroleum products.

Finally, we disagree with Dillinger that Commerce should also reconsider its rejection of Dillinger's proposed quality code for sour service pressure vessel steel, given that the Court already sustained Commerce's rejection of this quality code.[42] As a result, we have not revisited this issue in these final results of redetermination.

## V.    FINAL RESULTS OF REDETERMINATION

For the reasons discussed above, Commerce determines that the facts in this investigation and the investigation underlying *Bohler* are, in fact, analogous. Therefore, Commerce has

---

[41] *See* Draft Remand at 6-7.
[42] *See August 2021 Order* at 9.

reconsidered its rejection of Dillinger's proposed quality code for sour service petroleum transport plate (*i.e.*, 771) and now includes this quality code in the CONNUMs used in the margin calculations for Dillinger. Consequently, the final estimated weighted-average dumping margin for Dillinger increases to 4.99 percent. Because Dillinger's margin is different from the rate in the *Amended Final Determination*, we intend to issue a *Timken*[43] notice with the amended final determination, should the Court sustain these final results of redetermination.[44]

9/6/2023

X 

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance

---

[43] *See Timken Co. v. United States*, 893 F.2d 337 (Fed. Cir. 1990) (*Timken*).
[44] We note that the revision to Dillinger's margin here does not affect the calculation of the all-others rate. However, Commerce did revise the all-others rate in the *Second Remand Redetermination*. The CIT sustained this aspect of Commerce's determination in *Dillinger Germany III*. Therefore, we intend to include the revised all-others rate of 20.99 percent calculated in the *Second Remand Redetermination* in this *Timken* notice.

10

Slip Op. 23-187

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| AG DER DILLINGER HÜTTENWERKE, | |
| Plaintiff, | |
| and | |
| THYSSENKRUPP STEEL EUROPE AG, | |
| Plaintiff-Intervenor, | Before: Leo M. Gordon, Judge |
| v. | |
| UNITED STATES, | |
| Defendant, | Consol. Court No. 17-00158 |
| and | |
| NUCOR CORPORATION and SSAB ENTERPRISES LLC, | |
| Defendant-Intervenors. | |

**<u>OPINION</u>**

[Commerce's <u>Fourth Remand Results</u> sustained.]

Dated: December 21, 2023

<u>Marc E. Montalbine</u>, deKieffer & Horgan, PLLC, of Washington, D.C., for Plaintiff AG der Dillinger Hüttenwerke. With him on the brief were <u>Gregory S. Menegaz</u>, <u>Alexandra H. Salzman</u>, and <u>Merisa A. Horgan</u>.

<u>Robert L. LaFrankie</u>, Crowell & Moring, LLP of Washington, D.C., for Plaintiff-Intervenor thyssenkrupp Steel Europe AG.[1]

---

[1] Plaintiff-Intervenor thyssenkrupp Steel Europe AG did not file any comments on the <u>Fourth Remand Results</u>.

Kara M. Westercamp, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, D.C., for Defendant United States.  With her on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and Tara K. Hogan, Assistant Director.  Of counsel was Ayat Mujais, Attorney, U.S. Department of Commerce, Office of Chief Counsel for Trade Enforcement and Compliance of Washington, D.C.

Jeffrey Gerrish, Schagrin Associates, of Washington, D.C., for Defendant-Intervenor SSAB Enterprises LLC.  With him on the brief were Roger B. Schagrin, Luke A. Meisner, and Nicholas J. Birch.[2]

Stephanie M. Bell, Wiley Rein LLP, of Washington, D.C., for Defendant-Intervenor Nucor Corporation.  With her on the brief were Alan H. Price and Christopher B. Weld.

Gordon, Judge: This consolidated action involves challenges to the final determination in the antidumping ("AD") investigation conducted by the U.S. Department of Commerce ("Commerce") of certain carbon and alloy steel cut-to-length plate ("CTL plate") from the Federal Republic of Germany.  See Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany, 82 Fed. Reg. 16,360 (Dep't of Commerce Apr. 4, 2017) ("Final Determination"), and accompanying Issues and Decision Memorandum, A-428-844 (Mar. 29, 2017), http://enforcement.trade.gov/frn/summary/germany/2017-06628-1.pdf (last visited this date) ("Decision Memorandum").[3]

Before the court are Commerce's Final Results of Redetermination Pursuant to Court Remand, ECF No. 184 ("Fourth Remand Results") filed pursuant to the court's

---

[2] Defendant-Intervenor SSAB Enterprises LLC also did not file any comments on the Fourth Remand Results.

[3] The court previously issued a partial judgment as to the Ilsenburger and Salzgitter consolidated plaintiffs.  See Slip Op. 23-160, ECF No. 197 (Nov. 15, 2023) (opinion granting partial judgment as to issues raised by consolidated plaintiffs).

Consol. Court No. 17-00158                                                    Page 3

remand order in <u>AG der Dillinger Huttenwerke v. United States</u>, 47 CIT ___, 648 F. Supp. 3d 1321 (2023) ("<u>Dillinger III</u>").  The court presumes familiarity with the history of this action.  Plaintiff AG der Dillinger Hüttenwerke ("Dillinger") challenges Commerce's decision not to revisit its rejection of Dillinger's proposed quality code for sour service pressure vessel plate, while Defendant-Intervenor Nucor Corporation ("Nucor") challenges Commerce's determination to adjust its model match methodology to include a separate quality code for sour transport plate in calculating Dillinger's dumping margin. <u>See</u> Pl. Dillinger's Comments in Partial Opp'n to Final Results of Redetermination, ECF No. 192 ("Dillinger Opp'n Comments"); Def.-Int. Nucor Corp.'s Comments on Final Results of Redetermination, ECF No. 193 ("Nucor Opp'n Comments"); <u>see also</u> Def.'s Resp. to Comments on Remand Redetermination, ECF No. 199 ("Def.'s Resp."); Pl. Dillinger Comments in Partial Support to Final Results of Redetermination, ECF No. 200 ("Dillinger Support Comments"); Def.-Int. Nucor Corp.'s Comments in Support of Final Results of Redetermination, ECF No. 201 ("Nucor Support Comments").  The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii),[4] and 28 U.S.C. § 1581(c) (2018).

For the reasons set forth below, the court sustains the <u>Fourth Remand Results</u>.

---

[4] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2018 edition.

Consol. Court No. 17-00158                                                    Page 4

## I. Standard of Review

The court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole.  Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006); see also Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).  Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review.  3 Charles H. Koch, Jr. & Richard Murphy, Administrative Law and Practice § 9.24[1] (3d ed. 2023).  Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances

presented by the whole record." 8A <u>West's Fed. Forms</u>, National Courts § 3.6 (5th ed. 2023).

## II. Discussion

On remand, as directed by the court in <u>Dillinger III</u>, Commerce "reconsidered its rejection of Dillinger's proposed quality code for sour service petroleum transport plate (<u>i.e.</u>, 771) in light of [its] analysis of the facts in [<u>Bohler Bleche GMBH & Co. KG v. United States</u>, 42 CIT ___, 324 F. Supp. 3d 1344 (2018) ("<u>Bohler</u>")]." <u>Fourth Remand Results</u> at 3. Commerce examined the facts and decision in <u>Bohler</u> as compared to the facts and circumstances in the present matter, and ultimately found that "the facts of this case are analogous to those of <u>Bohler</u>." <u>Id.</u> at 5. As a result, Commerce "reconsidered [its] rejection of Dillinger's proposed quality code for sour service petroleum transport plate (<u>i.e.</u>, 771) and … included this quality code in the CONNUMs used in the margin calculations for Dillinger to account for commercially significant physical differences between sour service petroleum transport plate and other steels designated specifically for the transport of petroleum products." <u>Id.</u> at 6. Consequently, "the final estimated weighted-average dumping margin for Dillinger increas[ed] to 4.99 percent." <u>Id.</u>; <u>see also</u> Dillinger Opp'n Comments at 6 n.1 ("Dillinger's revised margin in the final results of redetermination has increased from 4.98% to 4.99%.").

Dillinger does not challenge Commerce's findings in the <u>Fourth Remand Results</u>, but rather emphasizes that "Commerce Properly Determined That the Facts of This Case Are Analogous to Those of <u>Bohler</u>." Dillinger Opp'n Comments at 1. However, Dillinger argues that "[i]n Light of Its Determination That the Facts of This Case Are Analogous to

Those of <u>Bohler</u>, Commerce Should Also Accept Dillinger's Quality Code for Sour Service Pressure Vessel Steel (Code 759)." <u>Id.</u> at 2.  Acknowledging that the court has already rejected Dillinger's claim as to sour service pressure vessel steel, Dillinger maintains that the court "Should Revise Its August 2021 Order and Remand Commerce's Determination Concerning the Quality Code for Sour Service Pressure Vessel Plate." <u>Id.</u> at 7. Specifically, Dillinger contends that a "key holding in <u>Bohler</u> is that the Court specifically found that the plaintiffs' proposed revisions to Commerce's model-match methodology were not untimely even though they were made after the initial comment period had expired and Commerce had issued its final product characteristics." <u>Id.</u> at 8 (citing <u>Bohler</u>, 324 F. Supp. 3d at 1352).  Dillinger reasons that "[i]f such significant additions to the model-match methodology [as those made in <u>Bohler</u>] cannot properly be considered untimely, then the limited addition of a Quality code for sour service pressure vessel steel as specifically permitted by the questionnaire instructions can certainly not be considered untimely." <u>Id.</u> at 4.

The Government disagrees and maintains that there is no basis for revisiting the sour service pressure vessel plate issue that was previously decided by the court. <u>See</u> Def.'s Resp. at 5–6.  Defendant explains that Commerce found that Dillinger provided a similar revision to the model match hierarchy used in <u>Bohler</u> and provided information on the record like that submitted in <u>Bohler</u> to demonstrate the consistently higher costs and net price for sour service petroleum transport plate. <u>Id.</u>  Thus, based on the information on the record and its similarities to the information submitted in <u>Bohler</u>, Commerce included Dillinger's proposed quality code for sour service petroleum transport

plate, i.e., 771, in the control numbers used in the margin calculations for Dillinger to account for commercially significant differences.  Id. at 6.

Defendant highlights that this Court's remand order "only directed Commerce on remand to reconsider its decision to reject Dillinger's proposed quality code for sour service petroleum transport plate, and not Dillinger's proposed quality code for sour service pressure vessel steel."  Id. at 5 (citing Dillinger III, 47 CIT at ___, 648 F. Supp. 3d at 1333–36).  In the Government's view, the limited nature of the remand made sense in light of the fact that the court had "already sustained Commerce's rejection of Dillinger's proposed quality code for sour service pressure vessel steel."  Id. (citing August 2021 Order, ECF No. 121, which upheld rejection of Dillinger's proposed quality code "because it was not submitted within the time for submitting model match comments, nor did Dillinger provide information during the investigation that would justify revisiting this issue").  Commerce decided that it would not reconsider its "rejection of Dillinger's proposed quality code for sour service pressure vessel steel, given that the Court already sustained Commerce's rejection of this quality code."  Fourth Remand Results at 9 (citing August 2021 Order).

As the parties acknowledge, the court has already sustained Commerce's rejection of Dillinger's proposed quality code for sour service pressure vessel steel.  See, e.g., Dillinger Opp'n Comments at 7 (recognizing that court would need to "revise its August 2021 Order" in order to grant Dillinger relief on this issue); Def.'s Resp. at 5 (citing August 2021 Order); Nucor Opp'n Comments at 2 n.1.  Notably, the court did not direct Commerce to reconsider this issue on remand, so Dillinger's arguments on this issue

essentially amount to a request for reconsideration of the court's <u>August 2021 Order</u>. The court observes that Dillinger did not frame its arguments against the standard for a motion for reconsideration. <u>See, e.g.</u>, USCIT R. 59 (setting forth guidance for moving for reconsideration of a court's judgment); USCIT R. 52(b) (permitting parties to move court to amend its findings and its judgment). Furthermore, while Dillinger's arguments highlight the similarities of its circumstances with those in <u>Bohler</u>, Dillinger does not account for the factual distinctions specific to this issue that may justify differing outcomes. As Defendant-Intervenor Nucor points out, Dillinger's reliance on <u>Bohler</u> is misplaced as "[i]n <u>Bohler</u>, the Court rejected the argument that plaintiffs' model match challenges were untimely." Nucor Support Comments at 3. As the <u>Bohler</u> court explained:

> Plaintiffs raised their concerns at every turn. Plaintiffs proposed addition of a GRADE field to account for alloy content was submitted with their questionnaire responses on July 15, 2016, just 35 days after the Department had issued its revised model-match methodology [and] four months prior to the Department's <u>Preliminary Determination</u> . . . . Commerce then reviewed Plaintiffs' GRADE-field proposal and sought additional clarifying information on this issue in its September 14, 2016 supplemental questionnaire, which Plaintiff then provided. <u>See</u> Pls. Supp. Questionnaire Resp. Sec. D & E 7. The court will not now entertain the Government's argument that the model-match methodology was a closed issue prior to July 15, 2016.

<u>Bohler</u>, 42 CIT at ___, 324 F. Supp. 3d at 1352. "In contrast, here, Dillinger not only failed to raise this issue in its product characteristic comments, but again failed to raise it in its initial questionnaire response. This is a fundamental difference between the two proceedings." Nucor Support Comments at 3–4.

While the court maintains the inherent authority to reconsider its ruling sustaining Commerce's rejection of the proposed quality code for sour service pressure vessel steel, Dillinger has not made the requisite showing to demonstrate that reconsideration is appropriate here.  Accordingly, the court rejects Dillinger's challenge and will sustain the Fourth Remand Results.

Curiously, despite Commerce's remand resulting in an increase to Dillinger's calculated dumping margin, Nucor challenges the Fourth Remand Results, arguing that Commerce's determination is "unsupported and insufficiently explained."  See Nucor Opp'n Comments at 2.  Specifically, Nucor contends that "although Commerce asserts that Dillinger has 'provided information on the record to demonstrate the consistently higher costs and net prices for sour service petroleum transport plate, along with supporting documentation,' the agency has provided no discussion or analysis of this information."  Id. at 3 (quoting Fourth Remand Results at 5–6).  Nucor further maintains that Commerce failed to "provide any citation to the record to support its determination or otherwise identify what information it was relying on or found to be persuasive."  Id.

Nucor also highlights that Commerce's draft remand redetermination differed significantly from the final determination in the Fourth Remand Results, and laments that Commerce failed to "provide any explanation of why [its draft remand redetermination] conclusion was no longer supported or what record evidence supported the opposite conclusion."  Id. at 3–4.  For instance, Nucor notes that "[i]n contesting Commerce's original determination before this Court, as well as challenging the agency's draft remand determination, Dillinger relies predominantly on information and analysis that it never

presented to Commerce in the original investigation." <u>Id.</u> at 4. Nucor maintains that Commerce failed to "discuss the information on the record, identify the record evidence it relied on, or analyze how this information supports its conclusion." <u>Id.</u> at 6–7. Nucor thus urges the court to conclude that "Commerce's brief, uncited statements that Dillinger provided certain information, without discussing what that information was or how it was taken into consideration, does not provide the guidance and clarity required for there to exist a rational connection between the facts found and the choices made." <u>Id.</u> at 7.

Nucor's arguments are unpersuasive. Commerce's remand redetermination explained why the facts of this action are analogous to <u>Bohler</u>. In particular, Commerce stated that the respondent in <u>Bohler</u> "argued for a revision to the model-match hierarchy, through the addition of two product characteristic fields (<u>i.e.</u>, 'grade' and 'process') to account for commercially significant physical differences, while Dillinger has similarly proposed a revision to the model match hierarchy, through the additional quality product characteristic code (<u>i.e.</u>, 771), to account for the different physical characteristics of sour service petroleum transport plate." <u>Fourth Remand Results</u> at 5.

"Additionally, in <u>Bohler</u>, the respondent provided information on the record to support the additional product characteristic to demonstrate the impact of alloy content on the {cost of production} of its products, while Dillinger similarly provided information on the record to demonstrate the consistently higher costs and net prices for sour service petroleum transport plate, along with supporting documentation." <u>Id.</u> at 5–6. This supporting documentation included: (1) sales and cost information for products with its proposed quality code, demonstrating the consistently higher net prices and costs

for sour service petroleum transport plate and other steels designated specifically for the transport of petroleum products; and (2) documentation comparing the manufacturing of sour service petroleum transport plate to other steels designated specifically for the transport of petroleum products, as well demonstrating the unique physical properties of sour service petroleum transport plate. Id. at 5; see Dillinger Section B Response and accompanying home market sales database (July 15, 2016) (PD[5] 194; CD 77, 88); Dillinger Section C Response and accompanying U.S. sales database (July 15, 2016) (PD 198; CD 95, 96); Dillinger Section D Response and accompanying cost database (July 15, 2016) (PD 199; CD 103). As a result, Commerce reconsidered its rejection of the proposed quality code for sour service petroleum transport plate and determined to include the quality code of 771 "for Dillinger to account for commercially significant physical differences between sour service petroleum transport plate and other steels designated specifically for the transport of petroleum products." Fourth Remand Results at 6. Thus, contrary to Nucor's argument, Commerce addressed why the facts of this case are analogous to Bohler and that there was sufficient record evidence to support this determination. Id. at 9.

Nucor also argues that Commerce relied on information and analysis that Dillinger never presented to Commerce in the investigation. See Nucor Opp'n Comments at 5–6. The court disagrees. While Dillinger provided more analysis of this issue in its briefing

---

[5] "PD ___" refers to a document contained in the public administrative record, which is found in ECF No. 23-5, unless otherwise noted. "CD ___" refers to a document contained in the confidential administrative record, which is found in ECF No. 23-6, unless otherwise noted.

before the Court, the information on which the analysis was based was already on the record.  See Dillinger Section B Response and accompanying home market sales database (July 15, 2016) (PD 194; CD 77, 88); Dillinger Section C Response and accompanying U.S. sales database (July 15, 2016) (PD 198; CD 95, 96); Dillinger Section D Response and accompanying cost database (July 15, 2016) (PD 199; CD 103); see also Nucor Opp'n Comments at 4 n.3 ("To be clear, Nucor is not claiming that Dillinger has relied on information that was not on the record in the underlying investigation, but instead that it has relied on information and analysis that was not presented or identified as relevant to the agency in support of its argument regarding the model match methodology." (emphasis added)).

Given that Commerce reasonably found the facts of Bohler to be analogous to the circumstances in this matter, and that Commerce reasonably explained why a similar analysis and outcome should apply here in light of the court's decision in Dillinger III, the court will reject Nucor's challenge and sustain the Fourth Remand Results.

### III. Conclusion

For the foregoing reasons, Commerce's Fourth Remand Results are sustained. Judgment will enter accordingly.


                                                    /s/ Leo M. Gordon
                                                   Judge Leo M. Gordon


Dated: December 21, 2023
         New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| AG DER DILLINGER HÜTTENWERKE,<br><br>        Plaintiff,<br><br>  and<br><br>THYSSENKRUPP STEEL EUROPE AG,<br><br>        Plaintiff-Intervenor,<br><br>  v.<br><br>UNITED STATES,<br><br>        Defendant,<br><br>  and<br><br>NUCOR CORPORATION and<br>SSAB ENTERPRISES LLC,<br><br>        Defendant-Intervenors. | Before: Leo M. Gordon, Judge<br><br><br>Consol. Court No. 17-00158 |

## __JUDGMENT__

This action having been submitted for decision, and the court after due deliberation having rendered opinions; now in conformity with those opinions, it is hereby

**ORDERED** that the final determination in the antidumping duty investigation covering <u>Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany</u>, 82 Fed. Reg. 16,360 (Dep't of Commerce Apr. 4, 2017) is sustained, except for the matters covered by the Final Results of Redetermination ("<u>First Remand Results</u>"), ECF No. 85, filed pursuant to <u>AG der Dillinger Huttenwerke v. United States</u>, 43 CIT ___, 399 F. Supp. 3d 1247 (2019); it is further

Consol. Court No. 17-00158                                              Page 2

      **ORDERED** that the <u>First Remand Results</u> are sustained, except for the matters covered by the Final Results of Redetermination ("<u>Second Remand Results</u>"), ECF No. 129, filed pursuant to <u>AG der Dillinger Huttenwerke v. United States</u>, 45 CIT ___, 534 F. Supp. 3d 1403 (2021); it is further

      **ORDERED** that the <u>Second Remand Results</u> are sustained, except for the matters covered by the Final Results of Redetermination ("<u>Third Remand Results</u>"), ECF No. 153, filed pursuant to <u>AG der Dillinger Huttenwerke v. United States</u>, 46 CIT ___, 592 F. Supp. 3d 1344 (2022); it is further

      **ORDERED** that the <u>Third Remand Results</u> are sustained, except for the matter covered by the Final Results of Redetermination ("<u>Fourth Remand Results</u>"), ECF No. 184, filed pursuant to <u>AG der Dillinger Huttenwerke v. United States</u>, 47 CIT ___, 648 F. Supp. 3d 1321 (2023); and it is further

      **ORDERED** that the <u>Fourth Remand Results</u> are sustained.


                                    /s/ Leo M. Gordon
                                 Judge Leo M. Gordon


Dated: December 21, 2023
     New York, New York

Agreement enters into force with respect to the United States [Jan. 1, 1995], and applicable with respect to investigations, reviews, and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as a note under section 1671 of this title.

#### Effective Date

Section applicable with respect to investigations initiated by petition or by the administering authority under parts I and II of this subtitle, and to reviews begun under section 1675 of this title, on or after Oct. 30, 1984, see section 626(b)(1) of Pub. L. 98–573, as amended, set out as an Effective Date of 1984 Amendment note under section 1671 of this title.

### § 1676a. Required determinations

#### (a) In general

Before the expiration date, if any, of a quantitative restriction agreement accepted under section 1671c(a)(2) or 1671c(c)(3) of this title (if suspension of the related investigation is still in effect)—

(1) the administering authority shall, at the direction of the President, initiate a proceeding to determine whether any countervailable subsidy is being provided with respect to the subject merchandise and, if being so provided, the net countervailable subsidy; and

(2) if the administering authority initiates a proceeding under paragraph (1), the Commission shall determine whether imports of the merchandise of the kind subject to the agreement will, upon termination of the agreement, materially injure, or threaten with material injury, an industry in the United States or materially retard the establishment of such an industry.

#### (b) Determinations

The determinations required to be made by the administering authority and the Commission under subsection (a) shall be made under such procedures as the administering authority and the Commission, respectively, shall by regulation prescribe, and shall be treated as final determinations made under section 1671d of this title for purposes of judicial review under section 1516a of this title. If the determinations by each are affirmative, the administering authority shall—

(1) issue a countervailing duty order under section 1671e of this title effective with respect to merchandise entered on and after the date on which the agreement terminates; and

(2) order the suspension of liquidation of all entries of subject merchandise which are entered, or withdrawn from warehouse for consumption, on or after the date of publication of the order in the Federal Register.

#### (c) Hearings

The determination proceedings required to be prescribed under subsection (b) shall provide that the administering authority and the Commission must, upon the request of any interested party, hold a hearing in accordance with section 1677c of this title on the issues involved.

(June 17, 1930, ch. 497, title VII, §762, as added Pub. L. 98–573, title VI, §611(a)(4), Oct. 30, 1984, 98 Stat. 3032; amended Pub. L. 103–465, title II, §§233(a)(5)(Z), (AA), 270(a)(1)(J), Dec. 8, 1994, 108 Stat. 4900, 4917.)

#### Amendments

1994—Subsec. (a)(1). Pub. L. 103–465, §§233(a)(5)(Z), 270(a)(1)(J), inserted "countervailable" before "subsidy" in two places and substituted "subject merchandise" for "merchandise subject to the agreement".

Subsec. (b)(2). Pub. L. 103–465, §233(a)(5)(AA), substituted "subject merchandise" for "merchandise subject to the order".

#### Effective Date of 1994 Amendment

Amendment by Pub. L. 103–465 effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States [Jan. 1, 1995], and applicable with respect to investigations, reviews, and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as a note under section 1671 of this title.

#### Effective Date

Section applicable with respect to investigations initiated by petition or by the administering authority under parts I and II of this subtitle, or reviews begun under section 1675 of this title, on or after Oct. 30, 1984, see section 626(b)(1) of Pub. L. 98–573, as amended, set out as an Effective Date of 1984 Amendment note under section 1671 of this title.

### Part IV—General Provisions

#### Codification

The designation "Part IV" was in the original "Subtitle D" and was editorially changed in order to conform the numbering format of this subtitle to the usages employed in the codification of the remainder of the Tariff Act of 1930 as originally enacted.

### § 1677. Definitions; special rules

For purposes of this subtitle—

#### (1) Administering authority

The term "administering authority" means the Secretary of Commerce, or any other officer of the United States to whom the responsibility for carrying out the duties of the administering authority under this subtitle are transferred by law.

#### (2) Commission

The term "Commission" means the United States International Trade Commission.

#### (3) Country

The term "country" means a foreign country, a political subdivision, dependent territory, or possession of a foreign country, and, except for the purpose of antidumping proceedings, may include an association of 2 or more foreign countries, political subdivisions, dependent territories, or possessions of countries into a customs union outside the United States.

#### (4) Industry

##### (A) In general

The term "industry" means the producers as a whole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product.

##### (B) Related parties

(i) If a producer of a domestic like product and an exporter or importer of the subject

regard to whether it is imported in the same condition as when exported from that country or in a changed condition by reason of re-manufacture or otherwise.

**(13) Repealed. Pub. L. 103–465, title II, § 222(i)(2), Dec. 8, 1994, 108 Stat. 4876**

**(14) Sold or, in the absence of sales, offered for sale**

The term ''sold or, in the absence of sales, offered for sale'' means sold or, in the absence of sales, offered—

(A) to all purchasers in commercial quantities, or

(B) in the ordinary course of trade to one or more selected purchasers in commercial quantities at a price which fairly reflects the market value of the merchandise,

without regard to restrictions as to the disposition or use of the merchandise by the purchaser except that, where such restrictions are found to affect the market value of the merchandise, adjustment shall be made therefor in calculating the price at which the merchandise is sold or offered for sale.

**(15) Ordinary course of trade**

The term ''ordinary course of trade'' means the conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind. The administering authority shall consider the following sales and transactions, among others, to be outside the ordinary course of trade:

(A) Sales disregarded under section 1677b(b)(1) of this title.

(B) Transactions disregarded under section 1677b(f)(2) of this title.

(C) Situations in which the administering authority determines that the particular market situation prevents a proper comparison with the export price or constructed export price.

**(16) Foreign like product**

The term ''foreign like product'' means merchandise in the first of the following categories in respect of which a determination for the purposes of part II of this subtitle can be satisfactorily made:

(A) The subject merchandise and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.

(B) Merchandise—

(i) produced in the same country and by the same person as the subject merchandise,

(ii) like that merchandise in component material or materials and in the purposes for which used, and

(iii) approximately equal in commercial value to that merchandise.

(C) Merchandise—

(i) produced in the same country and by the same person and of the same general class or kind as the subject merchandise,

(ii) like that merchandise in the purposes for which used, and

(iii) which the administering authority determines may reasonably be compared with that merchandise.

**(17) Usual commercial quantities**

The term ''usual commercial quantities'', in any case in which the subject merchandise is sold in the market under consideration at different prices for different quantities, means the quantities in which such merchandise is there sold at the price or prices for one quantity in an aggregate volume which is greater than the aggregate volume sold at the price or prices for any other quantity.

**(18) Nonmarket economy country**

**(A) In general**

The term ''nonmarket economy country'' means any foreign country that the administering authority determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise.

**(B) Factors to be considered**

In making determinations under subparagraph (A) the administering authority shall take into account—

(i) the extent to which the currency of the foreign country is convertible into the currency of other countries;[1]

(ii) the extent to which wage rates in the foreign country are determined by free bargaining between labor and management,

(iii) the extent to which joint ventures or other investments by firms of other foreign countries are permitted in the foreign country,

(iv) the extent of government ownership or control of the means of production,

(v) the extent of government control over the allocation of resources and over the price and output decisions of enterprises, and

(vi) such other factors as the administering authority considers appropriate.

**(C) Determination in effect**

(i) Any determination that a foreign country is a nonmarket economy country shall remain in effect until revoked by the administering authority.

(ii) The administering authority may make a determination under subparagraph (A) with respect to any foreign country at any time.

**(D) Determinations not in issue**

Notwithstanding any other provision of law, any determination made by the administering authority under subparagraph (A) shall not be subject to judicial review in any investigation conducted under part II of this subtitle.

**(E) Collection of information**

Upon request by the administering authority, the Commissioner of U.S. Customs and

---

[1] So in original. The semicolon probably should be a comma.

EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–573 effective Oct. 30, 1984, see section 626(a) of Pub. L. 98–573, set out as a note under section 1671 of this title.

## § 1677b. Normal value

### (a) Determination

In determining under this subtitle whether subject merchandise is being, or is likely to be, sold at less than fair value, a fair comparison shall be made between the export price or constructed export price and normal value. In order to achieve a fair comparison with the export price or constructed export price, normal value shall be determined as follows:

### (1) Determination of normal value

#### (A) In general

The normal value of the subject merchandise shall be the price described in subparagraph (B), at a time reasonably corresponding to the time of the sale used to determine the export price or constructed export price under section 1677a(a) or (b) of this title.

#### (B) Price

The price referred to in subparagraph (A) is—

(i) the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price, or

(ii) in a case to which subparagraph (C) applies, the price at which the foreign like product is so sold (or offered for sale) for consumption in a country other than the exporting country or the United States, if—

(I) such price is representative,

(II) the aggregate quantity (or, if quantity is not appropriate, value) of the foreign like product sold by the exporter or producer in such other country is 5 percent or more of the aggregate quantity (or value) of the subject merchandise sold in the United States or for export to the United States, and

(III) the administering authority does not determine that the particular market situation prevents a proper comparison with the export price or constructed export price.

#### (C) Third country sales

This subparagraph applies when—

(i) the foreign like product is not sold (or offered for sale) for consumption in the exporting country as described in subparagraph (B)(i),

(ii) the administering authority determines that the aggregate quantity (or, if quantity is not appropriate, value) of the foreign like product sold in the exporting country is insufficient to permit a proper comparison with the sales of the subject merchandise to the United States, or

(iii) the particular market situation in the exporting country does not permit a proper comparison with the export price or constructed export price.

For purposes of clause (ii), the aggregate quantity (or value) of the foreign like product sold in the exporting country shall normally be considered to be insufficient if such quantity (or value) is less than 5 percent of the aggregate quantity (or value) of sales of the subject merchandise to the United States.

### (2) Fictitious markets

No pretended sale or offer for sale, and no sale or offer for sale intended to establish a fictitious market, shall be taken into account in determining normal value. The occurrence of different movements in the prices at which different forms of the foreign like product are sold (or, in the absence of sales, offered for sale) in the exporting country after the issuance of an antidumping duty order may be considered by the administering authority as evidence of the establishment of a fictitious market for the foreign like product if the movement in such prices appears to reduce the amount by which the normal value exceeds the export price (or the constructed export price) of the subject merchandise.

### (3) Exportation from an intermediate country

Where the subject merchandise is exported to the United States from an intermediate country, normal value shall be determined in the intermediate country, except that normal value may be determined in the country of origin of the subject merchandise if—

(A) the producer knew at the time of the sale that the subject merchandise was destined for exportation;

(B) the subject merchandise is merely transshipped through the intermediate country;

(C) sales of the foreign like product in the intermediate country do not satisfy the conditions of paragraph (1)(C); or

(D) the foreign like product is not produced in the intermediate country.

### (4) Use of constructed value

If the administering authority determines that the normal value of the subject merchandise cannot be determined under paragraph (1)(B)(i), then, notwithstanding paragraph (1)(B)(ii), the normal value of the subject merchandise may be the constructed value of that merchandise, as determined under subsection (e).

### (5) Indirect sales or offers for sale

If the foreign like product is sold or, in the absence of sales, offered for sale through an affiliated party, the prices at which the foreign like product is sold (or offered for sale) by such affiliated party may be used in determining normal value.

### (6) Adjustments

The price described in paragraph (1)(B) shall be—

(A) increased by the cost of all containers and coverings and all other costs, charges,

and expenses incident to placing the subject merchandise in condition packed ready for shipment to the United States;

(B) reduced by—

(i) when included in the price described in paragraph (1)(B), the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the foreign like product in condition packed ready for shipment to the place of delivery to the purchaser,

(ii) the amount, if any, included in the price described in paragraph (1)(B), attributable to any additional costs, charges, and expenses incident to bringing the foreign like product from the original place of shipment to the place of delivery to the purchaser, and

(iii) the amount of any taxes imposed directly upon the foreign like product or components thereof which have been rebated, or which have not been collected, on the subject merchandise, but only to the extent that such taxes are added to or included in the price of the foreign like product, and

(C) increased or decreased by the amount of any difference (or lack thereof) between the export price or constructed export price and the price described in paragraph (1)(B) (other than a difference for which allowance is otherwise provided under this section) that is established to the satisfaction of the administering authority to be wholly or partly due to—

(i) the fact that the quantities in which the subject merchandise is sold or agreed to be sold to the United States are greater than or less than the quantities in which the foreign like product is sold, agreed to be sold, or offered for sale,

(ii) the fact that merchandise described in subparagraph (B) or (C) of section 1677(16) of this title is used in determining normal value, or

(iii) other differences in the circumstances of sale.

### (7) Additional adjustments

#### (A) Level of trade

The price described in paragraph (1)(B) shall also be increased or decreased to make due allowance for any difference (or lack thereof) between the export price or constructed export price and the price described in paragraph (1)(B) (other than a difference for which allowance is otherwise made under this section) that is shown to be wholly or partly due to a difference in level of trade between the export price or constructed export price and normal value, if the difference in level of trade—

(i) involves the performance of different selling activities; and

(ii) is demonstrated to affect price comparability, based on a pattern of consistent price differences between sales at different levels of trade in the country in which normal value is determined.

In a case described in the preceding sentence, the amount of the adjustment shall be based on the price differences between the two levels of trade in the country in which normal value is determined.

#### (B) Constructed export price offset

When normal value is established at a level of trade which constitutes a more advanced stage of distribution than the level of trade of the constructed export price, but the data available do not provide an appropriate basis to determine under subparagraph (A)(ii) a level of trade adjustment, normal value shall be reduced by the amount of indirect selling expenses incurred in the country in which normal value is determined on sales of the foreign like product but not more than the amount of such expenses for which a deduction is made under section 1677a(d)(1)(D) of this title.

### (8) Adjustments to constructed value

Constructed value as determined under subsection (e), may be adjusted, as appropriate, pursuant to this subsection.

## (b) Sales at less than cost of production

### (1) Determination; sales disregarded

Whenever the administering authority has reasonable grounds to believe or suspect that sales of the foreign like product under consideration for the determination of normal value have been made at prices which represent less than the cost of production of that product, the administering authority shall determine whether, in fact, such sales were made at less than the cost of production. If the administering authority determines that sales made at less than the cost of production—

(A) have been made within an extended period of time in substantial quantities, and

(B) were not at prices which permit recovery of all costs within a reasonable period of time,

such sales may be disregarded in the determination of normal value. Whenever such sales are disregarded, normal value shall be based on the remaining sales of the foreign like product in the ordinary course of trade. If no sales remain in the ordinary course of trade, the normal value shall be based on the constructed value of the merchandise.

### (2) Definitions and special rules

For purposes of this subsection—

#### (A) Reasonable grounds to believe or suspect

##### (i) Review

In a review conducted under section 1675 of this title involving a specific exporter, there are reasonable grounds to believe or suspect that sales of the foreign like product have been made at prices less than the cost of production of the product if the administering authority disregarded some or all of the exporter's sales pursuant to paragraph (1) in the investigation or, if a review has been completed, in the most recently completed review.

##### (ii) Requests for information

In an investigation initiated under section 1673a of this title or a review con-

ducted under section 1675 of this title, the administering authority shall request information necessary to calculate the constructed value and cost of production under subsections (e) and (f) to determine whether there are reasonable grounds to believe or suspect that sales of the foreign like product have been made at prices that represent less than the cost of production of the product.

**(B) Extended period of time**

The term ''extended period of time'' means a period that is normally 1 year, but not less than 6 months.

**(C) Substantial quantities**

Sales made at prices below the cost of production have been made in substantial quantities if—

(i) the volume of such sales represents 20 percent or more of the volume of sales under consideration for the determination of normal value, or

(ii) the weighted average per unit price of the sales under consideration for the determination of normal value is less than the weighted average per unit cost of production for such sales.

**(D) Recovery of costs**

If prices which are below the per unit cost of production at the time of sale are above the weighted average per unit cost of production for the period of investigation or review, such prices shall be considered to provide for recovery of costs within a reasonable period of time.

**(3) Calculation of cost of production**

For purposes of this part, the cost of production shall be an amount equal to the sum of—

(A) the cost of materials and of fabrication or other processing of any kind employed in producing the foreign like product, during a period which would ordinarily permit the production of that foreign like product in the ordinary course of business;

(B) an amount for selling, general, and administrative expenses based on actual data pertaining to production and sales of the foreign like product by the exporter in question; and

(C) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the foreign like product in condition packed ready for shipment.

For purposes of subparagraph (A), if the normal value is based on the price of the foreign like product sold for consumption in a country other than the exporting country, the cost of materials shall be determined without regard to any internal tax in the exporting country imposed on such materials or their disposition which are remitted or refunded upon exportation.

**(c) Nonmarket economy countries**

**(1) In general**

If—

(A) the subject merchandise is exported from a nonmarket economy country, and

(B) the administering authority finds that available information does not permit the normal value of the subject merchandise to be determined under subsection (a),

the administering authority shall determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses. Except as provided in paragraph (2), the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority.

**(2) Exception**

If the administering authority finds that the available information is inadequate for purposes of determining the normal value of subject merchandise under paragraph (1), the administering authority shall determine the normal value on the basis of the price at which merchandise that is—

(A) comparable to the subject merchandise, and

(B) produced in one or more market economy countries that are at a level of economic development comparable to that of the nonmarket economy country,

is sold in other countries, including the United States.

**(3) Factors of production**

For purposes of paragraph (1), the factors of production utilized in producing merchandise include, but are not limited to—

(A) hours of labor required,

(B) quantities of raw materials employed,

(C) amounts of energy and other utilities consumed, and

(D) representative capital cost, including depreciation.

**(4) Valuation of factors of production**

The administering authority, in valuing factors of production under paragraph (1), shall utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries that are—

(A) at a level of economic development comparable to that of the nonmarket economy country, and

(B) significant producers of comparable merchandise.

**(5) Discretion to disregard certain price or cost values**

In valuing the factors of production under paragraph (1) for the subject merchandise, the administering authority may disregard price or cost values without further investigation if the administering authority has determined that broadly available export subsidies existed or particular instances of subsidization occurred with respect to those price or cost values or if those price or cost values were subject to an antidumping order.

**(d) Special rule for certain multinational corporations**

Whenever, in the course of an investigation under this subtitle, the administering authority determines that—

(1) subject merchandise exported to the United States is being produced in facilities which are owned or controlled, directly or indirectly, by a person, firm, or corporation which also owns or controls, directly or indirectly, other facilities for the production of the foreign like product which are located in another country or countries,

(2) subsection (a)(1)(C) applies, and

(3) the normal value of the foreign like product produced in one or more of the facilities outside the exporting country is higher than the normal value of the foreign like product produced in the facilities located in the exporting country,

it shall determine the normal value of the subject merchandise by reference to the normal value at which the foreign like product is sold in substantial quantities from one or more facilities outside the exporting country. The administering authority, in making any determination under this paragraph, shall make adjustments for the difference between the cost of production (including taxes, labor, materials, and overhead) of the foreign like product produced in facilities outside the exporting country and costs of production of the foreign like product produced in facilities in the exporting country, if such differences are demonstrated to its satisfaction. For purposes of this subsection, in determining the normal value of the foreign like product produced in a country outside of the exporting country, the administering authority shall determine its price at the time of exportation from the exporting country and shall make any adjustments required by subsection (a) for the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for shipment to the United States by reference to such costs in the exporting country.

**(e) Constructed value**

For purposes of this subtitle, the constructed value of imported merchandise shall be an amount equal to the sum of—

(1) the cost of materials and fabrication or other processing of any kind employed in producing the merchandise, during a period which would ordinarily permit the production of the merchandise in the ordinary course of trade;

(2)(A) the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or

(B) if actual data are not available with respect to the amounts described in subparagraph (A), then—

(i) the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or re-

view for selling, general, and administrative expenses, and for profits, in connection with the production and sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise,

(ii) the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or

(iii) the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise; and

(3) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the subject merchandise in condition packed ready for shipment to the United States.

For purposes of paragraph (1), if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority may use another calculation methodology under this part or any other calculation methodology. For purposes of paragraph (1), the cost of materials shall be determined without regard to any internal tax in the exporting country imposed on such materials or their disposition that is remitted or refunded upon exportation of the subject merchandise produced from such materials.

**(f) Special rules for calculation of cost of production and for calculation of constructed value**

For purposes of subsections (b) and (e).—[1]

**(1) Costs**

**(A) In general**

Costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise. The administering authority shall consider all available evidence on the proper allocation of costs, including that which is made available by the exporter or producer on a timely basis, if such allocations have been historically used by the ex-

---

[1] So in original. The period preceding the dash probably should not appear.

porter or producer, in particular for establishing appropriate amortization and depreciation periods, and allowances for capital expenditures and other development costs.

**(B) Nonrecurring costs**

Costs shall be adjusted appropriately for those nonrecurring costs that benefit current or future production, or both.

**(C) Startup costs**

**(i) In general**

Costs shall be adjusted appropriately for circumstances in which costs incurred during the time period covered by the investigation or review are affected by startup operations.

**(ii) Startup operations**

Adjustments shall be made for startup operations only where—

(I) a producer is using new production facilities or producing a new product that requires substantial additional investment, and

(II) production levels are limited by technical factors associated with the initial phase of commercial production.

For purposes of subclause (II), the initial phase of commercial production ends at the end of the startup period. In determining whether commercial production levels have been achieved, the administering authority shall consider factors unrelated to startup operations that might affect the volume of production processed, such as demand, seasonality, or business cycles.

**(iii) Adjustment for startup operations**

The adjustment for startup operations shall be made by substituting the unit production costs incurred with respect to the merchandise at the end of the startup period for the unit production costs incurred during the startup period. If the startup period extends beyond the period of the investigation or review under this subtitle, the administering authority shall use the most recent cost of production data that it reasonably can obtain, analyze, and verify without delaying the timely completion of the investigation or review. For purposes of this subparagraph, the startup period ends at the point at which the level of commercial production that is characteristic of the merchandise, producer, or industry concerned is achieved.

**(2) Transactions disregarded**

A transaction directly or indirectly between affiliated persons may be disregarded if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration. If a transaction is disregarded under the preceding sentence and no other transactions are available for consideration, the determination of the amount shall be based on the information available as to what the amount would have been if the transaction had occurred between persons who are not affiliated.

**(3) Major input rule**

If, in the case of a transaction between affiliated persons involving the production by one of such persons of a major input to the merchandise, the administering authority has reasonable grounds to believe or suspect that an amount represented as the value of such input is less than the cost of production of such input, then the administering authority may determine the value of the major input on the basis of the information available regarding such cost of production, if such cost is greater than the amount that would be determined for such input under paragraph (2).

(June 17, 1930, ch. 497, title VII, §773, as added Pub. L. 96–39, title I, §101, July 26, 1979, 93 Stat. 182; amended Pub. L. 98–573, title VI, §§615, 620(b), Oct. 30, 1984, 98 Stat. 3036, 3039; Pub. L. 99–514, title XVIII, §1886(a)(11), Oct. 22, 1986, 100 Stat. 2922; Pub. L. 100–418, title I, §§1316(a), 1318, 1319, Aug. 23, 1988, 102 Stat. 1186, 1189; Pub. L. 103–465, title II, §224, Dec. 8, 1994, 108 Stat. 4878; Pub. L. 114–27, title V, §§504(b), (c), 505, June 29, 2015, 129 Stat. 385.)

### Editorial Notes

#### AMENDMENTS

2015—Subsec. (a)(1)(B)(ii)(III). Pub. L. 114–27, §504(b), which directed amendment of subcl. (III) by striking out "in such other country.", was executed by striking out "in such other country" after "particular market situation" to reflect the probable intent of Congress.

Subsec. (b)(2)(A). Pub. L. 114–27, §505(a), added subpar. (A) and struck out former subpar. (A). Prior to amendment, text read as follows: "There are reasonable grounds to believe or suspect that sales of the foreign like product were made at prices that are less than the cost of production of the product, if—

"(i) in an investigation initiated under section 1673a of this title or a review conducted under section 1675 of this title, an interested party described in subparagraph (C), (D), (E), (F), or (G) of section 1677(9) of this title provides information, based upon observed prices or constructed prices or costs, that sales of the foreign like product under consideration for the determination of normal value have been made at prices which represent less than the cost of production of the product; or

"(ii) in a review conducted under section 1675 of this title involving a specific exporter, the administering authority disregarded some or all of the exporter's sales pursuant to paragraph (1) in the investigation or if a review has been completed, in the most recently completed review."

Subsec. (c)(5). Pub. L. 114–27, §505(b), added par. (5).

Subsec. (e). Pub. L. 114–27, §504(c)(2), in concluding provisions, substituted "For purposes of paragraph (1), if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority may use another calculation methodology under this part or any other calculation methodology. For purposes of paragraph (1), the cost of materials shall be determined without regard to any internal tax in the exporting country imposed on such materials or their disposition that is remitted or refunded upon exportation of the subject merchandise produced from such materials." for "For purposes of paragraph (1), the cost of materials shall be determined without regard to any internal tax in the exporting country imposed on such materials or their disposition which are remitted

or refunded upon exportation of the subject merchandise produced from such materials.''

Subsec. (e)(1). Pub. L. 114–27, §504(c)(1), substituted ''trade'' for ''business''.

1994—Pub. L. 103–465 amended section generally, substituting present provisions for provisions relating to foreign market value, which provided for determination of value in subsec. (a), sales at less than cost of production in subsec. (b), treatment of merchandise from nonmarket economy countries in subsec. (c), special rule for certain multinational corporations in subsec. (d), determination of constructed value in subsec. (e), and exportation from an intermediate country in subsec. (f).

1988—Subsec. (a)(5). Pub. L. 100–418, §1319, added par. (5).

Subsec. (c). Pub. L. 100–418, §1316(a), amended subsec. (c) generally, substituting provisions relating to nonmarket economy countries, for provisions relating to State-controlled economies.

Subsec. (e)(2) to (4). Pub. L. 100–418, §1318, substituted ''(4)'' for ''(3)'' wherever appearing in par. (2), added par. (3), and redesignated former par. (3) as (4) and in introductory provisions substituted ''paragraphs (2) and (3)'' for ''paragraph (2)''.

1986—Subsecs. (f), (g). Pub. L. 99–514 redesignated subsec. (g) as (f).

1984—Subsec. (a)(1). Pub. L. 98–573, §615(1), substituted ''time such merchandise is first sold within the United States by the person for whom (or for whose account) the merchandise is imported to any other person who is not described in subsection (e)(3) of this section with respect to such person'' for ''time of exportation of such merchandise to the United States'' in provisions before subpar. (A).

Subsecs. (a)(1)(A), (4)(A), (e)(1)(B). Pub. L. 98–573, §615(2), substituted ''commercial quantities'' for ''wholesale quantities'' wherever appearing.

Subsec. (f). Pub. L. 98–573, §620(b), struck out subsec. (f) which related to the authority to use sampling techniques and to disregard insignificant adjustments.

Subsec. (g). Pub. L. 98–573, §615(3), added subsec. (g).

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 1994 AMENDMENT

Amendment by Pub. L. 103–465 effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States (Jan. 1, 1995), and applicable with respect to investigations, reviews, and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as a note under section 1671 of this title.

EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by sections 1316(a) and 1318 of Pub. L. 100–418 applicable with respect to investigations initiated after Aug. 23, 1988, and to reviews initiated under section 1673e(c) or 1675 of this title after Aug. 23, 1988, and amendment by section 1319 of Pub. L. 100–418 applicable with respect to reviews initiated under section 1673e(c) or 1675 of this title after Aug. 23, 1988, and to reviews initiated under such sections which are pending on Aug. 23, 1988, and in which a request for revocation is pending on Aug. 23, 1988, see section 1337(b), (f) of Pub. L. 100–418, set out as a note under section 1671 of this title.

EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by section 615 of Pub. L. 98–573 effective Oct. 30, 1984, and amendment by section 620(b) of Pub. L. 98–573 applicable with respect to investigations initiated by petition or by the administering authority under parts I and II of this subtitle, and to reviews begun under section 1675 of this title, on or after Oct. 30, 1984, see section 626(a), (b)(1) of Pub. L. 98–573, as amended, set out as a note under section 1671 of this title.

PLAN AMENDMENTS NOT REQUIRED UNTIL JANUARY 1, 1989

For provisions directing that if any amendments made by subtitle A or subtitle C of title XI [§§1101–1147 and 1171–1177] or title XVIII [§§1801–1899A] of Pub. L. 99–514 require an amendment to any plan, such plan amendment shall not be required to be made before the first plan year beginning on or after Jan. 1, 1989, see section 1140 of Pub. L. 99–514, as amended, set out as a note under section 401 of Title 26, Internal Revenue Code.

## § 1677b–1. Currency conversion

### (a) In general

In an antidumping proceeding under this subtitle, the administering authority shall convert foreign currencies into United States dollars using the exchange rate in effect on the date of sale of the subject merchandise, except that, if it is established that a currency transaction on forward markets is directly linked to an export sale under consideration, the exchange rate specified with respect to such currency in the forward sale agreement shall be used to convert the foreign currency. Fluctuations in exchange rates shall be ignored.

### (b) Sustained movement in foreign currency value

In an investigation under part II of this subtitle, if there is a sustained movement in the value of the foreign currency relative to the United States dollar, the administering authority shall allow exporters at least 60 days to adjust their export prices to reflect such sustained movement.

(June 17, 1930, ch. 497, title VII, §773A, as added Pub. L. 103–465, title II, §225(a), Dec. 8, 1994, 108 Stat. 4886.)

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE

Section effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States (Jan. 1, 1995), and applicable with respect to investigations, reviews, and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as an Effective Date of 1994 Amendment note under section 1671 of this title.

## § 1677c. Hearings

### (a) Investigation hearings

#### (1) In general

Except as provided in paragraph (2), the administering authority and the Commission shall each hold a hearing in the course of an investigation upon the request of any party to the investigation before making a final determination under section 1671d or 1673d of this title.

#### (2) Exception

If investigations are initiated under part I and part II of this subtitle regarding the same merchandise from the same country within 6 months of each other (but before a final determination is made in either investigation), the holding of a hearing by the Commission in the course of one of the investigations shall be

treated as compliance with paragraph (1) for both investigations, unless the Commission considers that special circumstances require that a hearing be held in the course of each of the investigations. During any investigation regarding which the holding of a hearing is waived under this paragraph, the Commission shall allow any party to submit such additional written comment as it considers relevant.

**(b) Procedures**

Any hearing required or permitted under this subtitle shall be conducted after notice published in the Federal Register, and a transcript of the hearing shall be prepared and made available to the public. The hearing shall not be subject to the provisions of subchapter II of chapter 5 of title 5, or to section 702 of such title.

(June 17, 1930, ch. 497, title VII, §774, as added Pub. L. 96–39, title I, §101, July 26, 1979, 93 Stat. 186; amended Pub. L. 98–573, title VI, §616, Oct. 30, 1984, 98 Stat. 3037.)

### Editorial Notes

AMENDMENTS

1984—Subsec. (a). Pub. L. 98–573 designated existing provisions as par. (1), inserted "Except as provided in paragraph (2),", and added par. (2).

### Statutory Notes and Related Subsidiaries

EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–573 effective Oct. 30, 1984, see section 626(a) of Pub. L. 98–573, set out as a note under section 1671 of this title.

## § 1677d. Countervailable subsidy practices discovered during a proceeding

If, in the course of a proceeding under this subtitle, the administering authority discovers a practice which appears to be a countervailable subsidy, but was not included in the matters alleged in a countervailing duty petition, or if the administering authority receives notice from the Trade Representative that a subsidy or subsidy program is in violation of Article 8 of the Subsidies Agreement, then the administering authority—

(1) shall include the practice, subsidy, or subsidy program in the proceeding if the practice, subsidy, or subsidy program appears to be a countervailable subsidy with respect to the merchandise which is the subject of the proceeding, or

(2) shall transfer the information (other than confidential information) concerning the practice, subsidy, or subsidy program to the library maintained under section 1677f(a)(1) of this title, if the practice, subsidy, or subsidy program appears to be a countervailable subsidy with respect to any other merchandise.

(June 17, 1930, ch. 497, title VII, §775, as added Pub. L. 96–39, title I, §101, July 26, 1979, 93 Stat. 186; amended Pub. L. 98–573, title VI, §617, Oct. 30, 1984, 98 Stat. 3037; Pub. L. 99–514, title XVIII, §1886(a)(12), Oct. 22, 1986, 100 Stat. 2922; Pub. L. 103–465, title II, §283(b), Dec. 8, 1994, 108 Stat. 4930.)

### Editorial Notes

AMENDMENTS

1994—Pub. L. 103–465 substituted "Countervailable subsidy" for "Subsidy" in section catchline and amended text generally. Prior to amendment, text read as follows: "If, in the course of a proceeding under this subtitle, the administering authority discovers a practice which appears to be a subsidy, but was not included in the matters alleged in a countervailing duty petition, then the administering authority—

"(1) shall include the practice in the proceeding if it appears to be a subsidy with respect to the merchandise which is the subject of the proceeding, or

"(2) shall transfer the information concerning the practice (other than confidential information) to the library maintained under section 1677f(a)(1) of this title, if the practice appears to be a subsidy with respect to any other merchandise."

1986—Pub. L. 99–514 substituted "a proceeding" for "an proceeding" in introductory provisions.

1984—Pub. L. 98–573 substituted "proceeding" for "investigation" wherever appearing.

### Statutory Notes and Related Subsidiaries

EFFECTIVE DATE OF 1994 AMENDMENT

Amendment by Pub. L. 103–465 effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States (Jan. 1, 1995), and applicable with respect to investigations, reviews, and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as a note under section 1671 of this title.

EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–573 effective Oct. 30, 1984, see section 626(a) of Pub. L. 98–573, set out as a note under section 1671 of this title.

PLAN AMENDMENTS NOT REQUIRED UNTIL
JANUARY 1, 1989

For provisions directing that if any amendments made by subtitle A or subtitle C of title XI [§§1101–1147 and 1171–1177] or title XVIII [§§1801–1899A] of Pub. L. 99–514 require an amendment to any plan, such plan amendment shall not be required to be made before the first plan year beginning on or after Jan. 1, 1989, see section 1140 of Pub. L. 99–514, as amended, set out as a note under section 401 of Title 26, Internal Revenue Code.

## § 1677e. Determinations on basis of facts available

**(a) In general**

If—

(1) necessary information is not available on the record, or

(2) an interested party or any other person—

(A) withholds information that has been requested by the administering authority or the Commission under this subtitle,

(B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 1677m of this title,

(C) significantly impedes a proceeding under this subtitle, or

(D) provides such information but the information cannot be verified as provided in section 1677m(i) of this title,

the administering authority and the Commission shall, subject to section 1677m(d) of this

title, use the facts otherwise available in reaching the applicable determination under this subtitle.

## (b) Adverse inferences

### (1) In general

If the administering authority or the Commission (as the case may be) finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from the administering authority or the Commission, the administering authority or the Commission (as the case may be), in reaching the applicable determination under this subtitle—

(A) may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available; and

(B) is not required to determine, or make any adjustments to, a countervailable subsidy rate or weighted average dumping margin based on any assumptions about information the interested party would have provided if the interested party had complied with the request for information.

### (2) Potential sources of information for adverse inferences

An adverse inference under paragraph (1)(A) may include reliance on information derived from—

(A) the petition,

(B) a final determination in the investigation under this subtitle,

(C) any previous review under section 1675 of this title or determination under section 1675b of this title, or

(D) any other information placed on the record.

## (c) Corroboration of secondary information

### (1) In general

Except as provided in paragraph (2), when the administering authority or the Commission relies on secondary information rather than on information obtained in the course of an investigation or review, the administering authority or the Commission, as the case may be, shall, to the extent practicable, corroborate that information from independent sources that are reasonably at their disposal.

### (2) Exception

The administrative authority and the Commission shall not be required to corroborate any dumping margin or countervailing duty applied in a separate segment of the same proceeding.

## (d) Subsidy rates and dumping margins in adverse inference determinations

### (1) In general

If the administering authority uses an inference that is adverse to the interests of a party under subsection (b)(1)(A) in selecting among the facts otherwise available, the administering authority may—

(A) in the case of a countervailing duty proceeding—

(i) use a countervailable subsidy rate applied for the same or similar program in a countervailing duty proceeding involving the same country; or

(ii) if there is no same or similar program, use a countervailable subsidy rate for a subsidy program from a proceeding that the administering authority considers reasonable to use; and

(B) in the case of an antidumping duty proceeding, use any dumping margin from any segment of the proceeding under the applicable antidumping duty order.

### (2) Discretion to apply highest rate

In carrying out paragraph (1), the administering authority may apply any of the countervailable subsidy rates or dumping margins specified under that paragraph, including the highest such rate or margin, based on the evaluation by the administering authority of the situation that resulted in the administering authority using an adverse inference in selecting among the facts otherwise available.

### (3) No obligation to make certain estimates or address certain claims

If the administering authority uses an adverse inference under subsection (b)(1)(A) in selecting among the facts otherwise available, the administering authority is not required, for purposes of subsection (c) or for any other purpose—

(A) to estimate what the countervailable subsidy rate or dumping margin would have been if the interested party found to have failed to cooperate under subsection (b)(1) had cooperated; or

(B) to demonstrate that the countervailable subsidy rate or dumping margin used by the administering authority reflects an alleged commercial reality of the interested party.

(June 17, 1930, ch. 497, title VII, § 776, as added Pub. L. 96–39, title I, § 101, July 26, 1979, 93 Stat. 186; amended Pub. L. 98–573, title VI, § 618, Oct. 30, 1984, 98 Stat. 3037; Pub. L. 100–418, title I, §§ 1326(d)(1), 1331, Aug. 23, 1988, 102 Stat. 1204, 1207; Pub. L. 103–465, title II, § 231(c), Dec. 8, 1994, 108 Stat. 4896; Pub. L. 114–27, title V, § 502, June 29, 2015, 129 Stat. 383.)

### Editorial Notes

#### Amendments

2015—Subsec. (b). Pub. L. 114–27, § 502(1), inserted par. (1) designation and heading before "If the administering", substituted "under this subtitle—" for "under this subtitle, may use", inserted "(A) may use" before "an inference that is adverse", substituted "facts otherwise available; and" for "facts otherwise available. Such adverse inference may include", added subpar. (B), inserted par. (2) designation, heading, and "An adverse inference under paragraph (1)(A) may include" before "reliance on information", and redesignated former pars. (1) to (4) as subpars. (A) to (D), respectively, of par. (2) and realigned margins.

Subsec. (c). Pub. L. 114–27, § 502(2), designated existing provisions as par. (1) and inserted heading, substituted "Except as provided in paragraph (2), when the" for "When the", and added par. (2).

Subsec. (d). Pub. L. 114–27, § 502(3), added subsec. (d).

1994—Pub. L. 103–465 amended section generally, substituting present provisions for provisions relating to verification of information, certification of submissions, and determinations required to be made on best information available.

1988—Subsec. (a). Pub. L. 100–418, §1331(1), (3), added subsec. (a). Former subsec. (a) redesignated (b).

Subsec. (b). Pub. L. 100–418, §1331(1), (2), redesignated former subsec. (a) as (b) and in heading substituted "Verification" for "General rule".

Subsec. (b)(3)(A). Pub. L. 100–418, §1326(d)(1), which directed the amendment of this subtitle by substituting "subparagraph (C), (D), (E), (F), or (G) of section 1677(9) of this title" for "subparagraph (C), (D), (E), or (F), of section 1677(9) of this title" was executed to subsec. (b)(3)(A) of this section by substituting "section 1677(9)(C), (D), (E), (F), or (G) of this title" for "section 1677(9)(C), (D), (E), or (F) of this title" to reflect the probable intent of Congress.

Subsec. (c). Pub. L. 100–418, §1331(1), redesignated former subsec. (b) as (c).

1984—Subsec. (a). Pub. L. 98–573 amended subsec. (a) generally, which prior to amendment read as follows: "Except with respect to information the verification of which is waived under section 1673b(b)(2) of this title, the administering authority shall verify all information relied upon in making a final determination in an investigation. In publishing such a determination, the administering authority shall report the methods and procedures used to verify such information. If the administering authority is unable to verify the accuracy of the information submitted, it shall use the best information available to it as the basis for its determination, which may include the information submitted in support of the petition."

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 1994 AMENDMENT

Amendment by Pub. L. 103–465 effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States (Jan. 1, 1995), and applicable with respect to investigations, reviews, and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as a note under section 1671 of this title.

EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100–418 applicable with respect to investigations initiated after Aug. 23, 1988, and to reviews initiated under section 1675e(c) or 1675 of this title after Aug. 23, 1988, see section 1337(b) of Pub. L. 100–418, set out as a note under section 1671 of this title.

EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–573 effective Oct. 30, 1984, see section 626(a) of Pub. L. 98–573, set out as a note under section 1671 of this title.

### § 1677f. Access to information

#### (a) Information generally made available

**(1) Public information function**

There shall be established a library of information relating to foreign subsidy practices and countervailing measures. Copies of material in the library shall be made available to the public upon payment of the costs of preparing such copies.

**(2) Progress of investigation reports**

The administering authority and the Commission shall, from time to time upon request, inform the parties to an investigation of the progress of that investigation.

**(3) Ex parte meetings**

The administering authority and the Commission shall maintain a record of any ex parte meeting between—

(A) interested parties or other persons providing factual information in connection with a proceeding, and

(B) the person charged with making the determination, or any person charged with making a final recommendation to that person, in connection with that proceeding,

if information relating to that proceeding was presented or discussed at such meeting. The record of such an ex parte meeting shall include the identity of the persons present at the meeting, the date, time, and place of the meeting, and a summary of the matters discussed or submitted. The record of the ex parte meeting shall be included in the record of the proceeding.

**(4) Summaries; non-proprietary submissions**

The administering authority and the Commission shall disclose—

(A) any proprietary information received in the course of a proceeding if it is disclosed in a form which cannot be associated with, or otherwise be used to identify, operations of a particular person, and

(B) any information submitted in connection with a proceeding which is not designated as proprietary by the person submitting it.

#### (b) Proprietary information

**(1) Proprietary status maintained**

**(A) In general**

Except as provided in subsection (a)(4)(A) and subsection (c), information submitted to the administering authority or the Commission which is designated as proprietary by the person submitting the information shall not be disclosed to any person without the consent of the person submitting the information, other than—

(i) to an officer or employee of the administering authority or the Commission who is directly concerned with carrying out the investigation in connection with which the information is submitted or any review under this subtitle covering the same subject merchandise, or

(ii) to an officer or employee of the United States Customs Service who is directly involved in conducting an investigation regarding negligence, gross negligence, or fraud under this subtitle.

**(B) Additional requirements**

The administering authority and the Commission shall require that information for which proprietary treatment is requested be accompanied by—

(i) either—

(I) a non-proprietary summary in sufficient detail to permit a reasonable understanding of the substance of the information submitted in confidence, or

(II) a statement that the information is not susceptible to summary accompanied by a statement of the reasons in support of the contention, and

(ii) either—

(I) a statement which permits the administering authority or the Commis-

merchandise produced by a foreign country (whether or not an Agreement country) may, if it has reason to believe that—

    (A) such merchandise is being dumped in an Agreement country; and

    (B) such domestic industry is being materially injured, or threatened with material injury, by reason of such dumping;

submit a petition to the Trade Representative that alleges the elements referred to in subparagraphs (A) and (B) and requests the Trade Representative to take action under subsection (c) on behalf of the domestic industry.

(2) A petition submitted under paragraph (1) shall contain such detailed information as the Trade Representative may require in support of the allegations in the petition.

**(c) Application for antidumping action on behalf of domestic industry**

(1) If the Trade Representative, on the basis of the information contained in a petition submitted under paragraph (1), determines that there is a reasonable basis for the allegations in the petition, the Trade Representative shall submit to the appropriate authority of the Agreement country where the alleged dumping is occurring an application pursuant to Article 12 of the Agreement which requests that appropriate antidumping action under the law of that country be taken, on behalf of the United States, with respect to imports into that country of the merchandise concerned.

(2) At the request of the Trade Representative, the appropriate officers of the Department of Commerce and the United States International Trade Commission shall assist the Trade Representative in preparing the application under paragraph (1).

**(d) Consultation after submission of application**

After submitting an application under subsection (c)(1), the Trade Representative shall seek consultations with the appropriate authority of the Agreement country regarding the request for antidumping action.

**(e) Action upon refusal of Agreement country to act**

If the appropriate authority of an Agreement country refuses to undertake antidumping measures in response to a request made therefor by the Trade Representative under subsection (c), the Trade Representative shall promptly consult with the domestic industry on whether action under any other law of the United States is appropriate.

(Pub. L. 100–418, title I, § 1317, Aug. 23, 1988, 102 Stat. 1188; Pub. L. 103–465, title VI, § 621(a)(1), Dec. 8, 1994, 108 Stat. 4992.)

**Editorial Notes**

CODIFICATION

Section was enacted as part of the Omnibus Trade and Competitiveness Act of 1988, and not as part of the Tariff Act of 1930 which comprises this chapter.

AMENDMENTS

1994—Subsec. (a)(1). Pub. L. 103–465 designated existing provisions as subpar. (A), substituted "GATT 1994" for "General Agreement on Tariffs and Trade", and added subpar. (B).

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 1994 AMENDMENT

Pub. L. 103–465, title VI, § 621(b), Dec. 8, 1994, 108 Stat. 4993, provided that: "The amendments made by this section [amending this section and sections 2171, 2411, 2702, 2905, 2906, 3107, 3111, and 3202 of this title] shall take effect on the date on which the WTO Agreement enters into force with respect to the United States (Jan. 1, 1995)."

**§ 1677l. Repealed. Pub. L. 116–113, title VI, § 601, Jan. 29, 2020, 134 Stat. 78**

Section, Pub. L. 103–182, title VI, § 691(a), Dec. 8, 1993, 107 Stat. 2223; Pub. L. 114–125, title VIII, § 802(d)(2), Feb. 24, 2016, 130 Stat. 210, related to annual reports on antidumping and countervailing duty collections.

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF REPEAL

Repeal effective on the date the USMCA entered into force (July 1, 2020), see section 601 of Pub. L. 116–113, set out as a note under former section 3301 of this title.

**§ 1677m. Conduct of investigations and administrative reviews**

**(a) Treatment of voluntary responses in countervailing or antidumping duty investigations and reviews**

**(1) In general**

In any investigation under part I or II of this subtitle or a review under section 1675(a) of this title in which the administering authority has, under section 1677f–1(c)(2) of this title or section 1677f–1(e)(2)(A) of this title (whichever is applicable), limited the number of exporters or producers examined, or determined a single country-wide rate, the administering authority shall establish an individual countervailable subsidy rate or an individual weighted average dumping margin for any exporter or producer not initially selected for individual examination under such sections who submits to the administering authority the information requested from exporters or producers selected for examination, if—

    (A) such information is so submitted by the date specified—

      (i) for exporters and producers that were initially selected for examination, or

      (ii) for the foreign government, in a countervailing duty case where the administering authority has determined a single country-wide rate; and

    (B) the number of exporters or producers subject to the investigation or review is not so large that any additional individual examination of such exporters or producers would be unduly burdensome to the administering authority and inhibit the timely completion of the investigation or review.

**(2) Determination of unduly burdensome**

In determining if an individual examination under paragraph (1)(B) would be unduly burdensome, the administering authority may consider the following:

    (A) The complexity of the issues or information presented in the proceeding, including questionnaires and any responses thereto.

(B) Any prior experience of the administering authority in the same or similar proceeding.

(C) The total number of investigations under part I or II and reviews under section 1675 of this title being conducted by the administering authority as of the date of the determination.

(D) Such other factors relating to the timely completion of each such investigation and review as the administering authority considers appropriate.

**(b) Certification of submissions**

Any person providing factual information to the administering authority or the Commission in connection with a proceeding under this subtitle on behalf of the petitioner or any other interested party shall certify that such information is accurate and complete to the best of that person's knowledge.

**(c) Difficulties in meeting requirements**

**(1) Notification by interested party**

If an interested party, promptly after receiving a request from the administering authority or the Commission for information, notifies the administering authority or the Commission (as the case may be) that such party is unable to submit the information requested in the requested form and manner, together with a full explanation and suggested alternative forms in which such party is able to submit the information, the administering authority or the Commission (as the case may be) shall consider the ability of the interested party to submit the information in the requested form and manner and may modify such requirements to the extent necessary to avoid imposing an unreasonable burden on that party.

**(2) Assistance to interested parties**

The administering authority and the Commission shall take into account any difficulties experienced by interested parties, particularly small companies, in supplying information requested by the administering authority or the Commission in connection with investigations and reviews under this subtitle, and shall provide to such interested parties any assistance that is practicable in supplying such information.

**(d) Deficient submissions**

If the administering authority or the Commission determines that a response to a request for information under this subtitle does not comply with the request, the administering authority or the Commission (as the case may be) shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews under this subtitle. If that person submits further information in response to such deficiency and either—

(1) the administering authority or the Commission (as the case may be) finds that such response is not satisfactory, or

(2) such response is not submitted within the applicable time limits,

then the administering authority or the Commission (as the case may be) may, subject to subsection (e), disregard all or part of the original and subsequent responses.

**(e) Use of certain information**

In reaching a determination under section 1671b, 1671d, 1673b, 1673d, 1675, or 1675b of this title the administering authority and the Commission shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements established by the administering authority or the Commission, if—

(1) the information is submitted by the deadline established for its submission,

(2) the information can be verified,

(3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination,

(4) the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by the administering authority or the Commission with respect to the information, and

(5) the information can be used without undue difficulties.

**(f) Nonacceptance of submissions**

If the administering authority or the Commission declines to accept into the record any information submitted in an investigation or review under this subtitle, it shall, to the extent practicable, provide to the person submitting the information a written explanation of the reasons for not accepting the information.

**(g) Public comment on information**

Information that is submitted on a timely basis to the administering authority or the Commission during the course of a proceeding under this subtitle shall be subject to comment by other parties to the proceeding within such reasonable time as the administering authority or the Commission shall provide. The administering authority and the Commission, before making a final determination under section 1671d, 1673d, 1675, or 1675b of this title shall cease collecting information and shall provide the parties with a final opportunity to comment on the information obtained by the administering authority or the Commission (as the case may be) upon which the parties have not previously had an opportunity to comment. Comments containing new factual information shall be disregarded.

**(h) Termination of investigation or revocation of order for lack of interest**

The administering authority may—

(1) terminate an investigation under part I or II of this subtitle with respect to a domestic like product if, prior to publication of an order under section 1671e or 1673e of this title, the administering authority determines that producers accounting for substantially all of the production of that domestic like product have expressed a lack of interest in issuance of an order; and

(2) revoke an order issued under section 1671e or 1673e of this title with respect to a domestic like product, or terminate an investigation suspended under section 1671c or 1673c of this title with respect to a domestic like product, if the administering authority determines that producers accounting for substantially all of the production of that domestic like product, have expressed a lack of interest in the order or suspended investigation.

**(i) Verification**

The administering authority shall verify all information relied upon in making—

(1) a final determination in an investigation,

(2) a revocation under section 1675(d) of this title, and

(3) a final determination in a review under section 1675(a) of this title, if—

(A) verification is timely requested by an interested party as defined in section 1677(9)(C), (D), (E), (F), or (G) of this title, and

(B) no verification was made under this subparagraph during the 2 immediately preceding reviews and determinations under section 1675(a) of this title of the same order, finding, or notice, except that this clause shall not apply if good cause for verification is shown.

(June 17, 1930, ch. 497, title VII, §782, as added Pub. L. 103–465, title II, §231(a), Dec. 8, 1994, 108 Stat. 4893; amended Pub. L. 114–27, title V, §506, June 29, 2015, 129 Stat. 386.)

**Editorial Notes**

Amendments

2015—Subsec. (a). Pub. L. 114–27 designated existing provisions as par. (1) and inserted heading, redesignated former par. (1) and subpars. (A) and (B) as subpar. (A) and cls. (i) and (ii), respectively, added par. (2), and redesignated former par. (2) as subpar. (B) of par. (1) and amended it generally. Prior to amendment, subpar. (B) of par. (1) read as follows: ''the number of exporters or producers who have submitted such information is not so large that individual examination of such exporters or producers would be unduly burdensome and inhibit the timely completion of the investigation.''

**Statutory Notes and Related Subsidiaries**

Effective Date

Section effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States (Jan. 1, 1995), and applicable with respect to investigations, reviews, and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as an Effective Date of 1994 Amendment note under section 1671 of this title.

## § 1677n. Antidumping petitions by third countries

**(a) Filing of petition**

The government of a WTO member may file with the Trade Representative a petition requesting that an investigation be conducted to determine if—

(1) imports from another country are being sold in the United States at less than fair value, and

(2) an industry in the petitioning country is materially injured by reason of those imports.

**(b) Initiation**

The Trade Representative, after consultation with the administering authority and the Commission and obtaining the approval of the WTO Council for Trade in Goods, shall determine whether to initiate an investigation described in subsection (a).

**(c) Determinations**

Upon initiation of an investigation under this section, the Trade Representative shall request the following determinations be made according to substantive and procedural requirements specified by the Trade Representative, notwithstanding any other provision of this subtitle:

(1) The administering authority shall determine whether imports into the United States of the subject merchandise are being sold at less than fair value.

(2) The Commission shall determine whether an industry in the petitioning country is materially injured by reason of imports of the subject merchandise into the United States.

**(d) Public comment**

An opportunity for public comment shall be provided, as appropriate—

(1) by the Trade Representative, in making the determination required by subsection (b), and

(2) by the administering authority and the Commission, in making the determination required by subsection (c).

**(e) Issuance of order**

If the administering authority makes an affirmative determination under paragraph (1) of subsection (c), and the Commission makes an affirmative determination under paragraph (2) of subsection (c), the administering authority shall issue an antidumping duty order in accordance with section 1673e of this title and take such other actions as are required by section 1673e of this title.

**(f) Reviews of determinations**

For purposes of review under section 1516a of this title or review under section 1675 of this title, if an order is issued under subsection (e), the final determinations of the administering authority and the Commission under this section shall be treated as final determinations made under section 1673d of this title.

**(g) Access to information**

Section 1677f of this title shall apply to investigations under this section, to the extent specified by the Trade Representative, after consultation with the administering authority and the Commission.

(June 17, 1930, ch. 497, title VII, §783, as added Pub. L. 103–465, title II, §232(a), Dec. 8, 1994, 108 Stat. 4897; amended Pub. L. 104–295, §20(b)(17), Oct. 11, 1996, 110 Stat. 3528.)

**Editorial Notes**

Amendments

1996—Subsec. (f). Pub. L. 104–295 substituted ''subsection (e)'' for ''subsection (d)''.

# U.S. Court of International Trade
## LIVE Database (New York)
## CIT DOCKET FOR CASE #: 1:17-cv-00158-LMG

AG der Dillinger Huttenwerke v. United States
**Assigned to:** Leo M. Gordon
**Lead Docket:**

**Jurisdiction:**
28USC § 1581(c) Antidumping or Countervailing Duty
Determination(s)

**Date Filed:** 06/23/2017
**Jury Demand:** No

**Date Terminated:** 12/21/2023

**Category:**
Final Negative Determination: Investigation 19USC § 1516a(a)(2)
(B)(ii)

**Date Reopened:**

**Does this action raise an issue of
constitutionality?:** N

**Agency:**
U.S. Department of Commerce

**Product Description:**
Certain Carbon and Alloy Steel Cut-To-Length Plate

**Export Country:**
Germany

**Plaintiff**

**AG der Dillinger Huttenwerke**

represented by **Gregory Stephen Menegaz**
deKieffer & Horgan, PLLC
1156 Fifteenth Street, N.W.
Suite 1101
Washington, DC 20005
(202) 783-6900
Fax: (202) 783-6909
Email: gmenegaz@dhlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Alexandra H. Salzman**
deKieffer & Horgan, PLLC
1156 Fifteenth Street, N.W.
Suite 1101
Washington, DC 20005
(202) 783-6900
Fax: (202) 783-6909

Email: asalzman@dhlaw.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**James Kevin Horgan**
deKieffer & Horgan, PLLC
1156 Fifteenth Street, N.W.
Suite 1101
Washington, DC 20005
(202) 783-6900
Fax: (202) 783-6909
Email: kevin.horgan@dhlaw.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**John Joseph Kenkel**
deKieffer & Horgan, PLLC
1156 Fifteenth Street, N.W.
Suite 1101
Washington, DC 20005
(202) 783-6900
Fax: (202) 783-6909
Email: jkenkel@dhlaw.com
***TERMINATED: 05/18/2023***
***Bar Status: ACTIVE***

**Marc Edward Montalbine**
deKieffer & Horgan, PLLC
1156 Fifteenth Street, N.W.
Suite 1101
Washington, DC 20005
(202) 783-6900
Fax: (202) 783-6909
Email: montalbine@dhlaw.de
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Merisa Anne Horgan**
deKieffer & Horgan, PLLC
1156 Fifteenth Street, NW.
Suite 1101
Washington, DC 20005
(202) 783-6900
Fax: (202) 783-6909
Email: merisahorgan@dhlaw.com
*ATTORNEY TO BE NOTICED*
***Bar Status: ACTIVE***

**Consolidated Plaintiff**

**Ilsenburger Grobblech GmbH**                represented by **David Edward Bond**
White & Case, LLP

701 Thirteenth Street, NW.
1100
Washington, DC 20005-3807
(202) 729-2307
Fax: (202) 639-9355
Email: dbond@whitecase.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Allison Jessie Gartner Kepkay**
White & Case, LLP
701 Thirteenth Street, NW.
1100
Washington, DC 20005-3807
(202) 729-2603
Fax: (202) 639-9355
Email: allison.kepkay@whitecase.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Richard G. King**
White & Case, LLP
701 Thirteenth Street, NW.
1100
Washington, DC 20005-3807
(202) 626-3600
Fax: (202) 639-9355
*ATTORNEY TO BE NOTICED*
***Bar Status: ACTIVE***

**Ron Kendler**
White & Case, LLP
701 Thirteenth Street, NW.
1100
Washington, DC 20005-3807
(202) 729-2312
Fax: (202) 639-9355
Email: ron.kendler@whitecase.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Consolidated Plaintiff**

**Salzgitter Flachstahl GmbH**          represented by **David Edward Bond**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Allison Jessie Gartner Kepkay**

(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Richard G. King**
(See above for address)
*ATTORNEY TO BE NOTICED*
***Bar Status: ACTIVE***

**Ron Kendler**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

### Consolidated Plaintiff

**Salzgitter Mannesmann Grobblech GmbH**                   represented by   **David Edward Bond**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Allison Jessie Gartner Kepkay**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Richard G. King**
(See above for address)
*ATTORNEY TO BE NOTICED*
***Bar Status: ACTIVE***

**Ron Kendler**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

### Consolidated Plaintiff

**Salzgitter Mannesmann International GmbH**                   represented by   **David Edward Bond**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Allison Jessie Gartner Kepkay**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Richard G. King**
(See above for address)
*ATTORNEY TO BE NOTICED*
**Bar Status: ACTIVE**

**Ron Kendler**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
**Bar Status: ACTIVE**

**Consolidated Plaintiff**

**Friedr. Lohmann GmbH**                    represented by   **Gregory Stephen Menegaz**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
**Bar Status: ACTIVE**

**Alexandra H. Salzman**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
**Bar Status: ACTIVE**

**James Kevin Horgan**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
**Bar Status: ACTIVE**

**John Joseph Kenkel**
(See above for address)
***TERMINATED: 05/18/2023***
**Bar Status: ACTIVE**

**Marc Edward Montalbine**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
**Bar Status: ACTIVE**

**Merisa Anne Horgan**
(See above for address)
*ATTORNEY TO BE NOTICED*
**Bar Status: ACTIVE**

**Plaintiff-Intervenor**

**thyssenkrupp Steel Europe AG**            represented by   **Robert Lewis LaFrankie , II**
Crowell & Moring, LLP
1001 Pennsylvania Avenue, NW.
Washington, DC 20004-2595
(202) 624-2500

Fax: (202) 628-5116
Email: rlafrankie@crowell.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Defendant**

**United States**                    represented by   **Kara Marie Westercamp**
U.S. Department of Justice
Commercial Litigation Branch - Civil
Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 305-7571
Fax: (202) 514-8624
Email: kara.m.westercamp@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Ayat Mujais**
Of Counsel
U.S. Department of Commerce
Office of Chief Counsel for Trade
Enforcement and Compliance
1401 Constitution Avenue, NW.
Suite 3622
Washington, DC 20230-0001
(202) 482-4750
Fax: (202) 501-8045
Email: ayat.mujais@trade.gov
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Ian Andrew McInerney**
Of Counsel
U.S. Department of Commerce
Office of Chief Counsel for Trade
Enforcement and Compliance
1401 Constitution Avenue, NW.
Washington, DC 20230-0001
(202) 482-4378
Fax: (202) 482-4912
Email: Ian.McInerney@trade.gov
***TERMINATED: 11/10/2020***
***Bar Status: ACTIVE***

**James Henry Ahrens , II**
Of Counsel
U.S. Department of Commerce

Office of Chief Counsel for Trade
Enforcement and Compliance
1401 Constitution Avenue, NW
Washington, DC 20230
(202) 482-3558
Fax: (202) 482-4912
Email: james.ahrens@trade.gov
*TERMINATED: 04/22/2019*
*Bar Status: ACTIVE*

**Kelly Ann Krystyniak**
U.S. Department of Justice
Commercial Litigation Branch - Civil
Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 307-0163
Fax: (202) 514-8640
Email: kelly.a.krystyniak@usdoj.gov
*TERMINATED: 02/22/2023*
*Bar Status: ACTIVE*

**Natan Pinchas Lyons Tubman**
Of Counsel
U.S. Department of Commerce
International Trade Administration
Office of Chief Counsel for Trade
Enforcement and Compliance
1401 Constitution Avenue, NW
Washington, DC 20230
(202) 482-6906
Fax: (202) 482-4912
*TERMINATED: 08/30/2019*
*Bar Status: ACTIVE*

**Tara Kathleen Hogan**
U.S. Department of Justice
Commercial Litigation Branch - Civil
Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 616-2228
Fax: (202) 305-7643
Email: tara.hogan@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Bar Status: ACTIVE*

**Vito Salvatore Solitro**
U.S. Department of Justice
Commercial Litigation Branch - Civil
Division
P.O. Box 480

Ben Franklin Station
Washington, DC 20044
(202) 305-7607
Fax: (202) 514-8640
Email: vito.s.solitro@usdoj.gov
*TERMINATED: 07/18/2019*
*Bar Status: INACTIVE*

**Defendant-Intervenor**

**SSAB Enterprises LLC**                    represented by  **Roger Brian Schagrin**
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
(202) 223-1700
Fax: (202) 429-2522
Email: rschagrin@schagrinassociates.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Christopher Todd Cloutier**
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
(202) 223-1700
Fax: (202) 429-2522
Email: ccloutier@schagrinassociates.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Elizabeth Jackson Drake**
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
(202) 223-1700
Fax: (202) 429-2522
Email: edrake@schagrinassociates.com
*ATTORNEY TO BE NOTICED*
*Bar Status: ACTIVE*

**Jeffrey David Gerrish**
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
(202) 223-1700
Email: jgerrish@schagrinassociates.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***

*Bar Status: ACTIVE*

**John Winthrop Bohn**
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
(202) 223-1700
Fax: (202) 429-2522
Email: johnwbohn@gmail.com
*TERMINATED: 01/23/2019*
*Bar Status: ACTIVE*

**Luke Anthony Meisner**
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
(202) 223-1700
Fax: (202) 429-2522
Email: lmeisner@schagrinassociates.com
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Nicholas Joel Birch**
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
(202) 223-1700
Email: nbirch@SchagrinAssociates.com
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Paul Wright Jameson**
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
(202) 223-1700
Fax: (202) 429-2522
Email: pjameson@schagrinassociates.com
*TERMINATED: 07/01/2021*
*ATTORNEY TO BE NOTICED*
*Bar Status: ACTIVE*

**Saad Younus Chalchal**
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
(202) 223-1700

Fax: (202) 429-2522
Email: schalchal@schagrinassociates.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Defendant-Intervenor**

**Nucor Corporation**                    represented by   **Alan Hayden Price**
Wiley Rein, LLP
2050 M Street, NW.
Washington, DC 20036
(202) 719-3375
Fax: (202) 719-7049
Email: aprice@wiley.law
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Enbar Toledano**
Wiley Rein, LLP
2050 M Street, NW.
Washington, DC 20036
(202) 719-4513
Fax: (202) 719-7049
Email: etoledano@wiley.law
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Stephen Joseph Obermeier**
Wiley Rein, LLP
2050 M Street, NW.
Washington, DC 20036
(202) 719-7465
Fax: (202) 719-7049
Email: sobermeier@wiley.law
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Adam Milan Teslik**
Wiley Rein, LLP
2050 M Street, NW.
Washington, DC 20003
(202) 719-3483
Fax: (202) 719-7049
Email: ateslik@wiley.law
*ATTORNEY TO BE NOTICED*
***Bar Status: ACTIVE***

**Christopher Bright Weld**

Wiley Rein, LLP
2050 M Street, NW.
Washington, DC 20036
(202) 719-4651
Fax: (202) 719-7049
Email: cweld@wiley.law
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Douglas Charles Dreier**
Wiley Rein, LLP
2050 M Street, NW.
Washington, DC 20036
(202) 719-4988
Fax: (202) 719-7049
Email: ddreier@wiley.law
***TERMINATED: 11/10/2021***
***Bar Status: ACTIVE***

**Laura El-Sabaawi**
Wiley Rein, LLP
2050 M Street, NW.
Washington, DC 20036
(202) 719-7042
Fax: (202) 719-7049
Email: lel-sabaawi@wiley.law
***TERMINATED: 04/14/2022***
***Bar Status: ACTIVE***

**Maureen Elizabeth Thorson**
Wiley Rein, LLP
2050 M Street, NW.
Washington, DC 20036
(202) 719-7272
Fax: (202) 719-7049
Email: mthorson@wiley.law
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Stephanie Manaker Bell**
Wiley Rein, LLP
2050 M Street, NW.
Washington, DC 20036
(202) 719-4384
Fax: (202) 719-7049
Email: sbell@wiley.law
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Tessa Victoria Capeloto**
Wiley Rein, LLP

2050 M Street, NW.
Washington, DC 20036
(202) 719-7586
Fax: (202) 719-7049
Email: tcapeloto@wileyrein.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Timothy C. Brightbill**
Wiley Rein, LLP
2050 M Street, NW.
Suite 9 East
Washington, DC 20036
(202) 719-3138
Fax: (202) 719-7049
Email: tbrightbill@wiley.law
***TERMINATED: 04/14/2022***
***Bar Status: ACTIVE***

| Date Filed | # | Docket Text |
|---|---|---|
| 06/23/2017 | 1 | Summons . Filed by Gregory Stephen Menegaz of deKieffer & Horgan PLLC on behalf of AG der Dillinger Huttenwerke. (Menegaz, Gregory) (Entered: 06/23/2017) |
| 06/23/2017 | 2 | Form 5 Information Statement *of AG der Dillinger Hüttenwerke*. Filed by Gregory Stephen Menegaz of deKieffer & Horgan PLLC on behalf of AG der Dillinger Huttenwerke. (Menegaz, Gregory) (Entered: 06/23/2017) |
| 06/23/2017 | 3 | Form 13 Corporate Disclosure Statement *of AG der Dillinger Hüttenwerke*. Filed by Gregory Stephen Menegaz of deKieffer & Horgan PLLC on behalf of AG der Dillinger Huttenwerke. (Menegaz, Gregory) (Entered: 06/23/2017) |
| 06/23/2017 | 4 | Form 11 Notice of Appearance *for Gregory S. Menegaz, Alexandra H. Salzman, James K. Horgan, John J. Kenkel & Marc E. Montalbine*. Filed by Gregory Stephen Menegaz of deKieffer & Horgan PLLC on behalf of AG der Dillinger Huttenwerke. (Menegaz, Gregory) (Entered: 06/23/2017) |
| 06/23/2017 | 5 | Form 17 Business Proprietary Information Certification filed on behalf of *Gregory S. Menegaz, Alexandra H. Salzman, James K. Horgan, John J. Kenkel & Marc E. Montalbine as Attorneys*. Filed by Gregory Stephen Menegaz of deKieffer & Horgan PLLC on behalf of AG der Dillinger Huttenwerke. (Menegaz, Gregory) (Entered: 06/23/2017) |
| 06/23/2017 | 6 | Certificate of service . Filed by Gregory Stephen Menegaz of deKieffer & Horgan PLLC on behalf of AG der Dillinger Huttenwerke. (Menegaz, Gregory) (Entered: 06/23/2017) |
| 06/27/2017 | 7 | Summons served by Clerk's Office upon Plaintiff and appropriate Government Agency/Agencies . (Benbow, Troy) (Entered: 06/27/2017) |
| 06/28/2017 | 8 | Form 11 Notice of Appearance . Filed by Vito Salvatore Solitro of U.S. Department of Justice on behalf of United States.(Solitro, Vito) (Entered: 06/28/2017) |
| 07/24/2017 | 9 | Complaint against United States. Administrative Record due by 9/11/2017. Filed by Gregory Stephen Menegaz of deKieffer & Horgan PLLC on behalf of AG der Dillinger |

| | | Huttenwerke. (Attachments: # 1 Certificate of Service)(Menegaz, Gregory) (Entered: 07/24/2017) |
|---|---|---|
| 08/09/2017 | 10 | Order entered on 8/9/2017, assigning action to Judge Leo M. Gordon. (Taronji, Steve) (Entered: 08/09/2017) |
| 08/14/2017 | 11 | Form 11 Notice of Appearance . Filed by James Henry Ahrens, II of U.S. Department of Commerce on behalf of United States.(Ahrens, James) (Entered: 08/14/2017) |
| 08/18/2017 | 12 | Letter filed by the Honorable Leo M. Gordon concerning *consolidation of cases. Parties to advise Steve Taronji, case manager, by the close of business on August 24, 2017 if they object to the consolidation*. (Love, Cynthia) (Entered: 08/18/2017) |
| 08/21/2017 | 13 | Consent Motion to Intervene as Defendant intervenor *for SSAB Enterprises LLC*. Responses due by 9/11/2017. Filed by Roger Brian Schagrin of Schagrin Associates on behalf of SSAB Enterprises LLC. (Attachments: # 1 Proposed Order For Leave to Intervene)(Schagrin, Roger) (Entered: 08/21/2017) |
| 08/21/2017 | 14 | Form 11 Notice of Appearance *for Roger B. Schagrin, Christopher T. Cloutier, Paul W. Jameson, and John W. Bohn*. Filed by Roger Brian Schagrin of Schagrin Associates on behalf of SSAB Enterprises LLC.(Schagrin, Roger) (Entered: 08/21/2017) |
| 08/21/2017 | 15 | Form 13 Corporate Disclosure Statement *for SSAB Enterprises LLC*. Filed by Roger Brian Schagrin of Schagrin Associates on behalf of SSAB Enterprises LLC. (Schagrin, Roger) (Entered: 08/21/2017) |
| 08/21/2017 | 16 | Form 17 Business Proprietary Information Certification filed on behalf of *Roger B. Schagrin, Christopher T. Cloutier, Paul W. Jameson and John W. Bohn, as attorneys. Michael F. Panfeld as a consultant*. Filed by Roger Brian Schagrin of Schagrin Associates on behalf of SSAB Enterprises LLC. (Schagrin, Roger) (Entered: 08/21/2017) |
| 08/22/2017 | 17 | Order entered on 8/22/2017, granting consent Motion to intervene. ORDERED that the SSAB Enterprises LLC ("Applicant") is a Defendant-Intervenor in this action. Related Doc # 13 ) (Taronji, Steve) (Entered: 08/22/2017) |
| 08/23/2017 | 18 | Consent Motion to Intervene as defendant intervenor *as a matter of right by Nucor Corporation and proposed order*. Responses due by 9/11/2017. Filed by Alan Hayden Price of Wiley Rein, LLP on behalf of Nucor Corporation.(Price, Alan) (Entered: 08/23/2017) |
| 08/23/2017 | 19 | Form 13 Corporate Disclosure Statement *of Nucor Corporation*. Filed by Alan Hayden Price of Wiley Rein, LLP on behalf of Nucor Corporation. (Price, Alan) (Entered: 08/23/2017) |
| 08/23/2017 | 20 | Form 11 Notice of Appearance *for Alan H. Price, Christopher B. Weld, Timothy C. Brightbill, Maureen E. Thorson, Tessa Capeloto, Laura El-Sabaawi, and Stephanie M. Bell*. Filed by Alan Hayden Price of Wiley Rein, LLP on behalf of Nucor Corporation. (Price, Alan) (Entered: 08/23/2017) |
| 08/23/2017 | 21 | Form 17 Business Proprietary Information Certification filed on behalf of *for Alan H. Price, Christopher B. Weld, Timothy C. Brightbill, Maureen E. Thorson, Tessa Capeloto, Laura El-Sabaawi, and Stephanie M. Bell*. Filed by Alan Hayden Price of Wiley Rein, LLP on behalf of Nucor Corporation. (Price, Alan) (Entered: 08/23/2017) |
| 08/24/2017 | 22 | Order entered on 8/24/2017, granting consent Motion to intervene. ORDERED, that Nucor be entered as a defendant-intervenor in the above-captioned action. (Related Doc # 18 ) (Taronji, Steve) (Entered: 08/24/2017) |

| | | |
|---|---|---|
| 09/11/2017 | 23 | Administrative Record Index for United States Department of Commerce filed . Filed by James Henry Ahrens, II of U.S. Department of Commerce on behalf of United States. (Attachments: # 1 Declaration, # 2 Final FR Notice, # 3 Amended Final FR Notice & Order, # 4 IDM, # 5 CRI Public, # 6 CRI BPI Releaseable, # 7 CRI BPI Not Releaseable) (Ahrens, James) (Entered: 09/11/2017) |
| 09/28/2017 | 24 | Motion to consolidate case(s) 17-cv-160; 17-cv-162 with lead case 17-cv-158 . Responses due by 10/13/2017. Filed by Vito Salvatore Solitro of U.S. Department of Justice on behalf of United States.(Solitro, Vito) Modified on 9/29/2017 (Love, Cynthia). (Entered: 09/28/2017) |
| 10/11/2017 | 25 | Joint status report and proposed briefing schedule. Filed by Marc Edward Montalbine of deKieffer & Horgan, PLLC on behalf of AG der Dillinger Huttenwerke. (Attachments: # 1 Proposed Order)(Montalbine, Marc) (Entered: 10/11/2017) |
| 10/12/2017 | 26 | Response *in opposition* to motion *to consolidate* (related document(s) 24 ). Filed by Marc Edward Montalbine of deKieffer & Horgan, PLLC on behalf of AG der Dillinger Huttenwerke. (Attachments: # 1 Proposed Order)(Montalbine, Marc) (Entered: 10/12/2017) |
| 10/20/2017 | 27 | Order entered on 10/20/2017; ORDERED that any additional filings regarding or consideration of a proposed briefing schedule is STAYED pending final disposition of defendant's motion to consolidate.(Swindell, Stephen) (Entered: 10/20/2017) |
| 12/15/2017 | 28 | Order entered on 12/15/2017 granting Motion to consolidate cases. ORDERED that Defendants motion is granted for the reasons set forth in Defendants motion; it is further ORDERED the above-captioned cases are consolidated into AG der Dillinger Huttenwerke v. United States, Consol. Court No. 17-00158; and it is further ORDERED that the parties shall file a proposed schedule for briefing on or before December 21, 2017. (Related Doc # 24 ). (Love, Cynthia) (Entered: 12/15/2017) |
| 12/21/2017 | 29 | Consent Proposed scheduling order . Filed by Vito Salvatore Solitro of U.S. Department of Justice on behalf of United States. (Solitro, Vito) (Entered: 12/21/2017) |
| 12/29/2017 | 30 | Form 11 Notice of Appearance . Filed by Elizabeth Jackson Drake of Schagrin Associates on behalf of SSAB Enterprises LLC.(Drake, Elizabeth) (Entered: 12/29/2017) |
| 01/19/2018 | 31 | Phone Conference held on 1/19/2018 at 11:30 a.m. in Courtroom #4. (Love, Cynthia) (Entered: 01/19/2018) |
| 01/23/2018 | 32 | Order entered on 1/23/2018, Scheduling Order: Plaintiff's Dispositive motions, if any, due by 3/5/2018. Defendant's Response to Dispositive Motion due by 6/6/2018. Defendant-Intervenor's Response to Dispositive Motion due by 7/5/2018. Replies due by 7/19/2018. Any motion for oral argument due by 8/9/2018. (Taronji, Steve) (Entered: 01/23/2018) |
| 01/23/2018 | 33 | Order entered on 1/23/2018, ORDERED that the briefing of the issues raised in the complaint filed by Friedr. Lohmann GmbH and thyssenkrupp Steel Europe AG, ECF No. 9, in Court No. 17-00162, which is part of this consolidated action, is stayed pending the final disposition by this Court of all other issues raised in the complaints, ECF No. 9 in Court No. 17-00158, and ECF No. 7 in Court No. 17-00160, the other constituent actions in this consolidated action. (Taronji, Steve) (Entered: 01/23/2018) |
| 02/22/2018 | 34 | Form 17 Business Proprietary Information Certification filed on behalf of Allison Kepkay as Attorney/Consultant(s) . Filed by David Edward Bond of White & Case, LLP on behalf of Ilsenburger Grobblech GmbH, Salzgitter Flachstahl GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Mannesmann International GmbH. (Bond, David) (Entered: 02/22/2018) |

| | | |
|---|---|---|
| 02/22/2018 | 35 | Form 11 Notice of Appearance *for Allison Kepkay*. Filed by David Edward Bond of White & Case, LLP on behalf of Ilsenburger Grobblech GmbH, Salzgitter Flachstahl GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Mannesmann International GmbH.(Bond, David) (Entered: 02/22/2018) |
| 03/01/2018 | 36 | Joint Motion for extension of time until 3/12/2018 to file brief *in support of motion for judgment on the agency record*. Responses due by 3/20/2018. Filed by Marc Edward Montalbine of deKieffer & Horgan, PLLC, David Edward Bond of White & Case, LLP, Robert Lewis LaFrankie, II of Crowell & Moring, LLP on behalf of Friedr. Lohmann GmbH, AG der Dillinger Huttenwerke, Ilsenburger Grobblech GmbH, Salzgitter Flachstahl GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Mannesmann International GmbH, thyssenkrupp Steel Europe AG.(Bond, David) (Entered: 03/01/2018) |
| 03/02/2018 | 37 | Order entered on 3/2/2018, granting Motion for extension of time to file briefs (Related Doc # 36 ). ORDERED that Plaintiff Dillinger and Consolidated Plaintiff Salzgitter shall file their motions for judgment on the agency record no later than March 12, 2018; it is further ORDERED that Defendant shall file its consolidated response brief no later than June 15, 2018; it is further ORDERED that Defendant-Intervenors shall file their response briefs no later than July 13, 2018; it is further ORDERED that Plaintiffs shall file their reply briefs no later than July 27, 2018; it is further ORDERED that any motion for oral argument shall be filed no later than August 16, 2018; And it is further ORDERED that all other provisions of the Scheduling Order of January 23, 2018 shall remain in effect. (Demb, Rebecca) (Entered: 03/02/2018) |
| 03/12/2018 | 38 | Motion for judgment on agency record 56.2 . Response to 56.2 Motion due by 6/15/2018. Filed by Marc Edward Montalbine of deKieffer & Horgan, PLLC on behalf of AG der Dillinger Huttenwerke. (Attachments: # 1 Proposed Order)(Montalbine, Marc) Modified on 3/12/2018 (Taronji, Steve). (Entered: 03/12/2018) |
| 03/12/2018 | 39 | Public Memorandum of Points and Authorities *In Support of Motion for Judgment on the Agency Record*. Filed by Marc Edward Montalbine of deKieffer & Horgan, PLLC on behalf of AG der Dillinger Huttenwerke. (Montalbine, Marc) (Entered: 03/12/2018) |
| 03/12/2018 | 40 | Confidential Memorandum of Points and Authorities *In Support of Motion for Judgment on the Agency Record*. Filed by Marc Edward Montalbine of deKieffer & Horgan, PLLC on behalf of AG der Dillinger Huttenwerke. (Montalbine, Marc) (Entered: 03/12/2018) |
| 03/12/2018 | 41 | Memorandum of Points and Authorities *in Support of Plaintiffs Salzgitter Rule 56.2 Motion*. Filed by Robert Lewis LaFrankie, II of Crowell & Moring, LLP on behalf of thyssenkrupp Steel Europe AG. (LaFrankie, Robert) (Entered: 03/12/2018) |
| 03/12/2018 | 42 | Confidential Motion for judgment on agency record 56.2 . Response to 56.2 Motion due by 6/15/2018. Filed by David Edward Bond of White & Case, LLP on behalf of Ilsenburger Grobblech GmbH, Salzgitter Flachstahl GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Mannesmann International GmbH. (Attachments: # 1 Proposed Order)(Bond, David) Modified on 3/13/2018 (Taronji, Steve). (Entered: 03/12/2018) |
| 03/13/2018 | 43 | **[\*\*\*NOTE: THIS DOCUMENT HAS BEEN SUPERSEDED BY DOC # 47\*\*\*]** Confidential Final Motion for judgment on agency record 56.2 . Response to 56.2 Motion due by 6/15/2018. Filed by David Edward Bond of White & Case, LLP on behalf of Ilsenburger Grobblech GmbH, Salzgitter Flachstahl GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Mannesmann International GmbH. (Attachments: # 1 Proposed Order)(Bond, David) Modified on 3/13/2018 (Taronji, Steve). Modified on 3/15/2018 (Taronji, Steve). (Entered: 03/13/2018) |

| 03/13/2018 | 44 | **[\*\*\*NOTE: THIS DOCUMENT HAS BEEN SUPERSEDED BY DOC # 48\*\*\*]** Public Motion for judgment on agency record 56.2 . Response to 56.2 Motion due by 6/15/2018. Filed by David Edward Bond of White & Case, LLP on behalf of Ilsenburger Grobblech GmbH, Salzgitter Flachstahl GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Mannesmann International GmbH.(Bond, David) Modified on 3/13/2018 (Taronji, Steve). Modified on 3/15/2018 (Taronji, Steve). (Entered: 03/13/2018) |
|---|---|---|
| 03/14/2018 | 45 | Consent Motion for errata to correct *the Memorandum of Points and Authorities in Support of Rule 56.2 Motion for Judgment Upon the Agency Record*. Filed with the Court electronically on 3/13/18 as document number 43 (related document(s) 43 ). Responses due by 4/2/2018. Filed by David Edward Bond of White & Case, LLP on behalf of Ilsenburger Grobblech GmbH, Salzgitter Flachstahl GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Mannesmann International GmbH. (Attachments: # 1 Proposed Order)(Bond, David) (Entered: 03/14/2018) |
| 03/14/2018 | 46 | Order entered on 3/14/2018, granting consent Motion for errata. ORDERED that Salzgitter shall file complete copies of the corrected confidential and public versions of its Initial Brief within one (1) business day of the issuance of this order. (Related Doc # 45 ). (Taronji, Steve) (Entered: 03/14/2018) |
| 03/14/2018 | 47 | Confidential Amended Motion for judgment on agency record 56.2 . Response to 56.2 Motion due by 6/15/2018. Filed by David Edward Bond of White & Case, LLP on behalf of Ilsenburger Grobblech GmbH, Salzgitter Flachstahl GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Mannesmann International GmbH. (Attachments: # 1 Proposed Order)(Bond, David) Modified on 3/15/2018 (Taronji, Steve). (Entered: 03/14/2018) |
| 03/14/2018 | 48 | Amended Motion for judgment on agency record 56.2 - *Public Version*. Response to 56.2 Motion due by 6/15/2018. Filed by David Edward Bond of White & Case, LLP on behalf of Ilsenburger Grobblech GmbH, Salzgitter Flachstahl GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Mannesmann International GmbH. (Attachments: # 1 Proposed Order)(Bond, David) Modified on 3/15/2018 (Taronji, Steve). (Entered: 03/14/2018) |
| 03/15/2018 | 49 | Certificate of Compliance (related document(s) 41 ). Filed by Robert Lewis LaFrankie, II of Crowell & Moring, LLP on behalf of thyssenkrupp Steel Europe AG. (LaFrankie, Robert) (Entered: 03/15/2018) |
| 05/15/2018 | 50 | Form 11 Notice of Appearance . Filed by Natan Pinchas Lyons Tubman of U.S. Department of Commerce on behalf of United States.(Tubman, Natan) (Entered: 05/15/2018) |
| 05/24/2018 | 51 | Consent Motion for extension of time until 6/29/2018 to file response brief . Responses due by 6/14/2018. Filed by Vito Salvatore Solitro of U.S. Department of Justice on behalf of United States.(Solitro, Vito) (Entered: 05/24/2018) |
| 05/25/2018 | 52 | Order entered on 5/25/2018 granting Motion for extension of time to file response brief. Defendant's Response brief due by 6/29/2018. Defendant-Intervenor's Response brief due by July 27, 2018. Plaintiff's Reply brief due by Aug 10, 2018. Motion for oral argument due by August 30, 2018. ORDERED that all provisions of the Scheduling Order of January 23, 2018 shall remain in effect.(Related Doc # 51 ). (Love, Cynthia) (Entered: 05/25/2018) |
| 06/25/2018 | 53 | Consent Motion for extension of time until 7/6/2018 to file response brief (related document(s) 52 ). Responses due by 7/16/2018. Filed by Vito Salvatore Solitro of U.S. Department of Justice on behalf of United States.(Solitro, Vito) (Entered: 06/25/2018) |

| 06/25/2018 | 54 | Order entered on 6/25/2018, granting consent Motion for extension of time to file response brief. Defendant's response brief due by 7/6/2018. Defendant-intervenors' response briefs due by August 3, 2018. Plaintiffs' reply briefs due by August 17, 2018. Motions for oral argument due by September 6, 2018. (Related Doc # 53 ). (Taronji, Steve) (Entered: 06/25/2018) |
| --- | --- | --- |
| 07/06/2018 | 55 | Confidential Response *to Plaintiffs' Rule 56.2 Motions* (related document(s) 38 , 47 ). Plaintiff's Reply due by 8/17/2018. Filed by Vito Salvatore Solitro of U.S. Department of Justice on behalf of United States.(Solitro, Vito) Modified on 7/6/2018 (Love, Cynthia). (Entered: 07/06/2018) |
| 07/06/2018 | 56 | Public Response *to Plaintiffs' Rule 56.2 Motions* (related document(s) 48 ). Plaintiff's Reply due by 8/17/2018. Filed by Vito Salvatore Solitro of U.S. Department of Justice on behalf of United States.(Solitro, Vito) Modified on 7/6/2018 (Love, Cynthia). (Entered: 07/06/2018) |
| 08/03/2018 | 57 | Confidential Response *Brief of Defendant-Intervenor Nucor Corporation* to motion *For Judgment Upon the Agency Record* (related document(s) 38 , 47 ). Reply due by 8/17/2018. Filed by Alan Hayden Price of Wiley Rein, LLP on behalf of Nucor Corporation.(Price, Alan) Modified on 8/6/2018 (Taronji, Steve). (Entered: 08/03/2018) |
| 08/06/2018 | 58 | Confidential Revised Response *Brief of Defendant-Intervenor Nucor Corporation* to motion *For Judgment Upon the Agency Record (Revised Confidential)* (related document(s) 38 , 47 ). Reply due by 8/17/2018. Filed by Alan Hayden Price of Wiley Rein, LLP on behalf of Nucor Corporation.(Price, Alan) Modified on 8/7/2018 (Taronji, Steve). (Entered: 08/06/2018) |
| 08/06/2018 | 59 | Public Response *Brief of Defendant-Intervenor Nucor Corporation* to motion *For Judgment Upon the Agency Record* (related document(s) 38 , 47 , 48 ). Reply due by 8/17/2018. Filed by Alan Hayden Price of Wiley Rein, LLP on behalf of Nucor Corporation.(Price, Alan) Modified on 8/7/2018 (Taronji, Steve). (Entered: 08/06/2018) |
| 08/15/2018 | 60 | Consent Motion for extension of time until 8/22/2018 to *file reply briefs* (related document(s) 54 ). Responses due by 9/5/2018. Filed by Marc Edward Montalbine of deKieffer & Horgan, PLLC on behalf of AG der Dillinger Huttenwerke. (Attachments: # 1 Proposed Order)(Montalbine, Marc) (Entered: 08/15/2018) |
| 08/16/2018 | 61 | Order entered on 8/16/2018, granting consent Motion for extension of time (Related Doc # 60 ). Replies due by 8/22/2018. Any motion for oral argument due by 9/11/2018. (Taronji, Steve) (Entered: 08/16/2018) |
| 08/22/2018 | 62 | Confidential Reply *Brief* (related document(s) 56 , 55 , 57 , 59 , 58 ). Filed by Marc Edward Montalbine of deKieffer & Horgan, PLLC on behalf of AG der Dillinger Huttenwerke.(Montalbine, Marc) (Entered: 08/22/2018) |
| 08/22/2018 | 63 | Public Reply *Brief* (related document(s) 56 , 55 , 57 , 59 , 58 ). Filed by Marc Edward Montalbine of deKieffer & Horgan, PLLC on behalf of AG der Dillinger Huttenwerke. (Montalbine, Marc) (Entered: 08/22/2018) |
| 08/22/2018 | 64 | Reply *in Support of Consolidated Plaintiffs' Rule 56.2 Motion for Judgment Upon the Agency Record* (related document(s) 56 , 55 , 57 , 59 , 58 ). Filed by David Edward Bond of White & Case, LLP on behalf of Ilsenburger Grobblech GmbH, Salzgitter Flachstahl GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Mannesmann International GmbH.(Bond, David) (Entered: 08/22/2018) |
| 09/05/2018 | 65 | Confidential Joint Appendix *Part I - App. 1-39*. Filed by Marc Edward Montalbine of deKieffer & Horgan, PLLC on behalf of AG der Dillinger Huttenwerke. (Attachments: # 1 Joint Appendix Part II - App. 40-53)(Montalbine, Marc) (Entered: 09/05/2018) |

| | | |
|---|---|---|
| 09/05/2018 | 66 | Joint Appendix *(Nonconfidential)* (related document(s) 65 ). Filed by Marc Edward Montalbine of deKieffer & Horgan, PLLC on behalf of AG der Dillinger Huttenwerke. (Montalbine, Marc) (Entered: 09/05/2018) |
| 09/11/2018 | 67 | Joint Motion for oral argument on Motions for Judgment on the Agency Record *for Salzgitter and Dillinger*. Responses due by 10/2/2018. Filed by Gregory Stephen Menegaz of deKieffer & Horgan, PLLC, Marc Edward Montalbine of deKieffer & Horgan, PLLC, Alexandra H. Salzman of deKieffer & Horgan, PLLC, David Edward Bond of White & Case, LLP, Ron Kendler of White & Case, LLP, Richard G. King of White & Case, LLP, Allison Jessie Gartner Kepkay of White & Case, LLP on behalf of AG der Dillinger Huttenwerke, Ilsenburger Grobblech GmbH, Salzgitter Flachstahl GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Mannesmann International GmbH. (Attachments: # 1 Proposed Order)(Bond, David) (Entered: 09/11/2018) |
| 12/26/2018 | 68 | Form 11 Notice of Appearance . Filed by Kelly Ann Krystyniak of U.S. Department of Justice on behalf of United States.(Krystyniak, Kelly) (Entered: 12/26/2018) |
| 01/23/2019 | 69 | Form 18 Notice of Termination of Access to Business Proprietary Information filed on behalf of *John W. Bohn*. Filed by Roger Brian Schagrin of Schagrin Associates on behalf of SSAB Enterprises LLC. (Schagrin, Roger) (Entered: 01/23/2019) |
| 04/16/2019 | 70 | Notice of Supplemental Authority filed. . Filed by David Edward Bond of White & Case, LLP on behalf of Ilsenburger Grobblech GmbH, Salzgitter Flachstahl GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Mannesmann International GmbH. (Attachments: # 1 Slip Opinion 18-150, # 2 17-159 Remand Results)(Bond, David) (Entered: 04/16/2019) |
| 04/22/2019 | 71 | Notice of withdrawal as attorney of record filed . Filed by James Henry Ahrens, II of U.S. Department of Commerce on behalf of United States.(Ahrens, James) (Entered: 04/22/2019) |
| 07/16/2019 | 72 | Order entered on 7/16/2019, Slip Op. 19-87, Considering Commerce's Final Determination on the application of partial adverse facts available. ORDERED that Commerce shall determine whether a similar correction as ordered in Dillinger France would materially affect the margins in this action; and it is further ORDERED that Commerce shall notify the court with the results of its analysis on or before August 7, 2019. (related document(s) 38 , 47 , 48 ) (Taronji, Steve) (Entered: 07/16/2019) |
| 07/26/2019 | 73 | Notice from the Court *The Office of the Clerk has learned that, due to a technical issue, the Courts CM/ECF System did not send out Notices of Electronic Filing (NEFs) to attorneys scheduled to receive daily summaries of case activity from 7/7/2019 to 7/17/2019. The Office of the Clerk will re-send those NEFs to the affected attorneys.*. (Swindell, Stephen) (Entered: 07/26/2019) |
| 08/07/2019 | 74 | Response to Court's Request/Order . Filed by Kelly Ann Krystyniak of U.S. Department of Justice on behalf of United States. (Krystyniak, Kelly) (Entered: 08/07/2019) |
| 08/09/2019 | 75 | Confidential Motion to supplement *briefing*. Responses due by 8/30/2019. Filed by Alan Hayden Price of Wiley Rein, LLP on behalf of Nucor Corporation. (Attachments: # 1 Proposed Order)(Price, Alan) (Entered: 08/09/2019) |
| 08/12/2019 | 76 | Motion to supplement *briefing* (related document(s) 75 ). Responses due by 8/30/2019. Filed by Alan Hayden Price of Wiley Rein, LLP on behalf of Nucor Corporation. (Attachments: # 1 Proposed Order, # 2 Attachment 1, # 3 Attachment 2)(Price, Alan) Modified on 8/13/2019 (Love, Cynthia). (Entered: 08/12/2019) |
| 08/30/2019 | 77 | Form 18A Notification of Termination of Government Attorney Access to Business Proprietary Information on behalf of . Filed by Natan Pinchas Lyons Tubman of U.S. |

| | | |
|---|---|---|
| | | Department of Commerce on behalf of United States (Tubman, Natan) (Entered: 08/30/2019) |
| 08/30/2019 | 78 | Response to motion *for supplemental briefing* (related document(s) 75 , 76 ). Filed by David Edward Bond of White & Case, LLP on behalf of Ilsenburger Grobblech GmbH, Salzgitter Flachstahl GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Mannesmann International GmbH. (Attachments: # 1 Proposed Order)(Bond, David) Modified on 9/3/2019 (Love, Cynthia). (Entered: 08/30/2019) |
| 08/30/2019 | 79 | Response to motion *to supplement briefing* (related document(s) 75 , 76 ). Filed by Marc Edward Montalbine of deKieffer & Horgan, PLLC on behalf of AG der Dillinger Huttenwerke.(Montalbine, Marc) (Entered: 08/30/2019) |
| 08/30/2019 | 80 | Response to motion *to supplement briefing* (related document(s) 75 , 76 ). Filed by Marc Edward Montalbine of deKieffer & Horgan, PLLC on behalf of Friedr. Lohmann GmbH, thyssenkrupp Steel Europe AG.(Montalbine, Marc) (Entered: 08/30/2019) |
| 09/03/2019 | 81 | Form 11 Notice of Appearance . Filed by Ayat Mujais of U.S. Department of Commerce on behalf of United States.(Mujais, Ayat) (Entered: 09/03/2019) |
| 09/06/2019 | 82 | Order entered on 9/6/2019: ORDERED that Defendant-Intervenor Nucor Corporations motion for supplemental briefing is denied. (Related Doc # 75 );(Related Doc # 76 ). (Love, Cynthia) (Entered: 09/06/2019) |
| 09/06/2019 | 83 | Order entered on 9/6/2019. ORDERED that this action is remanded to Commerce to recalculate the antidumping margin for Salzgitter; it is further ORDERED that Commerce shall file its remand results on or before October 7, 2019; and it is further ORDERED that the parties shall file a proposed scheduling order for comments, if any, on or before October 14, 2019.(Love, Cynthia) (Entered: 09/06/2019) |
| 09/18/2019 | 84 | Motion to clarify (related document(s) 83 ). Responses due by 10/9/2019. Filed by Marc Edward Montalbine of deKieffer & Horgan, PLLC on behalf of Friedr. Lohmann GmbH, thyssenkrupp Steel Europe AG. (Attachments: # 1 Proposed Order)(Montalbine, Marc) (Entered: 09/18/2019) |
| 10/07/2019 | 85 | Remand results filed by U.S. Department of Commerce . Filed by Ayat Mujais of U.S. Department of Commerce on behalf of United States. (Attachments: # 1 Remand Results) (Mujais, Ayat) (Entered: 10/07/2019) |
| 10/09/2019 | 86 | Public Form 11 Notice of Appearance . Filed by Ian Andrew McInerney of U.S. Department of Commerce on behalf of United States.(McInerney, Ian) (Entered: 10/09/2019) |
| 10/09/2019 | 87 | Errata Memorandum . Filed by Tara Kathleen Hogan of U.S. Department of Justice on behalf of United States.(Hogan, Tara) (Entered: 10/09/2019) |
| 10/10/2019 | 88 | Order entered on 10/10/2019. ORDERED that Plaintiffs' motion to clarify the remand order is denied as moot. (Related Doc # 84 ). (Love, Cynthia) (Entered: 10/10/2019) |
| 10/14/2019 | 89 | Proposed scheduling order *for remand redetermination comments*. Filed by David Edward Bond of White & Case, LLP on behalf of Ilsenburger Grobblech GmbH, Salzgitter Flachstahl GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Mannesmann International GmbH. (Attachments: # 1 Proposed Order)(Bond, David) (Entered: 10/14/2019) |
| 10/15/2019 | 90 | Scheduling Order entered on 10/15/2019: The parties shall file any comments in opposition to the agency's Remand Redetermination by November 13, 2019; and the parties shall file responsive comments in support of the agency's Remand Redetermination by December 13, 2019. (Love, Cynthia) (Entered: 10/15/2019) |

| 11/13/2019 | 91 | Form 11 Notice of Appearance . Filed by Roger Brian Schagrin of Schagrin Associates on behalf of SSAB Enterprises LLC.(Schagrin, Roger) (Entered: 11/13/2019) |
|---|---|---|
| 11/13/2019 | 92 | Form 11 Notice of Appearance . Filed by Roger Brian Schagrin of Schagrin Associates on behalf of SSAB Enterprises LLC.(Schagrin, Roger) (Entered: 11/13/2019) |
| 11/13/2019 | 93 | Form 17 Business Proprietary Information Certification filed on behalf of Luke A. Meisner as Attorney/Consultant(s) . Filed by Roger Brian Schagrin of Schagrin Associates on behalf of SSAB Enterprises LLC. (Schagrin, Roger) (Entered: 11/13/2019) |
| 11/13/2019 | 94 | Form 17 Business Proprietary Information Certification filed on behalf of Nicholas J. Birch as Attorney/Consultant(s) . Filed by Roger Brian Schagrin of Schagrin Associates on behalf of SSAB Enterprises LLC. (Schagrin, Roger) (Entered: 11/13/2019) |
| 11/13/2019 | 95 | Unopposed Motion for oral argument on Final Results of Redetermination Pursuant to Court Remand . Responses due by 12/4/2019. Filed by Roger Brian Schagrin of Schagrin Associates on behalf of SSAB Enterprises LLC.(Schagrin, Roger) (Entered: 11/13/2019) |
| 11/13/2019 | 96 | Comments on remand results *opposing*. Filed by Roger Brian Schagrin of Schagrin Associates on behalf of SSAB Enterprises LLC. (Schagrin, Roger) (Entered: 11/13/2019) |
| 11/13/2019 | 97 | Form 11 Notice of Appearance *on behalf of Stephen J. Obermeier, Enbar Toledano, and Douglas C. Dreier*. Filed by Alan Hayden Price of Wiley Rein, LLP on behalf of Nucor Corporation.(Price, Alan) (Entered: 11/13/2019) |
| 11/13/2019 | 98 | Form 17 Business Proprietary Information Certification filed on behalf of Stephen J. Obermeier, Enbar Toledano, and Douglas C. Dreier as Attorney/Consultant(s) . Filed by Alan Hayden Price of Wiley Rein, LLP on behalf of Nucor Corporation. (Price, Alan) (Entered: 11/13/2019) |
| 11/13/2019 | 99 | Confidential Comments on remand results (related document(s) 85 ). Filed by Alan Hayden Price of Wiley Rein, LLP on behalf of Nucor Corporation. (Price, Alan) (Entered: 11/13/2019) |
| 11/14/2019 | 100 | Confidential Revised Comments on remand results (related document(s) 99 ). Filed by Alan Hayden Price of Wiley Rein, LLP on behalf of Nucor Corporation. (Price, Alan) (Entered: 11/14/2019) |
| 11/14/2019 | 101 | Public Comments on remand results (related document(s) 100 ). Filed by Alan Hayden Price of Wiley Rein, LLP on behalf of Nucor Corporation. (Price, Alan) (Entered: 11/14/2019) |
| 12/11/2019 | 102 | Motion for extension of time until 12/18/2019 to *file responsive remand comments*. Responses due by 1/2/2020. Filed by David Edward Bond of White & Case, LLP on behalf of Ilsenburger Grobblech GmbH, Salzgitter Flachstahl GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Mannesmann International GmbH. (Attachments: # 1 Proposed Order)(Bond, David) (Entered: 12/11/2019) |
| 12/11/2019 | 103 | Order entered on 12/11/2019 granting Motion for extension of time (Related Doc # 102 ). Ordered that: Parties should file their responsive comments in support of the agency's Remand Redetermination by December 18, 2019.(Love, Cynthia) (Entered: 12/11/2019) |
| 12/18/2019 | 104 | Reply to comments on remand results (related document(s) 85 , 100 , 101 ). Filed by Kelly Ann Krystyniak of U.S. Department of Justice on behalf of United States. (Krystyniak, Kelly) (Entered: 12/18/2019) |
| 12/18/2019 | 105 | Confidential Reply to comments on remand results *in support of remand determination* (related document(s) 85 , 100 , 101 , 96 , 99 ). Filed by David Edward Bond of White & Case, LLP on behalf of Ilsenburger Grobblech GmbH, Salzgitter Flachstahl GmbH, |

| | | |
|---|---|---|
| | | Salzgitter Mannesmann Grobblech GmbH, Salzgitter Mannesmann International GmbH. (Bond, David) (Entered: 12/18/2019) |
| 12/19/2019 | 106 | Confidential Final Reply to comments on remand results *in support of the remand determination* (related document(s) 85 , 100 , 101 , 105 , 96 , 99 ). Filed by David Edward Bond of White & Case, LLP on behalf of Ilsenburger Grobblech GmbH, Salzgitter Flachstahl GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Mannesmann International GmbH. (Bond, David) (Entered: 12/19/2019) |
| 12/19/2019 | 107 | Public Reply to comments on remand results *in support of the remand determination* (related document(s) 85 , 100 , 101 , 105 , 96 , 99 , 106 ). Filed by David Edward Bond of White & Case, LLP on behalf of Ilsenburger Grobblech GmbH, Salzgitter Flachstahl GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Mannesmann International GmbH. (Bond, David) (Entered: 12/19/2019) |
| 12/20/2019 | 108 | Form 18A Notification of Termination of Government Attorney Access to Business Proprietary Information on behalf of . Filed by James Henry Ahrens, II of U.S. Department of Commerce on behalf of United States (Ahrens, James) (Entered: 12/20/2019) |
| 12/31/2019 | 109 | Motion for extension of time until 1/9/2020 to *file joint appendix*. Responses due by 1/21/2020. Filed by Roger Brian Schagrin of Schagrin Associates on behalf of SSAB Enterprises LLC. (Attachments: # 1 Proposed Order Motion for Extension of Time to File Joint Appendix for Remand Comments) (Schagrin, Roger) (Entered: 12/31/2019) |
| 12/31/2019 | 110 | Order entered on 12/31/2019 granting Motion for extension of time. Parties having submitted comments in opposition to the remand determination shall file a joint index under Rule 56.2(h)(4) of the rules of this Court within seven days of the filing of the index of new administrative record documents. (Related Doc # 109 ). (Goell, Geoffrey) (Entered: 12/31/2019) |
| 01/02/2020 | 111 | Administrative record for U.S. Department of Commerce filed . Filed by Ayat Mujais of U.S. Department of Commerce on behalf of United States. (Attachments: # 1 Declaration, # 2 Remand Index (BPI), # 3 Remand Index (Public))(Mujais, Ayat) (Entered: 01/02/2020) |
| 01/03/2020 | 112 | Telephone Conference set for 1/6/2020 10:30 AM. (Taronji, Steve) (Entered: 01/06/2020) |
| 01/06/2020 | 113 | Telephone Conference held on 1/6/2020 at 10:30 AM in Courtroom 4. (Taronji, Steve) (Entered: 01/06/2020) |
| 01/09/2020 | 114 | Confidential Joint Appendix . Filed by Roger Brian Schagrin of Schagrin Associates on behalf of SSAB Enterprises LLC. (Schagrin, Roger) (Entered: 01/09/2020) |
| 01/09/2020 | 115 | Joint Appendix . Filed by Roger Brian Schagrin of Schagrin Associates on behalf of SSAB Enterprises LLC. (Schagrin, Roger) (Entered: 01/09/2020) |
| 11/10/2020 | 116 | Form 18A Notification of Termination of Government Attorney Access to Business Proprietary Information on behalf of . Filed by Ian Andrew McInerney of U.S. Department of Commerce on behalf of United States (McInerney, Ian) (Entered: 11/10/2020) |
| 07/01/2021 | 117 | Form 18 Notice of Termination of Access to Business Proprietary Information filed on behalf of *Paul W. Jameson*. Filed by Roger Brian Schagrin of Schagrin Associates on behalf of SSAB Enterprises LLC. (Schagrin, Roger) (Entered: 07/01/2021) |
| 08/18/2021 | 118 | Order entered on 8/18/2021 Denying Motion for oral argument. ORDERED that Defendant-Intervenor's motion for oral argument on redetermination is denied. (Related Doc # 95 ). (Chien, Jason) (Entered: 08/18/2021) |

| | | |
|---|---|---|
| 08/18/2021 | [119](#) | Order entered on 8/18/2021, Slip-Op. 21-101: Commerce's Final Determination remanded in part. ORDERED that Commerce address the issues remanded above; and it is further ORDERED that Commerce shall file its remand results on or before November 16, 2021; and it is further ORDERED that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after Commerce files its remand results with the court. (related document(s) [100](#) , [101](#) , [104](#) , [105](#) , [107](#) , [96](#) , [99](#) , [106](#) , [85](#) ). (Chien, Jason) (Entered: 08/18/2021) |
| 08/18/2021 | [120](#) | Order entered on 8/18/2021, Slip-Op. 21-102: Commerce's Final Determination sustained in part. (related document(s) [85](#) , [100](#) , [119](#) , [101](#) , [104](#) , [105](#) , [107](#) , [96](#) , [99](#) , [106](#) ). (Chien, Jason) (Entered: 08/18/2021) |
| 08/18/2021 | [121](#) | Memorandum and Order entered on 8/18/2021: Model Match issue sustained in part with balance of issue stayed pending remand results. ORDERED that Commerce's rejection of Dillinger's proposed quality code for sour vessel plate is sustained; and it is further ORDERED that Dillinger's challenge to Commerce's rejection of Dillinger's proposed quality code for sour transport plate is stayed pending the outcome of the remanded issues pursuant to AG der Dillinger Huttenwerke v. United States, 45 CIT__ Slip-Op. 21-101 (August 18, 2021). (related document(s) [119](#) ) (Chien, Jason) (Entered: 08/18/2021) |
| 08/23/2021 | [122](#) | Errata filed for slip opinion 21-101 . (related document(s) [119](#) ). (Chien, Jason) (Entered: 08/23/2021) |
| 10/22/2021 | [123](#) | **[ENTERED IN ERROR. THIS DOCUMENT IS SUPERSEDED BY THE DOCUMENT AT ECF# 124]** Consent Motion for extension of time until 12/16/2021 to *file remand results*. Responses due by 11/12/2021. Filed by Kelly Ann Krystyniak of U.S. Department of Justice on behalf of United States.(Krystyniak, Kelly) Modified on 10/26/2021 (Chien, Jason). (Entered: 10/22/2021) |
| 10/25/2021 | [124](#) | Consent Motion for extension of time until 12/16/2021 to *file remand results (CORRECTED)*. Responses due by 11/15/2021. Filed by Kelly Ann Krystyniak of U.S. Department of Justice on behalf of United States.(Krystyniak, Kelly) (Entered: 10/25/2021) |
| 10/26/2021 | [125](#) | Order entered on 10/26/2021 granting Defendant's Consent Motion for Extension of Time. ORDERED that the U.S. Department of Commerce ("Commerce") shall file its remand results in this action on or before December 16, 2021; and it is further ORDERED that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after Commerce files its remand results with the court. (Related Doc # [124](#) ). (Chien, Jason) (Entered: 10/26/2021) |
| 11/10/2021 | [126](#) | Form 18 Notice of Termination of Access to Business Proprietary Information filed on behalf of *Douglas C. Dreier*. Filed by Maureen Elizabeth Thorson of Wiley Rein, LLP on behalf of Nucor Corporation. (Thorson, Maureen) (Entered: 11/10/2021) |
| 12/06/2021 | [127](#) | Consent Motion for extension of time until 1/20/2022 to *file remand redetermination*. Responses due by 12/27/2021. Filed by Kelly Ann Krystyniak of U.S. Department of Justice on behalf of United States.(Krystyniak, Kelly) (Entered: 12/06/2021) |
| 12/06/2021 | [128](#) | Order entered on 12/6/2021 granting Consent Motion for Extension of Time. ORDERED that Defendant's Consent Motion for Extension of Time is granted; it is further ORDERED that the U.S. Department of Commerce ("Commerce") shall file its remand results in this action on or before January 20, 2022; and it is further ORDERED that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after Commerce files its remand results with the court. (Related Doc # [127](#) ). (Chien, Jason) (Entered: 12/06/2021) |

| 01/20/2022 | 129 | Confidential Second Remand results filed by U.S. Department of Commerce . Filed by Ayat Mujais of U.S. Department of Commerce on behalf of United States. (Attachments: # 1 Second Remand Results)(Mujais, Ayat) (Entered: 01/20/2022) |
| 01/20/2022 | 130 | Second Remand results filed by U.S. Department of Commerce . Filed by Ayat Mujais of U.S. Department of Commerce on behalf of United States. (Attachments: # 1 Second Remand Results)(Mujais, Ayat) (Entered: 01/20/2022) |
| 01/27/2022 | 131 | Unopposed Proposed scheduling order . Filed by Marc Edward Montalbine of deKieffer & Horgan, PLLC on behalf of Friedr. Lohmann, AG der Dillinger Huttenwerke. (Attachments: # 1 Proposed Order) (Montalbine, Marc) (Entered: 01/27/2022) |
| 01/28/2022 | 132 | Scheduling Order entered on 1/28/2022: Upon consideration of the parties' proposed schedule regarding the remand redetermination filed by the U.S. Department of Commerce ("Commerce") in this action (ECF Nos. 129 &130), and all other papers and proceedings had in this action; and upon due deliberation; it is hereby ORDERED that the parties shall adhere to the following schedule: 1. On or before February 11, 2022, Commerce shall file a certified list and any new administrative record documents or their electronic equivalent; 2. On or before March 15, 2022, the parties may file and serve comments in opposition to Commerce's remand redetermination; 3. On or before April 14, 2022, Defendant and other parties supporting Commerce's redetermination may file and serve responsive comments in support of Commerce's remand redetermination; 4. On or before April 28, 2022, the parties submitting comments in opposition to Commerce's remand redetermination shall file a single join appendix containing a copy of those portions of the administrative record cited in the comments filed by all parties; and 5. No other comments or papers are allowed, except by leave of court. And it is further ORDERED that the parties' comments and responsive comments shall not exceed 10,000 words. If a party files both comments in opposition to Commerce's remand redetermination and responsive comments in support of Commerce's remand redetermination, its remand submissions cumulatively may not exceed 10,000 words. (related document(s) 131 ). (Chien, Jason) (Entered: 01/28/2022) |
| 02/11/2022 | 133 | Administrative record for U.S. Department of Commerce filed . Filed by Ayat Mujais of U.S. Department of Commerce on behalf of United States. (Attachments: # 1 Declaration, # 2 Second Remand Record (Public), # 3 Second Remand Record (BPI))(Mujais, Ayat) (Entered: 02/11/2022) |
| 03/15/2022 | 134 | Comments on remand results . Filed by Marc Edward Montalbine of deKieffer & Horgan, PLLC on behalf of AG der Dillinger Huttenwerke. (Montalbine, Marc) (Entered: 03/15/2022) |
| 03/15/2022 | 135 | Confidential Comments on remand results *(in Opposition to Second Remand Determination)* (related document(s) 129 ). Filed by David Edward Bond of White & Case, LLP on behalf of Ilsenburger Grobblech GmbH, Salzgitter Flachstahl GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Mannesmann International GmbH. (Bond, David) (Entered: 03/15/2022) |
| 03/15/2022 | 136 | Public Comments on remand results *(in Opposition to Second Remand Determination)* (related document(s) 130 , 135 ). Filed by David Edward Bond of White & Case, LLP on behalf of Ilsenburger Grobblech GmbH, Salzgitter Flachstahl GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Mannesmann International GmbH. (Bond, David) (Entered: 03/15/2022) |
| 04/05/2022 | 137 | Form 11 Notice of Appearance *for Merisa A. Horgan*. Filed by Gregory Stephen Menegaz of deKieffer & Horgan, PLLC on behalf of Friedr. Lohmann GmbH, AG der Dillinger Huttenwerke.(Menegaz, Gregory) (Entered: 04/05/2022) |

| 04/05/2022 | 138 | Form 17 Business Proprietary Information Certification filed on behalf of Merisa A. Horgan as Attorney/Consultant(s) . Filed by Gregory Stephen Menegaz of deKieffer & Horgan, PLLC on behalf of Friedr. Lohmann GmbH, AG der Dillinger Huttenwerke. (Menegaz, Gregory) (Entered: 04/05/2022) |
|---|---|---|
| 04/14/2022 | 139 | Confidential Comments on remand results *2nd Remand Results*. Filed by Roger Brian Schagrin of Schagrin Associates on behalf of SSAB Enterprises LLC. (Schagrin, Roger) (Entered: 04/14/2022) |
| 04/14/2022 | 140 | Comments on remand results *2nd Remand Results*. Filed by Roger Brian Schagrin of Schagrin Associates on behalf of SSAB Enterprises LLC. (Schagrin, Roger) (Entered: 04/14/2022) |
| 04/14/2022 | 141 | Confidential Response to Comments on Remand Results (related document(s) 134 , 135 , 136 ). Filed by Kelly Ann Krystyniak of U.S. Department of Justice on behalf of United States. (Krystyniak, Kelly) Modified on 4/14/2022 (Chien, Jason). (Entered: 04/14/2022) |
| 04/14/2022 | 142 | Public Response to Comments on Remand Results (related document(s) 134 , 135 , 136 ). Filed by Kelly Ann Krystyniak of U.S. Department of Justice on behalf of United States. (Krystyniak, Kelly) Modified on 4/14/2022 (Chien, Jason). (Entered: 04/14/2022) |
| 04/14/2022 | 143 | Form 11 Notice of Appearance *for Change of Counsel Address*. Filed by Alan Hayden Price of Wiley Rein, LLP on behalf of Nucor Corporation.(Price, Alan) (Entered: 04/14/2022) |
| 04/14/2022 | 144 | Form 18 Notice of Termination of Access to Business Proprietary Information filed on behalf of *Timothy C. Brightbill and Laura El-Sabaawi*. Filed by Alan Hayden Price of Wiley Rein, LLP on behalf of Nucor Corporation. (Price, Alan) (Entered: 04/14/2022) |
| 04/14/2022 | 145 | Confidential Comments on remand results *in Support of Second Redetermination (bracketing not final)* (related document(s) 129 ). Filed by Alan Hayden Price of Wiley Rein, LLP on behalf of Nucor Corporation. (Price, Alan) (Entered: 04/14/2022) |
| 04/15/2022 | 146 | Confidential Final Comments on remand results *in Support of Second Redetermination* (related document(s) 129 ). Filed by Alan Hayden Price of Wiley Rein, LLP on behalf of Nucor Corporation. (Price, Alan) (Entered: 04/15/2022) |
| 04/15/2022 | 147 | Public Comments on remand results *in Support of Second Redetermination* (related document(s) 146 ). Filed by Alan Hayden Price of Wiley Rein, LLP on behalf of Nucor Corporation. (Price, Alan) (Entered: 04/15/2022) |
| 04/28/2022 | 148 | Confidential Joint Appendix . Filed by Marc Edward Montalbine of deKieffer & Horgan, PLLC on behalf of AG der Dillinger Huttenwerke. (Montalbine, Marc) (Entered: 04/28/2022) |
| 04/28/2022 | 149 | Joint Appendix *Public* (related document(s) 148 ). Filed by Marc Edward Montalbine of deKieffer & Horgan, PLLC on behalf of AG der Dillinger Huttenwerke. (Montalbine, Marc) (Entered: 04/28/2022) |
| 05/06/2022 | 150 | Unopposed Motion for oral argument on remand redetermination . Responses due by 5/27/2022. Filed by Marc Edward Montalbine of deKieffer & Horgan, PLLC on behalf of AG der Dillinger Huttenwerke. (Attachments: # 1 Proposed Order) (Montalbine, Marc) Modified on 5/6/2022 (Chien, Jason) (Entered: 05/06/2022) |
| 09/23/2022 | 151 | Order entered on 9/23/2022 Denying Motion for oral argument. Upon consideration of the unopposed motion for oral argument filed by Plaintiff AG der Dillinger Hüttenwerke ("Dillinger"), ECF No. 150, all other papers and proceedings had in this action; and upon |

| | | due deliberation, it is hereby ORDERED that Dillinger's unopposed motion for oral argument is denied. (Related Doc # 150 ). (Chien, Jason) (Entered: 09/23/2022) |
|---|---|---|
| 09/23/2022 | 152 | Memorandum and Order entered on 9/23/2022, Slip-Op. 22-114: Remanding Commerce's Second Remand Results. ORDERED that this action is remanded to Commerce; it is further ORDERED that Commerce shall file its remand results on or before December 15, 2022; and it is further ORDERED that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after Commerce files its remand results with the court. (related document(s) 130 , 129 ). (Chien, Jason) (Entered: 09/23/2022) |
| 12/15/2022 | 153 | Third Remand results filed by U.S. Department of Commerce . Filed by Ayat Mujais of U.S. Department of Commerce on behalf of United States. (Attachments: # 1 Third Remand Results)(Mujais, Ayat) (Entered: 12/15/2022) |
| 12/22/2022 | 154 | Unopposed Proposed scheduling order . Filed by Marc Edward Montalbine of deKieffer & Horgan, PLLC on behalf of Friedr. Lohmann GmbH, AG der Dillinger Huttenwerke. (Attachments: # 1 Proposed Order)(Montalbine, Marc) (Entered: 12/22/2022) |
| 12/29/2022 | 155 | Administrative record for U.S. Department of Commerce filed . Filed by Ayat Mujais of U.S. Department of Commerce on behalf of United States. (Attachments: # 1 Declaration, # 2 Third Remand Record Index (Public), # 3 Third Remand Record Index (BPI))(Mujais, Ayat) (Entered: 12/29/2022) |
| 12/30/2022 | 156 | *Teams Conference Call set for Wednesday, January 4, 2023 at 10:00 a.m..* (Chien, Jason) (Entered: 12/30/2022) |
| 01/04/2023 | 157 | Conference Call held on 1/4/2023 at 10:30 a.m. in Offsite via Microsoft Teams. *Appearance Sheet attached.* (Chien, Jason) (Entered: 01/04/2023) |
| 01/04/2023 | 158 | Scheduling Order entered on 1/4/2023: Upon consideration of the parties' proposed scheduling order for comments on the U.S. Department of Commerce's remand determination; upon consultation with the parties; upon all other papers and proceedings had in this action; and upon due deliberation, it is hereby ORDERED that the schedule for proceedings on remand will be as follows: 1. Plaintiff AG der Dillinger Hüttenwerke's comments on the remand redetermination due on or before February 6, 2023. 2. Defendant's response to comments on the remand redetermination due on or before March 8, 2023. 3. Defendant-Intervenor Nucor Corporation's response to comments on the remand redetermination due on or before March 15, 2023. 4. Joint Appendix due on or before March 29, 2023. 5. Motion for Oral Argument, if any, due on or before April 5, 2023. (PLEASE SEE ORDER FOR FULL DETAILS) (related document(s) 154 ) (Chien, Jason) (Entered: 01/04/2023) |
| 02/01/2023 | 159 | Consent Motion for extension of time until 2/21/2023 to *file comments on remand redetermination*. Responses due by 2/22/2023. Filed by Marc Edward Montalbine of deKieffer & Horgan, PLLC on behalf of AG der Dillinger Huttenwerke. (Attachments: # 1 Proposed Order) (Montalbine, Marc) (Entered: 02/01/2023) |
| 02/02/2023 | 160 | Order entered on 2/2/2023 granting Consent Motion for extension of time: 1. Plaintiff AG der Dillinger Hüttenwerke's comments on the remand redetermination shall be due on or before February 21, 2023; 2. Defendant's response to comments on the remand redetermination shall be due on or before March 23, 2023; 3. Defendant-Intervenor Nucor Corporation's response to comments on the remand redetermination shall be due on or before March 30, 2023; 4. The Joint Appendix shall be due on or before April 13, 2023; and 5. Motion for Oral Argument, if any, shall be due on or before April 20, 2023. (Related Doc # 159 ). (Hugh, Lewis) (Entered: 02/02/2023) |

| 02/21/2023 | 161 | **[ENTERED IN ERROR. THIS DOCUMENT IS SUPERSEDED BY THE DOCUMENT AT ECF# 164]** Letter *Change of Address*. Filed by Marc Edward Montalbine of deKieffer & Horgan, PLLC on behalf of Friedr. Lohmann GmbH, AG der Dillinger Huttenwerke. (Montalbine, Marc) Modified on 2/21/2023 (Chien, Jason). (Entered: 02/21/2023) |
| 02/21/2023 | 162 | **[ENTERED IN ERROR. THIS DOCUMENT IS SUPERSEDED BY THE DOCUMENT AT ECF# 165]** Confidential Comments on remand results *in opposition to redetermination* (related document(s) 153 ). Filed by Marc Edward Montalbine of deKieffer & Horgan, PLLC on behalf of AG der Dillinger Huttenwerke. (Montalbine, Marc) Modified on 2/21/2023 (Chien, Jason). (Entered: 02/21/2023) |
| 02/21/2023 | 163 | **[ENTERED IN ERROR. THIS DOCUMENT IS SUPERSEDED BY THE DOCUMENT AT ECF# 166]** Public Comments on remand results *in opposition to redetermination* (related document(s) 162 , 153 ). Filed by Marc Edward Montalbine of deKieffer & Horgan, PLLC on behalf of AG der Dillinger Huttenwerke. (Montalbine, Marc) Modified on 2/21/2023 (Chien, Jason). (Entered: 02/21/2023) |
| 02/21/2023 | 164 | Corrected Letter *Change of Address*. Filed by Marc Edward Montalbine of deKieffer & Horgan, PLLC on behalf of Friedr. Lohmann GmbH, AG der Dillinger Huttenwerke. (Montalbine, Marc) Modified on 2/21/2023 (Chien, Jason). (Entered: 02/21/2023) |
| 02/21/2023 | 165 | Corrected Confidential Comments on remand results *in opposition to redetermination* (related document(s) 153 ). Filed by Marc Edward Montalbine of deKieffer & Horgan, PLLC on behalf of AG der Dillinger Huttenwerke. (Montalbine, Marc) Modified on 2/21/2023 (Chien, Jason). (Entered: 02/21/2023) |
| 02/21/2023 | 166 | Corrected Public Comments on remand results *in opposition to redetermination* (related document(s) 165 , 153 ). Filed by Marc Edward Montalbine of deKieffer & Horgan, PLLC on behalf of AG der Dillinger Huttenwerke. (Montalbine, Marc) Modified on 2/21/2023 (Chien, Jason). (Entered: 02/21/2023) |
| 02/22/2023 | 167 | Form 11 Notice of Appearance *of Kara M. Westercamp*. Filed by Kara Marie Westercamp of U.S. Department of Justice on behalf of United States.(Westercamp, Kara) (Entered: 02/22/2023) |
| 03/23/2023 | 168 | **[ENTERED IN ERROR. THIS DOCUMENT IS SUPERSEDED BY THE DOCUMENT AT ECF# 169]** Public Reply to comments on remand results *in support of the third remand redetermination* (related document(s) 166 , 153 ). Filed by Kara Marie Westercamp of U.S. Department of Justice on behalf of United States. (Westercamp, Kara) Modified on 3/27/2023 (Chien, Jason). (Entered: 03/23/2023) |
| 03/24/2023 | 169 | Public Reply to comments on remand results *in support of the third remand redetermination (with corrected case number)* (related document(s) 166 , 168 , 153 ). Filed by Kara Marie Westercamp of U.S. Department of Justice on behalf of United States. (Westercamp, Kara) (Entered: 03/24/2023) |
| 03/30/2023 | 170 | **[ENTERED IN ERROR. THIS DOCUMENT IS SUPERSEDED BY THE DOCUMENT AT ECF# 171]** Confidential Comments on remand results *(Bracketing Not Final)* (related document(s) 153 ). Filed by Alan Hayden Price of Wiley Rein, LLP on behalf of Nucor Corporation. (Price, Alan) Modified on 3/31/2023 (Chien, Jason). Modified on 4/3/2023 (Chien, Jason). (Entered: 03/30/2023) |
| 03/31/2023 | 171 | Confidential Final Comments on remand results *(Bracketing Final)* (related document(s) 170 ). Filed by Alan Hayden Price of Wiley Rein, LLP on behalf of Nucor Corporation. (Price, Alan) Modified on 4/3/2023 (Chien, Jason). (Entered: 03/31/2023) |

| 03/31/2023 | [172](#) | Public Comments on remand results (related document(s) [171](#) ). Filed by Alan Hayden Price of Wiley Rein, LLP on behalf of Nucor Corporation. (Price, Alan) (Entered: 03/31/2023) |
|---|---|---|
| 04/13/2023 | [173](#) | Confidential Joint Appendix . Filed by Marc Edward Montalbine of deKieffer & Horgan, PLLC on behalf of AG der Dillinger Huttenwerke. (Montalbine, Marc) (Entered: 04/13/2023) |
| 04/13/2023 | [174](#) | Joint Appendix *Public* (related document(s) [173](#) ). Filed by Marc Edward Montalbine of deKieffer & Horgan, PLLC on behalf of AG der Dillinger Huttenwerke. (Montalbine, Marc) (Entered: 04/13/2023) |
| 04/18/2023 | [175](#) | Form 11 Notice of Appearance *Jeffrey D. Gerrish*. Filed by Roger Brian Schagrin of Schagrin Associates on behalf of SSAB Enterprises LLC.(Schagrin, Roger) (Entered: 04/18/2023) |
| 04/18/2023 | [176](#) | Form 17 Business Proprietary Information Certification filed on behalf of Jeffrey D. Gerrish as Attorney/Consultant(s) . Filed by Roger Brian Schagrin of Schagrin Associates on behalf of SSAB Enterprises LLC. (Schagrin, Roger) (Entered: 04/18/2023) |
| 04/20/2023 | [177](#) | Unopposed Motion for oral argument on Remand Redetermination . Responses due by 5/11/2023. Filed by Marc Edward Montalbine of deKieffer & Horgan, PLLC on behalf of AG der Dillinger Huttenwerke. (Attachments: # [1](#) Proposed Order) (Montalbine, Marc) (Entered: 04/20/2023) |
| 04/26/2023 | [178](#) | Order entered on 4/26/2023 granting Unopposed Motion for Oral Argument. Upon consideration of Plaintiff's Unopposed Motion for Oral Argument, upon consultation with the parties, and all other papers and proceedings had in this action; and upon due deliberation, it is hereby ORDERED that Plaintiff's Unopposed Motion for Oral Argument is granted; and it is further ORDERED that Oral Argument in this action shall take place on Tuesday, May 9, 2023 commencing at 2:30 p.m. EST in Courtroom 4 of the U.S. Court of International Trade. (Related Doc # [177](#) ) (Chien, Jason) (Entered: 04/26/2023) |
| 05/02/2023 | [179](#) | Form 17 Business Proprietary Information Certification filed on behalf of David Albright as Attorney/Consultant(s) . Filed by Roger Brian Schagrin of Schagrin Associates on behalf of SSAB Enterprises LLC. (Schagrin, Roger) (Entered: 05/02/2023) |
| 05/09/2023 | [180](#) | Oral Argument held on 5/9/2023 at 2:00 p.m. in Courtroom 4. *Appearance Sheet attached*. (Chien, Jason) (Entered: 05/09/2023) |
| 05/18/2023 | [181](#) | **[ENTERED IN ERROR. THIS DOCUMENT IS SUPERSEDED BY THE DOCUMENT AT ECF# 182]** Form 18 Notice of Termination of Access to Business Proprietary Information filed on behalf of . Filed by John Joseph Kenkel of deKieffer & Horgan, PLLC on behalf of All Plaintiffs. (Kenkel, John) Modified on 5/23/2023 (Chien, Jason). (Entered: 05/18/2023) |
| 05/23/2023 | [182](#) | Corrected Form 18 Notice of Termination of Access to Business Proprietary Information filed on behalf of . Filed by John Joseph Kenkel of deKieffer & Horgan, PLLC on behalf of AG der Dillinger Huttenwerke. (Kenkel, John) Modified on 5/23/2023 (Chien, Jason). (Entered: 05/23/2023) |
| 06/23/2023 | [183](#) | Order entered on 6/23/2023, Slip-Op. 23-94: Commerce's application of facts otherwise available to Dillinger and partial adverse facts available to Salzgitter sustained; Commerce's application of its model-match methodology remanded. ORDERED that Commerce's determinations as to the cost adjustments for Dillinger's non-prime plate, as well as the application of partial AFA to Salzgitter, are sustained; it is further ORDERED that Commerce's determination to reject Dillinger's proposed quality code for sour |

| | | |
|---|---|---|
| | | transport plate is remanded for further explanation, and if appropriate, reconsideration; it is further ORDERED that Commerce shall file its remand results on or before September 7, 2023; and it is further ORDERED that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after Commerce files its remand results with the court. (related document(s) 153 ) (Chien, Jason) (Entered: 06/23/2023) |
| 09/07/2023 | 184 | Fourth Remand results filed by U.S. Department of Commerce . Filed by Ayat Mujais of U.S. Department of Commerce on behalf of United States. (Attachments: # 1 Fourth Remand Results)(Mujais, Ayat) (Entered: 09/07/2023) |
| 09/14/2023 | 185 | Consent Proposed Scheduling Order . Filed by Marc Edward Montalbine of deKieffer & Horgan, PLLC on behalf of Friedr. Lohmann GmbH, AG der Dillinger Huttenwerke. (Attachments: # 1 Proposed Order) (Montalbine, Marc) Modified on 9/14/2023 (Chien, Jason) (Entered: 09/14/2023) |
| 09/15/2023 | 186 | Scheduling Order entered on 9/15/2023: Upon consideration of the parties' proposed schedule concerning the remand redetermination filed by the U.S. Department of Commerce ("Commerce") in this action on September 7, 2023 (ECF # 184), it is hereby ORDERED that the following schedule is established: 1. Within 14 days of the date of entry of the Court's scheduling order, the agency must file a certified list and any new administrative record documents or their electronic equivalent; 2. Parties may file and serve comments in opposition to the agency's remand redetermination within 30 days after the date of entry of the Court's scheduling order; 3. The defendant and other parties supporting the agency's redetermination may file and serve responsive comments in support of the agency's remand redetermination within 30 days after the filing of the comments in opposition to the agency's remand redetermination. Where two or more parties file comments in opposition to the agency's remand redetermination, the due date for responsive comments in support of the agency's redetermination will be governed by the latest filing date of comments in opposition to the agency's remand redetermination; 4. Within 14 days of the date of filing of responsive comments in support of the agency's redetermination, the parties submitting comments in opposition to the agency's remand redetermination must file a single joint appendix containing a copy of those portions of the administrative record cited in the comments filed by all parties; and 5. No other comments or papers are allowed, except by leave of court, and it is further ORDERED that parties' comments and responsive comments shall not exceed 3,000 words. If a party files both comments in opposition to the agency's remand redetermination and responsive comments in support of the agency's remand redetermination, its remand submissions cumulatively may not exceed 5,000 words. SO ORDERED. (related document(s) 185 ) (Chien, Jason) (Entered: 09/15/2023) |
| 09/21/2023 | 187 | Administrative record for U.S. Department of Commerce filed . Filed by Ayat Mujais of U.S. Department of Commerce on behalf of United States. (Attachments: # 1 Declaration, # 2 Fourth Remand Record Index (Public), # 3 Fourth Remand Record Index (BPI)) (Mujais, Ayat) (Entered: 09/21/2023) |
| 09/26/2023 | 188 | Unopposed Motion to Sever *and Enter Final Judgment*. Responses due by 10/17/2023. Filed by David Edward Bond of White & Case, LLP on behalf of Ilsenburger Grobblech GmbH, Salzgitter Flachstahl GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Mannesmann International GmbH. (Attachments: # 1 Proposed Order)(Bond, David) Modified on 9/26/2023 (Chien, Jason). (Entered: 09/26/2023) |
| 09/27/2023 | 189 | *Teams Conference Call set for Thursday, September 28, 2023 at 11:00 a.m..* (Chien, Jason) (Entered: 09/27/2023) |
| 09/28/2023 | 190 | Conference Call held on 9/28/2023 at 11:00 a.m. in Offsite via Microsoft Teams. |

| | | *Appearance Sheet attached*. (Chien, Jason) (Entered: 09/28/2023) |
|---|---|---|
| 09/28/2023 | [191](#) | Order entered on 9/28/2023 Denying Motion to Sever and Enter Final Judgment. Upon consideration of Plaintiffs Ilsenburger Grobblech GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Flachstahl GmbH, and Salzgitter Mannesmann International GmbH's ("Salzgitter") Motion to Server and Enter Final Judgment ("Salzgitter's Motion"), and all other papers and proceedings had in this action; upon consultation with the parties; and upon due deliberation, it is hereby ORDERED that Salzgitter's Motion is denied without prejudice. (Related Doc # [188](#) ) (Chien, Jason) (Entered: 09/28/2023) |
| 10/16/2023 | [192](#) | Comments on remand results *in partial opposition to redetermination* (related document(s) [184](#) ). Filed by Marc Edward Montalbine of deKieffer & Horgan, PLLC on behalf of AG der Dillinger Huttenwerke. (Montalbine, Marc) (Entered: 10/16/2023) |
| 10/16/2023 | [193](#) | Comments on remand results (related document(s) [184](#) ). Filed by Alan Hayden Price of Wiley Rein, LLP on behalf of Nucor Corporation. (Price, Alan) (Entered: 10/16/2023) |
| 10/19/2023 | [194](#) | Consolidated Motion for partial summary judgment *(Partial Final Judgment)*. Response to Dispositive Motion due by 11/24/2023. Filed by David Edward Bond of White & Case, LLP on behalf of Ilsenburger Grobblech GmbH, Salzgitter Flachstahl GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Mannesmann International GmbH. (Attachments: # [1](#) Proposed Order)(Bond, David) Modified on 11/15/2023 (Chien, Jason). (Entered: 10/19/2023) |
| 10/27/2023 | 195 | *Teams Conference Call set for Tuesday, October 31, 2023 at 2:30 p.m..* (Chien, Jason) (Entered: 10/27/2023) |
| 10/31/2023 | [196](#) | Conference Call held on 10/31/2023 at 2:30 p.m. in Offsite via Microsoft Teams. *Appearance Sheet attached*. (Chien, Jason) (Entered: 10/31/2023) |
| 11/15/2023 | [197](#) | Order entered on 11/15/2023 Slip Op. 23-160: ORDERED that Salzgitter's motion for partial judgment pursuant to USCIT Rule 54(b) is granted. (related document(s) [194](#) ) (Hugh, Lewis) (Entered: 11/15/2023) |
| 11/15/2023 | [198](#) | Judgment entered on 11/15/2023: ORDERED that the Final Determination is sustained, except for the matter covered by the Final Results of Redetermination ("Second Remand Results"), ECF No. 129, filed pursuant to AG der Dillinger Hüttenwerke v. United States, 45 CIT ___, 534 F. Supp. 3d 1403 (2021); and it is further ORDERED that the Second Remand Results are sustained. (related document(s) [197](#) ) (Hugh, Lewis) (Entered: 11/15/2023) |
| 11/15/2023 | [199](#) | Public Reply to comments on remand results (related document(s) [193](#) , [184](#) , [192](#) ). Filed by Kara Marie Westercamp of U.S. Department of Justice on behalf of United States. (Westercamp, Kara) (Entered: 11/15/2023) |
| 11/15/2023 | [200](#) | Comments on remand results *in partial support of redetermination* (related document(s) [184](#) ). Filed by Marc Edward Montalbine of deKieffer & Horgan, PLLC on behalf of AG der Dillinger Huttenwerke. (Montalbine, Marc) (Entered: 11/15/2023) |
| 11/15/2023 | [201](#) | Comments on remand results (related document(s) [184](#) ). Filed by Alan Hayden Price of Wiley Rein, LLP on behalf of Nucor Corporation. (Price, Alan) (Entered: 11/15/2023) |
| 11/28/2023 | [202](#) | Notice of Appeal of Judgment/Order of 11/15/2023 filed. (related document(s) [198](#) , [197](#) ). Filed by David Edward Bond of White & Case, LLP on behalf of Ilsenburger Grobblech GmbH, Salzgitter Flachstahl GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Mannesmann International GmbH.(Bond, David) (Entered: 11/28/2023) |

| 11/29/2023 | 203 | Confidential Joint Appendix *for 4th Remand Results*. Filed by James Kevin Horgan of deKieffer & Horgan, PLLC on behalf of AG der Dillinger Huttenwerke. (Horgan, James) (Entered: 11/29/2023) |
|---|---|---|
| 11/29/2023 | 204 | Joint Appendix *for 4th Remand Results* (related document(s) 203 ). Filed by James Kevin Horgan of deKieffer & Horgan, PLLC on behalf of AG der Dillinger Huttenwerke. (Horgan, James) (Entered: 11/29/2023) |
| 12/05/2023 | 205 | Appeal of *Slip Op. 23-160 & Judgment* docketed on 12/4/2023 by the CAFC as appeal no. 2024-1219 (related document(s) 202 ). (Almonte, Giselle) (Entered: 12/05/2023) |
| 12/06/2023 | 206 | Unopposed Motion for oral argument on Remand Redetermination . Responses due by 12/27/2023. Filed by Marc Edward Montalbine of deKieffer & Horgan, PLLC on behalf of AG der Dillinger Huttenwerke. (Attachments: # 1 Proposed Order) (Montalbine, Marc) (Entered: 12/06/2023) |
| 12/21/2023 | 207 | Order entered on 12/21/2023 denying unopposed motion for oral argument. ORDERED that Dillinger's unopposed motion for oral argument is denied. (Related Doc # 206 ). (Almonte, Giselle) (Entered: 12/21/2023) |
| 12/21/2023 | 208 | Order entered on 12/21/2023: Slip-Op. 23-187: Commerce's Fourth Remand Results sustained. For the foregoing reasons, Commerce's <u>Fourth Remand Results</u> are sustained. Judgment will enter accordingly. (related document(s) 184 ) (Almonte, Giselle) (Entered: 12/21/2023) |
| 12/21/2023 | 209 | Judgment entered on 12/21/2023 for Slip-Op. 23-187: This action having been submitted for decision, and the court after due deliberation having rendered opinions; now in conformity with those opinions, it is hereby ORDERED that the final determination in the antidumping duty investigation covering <u>Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany</u>, 82 Fed. Reg. 16,360 (Dep't of Commerce Apr. 4, 2017) is sustained, except for the matters covered by the Final Results of Redetermination ("<u>First Remand Results</u>"), ECF No. 85, filed pursuant to <u>AG der Dillinger Huttenwerke v. United States</u>, 43 CIT ___, 399 F. Supp. 3d 1247 (2019); it is further ORDERED that the <u>First Remand Results</u> are sustained, except for the matters covered by the Final Results of Redetermination ("<u>Second Remand Results</u>"), ECF No. 129, filed pursuant to <u>AG der Dillinger Huttenwerke v. United States</u>, 45 CIT ___, 534 F. Supp. 3d 1403 (2021); it is further ORDERED that the <u>Second Remand Results</u> are sustained, except for the matters covered by the Final Results of Redetermination ("<u>Third Remand Results</u>"), ECF No. 153, filed pursuant to <u>AG der Dillinger Huttenwerke v. United States</u>, 46 CIT ___, 592 F. Supp. 3d 1344 (2022); it is further ORDERED that the <u>Third Remand Results</u> are sustained, except for the matter covered by the Final Results of Redetermination ("<u>Fourth Remand Results</u>"), ECF No. 184, filed pursuant to <u>AG der Dillinger Huttenwerke v. United States</u>, 47 CIT ___, 648 F. Supp. 3d 1321 (2023); and it is further ORDERED that the <u>Fourth Remand Results</u> are sustained. (related document(s) 208 ).(Almonte, Giselle) (Entered: 12/21/2023) |
| 02/13/2024 | 210 | Notice of Appeal of judgment/order of 12/21/2023 filed. (related document(s) 119 , 183 , 209 , 152 , 72 , 208 ). Filed by Marc Edward Montalbine of deKieffer & Horgan, PLLC on behalf of AG der Dillinger Huttenwerke.(Montalbine, Marc) (Entered: 02/13/2024) |
| 02/20/2024 | 211 | Appeal of *Slip Op. 23-187 & Judgment* docketed on 2/20/2024 by the CAFC as appeal no. 2024-1498 (related document(s) 210 ). (Almonte, Giselle) (Entered: 02/20/2024) |
| 02/27/2024 | 212 | Form 11 Notice of Appearance *Saad Y. Chalchal*. Filed by Roger Brian Schagrin of Schagrin Associates on behalf of SSAB Enterprises LLC.(Schagrin, Roger) (Entered: 02/27/2024) |

| 02/27/2024 | [213](#) | Form 17 Business Proprietary Information Certification filed on behalf of Saad Y. Chalchal as Attorney/Consultant(s) . Filed by Roger Brian Schagrin of Schagrin Associates on behalf of SSAB Enterprises LLC. (Schagrin, Roger) (Entered: 02/27/2024) |
|---|---|---|

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/27/2024 12:28:20 | | | |
| **PACER Login:** | montalbine | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:17-cv-00158-LMG |
| **Billable Pages:** | 26 | **Cost:** | 2.60 |

**FORM 19. Certificate of Compliance with Type-Volume Limitations**

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 24-1498

**Short Case Caption:** AG der Dillinger Huttenwerke v. US

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

[✓] the filing has been prepared using a proportionally-spaced typeface and includes 12,978 words.

[ ] the filing has been prepared using a monospaced typeface and includes _____ lines of text.

[ ] the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 06/21/2024

Signature: /s/ Marc E. Montalbine

Name: Marc E. Montalbine

Save for Filing