## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

AG DER DILLINGER HUTTENWERKE,

*Plaintiff-Appellant,*

ILSENBURGER GROBBLECH GMBH, SALZGITTER FLACHSTAHL GMBH, SALZGITTER MANNESMANN GROBBLECH GMBH, SALZGITTER MANNESMANN INTERNATIONAL GMBH, FRIEDR. LOHMANN GMBH, THYSSENKRUPP STEEL EUROPE AG,

*Plaintiffs,*

v.

UNITED STATES, SSAB ENTERPRISES LLC, NUCOR CORPORATION,

*Defendants – Appellees*

Appeal from the United States Court of International Trade in
Case No. 1:17-cv-00158, Senior Judge Leo M. Gordon

**RESPONSE BRIEF OF DEFENDANT-APPELLEES
NUCOR CORPORATION AND SSAB ENTERPRISES LLC**

Alan H. Price, Esq.
Christopher B. Weld, Esq.
Stephanie M. Bell, Esq.

**WILEY REIN LLP**
2050 M. Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Nucor Corporation*

Roger B. Schagrin, Esq.
Jeffrey D. Gerrish, Esq.

**SCHAGRIN ASSOCIATES**
900 Seventh Street, NW
Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel to SSAB Enterprises LLC*

Dated: August 16, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2024-1498 |
| **Short Case Caption** | AG der Dillinger Huttenwerke v. United States |
| **Filing Party/Entity** | Nucor Corporation - Defendant-Appellee |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 03/04/2024

Signature: /s/ Alan H. Price

Name: Alan H. Price

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Nucor Corporation | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐  Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable                    ☐   Additional pages attached

| | | |
|---|---|---|
| Douglas Charles Dreier | Tessa V. Capeloto | |
| Timothy C.  Brightbill | Adam M. Teslik | |
| Laura El-Sabaawi | Stephen J. Obermeier | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)   ☑   No   ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable                    ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 24-1498 |
| **Short Case Caption** | AG der Dillinger Huttenwerke v. US |
| **Filing Party/Entity** | SSAB Enterprises LLC |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 03/05/2024

Signature: /s/ Roger B. Schagrin

Name: Roger B. Schagrin

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| SSAB Enterprises LLC | | SSAB Enterprises LLC is a subsidiary of SSAB AB which is a publicly traded company on the NASDAQ OMX Stockholm with a secondary listing on the NASDAQ OMX Helsinki |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENS

Page

I. INTRODUCTION .................................................................. 1

II. STATEMENT OF RELATED CASES .......................................... 1

III. STATEMENT OF THE ISSUE .................................................. 1

IV. STATEMENT OF THE CASE .................................................. 2

V. SUMMARY OF THE ARGUMENT ............................................ 8

VI. STANDARD OF REVIEW ...................................................... 10

VII. ARGUMENT......................................................................... 11

    A. Commerce Properly Rejected Dillinger's Proposed Quality Code for Sour Service Pressure Vessel Plate ........................ 11

        1. Dillinger's Proposed Quality Code for Sour Service Pressure Vessel Plate Was Properly Rejected as Untimely.................................................................... 11

        2. Commerce's Determination Complies with 19 U.S.C. § 1677m(d). ................................................ 16

        3. Commerce Did Not Apply Disparate Treatment to Dillinger .................................................................. 18

    B. Commerce Properly Applied Facts Available to Determine Dillinger's Costs.................................................................... 20

        1. Commerce's Decision to Rely on Dillinger's Books and Records as Facts Available Instead of Dillinger's Estimated Costs Is In Accordance With Law.......................................................................... 22

        2. Commerce's Selection of Facts Available Is Supported by the Record.......................................... 26

        3. Commerce Was Not Required to Use Dillinger's Cost Estimates.......................................................... 29

VIII. CONCLUSION ...................................................................... 33

## **CONFIDENTIAL MATERIAL OMITTED**

The material omitted on lines 12-15 of page 28 describes certain aspects of a company's cost reporting.

**Cases**

*Ala. Aircraft Indus., Inc. v. United States*,
    586 F.3d 1372 (Fed. Cir. 2009) ........................................................31

*Bohler Bleche GmbH v. United States*,
    324 F. Supp. 3d 1344 (Ct. Int'l Trade 2018) ...........................9, 12, 15

*Carbon Activated Tianjin Co. v. United States*,
    No. 2022-1298, 2023 WL 3166188 (Fed. Cir. May 1, 2023)............17

*Dillinger France S.A. v. United States*,
    981 F.3d 1318 (Fed. Cir. 2020) ........................................................25

*Dillinger France S.A. v. United States*,
    No. 17-00159, slip op. 22-97 (Ct. Int'l Trade Aug. 18, 2022) ..............25, 26, 31

*Fujitsu Gen. Ltd. v. United States*,
    88 F.3d 1034 (Fed. Cir. 1996) ....................................................11, 17

*Hitachi Energy USA Inc. v. United States*,
    34 F.4th 1375 (Fed. Cir. 2022) .........................................................18

*IPSCO v. United States*,
    965 F.2d 1056 (Fed. Cir. 1992) ........................................................25

*JTEKT Corp. v. United States*,
    37 F. Supp. 3d 1326 (Ct. Int'l Trade 2014) ......................................14

*Loper Bright Enters. v. Raimondo*,
    603 U.S. __ (2024) (slip op. June 28, 2024).....................................10

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.
    Co.*, 463 U.S. 29 (1983) ............................................................21, 31

*Nexteel Co. v. United States*,
    601 F. Supp. 3d 1373 (Ct. Int'l Trade 2022) ....................................29

*SKF USA Inc. v. United States*,
    630 F.3d 1365 (Fed. Cir. 2011) ........................................................21

*U.S. Steel Corp. v. United States*,
    953 F. Supp. 2d 1332 (Ct. Int'l Trade 2013) ....................................................21

*Zhaoqing New Zhongya Aluminum Co. v. United States*,
    887 F. Supp. 2d 1301 (Ct. Int'l Trade 2012) ....................................................21

**Statutes**

19 U.S.C. § 1677e(a)......................................................................................30

19 U.S.C. § 1677m(d) .....................................................................................16

**Other Authorities**

Fed. Cir. R. 28(b) .............................................................................................1

Uruguay Round Agreements Act, Statement of Administrative Action,
    H.R. Doc. No. 103-316, vol. 1 (1994), *reprinted in* 1994
    U.S.C.C.A.N. 4040 .......................................................................................30

# I.    INTRODUCTION

On behalf of Defendant-Appellees Nucor Corporation ("Nucor") and SSAB Enterprises LLC ("SSAB") we respectfully submit this response to the June 21, 2024 opening brief filed by Plaintiff-Appellant AG der Dillinger Hüttenwerke ("Dillinger"). *See* Br. of Pl.-Appellant AG der Dillinger Hüttenwerke (June 21, 2024), ECF No. 19 ("Dillinger Br.").

# II.    STATEMENT OF RELATED CASES

There is no appeal in or from the same civil action or proceeding in the lower court that was previously before this or any other appellate court. However, the Court has determined that this proceeding and Appeal No. 2024-1219 shall be considered companion cases and assigned to the same merits panel. This case and Appeal No. 2024-1219 arise from the same civil action but concern different issues on appeal.

# III.    STATEMENT OF THE ISSUE[1]

Whether the U.S. Department of Commerce's ("Commerce") rejection of Dillinger's proposed quality code for sour service pressure vessel plate was supported by substantial evidence and otherwise in accordance with law given that Dillinger did not timely raise this proposal and provided only limited explanation.

---

[1]    Nucor and SSAB agree with the jurisdictional statement provided by Dillinger and therefore do not provide a separate statement of jurisdiction, pursuant to Fed. Cir. R. 28(b).

Whether Commerce's reliance on Dillinger's normal books and record as facts available to account for the costs of producing non-prime plate was supported by substantial evidence and otherwise in accordance with law.

## IV.   **STATEMENT OF THE CASE**

This appeal arises from Commerce's final determination in its antidumping duty investigation of certain carbon and alloy steel cut-to-length plate from the Federal Republic of Germany. *See* Appx9-12; Appx5882-5981. The U.S. Court of International Trade's ("CIT") opinion sustaining Commerce's determination to reject Dillinger's proposal for a separate quality code for sour service pressure vessel plate was published in *AG der Dillinger Hüttenwerke v. United States*, Memorandum and Order (Ct. Int'l Trade Aug. 18, 2021), Appx32-40. The CIT's opinion sustaining Commerce's selection of facts available for determining the costs of non-prime plate was published in *AG der Dillinger Hüttenwerke v. United States*, 648 F. Supp. 3d 1321 (Ct. Int'l Trade 2023), Appx128-155.

In the subject antidumping duty investigation, Commerce selected Dillinger as a mandatory respondent. *See* Appx5882. Consistent with its normal practice in investigations, prior to issuing questionnaires to the mandatory respondents, Commerce solicited comments from the parties on the physical characteristics to be used to develop control numbers ("CONNUMs") for the purpose of the product-comparison methodology. Appx225. In its letter, issued on May 19, 2016, Commerce

proposed potential CONNUM characteristics and afforded parties the opportunity to submit affirmative and rebuttal comments on this proposal. *Id.* In the proposal, Commerce included a field to identify steel "quality" and listed specific quality types, each associated with a different code. Appx229-231. Both Nucor and Dillinger submitted comments in response to Commerce's letter and discussed the proposed quality codes. Appx323-359; Appx237-322. In particular, Dillinger requested that the category covering steels for transport of petroleum products be split into two categories. Appx238-239. Dillinger provided no other affirmative comments regarding the proposed quality codes and did not discuss sour service pressure vessel plate. *Id.*

Commerce issued its final product characteristics on June 10, 2016, and requested that parties incorporate them into the responses to the initial questionnaires. Appx370-385. Dillinger submitted its response to the initial Section B questionnaire, which requested information on sales made in the home market, on July 15, 2016. Appx1672. With respect to the product characteristics, Commerce instructed that Dillinger identify the relevant quality code for each sale, listing the fourteen separate codes developed based on Commerce's proposal and the parties' comments. Appx1690-1692. Commerce also stated that respondents could

> {u}se additional number codes for each additional Quality you propose. Provide a detailed narrative description of each additional Quality you propose, and explain what differentiates each of those additional Qualities from each of the ones listed above with respect to actual

physical properties. Specifically, explain why you have assigned the particular numeric code within the Quality code hierarchy for matching purposes.

Appx1692. In response, Dillinger stated that it was reporting two additional quality codes, one for "{f}ine-grained structural steels, quenched and tempered" and one for "{s}teels {d}esignated specifically for {t}ransport of {p}etroleum {p}roducts in sour service" (*i.e.*, sour service transport plate). *Id.*

In a supplemental questionnaire, Commerce directed that Dillinger revise its reporting such that sales identified with the proposed quality code for sour service transport plate (*i.e.*, code 772) be categorized under the quality code for "{s}teels {d}esignated {s}pecifically for {t}ransport of {p}etroleum {p}roducts" (*i.e.*, code 771). Appx3086; Appx1691. In its response, submitted on September 20, 2016, Dillinger stated that it was not modifying its reporting as directed. Appx3086-3087. Dillinger then stated: "In its revised home market and U.S. sales databases, Dillinger has also added the following Quality codes: . . . 759 = Fine grained pressure vessel steel adapted to sour service conditions (verified in the hydrogen induced cracking (HIC) test in accordance with NACE TM 0284)" (*i.e.*, sour service pressure vessel plate). Appx3087.

In a subsequent supplemental questionnaire, Commerce instructed Dillinger to "{r}evise your home market sales database to report all sales with code '759' in field QUALITYH to instead assign QUALITYH codes as originally reported in {the

home market sales database} dhhm01." Appx4455. In response, Dillinger declined to do so, stating that it has already explained why it reported certain sales under the quality code "759." *Id.*

As part of its questionnaire responses, Dillinger also reported that, in the course of production, non-prime merchandise is generated as "an inevitable part of the manufacturing process because there will always be a certain amount of plate that does not meet the requirements for prime merchandise." Appx3952. As Dillinger explained, non-prime merchandise "may have defects/deviations in terms of dimensions, surface, tolerances, flatness or internal properties . . . {and} is sold without any warranty as to type, grade, specification or chemistry and no grade/specification information is recorded." *Id.* When asked how non-prime merchandise is "valued in Dillinger's normal books{,}" Dillinger explained that "non-prime merchandise is reported at its sales value (*i.e.*, manufacturing costs= net sales value)." Appx3954. In its costs reported for the antidumping duty investigation, however, Dillinger reported the cost of non-prime merchandise "based upon the average cost of all plate from the cost object heavy plate." *Id.*

In the preliminary determination, Commerce made certain adjustments to Dillinger's reporting for the purpose of calculating a preliminary antidumping duty. With regard to the product characteristics, Commerce relied on the quality codes that had been identified in the product characteristics letter, rejecting the additional codes

that Dillinger had proposed in its initial and first supplemental questionnaire responses, including the separate quality code for sour service pressure vessel plate. Appx4853. With respect to the cost of non-prime merchandise, Commerce adjusted Dillinger's reported costs for non-prime plate to be consistent with costs as reported in Dillinger's normal books and records. *See* Appx5982.

Following verification of the mandatory respondents' responses and the submission of written argument by the parties, Commerce issued its final determination. *See* Appx5882. In its case brief, Dillinger had argued, *inter alia*, that Commerce should have accepted its reporting regarding its proposed quality codes and the cost to produce prime and non-prime merchandise. Appx5952-5953, Appx5969-5970. With regard to Dillinger's proposed quality code for sour service pressure vessel plate, Commerce highlighted that Dillinger first proposed this quality code in a supplemental questionnaire response and provided limited information in doing so. Appx5957. As Dillinger failed to identify this potential quality code earlier in the proceeding, despite being aware of such products, and did not provide information sufficient to justify revising the quality codes after the parties had submitted their initial questionnaire responses, Commerce continued to reject Dillinger's proposal for a separate quality code for sour service pressure vessel plate. Appx5958. With regard to the cost to produce prime and non-prime plate, Commerce continued to reject Dillinger's estimated cost of non-prime plate and to rely on the

cost of non-prime plate reported in Dillinger's books and records. *See* Appx5970-5971.

Following Commerce's final determination, Dillinger challenged, *inter alia*, the agency's rejection of a separate quality code for sour service pressure vessel plate and the treatment of costs for non-prime plate. In examining Dillinger's claim that Commerce had improperly rejected its proposed quality code for sour service pressure vessel plate, the CIT recognized Commerce's concern with the late point in the proceeding in which Dillinger raised this proposal and the lack of evidence provided to support this delayed request. Appx35-39. The CIT found that, under these circumstances, it was reasonable for Commerce to have rejected Dillinger's proposed quality code for sour service pressure vessel plate. Appx39.

With regard to the cost of producing non-prime merchandise, the CIT recognized that, in *Dillinger France S.A. v. United States*, 981 F.3d 1318 (Fed. Cir. 2020), this Court found that relying on "information reflecting a respondent's 'likely selling price,' rather than actual cost data" when calculating costs pursuant to 19 U.S.C. § 1677b was inappropriate, as the statute directs that actual costs be used. Appx17-18. Accordingly, the CIT remanded for further consideration by Commerce. *Id.* On remand, Commerce requested that Dillinger provide additional information regarding its non-prime merchandise, including "the actual product-specific costs of production" for such goods. Appx50. In response, Dillinger stated that it could not

provide the actual product-specific cost of producing non-prime merchandise. *Id.*
Consequently, Commerce explained that, because actual cost information was
necessary to its determination and was missing from the record, the agency needed
to rely on facts available to fill this gap. Appx50-54. As facts available, Commerce
relied on the costs assigned in Dillinger's normal books and records, noting that it
was verified and constituted the best information on the record. *See* Appx56,
Appx83-84. In a subsequent remand, Commerce further supported this
determination, explaining that relying on Dillinger's books and record for the cost
of producing non-prime merchandise reasonably reflected the cost of producing the
merchandise under consideration because it accounted for the fact that prime
merchandise cannot be produced without the generation of non-prime merchandise.
*See* Appx115. As a result, the lost value associated with non-prime merchandise
represented a cost of producing prime, for which the agency properly accounted. *Id.*
The CIT sustained this determination. Appx128-155.

## V.   <u>SUMMARY OF THE ARGUMENT</u>

Commerce's calculation of Dillinger's antidumping duty margin was correct.
*First*, Commerce properly rejected Dillinger's proposal to add a quality code for sour
service pressure vessel plate to the product characteristics. Dillinger did not make
this proposal until the submission of its first supplemental questionnaire response,
which was submitted 110 days after Commerce solicited comments on the product

characteristics. As Dillinger failed to make this proposal in both its product characteristics comments and in its initial questionnaire response, it was untimely. Dillinger's proposal for sour service pressure vessel plate is thus distinguishable from its proposal for sour service transport plate and the CIT's decision in *Bohler Bleche GmbH v. United States*, as these proposals were made "at every turn." *Bohler Bleche GmbH v. United States*, 324 F. Supp. 3d 1344, 1352 (Ct. Int'l Trade 2018). Moreover, Commerce's rejection was not inconsistent with 19 U.S.C. § 1677m(d), as Dillinger's proposal was untimely, improperly submitted, and not provided in response to a request for information. Thus, this was not a deficiency of which Dillinger needed to be notified and afforded an opportunity to correct. Finally, Commerce did not apply different treatment to Dillinger's and Nucor's product characteristic proposals. Nucor's comments were timely filed and consistent with the agency's instructions; Dillinger's proposal for sour service pressure vessel plate was not.

*Second*, Commerce's selection of facts available with regard to Dillinger's cost of producing non-prime plate is supported by the record and in accordance with law. Because information on Dillinger's cost of producing non-prime plate was not on the record, Commerce was required to rely on facts available. As facts available, Commerce relied on Dillinger's costs as they were reported in its books and records. Commerce explained that this information was verified and properly took into

account the cost of producing both prime and non-prime merchandise. Dillinger's claim that this approach is prohibited is misplaced, as Commerce was relying on information under 19 U.S.C. § 1677e because it did not have the information required under 19 U.S.C. § 1677b. Additionally, Commerce's selection of facts available need only be reasonable under the circumstances, and its determination here met that standard. Commerce's approach was fully explained and supported by the record, and the agency also explained why Dillinger's alternative proposal should not be used.

## VI.  <u>STANDARD OF REVIEW</u>

Nucor and SSAB generally do not disagree with Dillinger's description of the standard of review. However, Nucor and SSAB recognize Dillinger's reference to *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), with regard to Commerce's interpretation of the antidumping statute. Dillinger Br. at 10. Subsequent to the submission of Dillinger's opening brief, the U.S. Supreme Court issued its opinion in *Loper Bright Enterprises v. Raimondo*, slip op. at 35 (June 28, 2024), in which the Court overruled *Chevron*. In doing so, the Court explained that "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority . . . ." *Loper Bright Enters. v. Raimondo*, 603 U.S. __, __ (2024) (slip op. at 35). Nucor and SSAB note that, to

date, no party has argued that the determinations at issue here are supported by, or inconsistent with, the deference that was afforded Commerce under *Chevron*.

Moreover, this Court has recognized that deference is afforded to Commerce in its implementation of the antidumping laws outside of the context of statutory interpretation and the guidance under *Chevron*. As this Court has explained:

> the antidumping statute "reveals tremendous deference to the expertise of the Secretary of Commerce in administering the antidumping law." *Smith–Corona Group v. United States*, 713 F.2d 1568, 1571, 1582 (Fed.Cir.1983), cert. denied, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). . . . This deference is both greater than and distinct from that accorded the agency in interpreting the statutes it administers, because it is based on Commerce's technical expertise in identifying, selecting and applying methodologies to implement the dictates set forth in the governing statute, as opposed to interpreting the meaning of the statute itself where ambiguous.

*Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996).

## VII. ARGUMENT

### A. Commerce Properly Rejected Dillinger's Proposed Quality Code for Sour Service Pressure Vessel Plate

#### 1. Dillinger's Proposed Quality Code for Sour Service Pressure Vessel Plate Was Properly Rejected as Untimely

Dillinger asserts that Commerce's rejection of its proposed quality code for sour service pressure vessel plate was in error in light of the agency's remand determination with regard to sour service transport plate and the CIT's determination in *Bohler*. Dillinger Br. at 22-23. According to Dillinger, the facts with regard to sour service pressure vessel plate are analogous to Dillinger's proposal of a separate

quality code for transport plate as well as the facts underlying the CIT's determination in *Bohler*. *Id.* This is incorrect and ignores the record and the determinations by Commerce and the CIT.

Despite Dillinger's attempts to analogize the facts regarding sour service pressure vessel plate with those of transport plate and *Bohler*, it fails to acknowledge a critical distinguishing fact. As noted above, Dillinger raised concerns regarding a separate quality code for transport plate at the outset of the proceeding, proposing a separate quality code in both its product characteristics comments and in its initial questionnaire response. Appx238-239; Appx1692. Similarly, in *Bohler*, "Plaintiffs raised their concerns *at every turn*{,}" and proposed the additional field with their initial questionnaire response "just 35 days after the Department had issued its revised model-match methodology {and} four months prior to the Department's *Preliminary Determination* . . . ." *Bohler Bleche GmbH*, 324 F. Supp. 3d at 1352 (emphasis added).

In contrast, here, Dillinger did not discuss the classification of sour service pressure vessel plate in its product characteristics comments or its initial questionnaire response. Appx238-239; Appx1692-1693. Instead, Dillinger advocated for a separate quality code for sour service pressure vessel plate for the first time in its first supplemental questionnaire response, which was submitted *110 days after* it submitted comments on the product characteristics and only *45 days*

*before* the preliminary determination. Appx3087. This is a fundamental difference regarding Dillinger's proposal for sour service pressure vessel plate and warrants differential treatment. *See* Appx173.

Thus, contrary to Dillinger's claims, Commerce and the CIT did explain why it was appropriate to not accept the proposed quality code for sour service pressure vessel plate notwithstanding the treatment of transport plate and *Bohler*. *See* Dillinger Br. at 23. As the CIT explained, "Dillinger's reliance on *Bohler* is misplaced" in light of Dillinger's failure to timely make its proposal. Appx173. Notably, as the CIT highlighted, Dillinger's delay in identifying this proposed quality code raised specific concerns for Commerce:

> Commerce explained that it found Dillinger's proposed rationale for its failure to include a sour vessel plate subcategory in its initial model match comments troubling, stating that "{i}t is not clear why Dillinger would have needed to perform additional analysis, unless it wanted further time to estimate the margin impact of such a proposal."

Appx39. Because the proposal for transport plate and the proposal in *Bohler* were timely made, this was not a concern in regard to those issues. *See* Appx5958-5960.

Dillinger also asserts that its comments on sour service pressure vessel plate cannot be considered untimely because Commerce permitted respondents to propose additional quality codes. Dillinger Br. at 31-32. This mischaracterizes Commerce's questionnaires and ignores the record. When Commerce issued the final product characteristics, it directed the parties to incorporate the product characteristics

instructions into their initial questionnaire responses. Appx370. Thus, the initial questionnaires effectively contained a question stating that parties could propose additional quality codes. However, Dillinger did not propose the additional quality code for sour service pressure vessel plate in response to this question. Instead, the first time Dillinger proposed a separate quality code for sour service pressure vessel plate was in a subsequent questionnaire response—submitted 67 days after the submission of its initial questionnaire—in response to the following question: "Revise your home market sales database to change the values reported in field QUALITYH from code '771' to code '772.'" Appx3086-3088. In other words, contrary to its claims otherwise, Dillinger did not "timely" propose a separate code for sour service pressure vessel plate; instead, it made this proposal more than two months later in response to a question (and questionnaire) that did not contain the same instructions or allowance for Dillinger to propose additional quality codes. That Commerce may have, in the initial questionnaire, permitted parties to propose additional quality codes does not equate to providing parties with the ability to unilaterally suggest such codes at any point in the proceeding. Indeed, the CIT has recognized this, confirming that Commerce does not abuse its discretion in rejecting untimely product characteristics proposals. *See JTEKT Corp. v. United States*, 37 F. Supp. 3d 1326, 1335-36 (Ct. Int'l Trade 2014).

Dillinger similarly misconstrues Commerce's rejection as being based only on the fact that the proposal was made after the deadline for product characteristics comments. *See* Dillinger Br. at 31. In its final determination, Commerce acknowledged that parties could raise proposals in the *initial* questionnaire responses. Appx5958. Dillinger, however, did not do so, nor did it "provide information that would justify . . . revisiting this issue once parties had submitted *their questionnaire responses.*" *Id.* (emphasis added). In other words, Commerce faulted Dillinger for failing to propose a quality code for sour service pressure vessel plate in either the product characteristics comments *or* in the initial questionnaire *and* for not demonstrating why such a belated proposal was appropriate.

As noted above, Dillinger's limited explanation for its proposal and its failure to explain why it was being raised at such a late time raised concerns for Commerce:

> It is not clear why Dillinger would have needed to perform additional analysis, unless it wanted further time to estimate the margin impact of such a proposal. As noted above, Dillinger only discussed pricing data associated with its proposed product characteristic changes in the context of the overall impact on Dillinger's weighted-average margin.

*Id.*; *see* Appx39. Contrary to Dillinger's claim, this is not inconsistent with *Bohler*, as, in that underlying proceeding, the respondent proposed an additional product characteristic field in the initial questionnaire response. *Bohler*, 324 F. Supp. 3d at 1352.

In short, Dillinger had multiple opportunities early in the proceeding to propose a separate quality code for sour service pressure vessel plate. Dillinger chose not to do so. Instead, Dillinger waited until *after* it submitted product characteristics comments—in which it identified other proposed quality codes—and *after* it submitted its initial questionnaire response—in which it again identified other proposed quality codes—to first raise this proposal, doing so only *45 days* before the preliminary determination. Thus, Dillinger failed to raise this issue "at every turn{.}" *Id.* That Commerce provided parties with an opportunity to propose additional quality codes in the initial questionnaire response does not grant Dillinger the ability to make such proposals at any time in the proceeding or require Commerce to accept such proposals. As such, Commerce's rejection of Dillinger's untimely proposal was appropriate.

### 2. Commerce's Determination Complies with 19 U.S.C. § 1677m(d)

Dillinger next claims that Commerce's rejection of its proposed quality code violated the requirements of 19 U.S.C. § 1677m(d). This is incorrect. The statute directs that, if a response to a request for information does not comply with the request, Commerce must notify the party of the nature of the deficiency and afford an opportunity to remedy or explain it. 19 U.S.C. § 1677m(d). Commerce's rejection of Dillinger's proposed quality code does not violate this provision.

As an initial matter, as discussed above, Dillinger's proposal for an additional quality code for sour service pressure vessel plate was untimely and therefore properly rejected. This was not a "deficiency" in the information that Dillinger could correct. Thus, Commerce properly rejected this proposal in light of its untimeliness and was not required to provide Dillinger with an opportunity to address shortcomings in the substance of its submission.

Moreover, Commerce did not resort to facts available in light of the issues with Dillinger's reporting; instead, Commerce simply did not accept Dillinger's proposed adjustment to its reporting. As the Court has recognized, Commerce properly places the burden of demonstrating entitlement to an adjustment with the party seeking an adjustment. *See, e.g., Fujitsu Gen. Ltd.*, 88 F.3d at 1040. Dillinger was the party seeking a change in the reporting and was the party that held the relevant information; thus, the burden was on Dillinger to sufficiently justify this late request. It failed to do so. The Court has also recognized that 19 U.S.C. § 1677m(d) does not apply to all submissions of information. As the Court has noted, this provision "applies to findings based on data provided in response to a request by Commerce and not to findings based on data voluntarily submitted on a respondent's own initiative." *Carbon Activated Tianjin Co. v. United States*, No. 2022-1298, 2023 WL 3166188, at *4 n.2 (Fed. Cir. May 1, 2023) (citing *Shenzhen Xinboda Indus. Co. v. United States*, 357 F. Supp. 3d 1295, 1304-05 (Ct. Int'l Trade

2018)). Here, Commerce did not request, and Dillinger was not required to provide, any additional quality codes. Accordingly, as with other information that parties may voluntarily provide, Commerce was not required here to notify Dillinger of any shortcomings and provide it with an opportunity to remedy them.

For this same reason, Dillinger's reliance on *Hitachi Energy USA Inc. v. United States* is misplaced. Dillinger Br. at 34. In that proceeding, the Court addressed Commerce's failure to provide the respondent with an opportunity to provide necessary information prior to the application of adverse facts available where the respondent's alleged failure to provide information stemmed from Commerce changing its method for evaluating the information at issue. *Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375, 1384 (Fed. Cir. 2022). Here, however, Commerce did not apply adverse facts available, or even facts available. Accordingly, contrary to Dillinger's claims, Commerce was not required to identify the shortcomings in its proposal for a new quality code for sour service pressure vessel plate and permit Dillinger to correct its prior failures.

### 3. Commerce Did Not Apply Disparate Treatment to Dillinger

Finally, Dillinger argues that Commerce erred in applying a different standard to Nucor and Dillinger with regard to comments on product characteristics. Dillinger Br. at 34-36. This argument is meritless. First, Nucor's comments regarding product characteristics were timely submitted within the time frame identified by Commerce

at the outset of the proceeding. Appx323-324. In contrast, Dillinger's proposal to add a quality code for sour service pressure vessel plate was submitted almost four months after the deadline to submit comments on the product characteristics and more than two months after submission of the initial questionnaire response. As such, its proposal was untimely.

Second, Nucor's comments were made at the outset of the proceeding prior to Commerce making any determinations with regard to product characteristics. In contrast, Dillinger's proposal was submitted after Commerce had issued the finalized product characteristics, to which Dillinger was requesting a modification. It is reasonable for Commerce to establish a higher bar for changes requested later in the proceeding and after the agency has already made a determination. This was reflected in the agency's statements and analysis. In soliciting comments on the proposed product characteristics, Commerce did not identify specific information or provide specific instructions regarding what should be included in parties' comments. Appx225. In contrast, the final product characteristics contained specific instructions regarding the narrative and supporting documentation required if a party were to propose a further modification. *See* Appx1692. Nucor's proposals complied with Commerce's instructions while Dillinger's proposal on sour service pressure vessel plate did not.

This difference is particularly noteworthy here given the late stage at which Dillinger first proposed this modification. As noted above, Dillinger failed to propose a separate quality code for sour service pressure vessel plate in response to Commerce's initial request for comments and in response to the initial questionnaire. Commerce noted its concern about the timing of Dillinger's proposal in its final determination, explaining that "{i}t is not clear why Dillinger would have needed to perform additional analysis, unless it wanted further time to estimate the margin impact of such a proposal." Appx5958. Dillinger never explained why it was making its proposal at such a late stage nor did it explain why it would be appropriate for Commerce to consider a new quality code submitted after the opportunities afforded in the product characteristics comments and the initial questionnaire response.

Thus, contrary to Dillinger's claims otherwise, its proposal for a new quality code in its first supplemental questionnaire response was not "similarly situated" to Nucor's comments on the proposed product characteristics. Dillinger fails to address these critical differences or explain why Commerce's actions were improper in light of the distinct circumstances. As such, Dillinger has failed to show that Commerce did not apply a fair and objective standard in considering these issues.

## B. Commerce Properly Applied Facts Available to Determine Dillinger's Costs

In the underlying proceeding, Commerce was required to rely on facts available to determine Dillinger's cost of producing non-prime plate because the

actual cost of producing non-prime plate was not on the record. *See* Appx113. As facts available, Commerce relied on the costs for producing non-prime plate recorded in Dillinger's normal books and records. *See id.* Dillinger challenges this determination, claiming that Commerce relied on an impermissible methodology to calculate its costs. Dillinger Br. at 36-58. Dillinger's argument is unsupported by the law and the facts and should be rejected.

"To be in accordance with law, {an agency} decision must not be arbitrary and capricious . . . and must be supported by substantial evidence and reasoned explanations." *U.S. Steel Corp. v. United States*, 953 F. Supp. 2d 1332, 1336 (Ct. Int'l Trade 2013) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41-43 (1983); *SKF USA Inc. v. United States*, 630 F.3d 1365, 1373-74 (Fed. Cir. 2011)). Accordingly, Commerce need only "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle*, 463 U.S. at 43 (citation omitted). Moreover, "{a} court may {not} displace the {agency's} choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Zhaoqing New Zhongya Aluminum Co. v. United States*, 887 F. Supp. 2d 1301, 1305 (Ct. Int'l Trade 2012) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)). As discussed below, Commerce provided a reasoned explanation for its selection of facts available based

on its consideration of the record evidence, and, consequently, the agency's determination here is supported by the record and in accordance with law.

### 1. Commerce's Decision to Rely on Dillinger's Books and Records as Facts Available Instead of Dillinger's Estimated Costs Is in Accordance with Law

As Commerce explained, because Dillinger's actual costs to produce non-prime merchandise are not available, there is an informational gap in the record. *See* Appx113. Given this gap in the record, Commerce further explained that relying on Dillinger's own books and records is a reasonable method to allocate Dillinger's costs between prime and non-prime products. Appx114-116. As Commerce highlights, and as Dillinger acknowledges, non-prime merchandise is an unintended and unavoidable consequence of producing prime plate. *Id.* In other words, while Dillinger may intend to produce 100 prime units, it may conclude that two units are imperfect (*i.e.*, non-prime) and thus have to sell the units at a reduced price. Appx115. As the production of non-prime merchandise is an unavoidable result of the production process for prime merchandise, the loss associated with the generation and selling of these two units is a cost of producing 98 prime units. *Id.* To ignore this reality would ignore the true cost of producing prime merchandise. Thus, Commerce explained, to assign costs in a manner that acknowledges this inherent cost of producing prime merchandise is an appropriate method for

allocating costs that results in a reasonable representation of the actual costs of production. *Id.*

In challenging Commerce's remand determination, Dillinger asserts that Commerce impermissibly shifted costs from non-prime plate to prime plate in contravention of the statute. Dillinger Br. at 42-47. Dillinger is incorrect. As an initial matter, Commerce did not "shift" production costs from non-prime products to prime products, as Dillinger contends. *Id.* at 42. The record does not contain information on Dillinger's actual costs of producing non-prime product versus prime product. *See* Appx113. That is the reason Commerce resorted to the application of facts available, a determination that Dillinger does not challenge. *See id.*; Dillinger Br. at 42-47. Thus, Dillinger's complaint ultimately lies with the fact that Commerce did not accept its cost estimates for producing prime versus non-prime products, which, as discussed below, fails to demonstrate any error in the agency's determination.

Dillinger similarly asserts that Commerce's methodology is prohibited, arguing that the statute instructs the agency to rely on actual costs and does not permit consideration of the "lost value" represented by the generation of non-prime merchandise. Dillinger Br. at 42-47. This argument, too, is unavailing. If the record contained the information necessary to calculate costs as outlined in 19 U.S.C. § 1677b, information would not be missing from the record and Commerce would

not have been required to rely on facts available. But, because this information is not available, Commerce had to rely on other information. *See* Appx113. Here, Commerce concluded that it was reasonable to rely on Dillinger's books and records as the basis for allocating costs between prime and non-prime merchandise and explained how this reasonably represents costs. *See id.* In doing so, Commerce explained that the production of non-prime merchandise is an unavoidable result of the production process for prime merchandise, meaning that the generation of non-prime merchandise is a cost of producing prime merchandise. *See* Appx115. Put another way, and using Commerce's example, the cost to produce 98 prime units is the cost of producing 98 prime units and 2 non-prime units. *Id.*

Further, as Commerce pointed out, Dillinger's auditors acknowledge that the lost value attributable to the production of non-prime products is an indirect cost of producing the prime products. Specifically, in discussing Dillinger's financial statement, Commerce noted that "the auditor acknowledged that Dillinger's practice of allocating the lost value attributable to the production of non-prime products resulted in a reasonable allocation of both the direct and indirect costs to the production of prime products." Appx124. For this same reason, Dillinger's claim that Commerce's approach is inconsistent with its treatment of inventory write-downs does not persuade. *See* Dillinger Br. at 43-45. As Commerce recognizes, the agency normally does not include write-downs of finished products in cost

calculations to avoid double counting costs. Appx125-126. Here, Commerce relied on Dillinger's books and records to determine how to allocate costs between prime and non-prime products. *See* Appx126. As such, there was no concern with double counting and, consequently, the concern underlying Commerce's approach to inventory write-downs was not implicated.

Finally, Dillinger's reliance on this Court's opinions in *Dillinger France S.A. v. United States*, 981 F.3d 1318 (Fed. Cir. 2020), and *IPSCO v. United States*, 965 F.2d 1056 (Fed. Cir. 1992), is misplaced. Dillinger Br. at 45-47. In both of those cases, the Court addressed the calculation of normal value under 19 U.S.C. § 1677b. *Dillinger France*, 981 F.3d at 1318; *IPSCO*, 965 F.2d at 1058-61; *see Dillinger France S.A. v. United States*, No. 17-00159, slip op. 22-97 (Ct. Int'l Trade Aug. 18, 2022) ("*Dillinger France IV*") at 14.[2] However, as noted above, Commerce could not calculate costs pursuant to 19 U.S.C. § 1677b and was thus required to rely on facts available. As the lower court has recognized, "{w}hile the Federal Circuit directed Commerce to determine the actual costs of prime and non-prime products to calculate normal value, this directive does not necessarily identify—or cabin— what information Commerce may or may not rely upon as facts otherwise available

---

[2]     Dillinger similarly points to the lower court's decision in *LG Chem, Ltd. v. United States*, 534 F. Supp. 3d 1386 (Ct. Int'l Trade 2021), which also addressed Commerce's calculation of costs under 19 U.S.C. § 1677b and did not concern the application of facts available.

under 19 U.S.C. § 1677e(a)(1), once the agency concludes that it cannot determine the actual costs of prime and non-prime products." *Dillinger France IV* at 14 (citations and quotations omitted). This makes sense. Commerce resorted to facts available because it did not have the information needed to calculate costs as instructed in 19 U.S.C. § 1677b. If Commerce had the information needed to calculate costs as directed by 19 U.S.C. § 1677b, it would have had no grounds to resort to facts available. Thus, Commerce's reliance on Dillinger's books and records as facts available for determining the cost of prime and non-prime plate was supported by the record, fully explained, and in accordance with law.

### 2. Commerce's Selection of Facts Available Is Supported by the Record

As discussed above, Commerce relied on Dillinger's books and records as facts available to allocate costs between prime and non-prime plate. In doing so, Commerce noted that its allocation methodology was consistent with Dillinger's financial statements. *See* Appx124-125. Dillinger claims that this was Commerce's "only justification" and is "demonstrably false." Dillinger Br. at 47-52. Dillinger is incorrect on both counts.

First, Commerce did not rely solely on the fact that its allocation was consistent with Dillinger's financial statements. In determining that it was appropriate to rely on facts available, Commerce explained that Dillinger did not record, and the record did not contain, the physical characteristics or actual product-

specific costs of non-prime merchandise. *See* Appx56. As a result, Commerce relied on the reported selling price for non-prime merchandise, given that "this amount is used by Dillinger in its normal books and records {and,} importantly, was verified by Commerce." *See id.* Commerce subsequently provided further support for its determination, explaining that Dillinger's books and records "recognize that the lost value of the non-prime products, which is an inevitable result of Dillinger's production of prime products, {and} is appropriately considered to be a cost of producing the prime products." *See* Appx115-116. Commerce then highlighted that the allocation in Dillinger's books and records is also consistent with its financial statements. Appx124-125. Thus, this was not the "only" fact relied upon by Commerce.

Second, although Dillinger asserts that it is "a fundamental error" for Commerce to "claim that Dillinger uses the likely selling price of non-prime products as their costs" in its financial statements, Dillinger Br. at 50, this argument is contradicted by the record. As Commerce recognized, "Dillinger's audited financial statements acknowledge that finished goods and work-in-process (WIP) inventories are assessed at its manufacturing costs or the lower fair value derived from the sales market" and thus recognize "Dillinger's practice of allocating the lost value attributable to the production of non-prime products to prime products." Appx124. This is confirmed in other aspects of Dillinger's reporting. Specifically,

when directed to explain how its "system records, classifies, aggregates, and allocates the costs to products, including the merchandise under consideration, in the normal course of business{,}" Dillinger explained that the "actual average cost system flows directly from the actual costs reported in the financial accounting system as those costs are booked to specific cost centers and materials accounts." Appx6376. Dillinger further explained that it generates a monthly report (*i.e.*, the "internal factory results") by product group, in which "the total actual average costs from the actual average cost system are allocated to specific product groups based upon the standard costs for each production order in such groups weighted by the sales quantity for each order." *Id.* Dillinger subsequently explained that "{i}n Dillinger's internal factor results {}, non-prime merchandise is reported its sales value (i.e., manufacturing costs = net sales value)." Appx3954. This [

*Description of cost reporting documents*

]. Appx4382-4385; Appx6438-6450.

Dillinger also argues that Commerce's determination is unsupported because the courts have rejected reliance on a company's books and records when reported costs utilize likely selling price. Dillinger Br. at 50-52. Dillinger points first to this Court's determination in *Dillinger France*, but, as discussed above, that case did not address the application of facts available and thus does not restrict Commerce's

actions here. *Nexteel Co. v. United States* is similarly inapplicable. *See id.* at 51-52.

In *Nexteel*, Commerce found that the respondent's "reported costs reflected the actual cost of producing both its prime and non-prime goods," and it was not relying on facts available. *Nexteel Co. v. United States*, 601 F. Supp. 3d 1373, 1378 (Ct. Int'l Trade 2022). Here, in contrast, Dillinger did not maintain the actual cost of producing prime and non-prime products and, therefore, Commerce relied on facts available. As Commerce resorted to facts available here—which Dillinger has not challenged—Commerce's actions in other proceedings in which it did not need to resort to facts available are distinguishable. Consequently, Dillinger's claim that the facts in *Nexteel* are "exactly the same" and require the same outcome does not persuade. Dillinger Br. at 52.

In sum, Commerce examined the record and Dillinger's reporting and explained why the agency's approach was reasonable. In doing so, Commerce has adequately explained why it selected costs as recorded in Dillinger's books and records and identified record evidence in support of this determination. Dillinger's claims to the contrary do not demonstrate otherwise and should thus be rejected.

### 3. Commerce Was Not Required to Use Dillinger's Cost Estimates

Finally, Dillinger claims that Commerce did not rely on the best available information as facts available, asserting that its reported costs estimates should have

been used instead. *Id.* at 52-58. This argument has no support in the law or the facts and should fail.

The statute provides that, where information is missing from the record, Commerce may rely on "facts otherwise available" to reach its determination. 19 U.S.C. § 1677e(a). The Statement of Administrative Action accompanying the Uruguay Round Agreements Act provides further guidance on the selection of facts available, noting that "the facts available are information or inferences which are reasonable to use under the circumstances." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 869 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4198 ("SAA"). Moreover, the SAA explicitly states that Commerce does not need to "prove that the facts available are the best alternative information{,}" recognizing that "proving that the facts selected are the best alternative facts would require that the facts available be compared with the missing information, which obviously cannot be done." *Id.* Here, Commerce selected an approach that was reasonable based on the circumstances, as is required. As discussed above, Commerce relied on information contained in Dillinger's normal books and records, which was verified and which accounted for costs associated with the production of prime and non-prime merchandise.

Dillinger's assertion that its proposal was better or more accurate is both moot and unsupported. Because the record does not contain Dillinger's actual product-

specific costs, it is not possible to determine which approach would be most accurate or result in costs closest to actual costs. This is why the SAA recognizes that Commerce does not need to rely on the best available information—it is impossible to know what the best available information is. As a result, Commerce is required only to use information that is reasonable. Thus, even assuming, *arguendo*, that Dillinger's proposal was reasonable, Commerce was not required to use it. *See Ala. Aircraft Indus., Inc. v. United States*, 586 F.3d 1372, 1376 (Fed. Cir. 2009) (citing *Motor Vehicle*, 463 U.S. at 43) ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."); *see also Dillinger France IV* at 11-12. Here, Commerce reviewed the information on the record and adequately explained the connection between the facts found, *i.e.*, Dillinger only tracks total costs and cannot differentiate prime from non-prime costs, and the choices made, *i.e.*, using Dillinger's books and records reflects the fact that non-prime plate is a consequence of producing prime plate and allocates costs accordingly. *See Motor Vehicle*, 463 U.S. at 43. That another proposal could also have been reasonable does not render Commerce's determination unsupported.

Moreover, Commerce sufficiently explained why it declined to use Dillinger's estimated costs. Dillinger developed its estimate using the yield rates from the period of investigation, and Commerce explained that Dillinger's assumptions underlying its estimate were unsupported. *See* Appx121. Namely, Dillinger assumed that the

actual costs of producing non-prime products are on average equal to its average costs of producing prime products. *Id.* Commerce noted that because Dillinger did not provide information on the physical characteristics of the non-prime products, there is no evidence to support the inference that the share of the physical characteristics of the non-prime products is the same as the share of the physical characteristics of the prime products. Appx122. Commerce also explained that there is no record evidence to support Dillinger's assumption that its costs of producing non-prime products cannot be lower than its costs to produce prime products. *Id.*

In short, Commerce fully supported and explained its selection of facts available. Commerce also explained why Dillinger's assertions regarding the accuracy and reasonableness of its own proposal were unsupported. That Dillinger would have weighed the evidence differently does not undermine Commerce's conclusion. Commerce's determination was reasonable under the circumstances, and Dillinger has failed to demonstrate otherwise.

# VIII. CONCLUSION

For the foregoing reasons, Nucor and SSAB respectfully request that the Court affirm Commerce's determination and the CIT opinions upholding it.

Respectfully submitted,

| | |
|---|---|
| */s/ Alan H. Price* | */s/ Roger B. Schagrin* |
| Alan H. Price, Esq. | Roger B. Schagrin, Esq. |
| Christopher B. Weld, Esq. | Jeffrey D. Gerrish, Esq. |
| Stephanie M. Bell, Esq. | |
| | **SCHAGRIN ASSOCIATES** |
| **WILEY REIN LLP** | 900 Seventh Street, NW |
| 2050 M Street, NW | Suite 500 |
| Washington, DC 20036 | Washington, DC 20001 |
| (202) 719-7000 | (202) 223-1700 |
| | |
| *Counsel to Nucor Corporation* | *Counsel to SSAB Enterprises LLC* |

Dated: August 16, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 24-1498

**Short Case Caption:** AG der Dillinger Huttenwerke v. US

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

[✓] the filing has been prepared using a proportionally-spaced typeface and includes __7,349__ words.

[ ] the filing has been prepared using a monospaced typeface and includes _____ lines of text.

[ ] the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 08/16/2024

Signature: /s/ Alan H. Price

Name: Alan H. Price