No. 24-1498

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

AG DER DILLINGER HUTTENWERKE,
Plaintiff-Appellant,

ILSENBURGER GROBBLECH GMBH, SALZGITTER FLACHSTAHL GMBH,
SALZGITTER MANNESMANN GROBBLECH GMBH, SALZGITTER
MANNESMANN INTERNATIONAL GMBH, FRIEDR. LOHMANN GMBH,
THYSSENKRUPP STEEL EUROPE AG,
Plaintiffs

v.

UNITED STATES, SSAB ENTERPRISES LLC, NUCOR CORPORATION,
Defendant-Appellees

Appeal from the United States Court of International Trade in 1:17-cv-00158-
LMG, Leo M. Gordon, Senior Judge

## RESPONSE BRIEF OF DEFENDANT-APPELLEE THE UNITED STATES

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

KARA M. WESTERCAMP
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C., 20044

Tel: (202) 305-7571
Fax:  (202) 514-8624

OF COUNSEL:
AYAT MUJAIS
Senior Attorney
U.S. Department of Commerce
Office of the Chief Counsel for Trade
Enforcement and Compliance

August 16, 2024                    Attorneys for Defendant-Appellee

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ............................................................. viii

STATEMENT OF THE ISSUES ...................................................................... 1

STATEMENT OF THE CASE............................................................................ 1

STATEMENT OF THE FACTS......................................................................... 3

    I.     Legal Framework.......................................................................... 3

    II.    The Underlying Investigation....................................................... 4

         A. Relevant Facts Relating To Model Match.......................... 4

         B. Relevant Facts Related To Dillinger's Costs Of Production For
            Non-Prime Plate ............................................................... 9

    III.   Trial Court Proceedings.......................................................... 11

         A. In *Dillinger II*, The Trial Court Remanded The Non-Prime Plate
            Cost Of Production Issue, But Sustained Commerce's Rejection
            Of Dillinger's Proposed Quality Code For Sour Vessel Plate......... 11

         B. In The Second Remand Redetermination, Commerce Explained
            Why It Was Reasonable To Use The Likely Selling Price As The
            Non-Prime Plate Cost Of Production ................................. 12

         C. In *Dillinger III*, The Trial Court Ordered Commerce To Explain
            Why The Likely Selling Price Reasonably Reflects Cost Of
            Production Of Non-Prime Plate ........................................ 15

         D. In *Dillinger IV*, The Trial Court Sustained Commerce's Cost Of
            Production For Non-Prime Plate And Remanded The
            Model Match For Sour Transport Plate.............................. 17

         E. In *Dillinger V*, The Trial Court Sustained Commerce's
            Model-Match Methodology ............................................... 19

SUMMARY OF THE ARGUMENT ....................................................................20

ARGUMENT .......................................................................................................21

I.    Standard Of Review ...........................................................................21

II.   The Trial Court Correctly Held That Commerce's Rejection Of
Dillinger's Proposed Sour Vessel Plate Quality Code Is Supported By
Substantial Evidence And In Accordance With Law ..........................22

    A. Commerce Did Not Abuse Its Discretion And Substantial Evidence
Supports Commerce's Decision To Reject The Untimely Submitted
Quality Code For Sour Vessel Plate ................................................22

    B. Dillinger Failed To Demonstrate That A Separate Quality Code
For Sour Vessel Plate Was Necessary .............................................27

III.  The Trial Court Correctly Held That The Likely Selling Price Of
Dillinger's Non-Prime Plate Is The Best Available Information For
Cost Of Production ...............................................................................31

    A. Legal Framework For Costs Of Production For Non-Prime
Merchandise ....................................................................................32

    B. Substantial Evidence Supports Commerce's Determination That
The Likely Selling Price Of Non-Prime Plate Is The Best Available
Information As Facts Otherwise Available......................................33

    C. Dillinger's Arguments Are Meritless And Do Not Undermine
Commerce's Facts Otherwise Available Selection..........................37

CONCLUSION ...................................................................................................44

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*AG der Dillinger Hüttenwerke v. United States*,
   399 F. Supp. 3d 1247 (Ct. Int'l Trade 2019) ........................................................2

*AG der Dillinger Hüttenwerke v. United States*,
   534 F. Supp. 3d 1403 (Ct. Int'l Trade 2021) ........................................................2

*AG der Dillinger Hüttenwerke v. United States*,
   592 F. Supp. 3d 1344 (Ct. Int'l Trade 2022) ........................................................2

*AG der Dillinger Hüttenwerke v. United States*,
   648 F. Supp. 3d 1321 (Ct. Int'l Trade 2023) ........................................................3

*AG der Dillinger Hüttenwerke v. United States*,
   672 F. Supp. 3d 1351 (Ct. Int'l Trade 2023) ........................................................3

*Bohler Bleche GMBH & Co. KG v. United States*,
   324 F. Supp. 3d 1344 (Ct. Int'l Trade 2018) ............................................. *passim*

*Boomerang Tube LLC v. United States*,
   856 F.3d 908 (Fed. Cir. 2017) ..............................................................................29

*Burlington Truck Lines, Inc. v. United States*,
   371 U.S. 156 (1962).............................................................................................35

*Deacero S.A.P.I. de C.V. v. United States*,
   996 F.3d 1283 (Fed. Cir. 2021) ...........................................................................43

*Dillinger France S.A. v. United States*,
   981 F.3d 1318 (Fed. Cir. 2020) .................................................................. *passim*

*Dillinger France S.A. v. United States*,
   589 F. Supp. 3d 1252 (Ct. Int'l Trade 2022) ......................................................15

*Dillinger France S.A. v. United States*,
   651 F. Supp. 3d 1294 (Ct. Int'l Trade 2023) ............................................. *passim*

*Fagersta Stainless AB v. United States*,
   577 F. Supp. 2d 1270 (Ct. Int'l Trade 2008) ......................................................4, 5

*Goodluck India Limited v. United States*,
   11 F.4th 1335 (Fed. Cir. 2021) .................................................. 23, 25

*IPSCO, Inc. v. United States*,
   965 F.2d 1056 (Fed. Cir. 1992) ...........................................................37

*Itochu Building Products Co., Inc. v. United States*,
   Slip Op. 17-73, No. 12-00065, 2017 WL 2703810 (Ct. Int'l Trade 2017) ..........35

*JTEKT Corp. v. United States*,
   37 F. Supp. 3d 1326 (Ct. Int'l Trade 2014)........................................................23

*LG Chem. Ltd. v. United States*,
   534 F. Supp. 3d 1386 (Ct. Int'l Trade 2021) ........................................................43

*Maverick Tube Corp. v. United States,*
   107 F. Supp. 3d 1318 (Ct. Int'l Trade 2015) ........................................................23

*NEXTEEL Co. v. United States*,
   601 F. Supp. 3d 1373 (Ct. Int'l Trade 2022) ........................................................42

*Norsk Hydro Canada, Inc. v. United States*,
   472 F.3d 1347 (Fed. Cir. 2006) ........................................................21

*NSK v. United States*,
   217 F. Supp. 2d 1291 (Ct. Int'l Trade 2002) ........................................................28

*Pesquera Mares Australes Ltda. v. United States*,
   266 F.3d 1372 (Fed. Cir. 2001) ........................................................4

*PSC VSMO-Avism a Corp. v. United States*,
   688 F.3d 751 (Fed. Cir. 2012) ........................................................33

*Qingdao Sea-Line Trading Co., Ltd. v. United States*,
   766 F.3d 1378 (Fed. Cir. 2014) ........................................................22

*QVD Food Co. v. United States,*
 658 F.3d 1318 (Fed. Cir. 2011) ...............................................................35

*Risen Energy Co., Ltd. v. United States,*
 611 F. Supp. 3d 1384 (Ct. Int'l Trade 2022) ..........................................35

*SKF USA, Inc. v. United States,*
 537 F.3d 1373 (Fed. Cir. 2008) ...........................................................4, 5

*Tension Steel Indus. Co. v. United States,*
 179 F. Supp. 3d 1185 (Ct. Int'l Trade 2016) ..........................................32

*Timken Co. v. United States,*
 630 F. Supp. 1327 (Ct. Int'l Trade 1986) ...............................................29

*Union Steel v. United States,*
 713 F.3d 1101 (Fed. Cir. 2013) ........................................................ 21, 22

*Universal Camera Corp. v. NLRB,*
 340 U.S. 474 (1951) ................................................................................22

**Statutes**

19 U.S.C. § 1516a(b) ...................................................................................22

19 U.S.C. § 1673 ............................................................................................3

19 U.S.C. § 1675(a) ........................................................................................3

19 U.S.C. § 1677(16) .......................................................................... 4, 28, 30

19 U.S.C. § 1677b(a) ..............................................................................3, 30

19 U.S.C. § 1677b(b) .......................................................................... 4, 39, 40

19 U.S.C. § 1677b(f) .............................................................................. 11, 32

19 U.S.C. § 1677e(a).............................................................................. *passim*

19 U.S.C. § 1677e(b) ...............................................................................34

19 U.S.C. § 1677m(d) ...................................................................... 28, 30

Uruguay Round Agreements Act, Statement of Administrative Action,
  H.R. Doc. No. 103-316, at 869-70 (1994), reprinted in 1994 U.S.C.C.A.N. 4040,
  420.............................................................................................................. 40

## Regulations

19 C.F.R. § 351.308(c)...........................................................................34

## Administrative Determinations

*Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of
  Germany*,
  82 Fed. Reg. 16,360 (Dep't Commerce Apr. 4, 2017) ...........................................1

*Certain Crystalline Silicon Photovoltaic Products from Taiwan*,
  82 Fed. Reg. 31,555 (Dep't of Commerce July 7, 2017) .................................... 33

*Certain Oil Country Tubular Goods from Korea*,
  79 Fed. Reg. 41,983 (Dep't of Commerce July 18, 2014). ..................................33

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Federal Circuit Rule 47.5, defendant-appellee's counsel states that she is unaware of any other appeal in or from this action that was previously before this Court, or any other appellate court, under the same or similar title. The Court has designated the following case as a companion case: *AG der Dillinger Huttenwerke v. United States*, Court No. 24-1219.

# STATEMENT OF THE ISSUES[1]

1.     Whether the Department of Commerce's application of its model match methodology and rejection of AG der Dillinger Hüttenwerke's (Dillinger) product quality code for sour service pressure vessel plate (sour vessel plate) is supported by substantial evidence and otherwise in accordance with law.

2.     Whether, as facts otherwise available, Commerce's determination that the likely selling prices of Dillinger's non-prime plate reasonably reflects the cost of production of non-prime plate is supported by substantial evidence and in accordance with law.

# STATEMENT OF THE CASE

This appeal concerns the final affirmative determination in the antidumping duty investigation covering certain carbon and alloy steel cut-to-length plate from the Federal Republic of Germany, during the period between April 1, 2015, through March 31, 2016.  *See Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany*, 82 Fed. Reg. 16,360 (Dep't Commerce Apr. 4, 2017) (final determination), Appx000009-000012, and the accompanying Issues and Decision Memorandum, Appx005882-005981.  Dillinger and another mandatory respondent, Ilsenburger Grobblech GmbH (ILG), Salzgitter

---

[1]  Pursuant to Fed. Cir. R. 28(b), we provide counter-statements of the issue, the case, and the facts because we disagree with those of plaintiff-appellant.

Mannesmann Grobblech GmbH (MGB), Salzgitter Flachstahl GmbH (SZFG), and Salzgitter Mannesmann International GmbH (SMID) (collectively, Salzgitter), both appealed to the Court of International Trade, and the cases were consolidated.

Following the first remand redetermination,[2] the trial court sustained Commerce's rejection of Dillinger's untimely proposed quality code for sour vessel plate. Appx000032-40. The trial court stayed consideration of Commerce's rejection of Dillinger's proposed quality code for sour service petroleum transport plate (sour transport plate) pending the outcome of other remanded issues in *AG der Dillinger Hüttenwerke v. United States*, 534 F. Supp. 3d 1403 (Ct. Int'l Trade 2021) (*Dillinger II*). Appx000013-000031.

Following the second remand redetermination, Appx000041-000101, the court remanded to Commerce with instructions to explain how information indicating the likely selling prices of non-prime plate as facts otherwise available reasonably reflects the cost of production of the non-prime plate. *AG der Dillinger Hüttenwerke v. United States*, 592 F. Supp. 3d 1344 (Ct. Int'l Trade 2022) (*Dillinger III*). Appx000102-000110. In *Dillinger IV*, the trial court sustained Commerce's explanation in the third remand redetermination for the cost

---

[2] The trial court previously sustained Commerce's resort to facts available with an adverse inference to certain of the respondents' home market sales. *AG der Dillinger Hüttenwerke v. United States*, 399 F. Supp. 3d 1247 (Ct. Int'l Trade 2019) (*Dillinger I*). That issue is on appeal in the related case.

adjustments for non-prime plate, Appx000111-000127, but again remanded for Commerce to further explain why it was reasonable to use a single quality code for all types of petroleum transport plate, rather than a separate quality code for sour transport plate. *AG der Dillinger Hüttenwerke v. United States*, 648 F. Supp. 3d 1321 (Ct. Int'l Trade 2023) (*Dillinger IV*).

Ultimately, the trial court sustained Commerce's fourth remand redetermination, and declined to reconsider its previous decision that had sustained Commerce's rejected proposed quality code for sour vessel plate. *AG der Dillinger Hüttenwerke v. United States*, 672 F. Supp. 3d 1351 (Ct. Int'l Trade 2023) (*Dillinger V*). The court also sustained Commerce's decision to accept the quality code for sour transport plate.

## STATEMENT OF THE FACTS

### I. Legal Framework

In an antidumping duty proceeding, Commerce determines whether subject merchandise is being, or is likely to be, sold at less than fair value in the United States by comparing the price of the merchandise sold in the United States and the "normal value" of the merchandise. *See* 19 U.S.C. §§ 1673, 1675(a)(2)(A), (C), 1677b(a). Commerce can determine the "normal value" in certain cases by considering sales of the merchandise in the home market. *See* 19 U.S.C. §1677b(a)(1). Generally, Commerce compares the cost of production to home

market sales prices to determine whether those home market prices can be used as a basis for normal value. *See* 19 U.S.C. §§ 1677b(b)(1), (b)(2)(A)(ii) (outlining "sales at less than cost of production" determinations).

## II.  The Investigation

### A.  Relevant Facts Relating To Model Match

Before Commerce can establish the dumping margin in an investigation, Commerce must first identify the "foreign like product" which will form the basis for comparison to merchandise exported to the United States. *See Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1375 (Fed. Cir. 2001); 19 U.S.C. § 1677(16)(B)-(C). To identify the "foreign like product," Commerce devises a hierarchy of commercially significant characteristics suitable to each class or kind of merchandise, and then utilizes these characteristics to compare United States sales to sales in the comparison market. *Fagersta Stainless AB v. United States*, 577 F. Supp. 2d 1270, 1275-76 (Ct. Int'l Trade 2008); *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1379 (Fed. Cir. 2008).

Commerce has a longstanding practice of developing a model matching methodology in the early stages of an investigation, and in consultation with interested parties. Appx005951-005952. Determining the appropriate model match hierarchy at the early stage is critical because it enables Commerce to request and obtain the necessary information from respondents through

questionnaires. Because merchandise need not be exactly the same to be considered "identical," *SKF USA*, 537 F.3d at 1384, Commerce does not attempt to account for every conceivable difference between products when determining which products are identical to others. Appx005953. Commerce determines what constitutes "commercially significant" physical differences on a case-by-case basis. *Fagersta Stainless*, 577 F. Supp. 2d at 1279.

Because Commerce must establish the comparison criteria early in the investigation, on May 19, 2016, Commerce sent its products characteristics letter to all interested parties, notifying parties of the proposed list of product characteristics that would be used for identification of specific products by control number and soliciting comments from interested parties. Appx000225-000236.

On June 2, 2016, Dillinger, petitioner Nucor Corporation (Nucor), and other interested parties in the cut-to-length plate investigations provided comments regarding the physical characteristics of the merchandise under consideration to be used for reporting purposes. Appx000237-000322, Appx000323-000359. In its model match comments in this investigation, Dillinger proposed quality codes for "sour service petroleum transport plate." Appx000238-000239. Dillinger did not propose a separate quality code for sour vessel plate. The parties also provided rebuttal comments. Appx006314-006354.

After analyzing parties' comments, on June 10, 2016, Commerce designated

a hierarchy of 12 product characteristics for product matching purposes.

Appx000370-000385; *see also* Appx005952-005953. Commerce did not accept

Dillinger's proposed quality code for sour transport plate. Commerce did,

however, instruct Dillinger that it could add number codes, but that it must:

> Provide a *detailed* narrative description of each
> additional Quality you propose, and explain what
> differentiates each of those additional Qualities from
> each of the ones listed above with respect to actual
> physical properties. Specifically, *explain* why you have
> assigned the particular numeric code within the Quality
> code hierarchy for matching purposes.

Appx000377 (emphasis added).

In its July 15, 2016, response to Commerce's Section B questionnaire,

Dillinger renewed its proposed number code for sour transport plate (code 771),

Appx001692-001693, but did not propose an additional number code for sour

vessel plate. On September 20, 2016, in response to Commerce's first

supplemental questionnaire, Dillinger for the first time proposed a separate quality

code (code 759) for sour vessel plate. Appx003086-003087. As its rationale for

including the new code, Dillinger explained that it "has already provided extensive

information on the corrosive effects of sour petroleum products" and claimed that

"{t}hese steels are made according to special specifications and have a higher cost

of production and price than steels used in non-corrosive environments because of

the different chemical composition and physical properties." Appx003088. Dillinger also referenced an exhibit stating the specifications for sour vessel plate. Appx003293-003309.

In the final determination, Commerce explained that Dillinger did not provide any evidence of significant systematic variations in pricing patterns between sour vessel plate and other pressure vessel/boiler quality plate. Appx005955. Commerce observed that Dillinger had borrowed verbatim several descriptions from its product data sheets for several products, including that the sour vessel plates were "fine grained" and "adapted" to "sour service conditions," but found that Dillinger did not otherwise distinguish the products from other pressure vessel products. Appx005957.

Regarding chemical composition, Commerce found that although Dillinger emphasized the difference in various levels of sulfur and phosphorus, Dillinger's data sheets did not indicate that other chemical elements varied "from the levels of those elements for other pressure vessel plate." Appx005957. Commerce also found that Dillinger's new code proposal was untimely, because it "did not propose distinguishing sour vessel plate products from other pressure vessel plate products" during the model match comments period, "even though it appears to have been aware of such sour service products at the time." Appx005958. Commerce found that Dillinger did not provide enough information that would "justify either

allowing Dillinger to report revised quality codes for different pressure vessel plate products, or revisiting this issue once parties had submitted their questionnaire responses." *Id.* Therefore, Commerce continued to reject Dillinger's proposed quality code of 759 for sour vessel plate and instead assigned the code of 760 for all pressure vessel/boiler quality steels. *Id.*

Likewise, Commerce continued to reject Dillinger's proposed quality code for sour transport plate. Appx005958-005960. Commerce recognized that Dillinger had first proposed the sour transport plate quality code in its model match comments and had included two examples of products. Appx005958-005959. Commerce explained that Dillinger had subsequently changed product examples in its questionnaire responses and that impeded Commerce's ability to assess the significance of the chemical composition of the products. Appx005959. For example, although Dillinger provided a PowerPoint slide presentation about the requirements for sour transport plate, Commerce explained that the presentation was inconsistent with the examples included in Dillinger's Section B response regarding chemical composition of the products. *Id.* Thus, Commerce also rejected Dillinger's proposed quality code for sour transport plate. Appx005960.

**B.    Relevant Facts Related To Dillinger's Costs Of Production For Non-Prime Plate**

Early in the investigation, Dillinger informed Commerce that it "is not able to report all the product characteristics for non-prime merchandise," explaining that any rejected merchandise "is sold by the railcar load as 'odds and ends'" and no grade/specification information is recorded in Dillinger's computerized sales records concerning these sales. Appx000360-000361. Physical characteristics of these "odds and ends" railcars are not recorded. Dillinger reported that railcar loads can have "various different sizes and grades of plate" and this non-prime merchandise is "sold without any warranty as to type, grade, specification or chemistry and no grade/specification information is recorded in Dillinger's computerized sales records concerning these sales." Appx000361.

In its Section D questionnaire response, in accounting for scrap or non-prime merchandise, Dillinger explained that "{a}ll losses in the production process are taken into account in the yield calculations of successive stages. Scrap revenue for useable scrap is offset at *market prices* against the cost of the stage where the scrap is generated, whether the material is sold or melted and reused." Appx006381-006382 (emphasis added).

In responding to the Supplemental Section D questionnaire, Dillinger explained that its prime products are used in applications that require certifications of grade, type, and chemistry. Appx003953-003954. By contrast, its non-prime

merchandise is sold without such certification of grade, type, or chemistry, and, therefore, for different end-use applications. *Id.*; *see also* Appx000361. Dillinger explained that it reported non-prime merchandise in its books "at its sales value (*i.e.*, manufacturing costs = net sales value)." Appx003954.

In the final determination, Commerce explained that its practice for determining the cost of production for non-prime products is to analyze the products on a "case-by-case basis to determine how the respondent records such products in its normal books and records, whether the products remain in scope, and whether the products can still be used in the same applications as prime products." Appx005970. When the downgraded product "cannot be used for the same applications as the prime product" and "the product's market value is usually significantly impaired to a point where its full cost cannot be recovered," then "assigning full costs to that product would be unreasonable." *Id.*

In accordance with this practice, Commerce reviewed Dillinger's internal factory results report wherein it "values non-prime products at their likely selling price and uses this value as an offset to prime production." Appx005971. Commerce determined that Dillinger's valuation of non-prime plate "is significantly lower than the average value of prime production that Dillinger assigned for purposes of reporting costs" to Commerce. *Id.* Therefore, Commerce "continued to adjust Dillinger's reported costs for non-prime products to reflect the

full weighted-average cost of prime plate production" as stated in Dillinger's normal books and records.  *Id.*

## III.  <u>Trial Court Proceedings</u>

### A.  In *Dillinger II*, The Trial Court Remanded The Non-Prime Plate Cost Of Production Issue And Sustained Commerce's Rejection Of Dillinger's Proposed Quality Code For Sour Vessel Plate

The trial court found that Commerce had improperly reallocated cost of production between prime and non-prime plates.  Appx000017-000018.  The court held that Commerce must reconcile its cost of production determination for non-prime plate consistent with *Dillinger France S.A. v. United States*, 981 F.3d 1318, 1321-24 (Fed. Cir. 2020) (*Dillinger France I*), which held that Commerce's reliance on information reflecting a respondent's "likely selling price," rather than actual cost data, violates 19 U.S.C. § 1677b(f).  Appx000018.

The trial court also addressed Dillinger's model match issues.  Appx000032-000040.  With respect to sour vessel plate, the trial court observed that "Dillinger continued to unilaterally assign other product codes" to this plate even after Commerce rejected Dillinger's proposed codes.  Appx000038.  Specifically, Commerce had rejected the proposed quality code for sour vessel plate "because it was not submitted within the time for submitting model match comments for the concurrent {cut-to-length} plate investigations."  Appx000038-000039.  The court held that substantial evidence supported Commerce's explanation that Dillinger

had not provided sufficient information to justify a revision to the quality codes for different pressure vessel plate products such that it was reasonable for Commerce to reject the code for sour vessel plate. Appx000039. However, the trial court stayed further consideration of Commerce's rejection of Dillinger's other proposed quality code for sour transport plate, pending the outcome of remanded issues in *Dillinger II*. Appx000040.

**B.** **In The Second Remand Redetermination, Commerce Explained Why It Was Reasonable To Use The Likely Selling Price As The Non-Prime Plate Cost Of Production**

In the second remand redetermination following *Dillinger II*, Commerce reopened the record and issued a supplemental questionnaire to Dillinger to obtain the physical characteristics and the actual production costs of the non-prime products. Appx000048-000049. Despite this opportunity to provide necessary information, Dillinger did not do so. Appx000049; *see also* Appx006086-006286. Dillinger stated that it had already reported the physical characteristics "at the greatest level of detail possible" and that Dillinger's systems for capturing costs does "not differentiate{} between prime and non-prime merchandise." Appx000050; *see also* Appx006098-006099. Dillinger continued to base its costs for producing non-prime plate on the "average actual total cost of manufacture for all plate" it had produced during the period of investigation. Appx000050.

Commerce explained why such reporting was inadequate: "not knowing the actual cost of producing the non-prime merchandise directly impacts the amount of costs assigned to the production of the prime products." *Id.*; Appx000078. Without accurate and complete product-specific production cost information, "{i}f too much or too little cost is assigned to the non-prime products, then too little or too much cost is assigned to the prime products produced." Appx000050-000051. Therefore, Commerce determined that necessary information was missing from the record and determined to rely on Dillinger's normal books and records as facts otherwise available. Appx000051; *see also* 19 U.S.C. § 1677e(a)(1).

Addressing Dillinger's attempt to "downplay the necessity" of the product-specific actual cost of production, Commerce explained that the "distortive nature of simply taking the average cost of all products can be seen by the wide disparity" in other actual reported costs. Appx000052-000053. Moreover, "Dillinger's inability to provide the actual physical characteristics of the non-prime products prevents Commerce from adjusting the reported overall average cost of prime products in an effort to estimate the actual product-specific costs of non-prime products" and results in Commerce not having the necessary information to determine the actual cost of production of non-prime products. Appx000053-000054; *see also* Appx000080-000081.

With this necessary information missing from the record, Commerce filled the gap by "using the cost assigned to the prime and non-prime merchandise as recorded in Dillinger's normal books and records, as facts otherwise available." Appx000056. Specifically, Commerce selected Dillinger's selling prices of the non-prime products as the best available information on the record. Commerce found that Dillinger used this amount in its normal books and records and the information was verified. *Id.* As Commerce observed, *if* Dillinger "had wanted to present evidence of the specific non-prime products produced, it could have relied on production reports or finished goods inventory excerpts to show which production runs resulted in the production of non-prime plate," but it failed to do so. Appx000083.

Finally, Commerce rejected Dillinger's assertion that it was inappropriate to use the likely selling price of non-prime plate as facts otherwise available because Dillinger itself reported that information in a questionnaire response. *Id.* Indeed, the information was "preferable because it is based on the actual costs Dillinger assigns to the non-prime products produced in its normal books and records." Appx000084.

**C.    In *Dillinger III*, The Trial Court Ordered Commerce To Explain Why The Likely Selling Price Reasonably Reflects Cost Of Production Of Non-Prime Plate**

Consistent with the remand proceedings in the parallel action of *Dillinger France S.A. v. United States*, 589 F. Supp. 3d 1252, 1261 (Ct. Int'l Trade 2022) (*Dillinger France II*), the trial court held that a further remand was necessary for Commerce to explain why reliance on the likely selling price as facts otherwise available reasonably reflects the cost of producing non-prime merchandise. Appx000108.  In *Dillinger France II*, the trial court held that *Dillinger France I* did "not prohibit Commerce from relying on Dillinger's normal books and records as facts otherwise available," because although Commerce must determine the *actual* costs of prime and non-prime products to determine normal value, "this directive does not necessarily identify—or cabin—what information Commerce may or may not rely upon as facts otherwise available under 19 U.S.C. § 1677e(a)(1)."  *Dillinger France II*, 589 F. Supp. 3d at 1261.  However, the trial court remanded the issue because Commerce had failed to "illuminate" why reliance on Dillinger's normal books and records better accords with Commerce's obligation to ensure that the reported costs of production reasonably reflect the cost of producing the merchandise under consideration.  *Id.* at 1262.  Because the issue and arguments were nearly identical in both the Dillinger France and Germany proceedings, the trial court remanded this issue in the instant case to ensure

consistency. Appx000109. In ordering the remand for additional explanation, the trial court confirmed that "{b}ecause Dillinger has failed to place information on the record demonstrating the actual cost of production of its non-prime products, Commerce may reasonably rely on facts otherwise available pursuant to § 1677e(a)(1){.}" *Id.*

Subsequently, in the third remand redetermination, Commerce explained why the likely selling price in Dillinger's books and records was the best available information to use as facts otherwise available. Appx000111-000127. Commerce explained that non-prime product production is "an inevitable consequence" of Dillinger's prime product production "because Dillinger does not intend to produce non-prime products." Appx000115. Reliance on Dillinger's own books and records, as facts otherwise available, was the "only reasonable approach because it recognizes that, where Dillinger cannot produce 98 perfect plates without producing two imperfect plates, the lost value of the two imperfect plates is actually a cost of producing the 98 perfect ones and should be accounted for as such." *Id.* In other words, using Dillinger's normal books and records results in the accurate allocation of total direct and indirect costs because "the actual costs of producing non-prime products cannot be lower than the cost of producing prime products." Appx000121-000122. Commerce rejected Dillinger's proffer to "estimate" costs of production because it was Dillinger's "decision not to provide

Commerce with information concerning the physical characteristics of the non-prime merchandise produced or the actual product-specific costs of producing non-prime products." Appx000121; *see also* Appx000122-000123.

Further, Commerce explained that there was no record evidence that reliance on the likely selling price was unreasonable, as Dillinger asserted. Appx000124. Rather, Commerce found "record evidence to demonstrate that the use of the likely selling price of non-prime products results in a reasonable allocation of total costs to prime products, because it recognizes the total direct costs (*i.e.*, direct materials and conversion costs) and indirect costs (*i.e.*, the lost value of the non-prime plates) attributable to the production of prime plates." *Id.* And even Dillinger's audited financial statements reflected Dillinger's "practice of allocating the lost value attributable to the production of non-prime products to prime products." *Id.*; *see also* Appx000125-000126.

### D. In *Dillinger IV*, The Trial Court Sustained Commerce's Cost Of Production For Non-Prime Plate And Remanded The Model Match For Sour Transport Plate

On June 23, 2023, the trial court sustained Commerce's determination with respect to Dillinger's non-prime plate cost of production, but remanded Commerce's model match methodology for Dillinger's sour transport plate. Appx000128-000155. First, the trial court sustained Commerce's application of facts otherwise available, and held that Dillinger "failed to demonstrate that

Commerce's application of facts otherwise available was unreasonable given the limited information in the record," noting that Commerce had provided Dillinger the opportunity on remand to provide cost information. Appx000134-000135. The court found "unpersuasive" Dillinger's alternative calculation, that is, to use the average actual total cost of manufacture for *all* its plate sold during the period of investigation. The court held that Commerce's reliance on the likely selling price of non-prime plate was a reasonable application of facts otherwise available under 19 U.S.C. § 1677e(a). Appx000135-000137. The court also rejected Dillinger's "naked assertion" that Commerce applied an adverse inference by using the information from Dillinger's own books and records. Appx000138.

Second, the court remanded for further consideration Commerce's rejection of Dillinger's proposed quality code 771 for sour transport plate. Appx000149-000154. Dillinger had explained to Commerce that there are non-minor, commercially significant differences between standard transport plate and its sour transport plate, because sour transport plate is used with "sour" petroleum products containing high amounts of hydrogen sulfide, resulting in sour transport plate made with "'extremely low levels of phosphorus and sulfur' to withstand the corrosion effects of the hydrogen sulfide." Appx000152.

The court found persuasive Commerce's model-match methodology sustained in *Bohler Bleche GMBH & Co. KG v. United States*, 324 F. Supp. 3d

1344 (Ct. Int'l Trade 2018). In that case, on remand, Commerce "revised its

methodology to better account for { } alloy content differences" in Bohler's

specialized high alloy steel products. Appx000152-000153. Although Commerce

had rejected Dillinger's argument that "lower levels of phosphorus and sulfur" in

sour transport plate "distinguished them from other petroleum transport plate," the

court instructed Commerce on remand "to further explain why its determination is

reasonable in light of its approach in *Bohler*, or if appropriate, reconsider its

rejection of Dillinger's proposed quality code for sour transport plate."

Appx000154.

### E. In *Dillinger V*, The Trial Court Sustained Commerce's Model-Match Methodology

In the fourth remand redetermination, Commerce reconsidered Dillinger's

proposed quality code for sour transport plate in light of *Bohler*, and determined

that the facts in *Bohler* were analogous to the facts of this proceeding.

Appx000159-000161. Commerce declined to reconsider its rejection of Dillinger's

proposed quality code for sour vessel plate, because the court had already sustained

its rejection in *Dillinger II*. Appx000164. Thus, Commerce revised Dillinger's

calculations using its reported quality code for sour transport plate (*i.e.*, code 771),

and recalculated Dillinger's final estimated weighted-average dumping margin by

increasing the margin to 4.99 percent. *Id.*

19

On December 21, 2023, the trial court sustained Commerce's model-match methodology. Appx000166-000177. First, the trial court explained that it had not directed Commerce to reconsider the sour vessel plate quality code issue on remand, and "so Dillinger's arguments on this issue essentially amount to a request for reconsideration of the court's *August 2021 Order*." Appx000172-000173. Dillinger also failed to account for any model-match issues in *Bohler* or "justify differing outcomes." Appx000173. Second, the trial court sustained, as supported by substantial evidence, Commerce's revised methodology with respect to sour transport plate. Appx000175-000176.

## SUMMARY OF THE ARGUMENT

This Court should affirm the trial court's judgment. Substantial evidence supports Commerce's determination to reject Dillinger's untimely submission of the sour vessel plate quality code, which came four months after Commerce finalized the product characteristic codes for all the cut-to-length steel plate investigations, covering 11 countries. Not only was Commerce well within its discretion to reject the untimely submission, but substantial evidence also supports Commerce's determination that Dillinger did not explain why this untimely quality code was necessary.

Second, the trial Court should sustain Commerce's application of facts otherwise available to fill the gap in the record concerning Dillinger's actual

production costs of non-prime plate.  The trial court correctly sustained Commerce's use of the likely selling price of Dillinger's non-prime plate as facts otherwise available.  That information was verified, came from Dillinger's own books and records, and best filled the informational gap.

The Court should also reject Dillinger's argument that alternative information, the average cost of production of all steel plate (prime and non-prime), more closely approximates to the cost of production.  Although Commerce must use actual cost of production information when it is available, 19 U.S.C. § 1677b(b)(3), here, the actual cost of production of non-prime plate is missing from the record, and Commerce resorted to using facts otherwise available.  For that reason, substantial evidence supports Commerce's use of the likely selling price of non-prime plate to fill the gap in the record.

## ARGUMENT

### I.     Standard Of Review

Although this Court recognizes the Court of International Trade's specialized expertise, this Court nevertheless reviews the trial court's decision *de novo*.  *See Union Steel v. United States*, 713 F.3d 1101, 1106 (Fed. Cir. 2013).  Specifically, the Court applies anew "the same standard of review the Court of International Trade used in reviewing the Commerce administrative record{.}" *Norsk Hydro Canada, Inc. v. United States*, 472 F.3d 1347, 1358 (Fed. Cir. 2006).

Thus, the Court will uphold Commerce's determination unless it is "'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Union Steel*, 713 F.3d at 1106 (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Univ. Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). "An agency finding may still be supported by substantial evidence even if two inconsistent conclusions can be drawn from the evidence." *Qingdao Sea-Line Trading Co., Ltd. v. United States*, 766 F.3d 1378, 1385 (Fed. Cir. 2014).

## II.    The Trial Court Correctly Held That Commerce's Rejection Of Dillinger's Proposed Sour Vessel Plate Quality Code Is Supported By Substantial Evidence And In Accordance With Law

Commerce's rejection of Dillinger's untimely-raised quality code for sour vessel plate is supported by substantial evidence and in accordance with law. Appx005957-005958. Dillinger's various arguments are meritless, as we explain below.

### A.    Commerce Did Not Abuse Its Discretion And Substantial Evidence Supports Commerce's Decision To Reject Dillinger's Untimely Submitted Quality Code For Sour Vessel Plate

Commerce was not required to accept Dillinger's untimely proposal for a separate quality code for sour vessel plate, nor did it abuse its discretion by declining to do so. During the time for submitting model match comments,

Dillinger did not propose a separate quality code for sour vessel plate. Appx000238-000239. Instead, Dillinger proposed the quality code four months *after* the deadline for model match comments. Appx003087-003088. The trial court correctly held that, for this reason alone, Commerce's decision to reject the quality code for sour vessel plate is supported by substantial evidence. Appx000039, Appx005957.

"{I}n light of the time constraints under which it must conduct a review and the obligations to ensure both consistency and procedural fairness with respect to all parties in a review," Commerce does not abuse its discretion by rejecting untimely proposals for product characteristics. *See JTEKT Corp. v. United States*, 37 F. Supp. 3d 1326, 1335-36 (Ct. Int'l Trade 2014). Accordingly, Commerce may reject proposed product characteristics that are submitted after the comment period set aside at the beginning of a proceeding. *See, e.g.*, *Maverick Tube Corp. v. United States*, 107 F. Supp. 3d 1318, 1330 (Ct. Int'l Trade 2015) (affirming Commerce's decision to reject model-match comments petitioners submitted after the end of the comment period).

Commerce's "discretion to establish and enforce time limits for submitting information," *Goodluck India Limited v. United States*, 11 F.4th 1335, 1342 (Fed. Cir. 2021) (citation omitted), has particular force with respect to this type of product characteristic information. Consistency requires that Commerce apply

revisions to the product characteristics used in the model-match methodology to the merchandise of all respondents subject to a proceeding. *Id.* at 1336. Procedural fairness mandates that "all interested parties have the opportunity to consider and comment on a proposal for a fundamental change to the methodology." *Id.* When parties such as Dillinger submit modifications to the product characteristics when it is too late in the proceeding to solicit additional comments, the record will lack input from the other interested parties on the proposed revisions. *Id.*

The importance for timely submittal of comments is underscored by the fact that Commerce's model match applies not just to this investigation relating to cut-to-length plate imports from Germany, but also to Commerce's concurrent investigations relating to cut-to-length plate imports from 11 other countries, *all* of which applied the same model-match criteria. Appx000370-000385. Commerce's decision to not deviate from its practice of allowing parties to comment on product characteristics, which is designed to provide procedural fairness to all interested parties, is supported by substantial evidence. Appx005958. Dillinger's arguments do not demonstrate otherwise.

First, Dillinger argues that the proposed quality code was not untimely because Commerce's Product Characteristics Letter allowed respondents to raise additional quality codes and Dillinger had alerted Commerce that it might propose

additional quality code subcategories in its own comments on the proposed product characteristics. Applnt. Br. at 31-32. Commerce was not required to consider an untimely-submitted quality code merely because Dillinger suggested that it might later propose other codes. Appx000239. Dillinger cites no authority in support of this argument, and we are unaware of any. To allow a party to "reserve its right" to submit information months after the comment period would deprive Commerce of the ability to enforce deadlines necessary for timely completion of the investigation. Rather, as explained above, Commerce may enforce its own deadlines, as it did here. *See* Appx0005958; *Goodluck*, 11 F.4th at 1342. Moreover, Commerce was skeptical that additional time was needed "to perform additional analysis, unless {Dillinger} wanted further time to estimate the margin impact of such a proposal" for sour vessel plate when making its product characteristics comments because it had already submitted the other proposed sour transport plate quality code.[3] Appx005958.

Second, Dillinger argues that Commerce held parties to different standards in consideration of quality codes, because Commerce accepted "significant changes in the originally proposed Quality codes" from Nucor. Applnt. Br. at 33-36. The key difference, of course, is that Nucor suggested changes to the product

---

[3] Dillinger has never explained why it waited four months after Commerce finalized the product characteristics for all of the cut-to-length steel investigations to submit another sour service code.

codes *within* the comment period for the product characteristics, allowing parties (such as Dillinger) the opportunity to rebut Nucor's comments before Commerce finalized the quality codes in the Product Characteristics Letter for all the cut-to-length plate investigations. Appx000328-000329; *see also* Appx006314-006323. Commerce's differing treatment of the parties' changes merely reflects its enforcement of deadlines communicated to all parties.

Finally, Dillinger argues that Commerce's determination not to accept its proposed quality code for sour vessel plate is inconsistent with the methodology sustained in *Bohler* and Commerce's acceptance of the proposed quality code for sour transport plate in the fourth remand redetermination. Applnt. Br. at 22-23. Specifically, Dillinger argues that Commerce found the facts of this case to be "analogous" to *Bohler* "and that a separate Quality code for sour service petroleum transport plate is therefore warranted." *Id.* at 22. Dillinger also complains that the trial court did not mention *Bohler* when it sustained Commerce's rejection of the additional quality code for sour vessel plate in the 2021 memorandum and order. *Id.* at 23; *see also* Appx000032-000040.

But the trial court *did* consider *Bohler*. The court held that Dillinger had failed to explain why the facts with respect to the sour vessel plate were analogous to *Bohler*. *Dillinger V*, Appx000173-000174. For example, the trial court explained that Nucor distinguished *Bohler* on the basis that the respondent there

had "raised their concerns {with the quality code} with every turn" and the court in *Bohler* held that the comments were not untimely. Appx000173. Dillinger, in contrast, never explained to Commerce or the trial court why the specific facts related to Commerce's rejection of the sour vessel plate quality code were analogous to *Bohler*, other than saying it must be so if Commerce accepts the sour transport plate quality code.

Thus, the trial court correctly held that Dillinger had failed to address "the factual distinctions specific to this issue that may justify differing outcomes" from *Bohler*. *Id.* Other than reiterating that Dillinger "provided Commerce with extensive documentation showing the differences" between sour vessel plate and standard pressure vessel plate, Applnt. Br. at 22, as before the trial court, Dillinger does not explain why *Bohler* should apply to the sour vessel plate.

In any event, even if Dillinger had attempted to analogize the *Bohler* facts to the sour vessel plate issue, which it did not, the trial court also explained that it had previously sustained Commerce's decision not to use that product characteristic, and Dillinger failed to demonstrate that reconsideration was appropriate. Appx000173-000174.

### B. Dillinger Failed To Demonstrate That A Separate Quality Code For Sour Vessel Plate Was Necessary

As we explained above, Dillinger's proposed sour vessel plate quality code was untimely, and the trial court correctly sustained Commerce's rejection of the

code. But even if Dillinger had timely proposed the sour vessel plate quality code, Commerce explained why it rejected the proffered code for sour vessel plate for model match purposes.

Dillinger argues that it provided Commerce with "extensive documentation showing the differences" between its proffered product code and Commerce's selected code. Applnt. Br. at 24-33. Dillinger also argues that Commerce failed to inform it of any deficiency in the proposed quality code pursuant to 19 U.S.C. § 1677m(d). *Id.* at 33-34. These arguments are meritless.

First, cost and price differences between sour vessel plate and its non-sour service counterpart do not justify a separate product code. *See id.* at 27. Model match is based on physical differences. *NSK v. United States*, 217 F. Supp. 2d 1291, 1299-1300 (Ct. Int'l Trade 2002); 19 U.S.C. §1677(16). Cost differences alone do not justify usage of a separate quality code.

With respect to price differences, Dillinger did not provide Commerce evidence of significant systematic variations in pricing patterns between sour vessel plate and other pressure vessel/boiler quality plate. Appx005955. Dillinger references its trial court brief, in which it provided aggregated tables that purported to demonstrate higher net prices and cost of production associated with sour vessel plate products. *See* Applnt. Br. at 27 (citing Appx006003). But because Dillinger did not provide that information to Commerce during the investigation, the Court

should not consider it now.  *See e.g.*, *Boomerang Tube LLC v. United States*, 856

F.3d 908, 912-13 (Fed. Cir. 2017).

Second, Dillinger argues that sour vessel plate warranted a unique product

code because it is in "sour service" and "specially manufactured with extremely

low levels of phosphorus (P) and sulfur (S) to withstand the corrosion effects of the

high level of sulfur in sour crude oil, such as hydrogen induced cracking."  Applnt.

Br. at 25.  Commerce found that these alleged attributes do not constitute

substantial evidence of differences requiring a separate product code because each

of these terms are taken verbatim from product data sheets for a few Dillinger

products.  Appx005957; *see also* Appx003293-003309.  Dillinger provided no

evidence indicating the extent to which product characterizations would also apply

to pressure vessel plate products beyond those Dillinger produces.  Appx005957.

Rather, the proposed model-match appears to be "the choice of merchandise most

advantageous to {Dillinger}."  *Timken Co. v. United States*, 630 F. Supp. 1327,

1338 (Ct. Int'l Trade 1986).

Dillinger also did not show how those Dillinger products compare to other

pressure vessel products across the broad range of all product qualities.  *See*

Appx003088, Appx005957.  To wit, Commerce explained that although Dillinger

claimed there were "required levels of 'expensive alloys' (nickel and copper), and

specific carbon content requirements)" in one submission, these allegedly required

elements were absent in other submissions.  Appx005958.  Substantial evidence, thus, supports Commerce's determination that "Dillinger did not subsequently provide information that would justify either allowing Dillinger to report revised quality codes for different pressure vessel plate products, or revisiting this issue once parties had submitted their questionnaire responses."  *Id.*

Third, Dillinger argues that Commerce did not provide notice of the deficiencies in the information it provided.  Applnt. Br. at 33-34.  Dillinger relies on 19 U.S.C. § 1677m(d), which requires that Commerce "promptly inform the person submitting" deficient information "the nature of the deficiency" and "to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency" before applying facts otherwise available.  Contrary to Dillinger's assertion, Commerce was not required to notify Dillinger that its proposed quality code needed additional information before Commerce would accept the code.

The statutory authorities for Commerce's model matching do not require that Commerce provide notice to parties concerning why Commerce declined to consider a specific product code.  *See* 19 U.S.C. §§ 1677(16)(B)-(C), 1677b(a)(6).  Nor does Commerce draw any adverse inference or apply facts otherwise available when it rejects a proposed quality code.  Rather, it simply reflects a methodological selection of relevant product characteristics that the respondents, including

Dillinger, were to use to report its information in this investigation.  *See* Appx000370-000385.

Thus, this Court should affirm the trial court's determination that substantial evidence supports Commerce's rejection of the sour vessel plate quality code. Appx000038-000039, Appx000173-000174, Appx005957-005958.

## III.   The Trial Court Correctly Held That The Likely Selling Price Of Dillinger's Non-Prime Plate Is The Best Available Information For Cost Of Production

The trial court correctly held that Dillinger's actual production costs of non-prime plate was missing from the record and determined that Commerce appropriately applied facts otherwise available to fill the gap.  Appx000109; 19 U.S.C. § 1677e(a).  Further, the court correctly sustained Commerce's use of the likely selling price of Dillinger's non-prime plate as facts otherwise available to fill the informational gap because that information was verified and came from Dillinger's own books and records.  Appx000119-000126, Appx000133-000139; *see also Dillinger France S.A. v. United States*, 651 F. Supp. 3d 1294, 1313-1318 (Ct. Int'l Trade 2023) (*Dillinger France III*) (sustaining use of Dillinger France's books and records as facts otherwise available to determine non-prime plate cost of production).

On appeal, Dillinger does not challenge the trial court's decision to sustain Commerce's determination to apply facts otherwise available.  Instead, it

challenges Commerce's selection of information to fill the informational gap concerning the actual costs of production of non-prime products. And Dillinger's arguments largely ignore the fact necessitating Commerce's application of facts otherwise available: Dillinger did not provide the physical characteristics or the actual product-specific cost of production of non-prime plate. As we explain below, Commerce's selection of information to fill the informational gap should be affirmed.

### A. Legal Framework For Costs Of Production For Non-Prime Merchandise

"Costs shall normally be calculated based on the records of the exporter or producer of the merchandise." 19 U.S.C. § 1677b(f)(1)(A). "The statute directs Commerce to use the normal books and records of the exporter or producer if such records are kept in accordance with Generally Accepted Accounting Principles (GAAP) and reasonably reflect the costs associated with the production and sale of subject merchandise." *Tension Steel Indus. Co. v. United States*, 179 F. Supp. 3d 1185, 1194 (Ct. Int'l Trade 2016). Thus, Commerce reviews, on a case-by-case basis, whether the non-prime merchandise can be used in the same applications as prime merchandise, how the products are reported in the respondent's normal books and records, and whether the products are covered by the scope of the order. *See* Appx005970; *see also* 19 U.S.C. §.1677b(f)(1)(A).

If non-prime merchandise cannot be used in the same applications as prime merchandise, Commerce normally values the non-prime merchandise based on their lower market value, rather than at its full cost. When respondents value non-prime products at the lower market value in their normal books in records, Commerce will normally treat non-prime merchandise accordingly. *See PSC VSMO-Avism a Corp. v. United States*, 688 F.3d 751, 764-65 (Fed. Cir. 2012) (sustaining Commerce's practice of assigning costs based on market value). Alternatively, Commerce may revalue non-prime products to the lower market value when respondents value non-prime products at full cost in their normal books and records. *See, e.g.*, *Certain Oil Country Tubular Goods from Korea*, 79 Fed. Reg. 41,983 (Dep't of Commerce July 18, 2014) (final determ.), and accompanying Issues and Decision Memorandum at Comment 18; *Certain Crystalline Silicon Photovoltaic Products from Taiwan*, 82 Fed. Reg. 31,555 (Dep't of Commerce July 7, 2017), and accompanying Issues and Decision Memorandum at Comment 7.

### B. Substantial Evidence Supports Commerce's Determination That The Likely Selling Price Of Non-Prime Plate Is The Best Available Information As Facts Otherwise Available

Substantial evidence supports Commerce's determination that the likely selling price of non-prime plate is the best available information to value non-prime plate, as the trial court correctly held. *See* Appx000133-000139. In the

remand following *Dillinger II*, Commerce re-opened the record and issued a supplemental questionnaire to Dillinger to obtain the physical characteristics of the non-prime plate produced and the actual cost of producing the non-prime products. Appx000048. Commerce explained that "it was not appropriate to rely on the overall average cost of producing all prime products as a surrogate for the actual cost of producing the specific non-prime products at issue and requested that Dillinger provide the actual product-specific {cost of production} of the non-prime products." Appx000048-000049.

In response, Dillinger did not provide the physical characteristics or the actual product specific cost of production of non-prime plate. Instead, it continued to report that the cost of production for non-prime plate "corresponds to the average **<u>actual</u>** total cost of manufacture for all plate produced during the {period of investigation}." Appx006097 (emphasis in original).

Commerce will use facts otherwise available to fill gaps in the record if necessary information is not available on the record. 19 U.S.C. § 1677e(a). In selecting among the facts otherwise available, Commerce may rely on information from: (1) the petition, (2) the final determination in the investigation, (3) any previous administrative review, or (4) any other information placed on the record. *See* 19 U.S.C. § 1677e(b); 19 C.F.R. § 351.308(c). Because necessary information

was missing from the record, Commerce applied facts otherwise available pursuant to 19 U.S.C. § 1677e(a)(1). Appx000051.

Commerce has broad discretion in determining the best available information to fill evidentiary gaps. *See QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011). Indeed, if Commerce uses facts otherwise available, it can use even actual production data to ensure an accurate margin calculation. *See Itochu Building Products Co., Inc. v. United States*, Slip Op. 17-73, No. 12-00065, 2017 WL 2703810, at *17 (Ct. Int'l Trade 2017) (stating that using mandatory respondent's own production data to fill the gap of missing factors of production data is neutral facts available and not adverse).

Here, Commerce articulated "'a rational connection between the facts found and the choice made.'" *Risen Energy Co., Ltd. v. United States*, 611 F. Supp. 3d 1384, 1390 (Ct. Int'l Trade 2022) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). Commerce explained why using the likely selling price of the non-prime products from Dillinger's own normal books and records was the best available information on the record. Appx000114-000115. Commerce explained that reliance on the books and records was "the only reasonable approach for determining the allocation of total costs between prime and non-prime products, and the per-unit costs of non-prime products." Appx000114; *see also* Appx000118-000126. Further, Commerce explained that

35

the recorded information "for non-prime products in Dillinger's normal books and records is not only the best available information on the record, but also ensures that the reported costs reasonably reflect the cost of producing both prime and non-prime products." Appx000115.

Commerce used as an example that, although Dillinger "may intend to produce 100 prime units, it may conclude after quality testing that two of the units are imperfect plates that are not suitable for use in the same applications as prime products." *Id.* Commerce determined, therefore, that "the only reasonable approach" was to rely on Dillinger's normal books and records as facts available "because it recognizes that, where Dillinger cannot produce 98 perfect plates without producing two imperfect plates, the lost value of the two imperfect plates is actually a cost of producing the 98 perfect ones and should be accounted for as such." *Id.* As a result, Commerce determined that it was unreasonable to use Dillinger's proposal to assign the average cost of all prime products "because Dillinger chooses not to track the actual costs of producing non-prime products{.}" Appx000116.

The trial court held that "Commerce's use of the likely selling price information to value the cost of production of non-prime products" was a "reasonable application of facts otherwise available under § 1677e(a)." Appx000137. This Court should affirm Commerce's selection of the likely selling

price of non-prime plate as facts otherwise available because it is supported by substantial evidence and in accordance with law. As explained below, Dillinger's arguments do not undermine Commerce's determination.

### C. Dillinger's Arguments Do Not Undermine Commerce's Facts Otherwise Available Selection

First, Dillinger argues that Commerce's shifting of production costs from non-prime products to prime products is contrary to 19 U.S.C. § 1677b(b)(3), which states that the reported costs of production "shall be an amount equal to" the cost of materials or other processing employed in producing the merchandise. Applnt. Br. at 42-47. Citing *Dillinger France* and *IPSCO, Inc. v. United States*, 965 F.2d 1056 (Fed. Cir. 1992), Dillinger argues that Commerce cannot use sales value as costs of production. Applnt. Br. at 46-47. Neither case considered the use of sales value as facts otherwise available for missing cost of production information. In *IPSCO*, this Court held that for determining *constructed value*, "{t}he selling price of pipe became a basis for measuring the fairness of the selling price of pipe" and "{t}his circular reasoning contravened the express requirements of the statute which set forth the cost of production as an independent standard for fair value." 965 F.2d at 1061.

The outcome of *Dillinger France* following the third remand redetermination is even more unhelpful for Dillinger. The trial court ultimately sustained Commerce's use of Dillinger France's normal books and records, that is,

the likely selling price of non-prime plate, as facts otherwise available for the non-prime plate cost of production.[4] *Dillinger France III*, 651 F. Supp. 3d at 1313-1318. The trial court held that Commerce's "explanation establishes that Dillinger's normal books and records are 'probative of the issue under consideration,' i.e., costs" for non-prime plate and that "Dillinger has not provided any information on those physical characteristics necessary to establish their actual costs." *Id.* at 1319. Notably, Dillinger's brief does not address this persuasive authority concerning *identical* issues for related companies, since Dillinger France has been a subsidiary of Dillinger for more than 30 years.[5]

Although Dillinger argues that Commerce also rejected a "value-based cost methodology" in *LG Chem. Ltd. v. United States*, 534 F. Supp. 3d 1386, 1394 (Ct. Int'l Trade 2021), precisely because it was "circular," Applnt. Br. at 47, Commerce explained that the products in *LG Chemical* were clearly "traceable." 534 F. Supp. 3d at 1594. Here, by contrast, Dillinger does not track or separately record the cost of production for non-prime plate. Appx006097. Thus, Commerce's determination in *LG Chem* is not applicable, nor relevant, here.

---

[4] Dillinger France did not appeal the trial court's decision.

[5] Intro: Dillinger France has been part of the German Dillinger Group for more than 30 years, https://www.dillinger-france.com/df/en/enterprise/introduction/#:~:text=Dillinger%20France%20has%20been%20part,in%20northern%20France%20since%201962 (last visited Aug. 15, 2024).

Second and relatedly, Dillinger argues that under 19 U.S.C. § 1677b(b)(3), "the actual costs of non-prime products must correspond, as closely as possible, to the cost of materials, fabrication or other processing employed in producing the non-prime products" and Commerce cannot "write-down" the value of the non-prime plate as "indirect costs" for the production of prime plate. Applnt. Br. at 44. In other words, that the costs of production "must reasonably reflect a respondent's actual costs regardless of how costs are reported in a respondent's books and records." *Id.* at 50.

Dillinger's argument ignores that sections 1677b(b)(3) and 1677e(a) are distinct and apply in different situations. "{T}he underlying requirements of § 1677b(b)(3) do not here govern" when Commerce uses facts otherwise available. *Dillinger France III*, 651 F. Supp. 3d at 1319. In other words, Dillinger conflates the different purposes of Commerce's use of cost of production and its use of facts available. Dillinger concedes that Commerce can use facts otherwise available, but argues that it must still restrict itself to looking at cost of production data. Applnt. Br. at 42-47. Dillinger offers no authority for this proposition, especially when the trial court held that Commerce may rely on facts otherwise available. Appx000109; *see also Dillinger France III*, 651 F. Supp. 3d at 1315 ("this court concludes that § 1677b(b)(3)'s definitional requirements do not constrain

Commerce's selection of facts otherwise available to fill in the missing cost information").

The fact that Commerce need not restrict itself to cost of production data when considering facts overwise available is reinforced by the Statement of Administrative Action accompanying the Uruguay Round Agreements Act, which explains that Commerce need not prove that the selected facts available are the "best alternative information" and there is no requirement that "the facts available be compared with the missing information" because it is missing. Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, at 869-70 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 420.

Additionally, Dillinger argues that 19 U.S.C. § 1677b(b)(3) does not allow Commerce "to reduce the costs of materials, fabrication and processing employed in producing the merchandise by the 'lost value' resulting from the sale of the merchandise." Applnt. Br. at 43. Where "known costs" are on the record, Commerce would not account for the lost value of non-prime plate as an indirect cost attributable to the production of prime plate. In that case, Commerce would have the actual costs of producing non-prime plate. There would be no need, nor would Commerce be permitted, to add lost value to the cost of prime products. *See Dillinger France I*, 981 F.3d at 1324 (requiring Commerce to use the actual costs of prime and non-prime products).

But the Court's directive to use the actual costs of non-prime plate is inapplicable here because Dillinger did not provide that information to Commerce, despite being invited to do so. *See Dillinger France I*, 981 F.3d at 1324. Notably, Commerce is not using the lost value rationale because Dillinger did not give Commerce the information it needed to calculate the actual cost of non-prime plate. Rather, Commerce used the information on the record from Dillinger's books and records, in which Dillinger allocates the lost value of non-prime plate as an indirect cost of prime plate. *See* Appx000114-000127. Commerce's consideration of an alternative source of information that may or may not include lost value as an indirect cost would not be necessary if the actual cost of non-prime plate was on the record. *See generally id.*

Third, Dillinger argues that Commerce's claimed factual basis for using the average sales price for non-prime plate is unsupported and it is not the best available information to use. *See* Applnt. Br. at 47-50. Dillinger is incorrect.

For example, Dillinger's audited financial statements explicitly acknowledge that the lost value attributable to the production of non-prime products is an indirect cost of producing prime products and such products are valued at their likely selling prices. Appx000124. Dillinger also explained in its Section D questionnaire response that revenue for non-prime products "is offset at *market prices* against the cost of the stage where the scrap is generated{.}" Appx006381-

006382 (emphasis added). And in the Supplemental Section D questionnaire response, Dillinger explained that it reported non-prime merchandise "at its sales value (*i.e.*, manufacturing costs = net sales value)." Appx003954.

Dillinger argues that how an item is treated in normal books and records is not determinative, and cites *NEXTEEL Co. v. United States*, 601 F. Supp. 3d 1373, 1378 (Ct. Int'l Trade 2022). Applnt. Br. at 50-52. *NEXTEEL* is distinguishable. There, Commerce was not selecting information in applying facts otherwise available. The trial court sustained the remand redetermination because "Commerce found NEXTEEL's reported costs reflected the actual costs of producing both its prime and non-prime goods," and "reversed its decision to apply an adjustment to NEXTEEL's *constructed value* for non-prime products." *Id.* at 1378 (emphasis added). Dillinger cites no authority that forecloses Commerce from using the likely sales value of non-prime merchandise when selecting among facts otherwise available. Indeed, as we explained above, the trial court sustained the same use of Dillinger France's books and records, which was not appealed. *See Dillinger France III*, 651 F. Supp. 3d at 1313-1318.

Dillinger's passing reference that Commerce's use of the likely sales value for facts otherwise available is an adverse inference, Applnt. Br. at 57, is also unsupported. As the trial court correctly held, "Dillinger's dissatisfaction with its resulting dumping margin, without more, does not demonstrate that Commerce's

selection of facts otherwise available was made with an impermissible adverse inference." Appx000138.

Finally, Dillinger argues that it would be more reasonable for Commerce to use an average actual total of all plate, because it does not track the actual costs of production for non-prime plate. Applnt. Br. at 54-55. Dillinger asserts that this alternative is more specific to the missing cost of production data. *Id.* at 56-58. In essence, Dillinger asks the Court to re-weigh the evidence, but Dillinger's proposed estimate of the production cost of non-prime plate is no different than the Court rejecting an "alternative interpretation of the record." *Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283, 1297 (Fed. Cir. 2021).

Indeed, Dillinger's proffered "estimate" is based on assumptions due to Dillinger's decision not to provide Commerce with information concerning the physical characteristics of the non-prime merchandise produced or the actual product-specific costs of producing non-prime products. Appx000122. In the absence of any information concerning the physical characteristics of non-prime products, the record does not support an inference that the dispersion of the physical characteristics of non-prime products is the same as the dispersion of the physical characteristics of prime products, as Dillinger claims. Appx000122-000123. Thus, Commerce's use of the likely sales value of non-prime plate is the

best available information on the record to calculate cost of production.

Appx000122-000123.

# **CONCLUSION**

For these reasons, we respectfully request that the Court affirm the trial

court's judgment.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director

/s/ Kara M. Westercamp
KARA M. WESTERCAMP
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C., 20044
Tel: (202) 305-7571
Fax:  (202) 514-8624

OF COUNSEL:
AYAT MUJAIS
Senior Attorney
U.S. Department of Commerce
Office of the Chief Counsel for Trade

Enforcement and Compliance

August 16, 2024                    Attorneys for Defendant-Appellee

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** 24-1498

**Short Case Caption:** AG der Dillinger Huttenwerke v. United States

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 9,229 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 08/16/2024

Signature: /s/ Kara M. Westercamp

Name: Kara M. Westercamp