IN THE
# United States Court of Appeals for the Federal Circuit

AG DER DILLINGER HUTTENWERKE,

*Plaintiff-Appellant,*

ILSENBURGER GROBBLECH GMBH, SALZGITTER FLACHSTAHL GMBH, SALZGITTER MANNESMANN GROBBLECH GMBH, SALZGITTER MANNESMANN INTERNATIONAL GMBH, FRIEDR. LOHMANN GMBH, THYSSENKRUPP STEEL EUROPE AG,

*Plaintiffs,*

V.

UNITED STATES, SSAB ENTERPRISES LLC, NUCOR CORPORATION,

*Defendants-Appellees.*

Appeal from the United States Court of International Trade in
1:17-cv-00158-LMG, Leo M. Gordon, Senior Judge

## REPLY BRIEF OF
## PLAINTIFF-APPELLANT AG DER DILLINGER HÜTTENWERKE

Marc E. Montalbine
J. Kevin Horgan
Merisa A. Horgan
**deKieffer & Horgan, PLLC**
1156 Fifteenth St., N.W.
Suite 1101
Washington, DC 20005
(202) 783-6900
*Counsel for Plaintiff-Appellant*

September 20, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number** 24-1498

**Short Case Caption** AG der Dillinger Huttenwerke v. US

**Filing Party/Entity** AG der Dillinger Hüttenwerke

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 09/20/2024

Signature: /s/ Marc E. Montalbine

Name: Marc E. Montalbine

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| AG der Dillinger Hüttenwerke | | DHS-Dillinger Hütte Saarstahl AG |
| | | ArcelorMittal France S.A.S. |
| | | Saarstahl Aktiengesellschaft |
| | | SHS - Stahl-Holding-Saar GmbH & Co. KG a.A. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐     Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| John Joseph Kenkel | | |
| | | |
| | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑  Yes (file separate notice; see below)    ☐  No    ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

ARGUMENT .......................................................................................1

I.    Commerce Erred in Rejecting Dillinger's Additional Quality Code for
Sour Service Pressure Vessel Plate ................................................1

      A.    Dillinger's Information Supporting the Additional Quality Code
Was Timely Submitted and Accepted on the Administrative
Record....................................................................................1

      B.    Dillinger Raised Its Concerns Regarding Sour Service Steel at
Every Turn.............................................................................5

      C.    The Record Evidence Substantiates the Commercially Significant
Physical Differences Between Sour Service Pressure Vessel
Plate and Standard Pressure Vessel Plate...........................13

II.    Commerce Erred in Reducing the Reported Costs of Non-Prime
Plate to Their Sales Value and Allocating the Difference to the Costs
of Prime Plate ..............................................................................18

CONCLUSION AND RECOMMENDED APPELLATE REMEDY ...................29

# TABLE OF AUTHORITIES

**Cases**

AG der Dillinger Hüttenwerke v. United States,
  648 F. Supp. 3d 1321 (CIT June 23, 2023)............................................................12

AG der Dillinger Hüttenwerke v. United States,
  672 F. Supp. 3d 1351 (CIT Dec. 21, 2023) ..........................................................11

Bohler Bleche GMBH & Co. KG v. United States,
  324 F. Supp. 3d 1344 (CIT 2018)....................................................................*passim*

Bohler Bleche GMBH & Co. KG v. United States,
  362 F. Supp. 3d 1377 (CIT 2019) ..........................................................................10

Burlington Truck Lines Inc. v. United States,
  371 U.S. 156 (1962).........................................................................................13, 27

Dillinger France S.A. v. United States,
  981 F.3d 1318 (Fed. Cir. 2020)...................................................................... *passim*

Dillinger France S.A. v. United States,
  651 F. Supp. 3d 1294 (CIT 2023)....................................................................25, 26

Grobest & I-Mei Indus. (Vietnam) Co. v. United States,
  815 F. Supp. 2d 1342 (CIT 2012) ............................................................................9

IPSCO, Inc. v. United States,
  965 F.2d 1056 (Fed. Cir. 1992)..............................................................18, 19, 20

PSC VSMPO-Avisma Corp. v. United States,
  688 F.3d 751 (Fed. Cir. 2012)..........................................................................19, 20

Risen Energy Co. v. United States,
  611 F. Supp. 3d 1384 (CIT 2022).........................................................................27

SEC v. Chenery Corp.,
  332 U.S. 194 (1947)................................................................................................13

SKF USA Inc. v. United States,
  263 F.3d 1369 (Fed. Cir. 2001)..........................................................................11, 15

Transactive Corp. v. United States,
  91 F.3d 232 (D.C. Cir. 1996) ............................................................................11, 15

Zhejiang Dunan Hetian Metal Co. v. United States,
  652 F.3d 1333 (Fed. Cir. 2011)................................................................................20

**Statutes**

19 U.S.C. § 1677(16)(A)............................................................................................17

19 U.S.C. § 1677b(a)...........................................................................................10, 17

19 U.S.C. § 1677b(b)(3) .....................................................................................26, 27

19 U.S.C. § 1677e(a)...........................................................................................20, 26

**Other Authorities**

Statement of Administrative Action *accompanying the* Uruguay Round Agreements
Act, H.R. No. 103-316, vol. 1 (1994) ......................................................................20

# INTRODUCTION

This brief is filed on behalf of Plaintiff-Appellant AG der Dillinger

Hüttenwerke ("Dillinger") in reply to the response briefs filed by Defendants-

Appellees United States, Nucor Corporation ("Nucor") and SSAB Enterprises LLC

("SSAB").

# ARGUMENT

## I. Commerce Erred in Rejecting Dillinger's Additional Quality Code for Sour Service Pressure Vessel Plate

### A. Dillinger's Information Supporting the Additional Quality Code Was Timely Submitted and Accepted on the Administrative Record

First, it is important to stress that Commerce never rejected any of

Dillinger's submissions as untimely.  Commerce accepted all of the factual

information provided by Dillinger as timely, and all of this information remains on

the administrative record.  Defendants-Appellees do not dispute this fact.

Second, the United States' entire argument that Dillinger's addition of a

Quality code for sour service pressure vessel plate was untimely is based solely

upon its contention that the proposal was not made during the initial model-match

comment period.  *See* U.S. Br. 22-25;[1] *see also* <u>Final-IDM</u>, 77 (Appx005958).

---

[1] Citations to the response brief of Defendant-Appellee United States are
designated as "U.S. Br. ##." Citations to the response brief of Defendants-
Appellees Nucor and SSAB are designated as "Int. Br. ##."

However, what the United States fails to appreciate is that the final model-match criteria issued after the comment period permitted, even directed, respondents to "{u}se additional number codes for each additional Quality you propose." DOC Product Characteristics Letter at Attachment 1, p. 8 (Appx000377). Thus, Dillinger was not requesting Commerce to modify its model-match criteria but rather simply to add additional Quality codes within the structure of the model-match criteria as specifically permitted by Commerce.

Therefore, the authorities cited by the United States stating that the model-match criteria have to be determined early in the investigation and must be uniform for all respondents from all countries covered by parallel investigations are not relevant to this situation. *See* U.S. Br. 22-24. The Quality code element of the model-match criteria determined by Commerce specifically permitted respondent-specific additions to the Quality code after the model-match criteria were established during the initial comment period. In fact, both Commerce's proposed product characteristics and its final product characteristics contained the direction for the Quality code field to "{u}se additional number codes for each additional Quality you propose." DOC Proposed Product Characteristics Letter, 7 (Appx000231); DOC Product Characteristics Letter, Attachment 1, p. 8 (Appx000377).

Moreover, in *Bohler I*, the U.S. Court of International Trade ("CIT") held

that Commerce should have permitted respondents in the parallel proceeding on *Cut-to-Length Plate from Austria* to add an all new model-match field for steel grade (GRADE) after the model-match comment period during the questionnaire response phase. Bohler Bleche GMBH & Co. KG v. United States, 324 F. Supp. 3d 1344, 1352 (CIT 2018) ("Bohler I"). As a result of this decision, the model-match criteria for respondents in the parallel proceeding involving Austria are significantly different from the model-match criteria for respondents in the other *Cut-to-Length Plate* proceedings, including this proceeding involving Germany. In fact, the court in *Bohler I* stated that Commerce had cited "no authority supporting a right to apply a single methodology across multiple investigations, notwithstanding potentially serious issues with that methodology." Id. at 1353.

Accordingly, it cannot be disputed that Commerce's letter notifying respondents of the final model-match criteria in no way restricted respondents' ability to add additional Quality codes after the initial comment period.

Indeed, throughout the entire investigation prior to the final determination, Commerce never claimed that Dillinger's information concerning the additional Quality codes was untimely or in any way deficient. For example, the sole reason given by Commerce in its preliminary determination for disregarding all of Dillinger's additional quality codes was "{b}ecause Dillinger reported quality code values in product characteristic field 3.1 (QUALITYH) that were not included in

Commerce's Questionnaire." Preliminary Sales Calculation Memo, 2 (Nov. 4, 2016) (Appx004853).

All the information submitted by Dillinger was accepted by Commerce and remains on the administrative record. This information was timely submitted during the normal questionnaire process and can in no way be considered late. In fact, on August 29, 2016, at the request of petitioners, Commerce postponed the preliminary determinations in all the parallel investigations until November 4, 2016 to "provide the Department with sufficient time to develop the record in these proceedings through additional questionnaires." Certain Carbon and Alloy Steel Cut-to-Length Plate from Austria, Belgium, France, the Federal Republic of Germany, Italy, Japan, the Republic of Korea, the People's Republic of China, and Taiwan: Postponement of Preliminary Determinations of Antidumping Duty Investigations, 81 Fed. Reg. 59185 (2016) (Appx006489).

It is also important to remember how Commerce radically reduced the number of Quality codes for pressure vessel steel in its final model-match criteria. As already explained in Dillinger's opening brief, the initial product characteristics proposed by Commerce listed seven different Quality codes for pressure vessel steels. Dillinger Br. 13-14 & 35-36;[2] DOC Proposed Product Characteristics

---

[2] Citations to Dillinger's opening brief are designated as "Dillinger. Br. ##."

Letter, 5-7 (Appx000229-231). Therefore, Dillinger did not know until Commerce released the final model-match criteria on June 10, 2016 that the seven original Quality codes for pressure vessel steels had all been condensed into one general Quality code. DOC Product Characteristics Letter, Attachment 1, p. 6-7 (Appx000375-376).

These final model-match criteria were issued just five days before the original deadline to respond to sections B, C and D of the antidumping questionnaire. Id. at 1 (Appx000370). While the questionnaire response deadline was extended, this sudden and extensive change in the Quality codes for pressure vessel steels made it very difficult to understand whether the revised Quality codes properly accounted for all commercially significant physical differences in the various pressure vessel steels. This was especially true in light of the enormous time pressure for providing full and accurate responses to sections B, C and D of the antidumping questionnaire.

What is clear, as detailed below, Dillinger timely and diligently raised its concerns regarding the matching of sour service steels at every opportunity during the investigation.

## B. Dillinger Raised Its Concerns Regarding Sour Service Steel at Every Turn

At every turn during the investigation, Dillinger raised its concerns that the

model-match criteria did not account for commercially significant physical differences in sour service steel.

On June 2, 2016, during the initial model-match comment period, Dillinger submitted extensive information detailing the special requirements and manufacturing process for steel plates in sour service (*i.e.*, used in contact with "sour" or corrosive crude oil containing large amounts of sulfur) and the dangers of hydrogen induced cracking (HIC). Dillinger Product Characteristics Comments at App. 1 (Appx000248-322). This information was not in any way limited to line pipe plate (*i.e.*, steel plate used to produce pipelines to transport sour crude oil). Rather, as Commerce readily admits, this information also made numerous references to pressure vessels (*i.e.*, steel plate used in tanks to store sour crude oil). *See* Final-IDM, 77, n.236 (Appx005958). The issues involving the production of steel plate used for sour service are exactly the same, regardless of whether the plate is ultimately used to manufacture pipelines or pressure vessels (tanks).

In its initial section B questionnaire response on July 15, 2016, Dillinger again raised its concerns regarding the matching of sour service steel and added an additional Quality code to distinguish sour service petroleum transport plate from standard petroleum transport plate. Section B Response, B-15 to B-16 (Appx001692-1693). Dillinger also submitted extensive specifications for line pipe plate and pressure vessel plate. Id. at App. B-6, p. 458-646 (specification API

6

5L) (Appx002238- 2426), p. 263-264 (specification A516/A516M) (Appx002043-2046) & p. 1044-1059 (specification EN 10028-3) (Appx002824-2839).

In addition, with its Section B and C questionnaire responses, Dillinger provided complete sales and cost information for every transaction sold in the U.S. and home markets during the period of investigation ("POI"). This information demonstrated significant systematic variations in both costs of production and pricing patterns between sour service steel plate and standard steel plate owing to the extensive manufacturing process for removing phosphorus and sulfur from steels used in sour service. *See*, Dillinger Br. 15.

In response to Commerce's August 23, 2016 supplemental questionnaire related to Dillinger's additional Quality codes, Dillinger reiterated its concerns regarding the matching of sour service steel and reminded Commerce that the same concerns relating to sour service petroleum transport plate also applied to sour service pressure vessel plate. Dillinger therefore added an additional Quality code to identify sour service pressure vessel plate in the same way that it had added a Quality code to identify sour service petroleum transport plate. Dillinger also submitted additional steel specifications for sour service pressure vessel plate. Supplemental Section B & C Response, 10-12 & App. SBC-11 (DICREST specifications DH-E51-F, DH-E17-I & DH-E18-I) (Appx003086-3088 & Appx003293-3309).

Contrary to the claims of Nucor and SSAB, the information provided by Dillinger was fully responsive to Commerce's supplemental questionnaire. *See* Int. Br. 13-14. Commerce's supplemental questionnaire posed questions concerning the additional quality codes reported by Dillinger and seemed to reflect Commerce's misunderstanding that the questionnaire did not permit the use of additional Quality codes. *See* Supplemental Section B & C Response, 10-11 (Appx003086-3087). It was therefore important and fully responsive to explain to Commerce that the instructions to the Quality field specifically permitted the use of additional Quality codes and to further detail the issues involved in the matching of sour service steels, including those used in the production of pressure vessels.

It also is crucial to understand that all of the sales price and cost information for the sour service pressure vessel plate transactions had already been submitted to Commerce by Dillinger with its initial home market and U.S. sales files on July 15, 2016. The only thing that Dillinger did with its supplemental response was to revise the quality code on the pressure vessel steel transactions involving sour service steel so that Commerce would properly match these transactions.

Accordingly, the contention that Dillinger did not raise its concerns at every turn like the respondents in *Bohler I* is without merit. As the court in *Bohler I* carefully explained, the plaintiffs in that case had initially only raised specific issues concerning the placement of the Quality code field in the model-match

8

hierarchy and the addition of a Quality subcategory for high alloy tool steel. Bohler I, 324 F. Supp. 3d at 1348. It was not until their original questionnaire response of July 15, 2016 that the plaintiffs proposed that a new GRADE field be added to the model-match criteria and not until their supplemental questionnaire response of October 13, 2016 that they proposed that an additional PROCESS field be added to the model-match criteria. Id. The plaintiffs also provided Commerce with additional information concerning the GRADE field in their supplemental questionnaire response of October 6, 2016. Id.

The court in *Bohler I* determined that neither the GRADE field nor the PROCESS field proposals should be treated as untimely, reasoning that "'the interests in fairness and accuracy outweigh the burden upon Commerce' presented by having to consider Plaintiffs' concerns about the model-match methodology." Id. at 1352 (citing Grobest & I-Mei Indus. (Vietnam) Co. v. United States, 815 F. Supp. 2d 1342, 1367 (CIT 2012)). The court remanded the case back to Commerce to "amend its model-match methodology . . . to better account for the commercially significant differences in physical characteristics among Plaintiffs' products owing to alloy content." Bohler I, 324 F. Supp. 3d at 1354. On the issue of the PROCESS field, the court sustained Commerce's determination upon the basis that, with the addition of the GRADE field, "the PROCESS field would have no impact." Id.

On remand, Commerce utilized the plaintiffs proposed alternative model-match methodology, which replaced the QUALITY field with a GRADE field, and recalculated the dumping margin. Bohler Bleche GMBH & Co. KG v. United States, 362 F. Supp. 3d 1377, 1379 (CIT 2019) ("Bohler II"). The court sustained Commerce's remand determination, again stressing that the original model-match methodology failed to comply with the requirements of 19 U.S.C. § 1677b(a) for a "fair comparison" between products sold in the United States and the home market. Id. at 1380.

Accordingly, a thorough review of the specific facts of *Bohler I* shows that that case is fully analogous to how Dillinger raised its concerns about sour service steel and the model-match criteria in the German investigation. In fact, as detailed above, Dillinger was much more precise and consistent in raising its concerns about the matching of sour service steels, and its proposal of additional Quality codes for sour service petroleum transport plate and sour service pressure vessel plate stayed within the prescribed structure of the model-match methodology. This stands in sharp contrast to the respondents in *Bohler I*, who sought to replace the Quality field entirely and add an entirely new PROCESS field with their supplemental questionnaire response.

Defendants-Appellees fail to fully address the facts presented in *Bohler I* when they claim that there is a "fundamental difference" between *Bohler I* and this

proceeding. *See, e.g.,* Int. Br.12-13. The Defendants-Appellees simply ignore the facts that the plaintiffs in *Bohler I* did not raise their specific proposal to replace the Quality code with a GRADE field until their questionnaire responses and that they submitted additional information and proposed that an additional PROCESS field be added in their supplemental questionnaire responses. Bohler I, 324 F. Supp. 3d at 1348. Similarly, in its opinion of December 21, 2023, the CIT also fails to provide any meaningful discussion of the full facts of *Bohler I* and quotes Nucor's superficial assertion that there is "a fundamental difference between the two proceedings." *See* AG der Dillinger Hüttenwerke v. United States, 672 F. Supp. 3d 1351, 1356 (CIT Dec. 21, 2023) ("Dillinger VII").

The United States also fails to explain how Commerce's determination refusing to recognize a separate Quality code for sour service pressure vessel plate is consistent with its fourth remand determination finding that the facts of this case are "analogous" to *Bohler I* thereby warranting an additional Quality code for sour service petroleum transport plate.[3] *See* Redetermination IV, 2-4 & 10 (Appx000157-159 & Appx000165). In fact, in its fourth remand determination, Commerce specifically refused to address this issue, stating only that it would not

---

[3] As this Court stressed in *SKF*, "'an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently.'" SKF USA Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (quoting Transactive Corp. v. United States, 91 F.3d 232, 237 (D.C. Cir. 1996)).

revisit the issue of Dillinger's proposed Quality code for sour service pressure vessel steel, given that the CIT already sustained Commerce's rejection of this quality code in its August 2021 Order.  Id. at 9 (Appx000164).

Notably, however, the CIT's August 2021 Order fails to make any mention of *Bohler I* even though Dillinger specifically discussed the case in its August 22, 2018 reply brief filed with the court.  *See* AG der Dillinger Hüttenwerke v. United States, No. 17-00158 (CIT Aug. 18, 2021) (memorandum & order) (Appx000032-40); Dillinger Reply Brief, 1-6 (Aug. 22, 2018) (Appx006050-6055).  In fact, although the CIT remanded the issue of the additional Quality code for sour service petroleum transport plate to Commerce in order to provide it with the opportunity to explain why an outcome similar to *Bohler I* was "not warranted here" given "Commerce's apparent recognition in Bohler that its model-match methodology insufficiently accounted for variations in the alloy content of the products at issue in that proceeding," the CIT never gave Commerce the same opportunity with respect to the additional Quality code for sour service pressure vessel plate.  *See* AG der Dillinger Hüttenwerke v. United States, 648 F. Supp. 3d 1321, 1335-36 (CIT June 23, 2023) ("Dillinger V").  There is therefore no agency determination on this issue.

Thus, because the administrative determinations on appeal in this proceeding provide no finding on the application of *Bohler I* to the addition of a Quality code

for sour service pressure vessel plate, the arguments made by Defendants-Appellees in this regard are nothing more than *post hoc* rationalizations made by counsel and do not represent the grounds invoked by the agency. *See, e.g.,* Burlington Truck Lines Inc. v. United States, 371 U.S. 156, 168 (1962) (stating that "courts may not accept appellate counsel's *post hoc* rationalizations for agency action"); SEC v. Chenery Corp., 332 U.S. 194, 196 (1947) (warning that courts "must judge the propriety of {agency} action solely by the grounds invoked by the agency").

What is beyond dispute is that the issues involving sour service petroleum transport plate and sour service pressure vessel plate are exactly the same, and that these issues were first raised by Dillinger at the earliest opportunity during the model-match comment period.

C.   **The Record Evidence Substantiates the Commercially Significant Physical Differences Between Sour Service Pressure Vessel Plate and Standard Pressure Vessel Plate**

As explained above, Commerce accepted all of the factual information provided by Dillinger as timely, and all of this information remains on the administrative record. This record evidence demonstrates that there are commercially significant physical differences between sour service pressure vessel plate and standard pressure vessel plate, just as Commerce found with respect to sour service petroleum transport plate in its fourth remand determination.

In its opening brief, Dillinger detailed each item of record evidence supporting Dillinger's addition of a Quality code for sour service pressure vessel plate and responded to each of the claims made by Commerce for rejecting this additional code in its final determination. *See* Dillinger Br. 24-31. This discussion demonstrates that Commerce's grounds for rejecting Dillinger's additional Quality code for sour service pressure vessel plate are not supported by substantial evidence on the administrative record, and the response briefs filed by Defendants-Appellees do not effectively undercut any of Dillinger's arguments. In fact, the response brief filed by Nucor and SSAB fails to discuss the substance of this factual information at all.

During the original investigation, Dillinger provided extensive factual information showing the physical differences between steel plate for sour service and steel plate for regular service, both with respect to petroleum transport plate and pressure vessel plate. In its fourth remand determination, Commerce found that these physical differences were commercially significant with respect to petroleum transport plate, and no one has challenged the correctness of this determination. Redetermination IV, 4-6 (Appx000159-161). Precisely the same physical differences exist with respect to sour service petroleum transport plate as with sour service pressure vessel plate, and Dillinger provided the same sort of factual information for each product.

14

For example, Dillinger provided detailed information on the sales prices and costs for each individual sales transaction, specifically listing the Quality code for each transaction. *See* Dillinger Br. 26-27. This transaction-specific price and cost information submitted during the investigation in Dillinger's sales and cost data files showed significant systematic variations in the pricing patterns and costs of production between sour service pressure vessel plate and other pressure vessel plate in the same way that it showed significant systematic variations in the pricing patterns and costs of production between sour service petroleum transport plate and other petroleum transport plate. Id.

Therefore, the United States' contention that "Dillinger did not provide Commerce evidence of significant systematic variations in pricing patterns between sour vessel plate and other pressure vessel/boiler quality plate" is demonstrably false. *See* U.S. Br. 28-29. Indeed, Commerce accepted precisely this same transaction-specific price and cost information to support its remand determination that Dillinger properly added an additional Quality code for sour service petroleum transport plate. Redetermination IV, 5 (Appx000160). As this Court has noted, "'an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently.'" SKF, 263 F.3d at 1382 (Fed. Cir. 2001) (quoting Transactive Corp., 91 F.3d at 237 (D.C. Cir. 1996)).

What the United States fails to appreciate is that the aggregated tables in

Dillinger's trial court brief are just that: "aggregated tables" of the information that is on the administrative record. *See* U.S. Br. 28 (citing <u>Dillinger CIT Brief</u>, 7 (Appx006003)). The same sort of aggregated tables were provided in Dillinger's trial court brief with respect to sour service petroleum transport plate, and Commerce raised no objections to this information in its fourth remand determination accepting the additional Quality code for sour service petroleum transport plate. *See* <u>Dillinger CIT Brief</u>, 12 (Appx006008).

Similarly, the United States' claims of some lack in the product characteristic information supplied by Dillinger are also without merit. *See* U.S. Br. 29-30. As already detailed in Dillinger's opening brief, the product specifications provided by Dillinger show that the physical differences between sour service pressure vessel plate and standard pressure vessel plate relate to the levels of phosphorus and sulfur in the steel. Dillinger Br. 28-29. Sour service pressure vessel plate has severe limitations in the levels of sulfur and phosphorus, which require the steel to undergo costly desulfurization and dephosphorization processes.

These differences in the levels of sulfur and phosphorous are precisely the same physical differences that Commerce found justified an additional Quality code for sour service petroleum transport plate in its fourth remand determination. <u>Redetermination IV</u>, 5 (Appx000160). The United States has provided no

explanation as to why Commerce would accept this information on product characteristics with respect to sour service petroleum transport plate and then reject precisely the same information with respect to sour service pressure vessel plate.

It must also be remembered that Commerce's instructions for adding additional Quality codes stated only that respondents should (1) provide a detailed narrative description of each additional Quality code proposed, (2) explain what differentiates each additional Quality code from the codes already listed with respect to actual physical properties and (3) explain the particular numeric code assigned within the Quality code hierarchy for matching purposes. DOC Product Characteristics Letter, at Attachment 1, p. 8 (Appx000377). None of the Defendants-Appellees claim that the information provided by Dillinger did not satisfy these stated requirements.

Accordingly, Commerce's rejection of Dillinger's additional Quality code for sour service pressure vessel plate in its final determination is not supported by substantial evidence on the administrative record. Commerce's determination is also not in accordance with law because it fails to account for commercially significant differences in the physical characteristics between sour service pressure vessel steel and standard pressure vessel steel as required by 19 U.S.C. §§ 1677(16)(A) and 1677b(a). *See* Dillinger Br. 11-16

## II. Commerce Erred in Reducing the Reported Costs of Non-Prime Plate to Their Sales Value and Allocating the Difference to the Costs of Prime Plate

Commerce's determination to reduce Dillinger's reported costs for non-prime plate to reflect their sales value and allocate the difference to the costs for Dillinger's prime plate is directly contrary to this Court's decision in *Dillinger France*. Dillinger France S.A. v. United States, 981 F.3d 1318, 1321 & 1324 (Fed. Cir. 2020) ("Dillinger France"). Citing its earlier decision in *IPSCO*, the Court in *Dillinger France* stated that calculating the costs of non-prime material based upon its likely selling price was "'an unreasonable circular methodology' because it 'contravened the express requirements of the statute which set forth the cost of production as an independent standard for fair value.'" Dillinger France, 981 F.3d at 1322 (quoting IPSCO, Inc. v. United States, 965 F.2d 1056, 1061 (Fed. Cir. 1992)).

Dillinger's reporting of the cost for non-prime plate using the average actual cost of all plate is precisely the same procedure as used by the foreign producer in *Dillinger France*. As this Court specifically explained in *Dillinger France*, the foreign producer in *Dillinger France* had "reported the cost of non-prime plate as equal to the average actual cost of all plate" because "'non-prime plate undergoes the same production process as prime plate and . . . is not less costly to produce simply because it cannot be sold at full price.'" Id. at 1321 (citation omitted). The

Court in no way challenged the foreign producer's reporting the costs of non-prime plate as equal to the average actual cost of all plate. Rather, the Court found Commerce's reduction of the reported costs for non-prime plate to reflect their sales value and its allocation of the difference to the costs of prime plate to be contrary to law. Id. The Court also specifically found that the reliance upon the foreign respondent's books and records could not justify the use of the sales value as the costs of production. Id.

Despite this Court's decision in *Dillinger France*, Commerce makes the exact same adjustment to Dillinger's reported costs of non-prime plate, reducing them to sales value and allocating the difference to the costs of prime plate. Commerce simply treats this Court's prior decisions in *Dillinger France* and *IPSCO* as fully irrelevant. This is also seen in the response briefs filed by the Defendants-Appellees. For example, in one short sentence, the United States summarily dismisses the decisions in both *Dillinger France* and *IPSCO*, stating that "{n}either case considered the use of sales value as facts otherwise available for missing cost of production information." U.S. Br. 37.[4]

---

[4] In addition, the United States' statement that this Court's decision in *PSC* sustained "Commerce's practice of assigning costs based on market value" is also incorrect. U.S. Br. 33 (citing PSC VSMPO-Avisma Corp. v. United States, 688 F.3d 751, 764-65 (Fed. Cir. 2012)). As this Court explained in *Dillinger France*, "*PSC* concerned the use of purchase price to determine cost rather than using likely selling price of the end product to allocate costs." Dillinger France, 981 F.3d at

Commerce's couching the issue of the cost of production of non-prime plate in terms of partial neutral facts available under 19 U.S.C. § 1677e(a) does not render this Court's prior decisions in *Dillinger France* and *IPSCO* as irrelevant. Rather, these decisions show what constitutes the costs of production under the antidumping statute and whether selling price can be considered as the costs of production.

As this Court explained in *Zhejiang*, Commerce can only use facts otherwise available to fill a specifically identified gap in the record. Zhejiang Dunan Hetian Metal Co. v. United States, 652 F.3d 1333, 1348 (Fed. Cir. 2011). The legislative history to section 1677e(a) states that the information Commerce uses as facts available must be "reasonable to use under the circumstances" and "most probative of the issue under consideration." Statement of Administrative Action, H.R. Rep. No. 103-316, at 869 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4198.

In this case, Commerce does not dispute that Dillinger reported the cost of production for non-prime plate as the ***actual*** average cost of production of all plate during the POI. *See* Dillinger Br. 54-55. At the earliest stages of the investigation in June 2016, Dillinger informed Commerce that it could not identify the

---

1324. The Court therefore held that *PSC* did not support Commerce's reporting the cost of non-prime plate based on "likely selling price." Id. at 1323-24. Again, the United States fails to properly recognize this Court's decision in *Dillinger France*.

dimensions and specifications of non-prime plate because the plate was sold by the railcar load as "odds and ends," with any one railcar load comprising various different sizes and grades of plate.  <u>Notification of Difficulties in Responding to the Questionnaire & Contact with Official in Charge</u>, 1-2 (June 8, 2016) (Appx000360-361).  Therefore, Dillinger reported the costs of non-prime plate as the actual average cost of production of all plate during the POI since non-prime plate undergoes the same production process as prime plate and can only be identified at the end of production.  Non-prime plate accounted for less than 3% of Dillinger's total production during the POI.  *See* <u>Dillinger Supplemental Section D Questionnaire Response</u>, 22 (Sept. 28, 2016) (Appx003954).

It was not until nearly six years later, in Commerce's second remand determination, that Commerce claimed there was a gap in the record.  *See* <u>Redetermination II</u>, (Jan. 20, 2022) (Appx000041-84).  Although Commerce acknowledged that the reported cost for non-prime plate were based upon the total actual costs incurred by Dillinger and verified by Commerce, it stated that the reported costs were not "product-specific" because Dillinger could not identify the dimensions and specifications of the non-prime plate.  <u>Id</u>. at 5-8 (Appx000048-51).  Thus, Commerce claimed that the informational gap to be filled by partial neutral facts available was "the actual product-specific cost of producing non-prime products."  <u>Id</u>. at 9 (Appx000052).

Commerce then replaced Dillinger's reported actual average costs of production with the average selling price of non-prime plate. Id. at 13 (Appx000056). Throughout all of the court remands and briefing before the CIT and this Court, the United States has never explained how the average selling price of non-prime plate bears any relation to the stated gap to be filled of "the actual product-specific cost of producing non-prime products." The average selling price is not product-specific and it bears no connection to the costs of production.

The only support Commerce proffers for its use of the average selling price of non-prime plate instead of the average actual costs of production, is the incorrect claim that Dillinger uses "this precise accounting treatment in its audited financial statements." Redetermination III, 5 (Appx000115). In its opening brief, Dillinger has presented extensive evidence demonstrating that this claim is incorrect and that its audited financial statements and records kept in accordance with German generally accepted accounting principles (GAAP) assign the same manufacturing costs to both prime and non-prime products. See Dillinger Br. 47-50. In their response briefs, Defendants-Appellees cite to no record evidence contradicting Dillinger's arguments.

For example, in support for its statement that "Dillinger's audited financial statements explicitly acknowledge that the lost value attributable to the production of non-prime products is an indirect cost of producing prime products and such

products are valued at their likely selling prices," the United States' response brief simply cites back to Commerce redetermination, which does not provide any factual support for this assertion. *See* U.S. Br. 41 (citing <u>Redetermination III</u>, 14 (Appx000124)); *see also* Int. Br. 24. In its opening brief, Dillinger explained how the notes to its audited financial statements do not show any shifting of costs from non-prime to prime plate and that the valuing of inventory at the lower of cost or market value at the end of the fiscal year is a basic accounting principle that does not in any way result in the shifting of costs from non-prime to prime merchandise. *See* Dillinger Br. 49-50. The Defendants-Appellees have simply provided no response to these facts.

The United States also makes a false reference to Dillinger's section D questionnaire response making it seem like the cited passage is referring to non-prime products. *See* U.S. Br. 41. However, the subject of the actual passage is revenue from "scrap" not non-prime products. *See* <u>Dillinger Section D Questionnaire Response</u>, D-22 (July 15, 2016) (Appx006382). Non-prime products are finished plates, not scrap. Scrap consists of metal pieces generated during the production process, which can be reintroduced into the process of producing molten (crude) steel. <u>Id</u>. at D-4 to D-5 (Appx006364-6365).

The Defendants-Appellees also cite to an "internal" factory report referred to in Dillinger's supplemental section D questionnaire response. *See* U.S. Br. 42

(citing <u>Supplemental Section D Response</u>, 22 (Appx003954)); *see also* Int. Br. 28. However, this internal factory report is just that: an "internal" report produced for management. This internal report is not used in reporting the costs of production or inventory values in Dillinger's audited financial statements prepared in accordance with German GAAP. Rather, as already explained above, Dillinger's audited financial statements and records kept in accordance with German GAAP assign the same manufacturing costs to both prime and non-prime products. *See* Dillinger Br. 47-50. Moreover, the sales value used by Commerce as the cost of production for non-prime products is not taken from the internal factory report but rather from the narrative response to Dillinger's supplemental section D questionnaire on the question concerning the "quantity and value of non-prime, defective, and low quality plates sold during the POI." *See* <u>Final COP Memo</u>, Attachment 1 (March 29, 2017) (Appx005986) (citing to <u>Dillinger Supplemental Section D Questionnaire Response</u>, 22 (Sept. 28, 2016) (Appx003954)). This figure has absolutely nothing to do with the costs of production.

There is therefore no evidence on the administrative record supporting any assertion that Dillinger's audited financial statements and records kept in accordance with German GAAP either report separate costs of production for prime and non-prime material or transfer any supposed "loss in value" on the sale of non-prime material to the cost of production for prime material. In any event, as

this Court determined in *Dillinger France*, even if the books and records did report the cost of non-prime merchandise at their selling price, it would be an error for Commerce to rely on them in determining the cost of production.  <u>Dillinger France</u>, 981 F.3d at 1324.

Defendants-Appellees reliance upon the August 2023 CIT opinion in *Dillinger France* is also misplaced.  The case involved an entirely separate administrative record and accounting records prepared in accordance with French GAAP.  The court's decision in that case is specifically premised upon the court's factual determination that a precise footnote in the foreign respondent's financial statements specifically stated that "2nd choice sheet metal" was "valued at its likely selling prices."  <u>Dillinger France S.A. v. United States</u>, 651 F. Supp. 3d 1294, 1317-18 (CIT 2023).  As explained above and in Dillinger's opening brief, there is no such statement in Dillinger's financial statements.  Rather, Dillinger's financial statements make no distinction between prime and non-prime material and report the cost of production of all plate using a single actual average cost. Dillinger Br. 49.

The United States is also incorrect to suggest that the CIT's decision in *Dillinger France* could have any preclusive effect upon Dillinger in this current proceeding.  U.S. Br. 38.  Dillinger, the Plaintiff-Appellant in this case, is an independent corporation established under German law.  The foreign respondent in

Dilliner France, although affiliated with Plaintiff-Appellant, is an independent corporation established under French law, with independent and differing reporting requirements under French GAAP. The issues concerning how the costs of non-prime material are reported in each company's financial statements is therefore not "identical" as wrongly asserted by the United States. Id. Moreover, contrary to the United States assertions, it is also irrelevant to this case whether the foreign respondent in *Dillinger France* appealed the trial court's decision in that case. *See* id. at n.4. In footnote 5 of its brief, the United States also seems to cite to internet information that is not part of the administrative record in this proceeding. Id. at n.5.

The lower court's decision in *Dillinger France* also seems wrongly decided as to the issue of whether the statutory definition of "cost of production" in 19 U.S.C. § 1677b(b)(3) is relevant in determining whether Commerce's choice of facts available for the actual product-specific cost of producing non-prime products is "reasonable to use under the circumstances" and "most probative of the issue under consideration." The lower court's conclusion that the statutory definition of "cost of production" in section 1677b(b)(3) is not relevant to this determination is based upon the court's conclusion that "§ 1677b(b)(3) does not mention or otherwise cross-reference § 1677e(a)" (*i.e.*, the statutory provision relating to neutral facts available). Dillinger France, 651 F. Supp. 3d at 1309.

It seems a principle of basic reasoning that, if Commerce is to fill a gap related to the actual costs of production, then the statutory definition of "cost of production" would be relevant to determining the reasonableness and probative value of the information used by Commerce.  Section 1677b(b)(3) defines that the cost of production shall be an amount equal to the cost of materials, fabrication and other processing employed in producing the foreign like product.  This then guides Commerce and the courts in determining the type of information relevant to the cost of production.  In this case, Commerce has applied the average selling price as facts available for the actual product-specific cost of producing non-prime products.  However, Commerce has failed to articulate any "rational connection" between the average selling price of non-prime plate and the cost of materials, fabrication and other processing employed in producing that material.  *See* Risen Energy Co. v. United States, 611 F. Supp. 3d 1384, 1390 (CIT 2022) (citing Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962)) (stating that in determining the substantiality of evidence "Commerce must articulate a 'rational connection between the facts found and the choice made'").

By contrast, the average actual cost of production reported by Dillinger is rationally connected to the cost of materials, fabrication and other processing employed in producing non-prime plate.  It is undisputed that non-prime plate cannot be identified until the end of production and therefore undergoes the exact

same production steps as prime plate, employing the same materials, fabrication and other processing. *See* Dillinger Br. 54-55 & 57-58. Dillinger has reported the actual product-specific costs for each prime product[5] during the POI. The non-prime products during the POI could only have come from these prime products (*i.e.*, CONNUMs). The actual costs of these prime-product CONNUMs range from approximately 400 Euros/ton to 2,700 Euros/ton, with a weighted-average cost of approximately 550 Euros/ton. Comments in Opposition to Redetermination III, 4-5 (Appx006295-6296).

Commerce's use of an average sales value for non-prime plate of less than 350 Euros/ton is below the costs of any of the prime-product CONNUMs and therefore bears no relation to the costs of materials, fabrication and other processing used in producing this merchandise. Non-prime plate does not magically become less costly simply because it cannot be sold at full price. Rather, because non-prime plate goes through the exact same production steps as prime plate, it is ***impossible*** for the actual cost of production of non-prime plate to be lower than the actual cost of production of any of the prime-product CONNUMs. Therefore, Commerce's use of average sales price as the "best available information on the record" concerning the actual cost of production of

---

[5] These products are defined by matching control number or "CONNUM."

non-prime products has no reasonable basis in the administrative record and must be rejected.

## CONCLUSION AND RECOMMENDED APPELLATE REMEDY

In light of the foregoing, Plaintiff-Appellant requests that this Court enter judgment in its favor, reversing the judgment of the U.S. Court of International Trade and remanding the matter to the U.S. Department of Commerce with instructions to recalculate Plaintiff-Appellant's weighted-average dumping margin by (1) no longer reassigning Dillinger's reported 759 quality code as the 760 quality code and (2) accepting the costs of production reported for prime and non-prime plate without any adjustment for market value.

Respectfully submitted,

/s/ Marc E. Montalbine

Marc E. Montalbine*
J. Kevin Horgan
Merisa A. Horgan
**deKieffer & Horgan, PLLC**
1156 Fifteenth St., NW
Suite 1101
Washington, DC 20005
(202) 783-6900
September 20, 2024      *Counsel for Plaintiff-Appellant*

_____

* Admitted to Virginia Bar; practice limited to Federal International Trade Matters pursuant to D.C. Bar Rule 49(c)(2).

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** 24-1498

**Short Case Caption:** AG der Dillinger Huttenwerke v. US

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 6,406 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 09/20/2024

Signature: /s/ Marc E. Montalbine

Name: Marc E. Montalbine